# Exhibit C

Adeghe v. Procter & Gamble Company, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-04295-EK-LKE   Document 43-5   Filed 02/23/26   Page 2 of 64 PageID #: 565

2024 WL 22061
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Aja ADEGHE, individually and on behalf
of all others similarly situated, Plaintiff,
v.
The PROCTER & GAMBLE COMPANY, Defendant.

No. 22-CV-10025 (CS)
|
Signed January 2, 2024

**Attorneys and Law Firms**

Spencer Sheehan, Sheehan & Associates, P.C., Great Neck, New York, James Chung, Law Office of James Chung, Bayside, New York, Counsel for Plaintiff.

Henry Liu, Covington & Burling LLP, Washington, D.C., Eli Jacobs, Covington & Burling LLP, New York, New York, Counsel for Defendant.

**OPINION & ORDER**

Seibel, United States District Judge

 **\*1** Before the Court is Defendant's motion to dismiss. (ECF No. 20.) For the following reasons, Defendant's motion is GRANTED.

**I. BACKGROUND**

For purposes of this motion, the Court accepts as true the facts, but not the conclusions, alleged by Plaintiff in her First Amended Complaint. (*See* ECF No. 16 ("FAC").)

 **A. Facts**

The Procter & Gamble Company ("Defendant" or "P&G") manufactures and sells laundry detergent under its Tide brand, including Tide 2.72 liter liquid detergent, (the "Product"). (FAC ¶ 1.) The Product is sold in bottles that retail for approximately $12.99 each. (*See id.* ¶¶ 1, 17.) Plaintiff purchased the Product at various locations, including a ShopRite supermarket in New Rochelle, New York, at various times in 2021 and 2022. (*Id.* ¶ 28.)

The front label of the Product states that it contains enough detergent for "64 $_{loads}\diamond$." (*Id.* ¶ 1.) A picture of the front label included in Plaintiff's FAC is reproduced below.



(*Id.*)
Plaintiff maintains that the diamond ( "$\diamond$" ) following the word "loads" on the Product's front label is "difficult-to-see," [1] (*id.* ¶ 2), and requires the consumer to "navigate[ ] hundreds of words of varying size and fonts" to see that the diamond is linked to language on the Product's back label which informs consumers that the bottle contains enough detergent for "approximately 64 loads as measured just below Bar 1 on cap," (*id.* ¶ 3). Immediately above that language is a graphic describing "just below Bar 1" as enough for a "Medium Load[ ]," which Plaintiff notes is "the smallest size listed." (*Id.* ¶ 4.) The graphic describes "just below Bar 3" as enough for a "Large Load[ ]," and "Bar 5" as enough for a "h[igh] e[fficiency] Full Load[ ]." (*Id.* ¶ 3.) A picture of the Product's back label, which is included in Plaintiff's FAC and identifies those different load sizes and their corresponding bars on the Product's cap, is reproduced below.

**Adeghe v. Procter & Gamble Company, Not Reported in Fed. Supp. (2024)**



(*Id.*)

Plaintiff alleges that based on the "64 loads◇" statement on the Product's front label, she – and consumers in general – expect the Product to contain enough detergent for "64 full size loads of laundry." (*Id.* ¶ 32.) She claims that "[c]onsumers understand 'loads' in the context of laundry to refer to full units, in the same way as other ... units of measurement, such as meters, liters, grams, feet, ounces and pounds," (*id.* ¶ 5), and that she and "most Americans" typically only do laundry when they "ha[ve] enough laundry to fill up most of [their] washing machine ... which means the size of the loads of laundry [they] do[ ] is best described as 'full' or 'very large' and not 'small,' " (*id.* ¶ 30).

Plaintiff also bases her claim that reasonable consumers understand the term "loads" to refer to full loads on several other sources, including the Department of Energy, which "referenc[ed] how washing machine directions generally tell consumers to load them to the point that the clothes container is loosely filled," (*id.* ¶ 6 (internal quotation marks omitted)), and "determined that the term 'full load' is widely understood by consumers, washing machine manufacturers and detergent companies as referring to a load size that takes advantage of the whole usable capacity of the clothes washer," (*id.* ¶ 7); certain "[u]npublished data from [P&G] ... indicat[ing] that North American households prefer large size loads (43%) over very large or medium loads (21% each)," (*id.* ¶ 8); a survey conducted by California utility

companies, which "concluded that 59 percent ... [of] laundry loads were either large or very large, more than twice as much as medium laundry loads," (*id.* ¶ 9); "[c]onsumer laundry habits in favor of larger loads," (*id.* ¶ 13); and a CNN survey recommending that Americans do their laundry "in a few big loads versus several smaller loads to mitigate the environmental impact," (*id.* ¶ 14 (internal quotation marks omitted)).[2]

**\*2**  Given her understanding that the term "load" refers to full loads of laundry, Plaintiff contends that the "64 loads◇" statement on the Product's front label is materially misleading, as the Product only contains enough detergent for 32 full loads. (*See id.* ¶¶ 15-16, 29.) Plaintiff maintains that she "paid more for the Product than she would have had she known she would only be able to do 32 full loads of laundry [with it]," (*id.* ¶ 35), and that "[t]he value of the Product ... was materially less than [what she paid for it]," (*id.* ¶ 36).

**B. Procedural History**

Plaintiff filed her initial Complaint on November 25, 2022. (ECF No. 1.) On January 31, 2023, Defendant filed a pre-motion letter in anticipation of a motion to dismiss. (ECF No. 10.) I held a pre-motion conference on February 28, 2023, at which I granted Plaintiff leave to amend and set a briefing schedule. (*See* Minute Entry dated Feb. 28, 2023.)

The operative complaint, Plaintiff's FAC, was filed on March 20, 2023, and asserts claims for: (1) violations of Sections 349 and 350 of the New York General Business Law ("GBL"); (2) violations of "State Consumer Fraud Acts;" (3) breaches of express warranty and the implied warranty of merchantability and violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, *et seq.*; and (4) unjust enrichment. (FAC ¶¶ 45-66.) Plaintiff wishes to represent a class of all persons residing in New York who purchased the Product within the statute of limitations, as well as a separate multi-state class of similar purchasers from South Dakota, Wyoming, Idaho, Alaska, West Virginia, Arkansas, North Carolina, and Utah, (*id.* ¶¶ 38-44), and seeks both monetary damages and costs and expenses, including attorney's fees, (*id.* at 10-11).

The instant motion followed. (*See* ECF No. 20.) In a footnote in her Opposition, Plaintiff withdrew her claim for violation of the MMWA. (ECF No. 22 ("P's Opp.") at 1 n.1.)[3]

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). [4] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

**\*3** In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

## III. DISCUSSION

### A. New York General Business Law Claims

Plaintiff's first cause of action arises under Sections 349 and 350 of the GBL. The former prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce," N.Y. Gen. Bus. Law § 349, and the latter prohibits "[f]alse advertising in the conduct of any business, trade or commerce," *id.* § 350. To state a claim under either section, a plaintiff must plausibly allege "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."

*Izquierdo v. Mondelez Int'l, Inc.*, No. 16-CV-4697, 2016 WL 6459832, at \*6 (S.D.N.Y. Oct. 26, 2016); *see Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015).

"New York courts apply an objective standard in determining whether acts or practices are materially deceptive or misleading: whether the alleged act is likely to mislead a reasonable consumer acting reasonably under the circumstances." *Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137, 149 (S.D.N.Y. 2022). "To survive a motion to dismiss, a plaintiff must do more than plausibly allege that a label might conceivably be misunderstood by some few consumers." *Id.* Instead, "a plaintiff must plausibly allege that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled." *Id.* "Although the question of whether a business practice or advertisement is misleading to the reasonable consumer is generally a question of fact, it is well settled that a court may determine as a matter of law that an allegedly deceptive [practice] would not have misled a reasonable consumer." *Wynn v. Topco Assocs., LLC*, No. 19-CV-11104, 2021 WL 168541, at \*2 (S.D.N.Y. Jan. 19, 2021).

Plaintiff alleges that the Product's labeling is materially misleading because: (1) consumers understand the term "load" in the context of laundry to refer to "full" loads, (P's Opp. at 2-4); and (2) the "64 loads◇" statement on the Product's front label "giv[es] an impression that the Product would provide enough detergent to wash 64 full loads of laundry," thereby "extinguish[ing] the need" to consult the rest of the Product's label, (*id.* at 5). The Court disagrees.

As the Second Circuit has made clear, "[i]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018). In certain contexts "involving statements susceptible to only one interpretation" – *i.e.*, "[w]hen the meaning of a challenged statement is clear [–] shoppers expect that the rest of the package will confirm that representation and are not reasonably expected to investigate further." *Nguyen v. Algenist LLC*, No. 22-CV-13, 2022 WL 17251733, at \*7 (S.D.N.Y. Nov. 28, 2022). "But when a statement is ambiguous, every reasonable shopper knows the devil is in the details and thus would seek clarification elsewhere on the package." *Id.*; *see Engram v. GSK Consumer Healthcare Holdings (US) Inc.*, No. 19-CV-2886, 2021 WL 4502439, at \*3 (E.D.N.Y. Sept. 30, 2021) ("Where the front of a package makes a bold and blatant misstatement about a key element

**Adeghe v. Procter & Gamble Company, Not Reported in Fed. Supp. (2024)**

of a product, there is little chance that clarification or context on the reverse of the package will suffice to overcome a deception claim .... But when the front of the package is better characterized as ambiguous than misleading, courts look[ ] at the alleged misrepresentations in their full context and are more likely to grant a motion to dismiss.").

**\*4** That is precisely the case here, where the allegations in the FAC themselves demonstrate that the term "load" is ambiguous. The term is typically accompanied by a size-qualifying adjective. (*See, e.g.*, FAC ¶ 7 (alleging that the Department of Energy "determined that the term '*full* load' is widely understood by consumers ... as referring to a load size that takes advantage of the whole usable capacity of the clothes washer.") (emphasis added); *id.* ¶ 8 (citing "data from Procter & Gamble [which] indicate that North American households prefer *large size* loads ... over *very large* or *medium* loads ....") (emphases added); *id.* ¶ 9 ("California's utility companies ... concluded that 59 percent ... [of] laundry loads were either *large* or *very large*, more than twice as much as *medium* laundry loads.") (emphases added); *id.* ¶ 13 ("Consumer laundry habits ... favor ... *larger* loads ....") (emphasis added); *id.* ¶ 14 (citing a CNN survey recommending that Americans do their laundry "in a few *big* loads versus several *smaller* loads" to promote environmental sustainability) (emphases added). Given such allegations, none of which show that the term "64 loads◇" is susceptible to only one interpretation, Plaintiff's insistence that the Product's front label is "unambiguous," (P's Opp. at 4), and "giv[es] an impression that the Product would provide enough detergent to wash 64 full loads of laundry," thereby eliminating "the need to consult ... the back of the box," (*id.* at 5 (internal quotation marks and alterations omitted)), is simply not plausible.

Instead, the ambiguity on the Product's front label – and the ◇ after the word "loads" – would prompt a reasonable consumer to consult the Product's back label. There, they would find additional context clarifying the "64 loads◇" representation, expressly stating that the Product contains enough detergent for 64 medium loads as measured using the Product's cap. (FAC ¶¶ 3-4.) Such "clarification ... defeat[s] [Plaintiff's] claim," *Reyes v. Crystal Farms Refrigerated Distrib. Co.*, No. 18-CV-2250, 2019 WL 3409883, at *3 (E.D.N.Y. July 26, 2019), as no reasonable consumer considering the Product's labeling as a whole would interpret the phrase "64 loads◇" to mean that the Product contains enough detergent for 64 high-efficiency full loads of laundry, *see, e.g., Hardy v. Olé Mexican Foods, Inc.*, 616 F. Supp.

3d 247, 252 (W.D.N.Y. 2022) (rejecting GBL claim where "[a]t worst, the front-label representations are ambiguous as to where the [product is] made, which is resolved after reading the ... back of the package."), *aff'd*, 2023 WL 3577867 (2d Cir. May 22, 2023); *Warren v. Whole Foods Mkt. Grp., Inc.*, 574 F. Supp. 3d 102, 117 (E.D.N.Y. 2021) ("Plaintiffs' understanding of [the challenged term] is debatable at best. And the [back] label would set plaintiffs straight." Accordingly, "plaintiffs' allegations would fall short even if their reading of the [challenged term], in isolation, were a colorable construction."); *Foster v. Whole Foods Mkt. Grp., Inc.*, No. 22-CV-1240, 2023 WL 1766167, at *4 (E.D.N.Y. Feb. 3, 2023) ("[T]he statements on the Product's front label, while ambiguous, are not false. More significantly, the context provided on the Product's back label ... is sufficient to clarify any arguable ambiguity contained on the front label. I therefore dismiss plaintiff's GBL claims."). [5]

Plaintiff's assertion that "[c]onsumers understand 'loads' in the context of laundry to refer to full units, in the same way as other ... units of measurement, such as meters, liters, grams, feet, ounces and pounds," (FAC ¶ 5), is simply an unsupported conclusion that I need not credit, particularly as it is contradicted by other allegations in the FAC demonstrating that consumers understand that loads of laundry may be different sizes, *see Rockaway Bev., Inc. v. Wells Fargo & Co.*, 378 F. Supp. 3d 150, 160 (E.D.N.Y. 2019) ("[C]ourts ... need not credit conclusory statements unsupported by assertions of facts" or "accept as truth conflicting pleadings that make no sense ... or that are contradicted ... by statements in the complaint itself ...."). Moreover, the assertion is implausible. Meters, liters, grams, feet, ounces, and pounds all have agreed-upon, indisputable parameters. A reasonable consumer seeing the word "foot" would know that it meant twelve inches, but given that washing machines vary in their capacity and people vary in their needs and preferences, it is not plausible that she would see the word "load" on the Product and assume that the manufacturer meant "the amount of laundry that fills my machine." At most (and whether or not she saw the diamond) she would think, "I wonder what they mean by 'load' " – a question that is answered by the back label.

**\*5** Plaintiff's claim reflects little more than "her selective interpretation of [an] individual word[ ] from the Product's labeling." *Warren v. Coca-Cola Co.*, No. 22-CV-6907, 2023 WL 3055196, at *6 (S.D.N.Y. Apr. 21, 2023). But she "is not entitled to take a fleeting glimpse at the front of a product label, home in on the one word that confirms her hopes about

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 6 of 64 PageID #: 569

Adeghe v. Procter & Gamble Company, Not Reported in Fed. Supp. (2024)

the product ... and then sue to recover the purchase price when she eventually learns that the product is what the label, read in its entirety, says it is." *Id.* [6]

Simply put, a reasonable consumer viewing the Product's label as a whole would not conclude that the Product contained enough detergent for 64 full loads of laundry. Accordingly, Plaintiff's GBL claims must be dismissed. [7]

### B. Plaintiff's Remaining Claims
Plaintiff also advances claims for violations of certain state consumer fraud acts, breach of express and implied warranties, and unjust enrichment.

### 1. State Consumer Fraud Acts

The FAC alleges that Defendant violated the "Consumer Fraud Acts" of eight states, which "are similar to the [GBL] ... and prohibit the use of unfair or deceptive business practices." (FAC ¶ 49; *see id.* ¶ 38.)

Plaintiff, however, fails to identify the specific "Consumer Fraud Acts" at issue or how Defendant allegedly violated them. (*See generally* FAC.) That failure "has made it impossible for Defendant to assess what she ultimately hopes to prove" and "falls short of satisfying Rule 8's pleading requirements ...." *Brownell v. Starbucks Coffee Co.*, No. 22-CV-119, 2023 WL 4489494, at *6 (N.D.N.Y. July 12, 2023); *see Smith v. Adidas Am., Inc.*, No. 22-CV-788, 2023 WL 5672576, at *7 (N.D.N.Y. Sept. 1, 2023) ("Plaintiff's failure to identify the relevant state-law statutes or otherwise identify the applicable state law theories of liability provides Defendant with insufficient notice of the claims against it."); *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1016 (S.D. Iowa 2009) (" 'Shotgun pleading' is especially problematic with respect to pleading numerous causes of action under a variety of state consumer protection statutes because the type and degree of protection offered by the various state laws varies extensively."). [8]

In any event, even if each state statute had identical requirements, Plaintiff's State Consumer Fraud Acts claims are also subject to dismissal for the independent reason that they fail under the same reasonable consumer standard which was fatal to her GBL claim. "[C]onsumer protection statutes from states across the country" share the common requirement that "a reasonable consumer would be misled

by a defendant's statement," *Van Orden v. Hikari Sales U.S.A., Inc.*, No. 22-CV-504, 2023 WL 5336813, at *6 (N.D.N.Y. Aug. 18, 2023), and "because this Court has already determined that the Product's labeling would not mislead a reasonable consumer, [her] consumer fraud multi-state class claim [must be] dismissed," *Id.*; *see Vaglica v. Reckitt Benckiser LLC*, No. 22-CV-5730, 2023 WL 6930754, at *4 (E.D.N.Y. Oct. 19, 2023) ("Where the court finds that Plaintiff's individual claims should be dismissed, it lacks jurisdiction to decide the putative class claims.").

**\*6** Accordingly, Plaintiff's "State Consumer Fraud Acts" claim must be dismissed.

### 2. Express Warranty

An express warranty is an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.Y. U.C.C. Law § 2-313 (1)(a). "While no formal wording is necessary to create an express warranty, there must be a representation of fact or specific promise about the product, rather than an expression of opinion." *Brodie v. Green Spot Foods, LLC*, 503 F. Supp. 3d 1, 9 (S.D.N.Y. 2020) (citing N.Y. U.C.C. Law § 2-313(2)). Additionally, "[t]o assert a breach of warranty claim under New York Law, the buyer must within a reasonable amount of time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." *Gordon v. Target Corp.*, No. 20-CV-9589, 2022 WL 836773, at *14 (S.D.N.Y. Mar. 18, 2022). "To adequately plead the pre-suit notice requirement, plaintiffs must provide factual allegations – such as the date and method plaintiffs sent a pre-suit notice – supporting the contention that they notified the defendant of the alleged breach within a reasonable time." *Dwyer*, 598 F. Supp. 3d at 155.

Here, the FAC alleges only that "Plaintiff recently became aware of Defendant's breach of the Product's warranties," (FAC ¶ 60), and that "Plaintiff provided or provides notice to Defendant ... that it breached the Product's warranties," (*id.* ¶ 61). But as the Court recently held in another case brought by Plaintiff's counsel involving a nearly identical express warranty claim, "[s]uch a vague allegation is insufficient to avoid dismissal." *Fuller*, 2023 WL 8005319, at *8; *see Gordon*, 2022 WL 836773, at *14 (collecting cases).

Plaintiff argues in the alternative that breach of express warranty notice requirements " 'have long been jettisoned

Adeghe v. Procter & Gamble Company, Not Reported in Fed. Supp. (2024)

in New York' for retail sales." (P's Opp. at 10) (quoting *Gavilanes v. Gerber Prods. Co.*, No. 20-CV-5558, 2021 WL 5052896, at *7 (E.D.N.Y. Nov. 1, 2021)). But *Gavilanes*, the case on which Plaintiff relies, "has been repeatedly criticized by courts in this district as misapplying New York law and reflects a disfavored minority view." *Fuller*, 2023 WL 8005319, at *8. Moreover, the *Gavilanes* exception to the notice requirement "is limited to products for human consumption that cause physical injury," *Bassaw v. United Indus. Corp.*, 482 F. Supp. 3d 80, 86 n.3 (S.D.N.Y. 2020), and simply "does not apply where, as here, a plaintiff alleges only economic injury," *Gordon*, 2022 WL 836773, at *14, in connection with "claims involving a product not intended for human consumption," *Smith*, 2023 WL 5672576, at *8; *see Budhani v. Monster Energy Co.*, 527 F. Supp. 3d 667, 685 (S.D.N.Y. 2021) (explaining that "[t]he pre-suit notice requirement is waived only in cases involving personal injury" and rejecting breach of express warranty claim where "[p]laintiff has not alleged any physical or personal injury as a result of Defendant's alleged breach"). [9]

 **\*7** Accordingly, Plaintiff's express warranty claim must be dismissed.

### 3. Implied Warranty of Merchantability

A breach of the implied warranty of merchantability occurs when the product at issue is "unfit for the ordinary purposes for which such goods are used." *Santiful v. Wegmans Food Mkts., Inc.*, No. 20-CV-2933, 2023 WL 2457801, at *4 (S.D.N.Y. Mar. 10, 2023). In this case, that would mean that the Product is unfit for use as laundry detergent. But the FAC alleges that the Product is defective simply because it only had enough detergent to do 32 full loads of laundry – *i.e.*, it contained less detergent than expected. (*See* FAC ¶¶ 15, 32, 35, 55-57.) There are no allegations that the Product is "unsafe for use ... [,] so bad as to be [unusable]," *Warren*, 574 F. Supp. 3d at 119, or otherwise not of merchantable quality.

Accordingly, Plaintiff's implied warranty claim must also be dismissed. [10]

### 4. Unjust Enrichment

To state a claim for unjust enrichment under New York law a plaintiff must show that "(1) the defendant was enriched;

(2) at the expense of the plaintiff; and (3) that it would be inequitable to permit the defendant to retain that which is claimed by Plaintiff." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 524 (S.D.N.Y. 2015). "Unjust enrichment is available only in unusual situations when, though the defendant has not breached a contract or committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Mahoney v. Endo Health Sols., Inc.*, No. 15-CV-9841, 2016 WL 3951185, at *11 (S.D.N.Y. July 20, 2016). Courts will routinely dismiss an unjust enrichment claim that "simply duplicates, or replaces, a conventional contract or tort claim." *Ebin v. Kangadis Food Inc.*, No. 13-CV-2311, 2013 WL 6504547, at *7 (S.D.N.Y. Dec. 11, 2013).

Here, Plaintiff "makes no factual allegations unique to [her] unjust enrichment claim and fails to explain why the unjust enrichment claim is distinct from ... [her other] claims." *Advanced Knowledge Tech, LLC v. Fleitas*, No. 21-CV-992, 2021 WL 6126966, at *5 (S.D.N.Y. Dec. 28, 2021); *see Ebin*, 2013 WL 6504547, at *7 (dismissing unjust enrichment claim because plaintiffs failed to explain how it was not duplicative of negligent misrepresentation, fraud, and breach of warranty claims); *Barreto*, 518 F. Supp. 3d at 808-09 (dismissing unjust enrichment claim because based on same facts as consumer deception claims); *Alce v. Wise Foods, Inc.*, No. 17-CV-2402, 2018 WL 1737750, at *12 (S.D.N.Y. Mar. 27, 2018) (dismissing unjust enrichment claim as duplicative of GBL §§ 349 and 350 claims).

Therefore, Plaintiff's unjust enrichment claim is dismissed. [11]

### C. Leave to Amend

 **\*8** Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018). "Leave to amend, though liberally granted, may properly be denied" for " 'repeated failure to cure deficiencies by amendments previously allowed' " or " 'futility of amendment,' " among other reasons. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

In her Opposition, Plaintiff requested that I either deny Defendant's motion or grant her leave to amend a second time. (*See* P's Opp. at 12.) But because most of "[t]he problems with the dismissed claims are substantive" and

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 8 of 64 PageID #: 571

Adeghe v. Procter & Gamble Company, Not Reported in Fed. Supp. (2024)

"better pleading will not cure them," *Leschak v. Raiseworks, LLC*, No. 14-CV-8072, 2016 WL 11695068, at *10 (S.D.N.Y. Mar. 7, 2016), amendment would largely be futile, *Trombetta v. Novocin*, 414 F. Supp. 3d 625, 634 (S.D.N.Y. 2019); *see Boswell v. Bimbo Bakeries USA, Inc.*, 570 F. Supp. 3d 89, 97 (S.D.N.Y. 2021); *Roundtree v. N.Y.C.*, No. 19-CV-2475, 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (collecting cases).

Moreover, Plaintiff has already amended her Complaint once, after receiving a pre-motion letter outlining the grounds on which Defendant planned to move. (*See* ECF No. 10.) Generally, the failure to fix deficiencies in an initial pleading, after being provided notice of those deficiencies, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim."); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.").

Further, Plaintiff has not suggested that she is in possession of facts that would cure the deficiencies identified in this ruling. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in

dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Olsen v. Sherry Netherland, Inc.*, No. 20-CV-103, 2022 WL 4592999, at *15 (S.D.N.Y. Sept. 30, 2022) (denying leave to amend where plaintiff did not "explain how any amendment would cure the deficiencies identified by the Court").

**\*9** Accordingly, the Court declines to grant Plaintiff leave to amend a second time.

\* \* \*

I join my Northern District colleague in noting that, thanks to Mr. Sheehan and his colleagues,

> courts around the country have been inundated with a seemingly endless supply of trivial (bordering on frivolous) lawsuits, asking the courts to read the labels of consumer goods in manners that strain credulity or to simply ignore other relevant language provided on the labels. The case before the Court here is one of many that should give pause to Mr. Sheehan and serve as a reminder that **CONTEXT MATTERS** and that a label should be read in its entirety.

*Van Orden*, 2023 WL 5336813, at *10 (emphasis in original).

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.

## SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2024 WL 22061

Adeghe v. Procter & Gamble Company, Not Reported in Fed. Supp. (2024)

---

## Footnotes

1    Plaintiff also claims that she "did not notice the diamond next to the word 'loads' which referred to the back label, and significantly qualified the 64 loads." (FAC ¶ 31.)

2    Plaintiff also notes that "[t]he tendency towards filling up a washing machine is not limited to the United States," (*id.* ¶ 11), and that approximately 75% of Europeans use the full capacity of their washer when doing laundry, (*id.* ¶ 12).

3    One of Plaintiff's lawyers, Spencer Sheehan, regularly brings such claims and then withdraws them (whether personally or, as here, through a brief signed by co-counsel) in the face of a motion to dismiss. *See Fuller v. Stop & Shop Supermarket Co. LLC*, No. 22-CV-9824, 2023 WL 8005319, at *2 n.1 (S.D.N.Y. Nov. 17, 2023) (collecting cases). The Court again questions how counsel can continue to bring such claims in good faith, as he plainly knows he will be unable to justify them.

4    Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

5    Plaintiff's suggestion that she "did not notice the diamond next to the word 'loads' which referred to the back label," (FAC ¶ 31; *see id.* ¶ 2 (describing the # on the Product's front label as "difficult-to see")), is beside the point, as a reasonable consumer is expected to consult an ambiguous label in its entirety, *see, e.g.*, *Brown v. Kellogg Sales Co.*, No. 20-CV-7283, 2022 WL 992627, at *6 (S.D.N.Y. Mar. 31, 2022) ("[A] manufacturer may clarify an ambiguous interpretation of a label based on disclaimers and disclosures on the side or back of product packaging" and "the reasonable consumer would overcome any confusion by referring to the unambiguous ingredient list on the [back of the] packaging."); *Scruggs v. Mars, Inc.*, No. 22-CV-5617, 2023 WL 8263364, at *7 (C.D. Cal. Nov. 9, 2023) ("[A] reasonable consumer would be expected to review and consider the back label" where "the front label of the Product is ambiguous ....").

6    Indeed, there are no allegations in the FAC that the Product does not contain enough laundry detergent for 64 medium loads when used as directed, (*see generally* FAC), and where a "Product's label would not have misled a reasonable consumer[ ] who followed the instructions on the label," it is not misleading as a matter of law, *Devey v. Big Lots, Inc.*, 635 F. Supp. 3d 205, 212-13 (W.D.N.Y. 2022).

7    Because Plaintiff has failed to allege that the Product's label is materially misleading, I need not reach the parties' remaining arguments as to whether or not she has adequately alleged an injury in connection with her purchase of the Product. *See Foster*, 2023 WL 1766167, at *4 n.5.

8    Mr. Sheehan was counsel in both *Brownell* and *Smith*. The Court therefore questions why he continues to plead in an insufficient fashion, when a modicum of legal research would avoid the problem.

9    Mr. Sheehan was counsel for plaintiff in *Gordon, Smith* and *Budhani*. As the Court stressed when admonishing him in its recent *Fuller* decision, he should by now be aware that this sweeping notice argument based on *Gavilanes* is frivolous. *See* 2023 WL 8005319, at *8 n.8. That this time the frivolous argument was made in a brief signed by co-counsel is hardly comforting. Mr. Sheehan and those with whom he works should consider the provisions of Rule 11 before attempting to raise this argument in the future. *See* Fed. R. Civ. P. 11(b)(2). Indeed, they should do so before including an express warranty claim in a complaint.

10    To the extent Plaintiff bases her implied warranty claim on the allegation that the Product does not conform to any promise or affirmation of fact made on its label – and it is hard to tell, as she pleads her express

---

and implied warranty claims together – the implied warranty claim fails for the same reasons as her express warranty claim. *See Barreto v. Westbrae Nat., Inc.*, 518 F. Supp. 3d 795, 807 (S.D.N.Y. 2021).

11    Plaintiff's assertion that she is "permit[ted] ... to set out 2 or more statements of a claim or defense alternatively or hypothetically," (P's Opp. at 11), does not alter this outcome. As previously explained to Plaintiff's counsel, while "unjust enrichment may be pleaded in the alternative[,] it is equally true that, even pleaded in the alternative, claims for unjust enrichment will not survive a motion to dismiss where plaintiffs fail to explain how their unjust enrichment claim is not merely duplicative of their other causes of action." *Fuller*, 2023 WL 8005319, at *9 n.10; *see Bermudez v. Colgate-Palmolive Co.*, No. 21-CV-10988, 2023 WL 2751044, at *15 (S.D.N.Y. Mar. 31, 2023).

---

**End of Document**                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1332575
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

James W. D'AMICO, on behalf of himself
and all others similarly situated, Plaintiff,
v.
WASTE MANAGEMENT OF
NEW YORK, LLC, Defendant.

6:18-CV-06080 EAW
|
Signed 03/25/2019

**Attorneys and Law Firms**

Nicholas Alexander Coulson, Steven David Liddle, Liddle &
Dubin, P.C., Detroit, MI, Jan M. Smolak, Michaels & Smolak,
P.C., Auburn, NY, for Plaintiff.

Eugene Edward Mathews, III, Pro Hac Vice, R. Trent Taylor,
Pro Hac Vice, McGuire Woods LLP, Richmond, VA, Joseph
D. Picciotti, Kelly S. Foss, Harris Beach LLP, Pittsford, NY,
Philip A. Goldstein, McGuireWoods LLP, New York, NY, for
Defendant.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

 *1  Plaintiff James W. D'Amico ("Plaintiff") brings this
putative class action, on behalf of himself and all others
similarly situated, against Defendant Waste Management
of New York, LLC ("Defendant"), alleging common law
claims for nuisance, negligence, and gross negligence, arising
from Defendant's operation of the High Acres Landfill
and Recycling Center (the "Landfill") in Fairport, New
York. (Dkt. 4). Specifically, Plaintiff alleges that Defendant's
operation of the Landfill has caused noxious odors to
be emitted into the surrounding environment, resulting in
property damage to himself and the owner/occupants and
renters in the surrounding area. (*Id.* at 2-5).

Presently before the Court is Defendant's motion to dismiss.
(Dkt. 13). For the following reasons, Defendant's motion is
granted in part and denied in part.

**BACKGROUND** [1]

Defendant operates the Landfill on a 1, 100-acre site and
"accepts municipal solid waste, industrial and special waste,
construction and demolition debris, and other waste for
disposal." (Dkt. 4 at ¶¶ 4, 6). As the waste decomposes at the
Landfill, it creates "odorous landfill gas, leachate, and other
byproducts." (*Id.* at ¶ 7). Defendant is obligated to control
odorous emissions by, among other things, "following proper
landfilling practices, utilizing adequate landfill cover, and
installing, operating, and maintaining a sufficient landfill gas
collection system to capture and destroy landfill gas." (*Id.* at ¶
10). In order to effectively maintain the landfill gas collection
system (the "Collection System"), Defendant must prevent
"excess liquid" from entering the system and interfering with
its operation. (*Id.* at ¶ 11).

Defendant has allegedly failed to satisfactorily control the
odors emitted from the Landfill. (*Id.* at ¶ 12). Specifically,
Plaintiff claims that Defendant has failed to properly operate
the Collection System and has allowed it to become "watered
in." (*Id.*). This alleged operating failure is due to inadequate
drainage systems, Defendant's reliance upon vertical gas
wells, insufficient preparation for wet weather conditions,
an "inadequate wellhead vacuum," the failure to properly
monitor the system and use a proper "cover and covering
practices," and the "inadequate use of odor neutralizing
systems and products." (*Id.*).

As a result, Defendant has allegedly released "odorous
emissions ... onto the property of Plaintiff and the class on
occasions too numerous to recount individually." (*Id.* at ¶ 13).
The odors are "offensive" and have interfered with Plaintiff's
and the putative class members' use and enjoyment of their
property. (*Id.* at ¶ 14). Plaintiff claims that "Defendant's
emissions are especially injurious to the Class as compared
with the public at large, given the impacts to their homes."
(*Id.* at ¶ 15). In particular, these emissions have caused a
diminution in the value of Plaintiff's and the putative class
members' property. (*Id.* at ¶ 16).

 *2  Numerous individuals have filed complaints with the
New York State Department of Environmental Conservation
("NYSDEC") detailing the noxious odors in the community.
(*Id.* at ¶ 17). "[M]ore than 180 households have contacted
Plaintiffs' counsel documenting the odors they attribute to"
the Landfill. (*Id.* at ¶ 18).

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 12 of 64 PageID #: 575

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

Plaintiff seeks to certify the following putative class: "All (a) owner/occupants and (b) renters of residential property residing within two and one-half (2.5) miles of the Defendant's Landfill." (*Id.* at ¶ 20). Plaintiff also claims that "there are over three thousand (3,000) households within the 2.5-mile radius that are being impacted." (*Id.* at 121).

## PROCEDURAL HISTORY

On January 26, 2018, Plaintiff commenced this putative class action, on behalf of himself and all others similarly situated, seeking compensatory and punitive damages as well as injunctive relief under theories of common law nuisance, negligence, and gross negligence. (Dkt. 1). On April 27, 2018, Plaintiff filed an Amended Complaint, which removed Waste Management, Inc. as a defendant. (Dkt. 4). The Amended Complaint remains the operative pleading in this matter. On July 23, 2018, Defendant filed a motion to dismiss. (Dkt. 13). Plaintiff opposed Defendant's motion to dismiss (Dkt. 14), and Defendant submitted reply papers in further support of its motion (Dkt. 16). The Court held oral argument on Defendant's motion on December 7, 2018, and reserved decision. (Dkt. 27).

## DISCUSSION

### I. Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279 (2017). To withstand dismissal, a plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

## II. Plaintiff's Cause of Action for Nuisance Fails to State a Claim

### A. General Principles

"There are two types of nuisance actions in New York State, public nuisance and private nuisance." *Hicksville Water Dist. v. Philips Elecs. N. Am. Corp.*, No. 2:17-CV-04442 (ADS) (ARL), 2018 WL 1542670, at *7 (E.D.N.Y. Mar. 29, 2018). "Public and private nuisance bear little relationship to each other. Although some rules apply to both, other rules apply to one but not the other." *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1050 (2d Cir. 1985). "A public nuisance under New York law exists when there is a substantial interference with a public right." *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 390 (E.D.N.Y. 2004). By contrast, "[a] private nuisance threatens one person or a relatively few, an essential feature being an interference with the use or enjoyment of land." *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 41 N.Y.2d 564, 568 (1977); *see Scribner v. Summers*, 84 F.3d 554, 559 (2d Cir. 1996) (same). "A nuisance is the actual invasion of interests in land, and it may arise from varying types of conduct." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292 (2001). Generally speaking, a landowner "is subject to liability for either a public or private nuisance on its property upon learning of the nuisance and having a reasonable opportunity to abate it." *Shore Realty Corp.*, 759 F.2d at 1050 (footnote omitted).

**\*3** Although Plaintiff's Amended Complaint does not specifically identify whether he asserts a claim under theories of private nuisance, public nuisance, or both, at oral argument Plaintiff's counsel agreed that he has alleged only a public nuisance cause of action. Accordingly, the Court will review the sufficiency of Plaintiff's allegations under a public nuisance theory of liability.

### B. Public Nuisance

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

"A public nuisance exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons." *532 Madison Ave.*, 96 N.Y.2d at 292. "It is uncontested that the historical purpose of the doctrine of public nuisance was primarily to protect the public from harm or danger; the same is equally true of the modern tort of public nuisance." *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 481 (E.D.N.Y. 2003). For this reason, a public nuisance is considered "an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency." *Copart Indus., Inc.*, 41 N.Y.2d at 568. "The State has standing to bring actions for public nuisance as a matter of course in its role as 'guardian of the environment.' " *Chase Manhattan Bank N.A. v. T & N plc*, 905 F. Supp. 107, 125 (S.D.N.Y. 1995) (quoting *Shore Realty Corp.*, 759 F.2d at 1051).

"Generally, '[a] public nuisance is actionable by a private person only if it is shown that the person suffered special injury beyond that suffered by the community at large.' " *Janki Bai Sahu v. Union Carbide Corp.*, 528 F. App'x 96, 102 n.4 (2d Cir. 2013) (quoting *532 Madison Ave.*, 96 N.Y.2d at 292); *see Johnson*, 304 F. Supp. 2d at 392 ("A private plaintiff does not have standing to bring a public nuisance cause of action unless he or she shows some harm different from that suffered by the public generally."). "In this way, a private wrong may be distinguished from a common injury to the public, and a private right of action is restored." *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233, 248 (N.D.N.Y. 2017) (citing *Kavanagh v. Barber*, 131 N.Y. 211, 214 (1892) ("The public nuisance as to the person who is specially injured therein in the enjoyment or value of his lands becomes a private nuisance also.") ); *see also* 81 N.Y. Jur. 2d *Nuisances* § 6 (2018) ("[A] public nuisance becomes also a private nuisance as to any person who is specially injured by it to any extent beyond the injury to the public." (citing *Ackerman v. True*, 175 N.Y. 353, 360-61 (1903) ) ). "This principle recognizes the necessity of guarding against the multiplicity of lawsuits that would follow if everyone were permitted to seek redress for a wrong common to the public." *532 Madison Ave.*, 96 N.Y.2d at 292.

A review of the allegations contained in the Amended Complaint reveals that it does not once specifically allege that Defendant's operation of the Landfill has interfered with a right held in common by the public. *See Haire v.*

*Bonelli*, 57 A.D.3d 1354, 1358 (3d Dep't 2008) (affirming dismissal of the plaintiff's public nuisance cause of action where the plaintiff "did not allege an interference with rights belonging to the general public, nor an interest in public land"); *Reid v. Kawasaki Motors Corp., U.S.A.*, 189 A.D.2d 954, 957 (3d Dep't 1993) ("The *sine qua non* of an action for public nuisance ... is the interference by a defendant with a public right. The complaint here simply is bereft of any such allegations." (citation omitted) ). At oral argument, Plaintiff's counsel argued that this Court should infer that the Landfill is causing harm to the public's right to clean air. Plaintiff's Amended Complaint alleges, among other things, that Defendant owes a duty "to prevent and abate the interference with the invasion of *the private interests* of the Plaintiffs," and that "Defendant has intentionally and negligently caused an unreasonable invasion of *Plaintiffs' interest* in the use and enjoyment of *their property.*" (Dkt. 4 at ¶¶ 32-33 (emphases added) ). Notably, the Amended Complaint fails to set forth a single allegation specifically stating that Defendant's operation of the Landfill has substantially interfered with a public right; rather, the relevant allegations pertain to Defendant's purported interference with private property rights.

**\*4** A liberal construction of the Amended Complaint might *conceivably* permit an inference that the Landfill's noxious emissions have substantially interfered with the public's right to uncontaminated and unpolluted air. *See generally Town of Mount Pleasant v. Van Tassell*, 7 Misc. 2d 643, 646 (N.Y. Sup. Ct., Westchester Cty. 1957) ("[I]t is well established that noxious smells or odors alone may constitute a nuisance although they are not unwholesome or injurious to the health but merely offensive and unpleasant."), *aff'd*, 6 A.D.2d 880 (1958); Restatement (Second) of Torts § 821B cmt. g. (1979) ("In any case in which a private nuisance affects a large number of persons in their use and enjoyment of land it will normally be accompanied by some interference with the rights of the public as well. Thus the spread of smoke, dust or fumes over a considerable area filled with private residences may interfere also with the use of the public streets or affect the health of so many persons as to involve the interests of the public at large."). However, the mere possibility that there has been a "substantial interference" with the public's right to clean air does not satisfy federal pleading standards; if a plaintiff has "not nudged [his] claims across the line from *conceivable to plausible*, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570 (emphasis added). Because Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," *id.*, Plaintiff's allegations that the

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 14 of 64 PageID #: 577

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

noxious odors have interfered with the use and enjoyment of private property rights fail to sufficiently allege a substantial interference with a right enjoyed by the public generally. Accordingly, Plaintiff's public nuisance claim is dismissed without prejudice. As a result, the Court does not reach Defendant's other arguments challenging the sufficiency of Plaintiff's public nuisance claim.

### III. Plaintiff's Amended Complaint States a Claim for Ordinary Negligence, But Fails to State a Claim for Gross Negligence

Under New York law, "a plaintiff must establish three elements to prevail on a negligence claim: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.' " *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981) ). To prevail on a claim for gross negligence, a plaintiff must establish the three elements required of ordinary negligence and further demonstrate that the defendant engaged in "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 823-24 (1993) ). As discussed below, Plaintiff has adequately alleged a negligence cause of action, but not a gross negligence claim.

#### A. Ordinary Negligence

At the heart of the parties' dispute regarding the negligence cause of action is whether Plaintiff has sufficiently alleged legally cognizable damages to state a claim for ordinary negligence. Defendant argues that Plaintiff's alleged diminution in property values is a "purely economic harm[ ]" that is not recoverable under a theory of negligence. (Dkt. 13-1 at 16-18).

The "Second Circuit has determined that New York does not recognize a tort cause of action when only economic loss is sought." *Greater N.Y. Auto. Dealers Ass'n v. Envtl. Sys. Testing, Inc.*, 211 F.R.D. 71, 82 (E.D.N.Y. 2002); *see Suffolk County v. Long Island Lighting Co.*, 728 F.2d 52, 62 (2d Cir. 1984) ("New York law holds that a negligence action seeking recovery for economic loss will not lie."). "In other words, 'it is well-established under New York law that, where a plaintiff alleges only economic damages resulting from defendant's alleged negligence, defendants owe no duty to plaintiffs with whom they are not in contractual privity.' " *Four Directions*

*Air, Inc. v. United States*, No. 5:06-CV-283 (NAM/GHL), 2007 WL 2903942, at *3 (N.D.N.Y. Sept. 30, 2007) (quoting *Land Mine Enters. v. Sylvester Builders, Inc.*, 74 F. Supp. 2d 401, 407 (S.D.N.Y. 1999), aff'd, 234 F.3d 1262 (2d Cir. 2000) ); *see also Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, 725 F. Supp. 656, 665 n.6 (N.D.N.Y. 1989) ("The term 'economic loss' or 'economic damage' in this context refers to damages which are sought by a plaintiff other than for 'physical damage to person or property resulting from an accidental cause.' " (quoting *Antel Oldsmobile-Cadillac, Inc. v. Sirus Leasing Co., Div. of Sirus Enters.*, 101 A.D.2d 688, 688 (4th Dep't 1984) ) ).

**\*5** Nevertheless, the case law reveals that " 'stigma damages' have been recognized as a valid category of damages by the New York courts in environmental cases." *87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1223 (S.D.N.Y. 2002) (quoting *Commerce Holding Corp. v. Bd. of Assessors of the Town of Babylon*, 88 N.Y.2d 724, 732 (1996) ). Stigma damages have been "defined loosely as the public's perhaps unwarranted fears concerning a property" that result in the diminution in that property's value. *Nashua Corp. v. Norton Co.*, No. 90-CV-1351 (RSP/RWS), 1997 WL 204904, at *6 (N.D.N.Y. Apr. 15, 1997). These damages are recoverable because the diminished property values result from an actual or imminent invasion of a landowner's property by a defendant's polluting conduct. [2] *See Donavan v. Saint-Gobain Performance Plastics Corp.*, No. 1:16-CV-924 (LEK/DJS), 2017 WL 3887904, at *5 (N.D.N.Y. Sept. 5, 2017) ("Courts applying New York law have concluded that loss-of-value damages constitute a sufficient injury in contamination suits when the plaintiff's property is *directly affected* by the defendant's conduct." (emphasis added) ); *see Baker*, 232 F. Supp. 3d at 246 (same); *Halliday v. Norton Co.*, 265 A.D.2d 614, 617 (3d Dep't 1999) (holding that where there was inadequate proof of "contamination in plaintiffs' soil or water wells, or in the surrounding neighborhood[, a]ny alleged consequential damages emanating, in part, from the adverse publicity associated with the landfill were ... not proven to have arisen from the migration of toxins or from defendants' actions" (citation omitted) ); *Nalley v. Gen. Elec. Co.*, 165 Misc. 2d 803, 810 (N.Y. Sup. Ct., Rensselaer County 1995) (denying recovery for "negative market stigma" where there was "no evidence that the land or water of the plaintiffs ... is contaminated by toxic substances" nor "a competent evidentiary showing of an imminent threat of contamination to any of these properties, or even a showing of a high likelihood of future contamination"); *see also Adams v. Star*

Case 1:25-cv-04295-EK-LKE   Document 43-5   Filed 02/23/26   Page 15 of 64 PageID #: 578

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

*Enter.*, 851 F. Supp. 770, 773 (E.D. Va. 1994) (dismissing the plaintiffs' claim because their alleged "risk to health and property" from an underground oil plume was "no more than mere mental distress" where they did "not complain of actual oil odors, ground water contamination, or other material interference with their properties"), *aff'd*, 51 F.3d 417 (4th Cir. 1995); *cf. Hanna v. Motiva Enters., LLC*, 839 F. Supp. 2d 654, 680 (S.D.N.Y. 2012) (granting summary judgment against the plaintiffs' "general claim that the stigma associated with the contamination of their property renders it unmarketable" because the plaintiffs "point to no other evidence linking the contamination of their property with any diminution property value"); *see generally Criscuola*, 81 N.Y.2d at 651.[3]

**\*6** In other words, stigma damages, while economic in nature, are distinguishable from "purely economic harm" that arises from the loss of intangible financial interests unaccompanied by any tangible intrusion onto the property. *See Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000) (stating that New York courts, to prevent "open-ended liability, ... have applied the economic loss rule to prevent the recovery of damages that are inappropriate because they actually lie in the nature of breach of contract as opposed to tort" (citing *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 271 A.D.2d 49, 52 (1st Dep't 2000), *rev'd on other grounds*, 96 N.Y.2d 280 (2001) ) ); *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018) (stating that the economic loss rule "reflects the premise that 'damages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort, unless a legal duty independent of the contract itself has been violated' " (quoting *Suffolk Laundry Servs., Inc. v. Redux Corp.*, 238 A.D.2d 577, 578 (2d Dep't 1997) ) ); *Carmania Corp., N. V. v. Hambrecht Terrell Int'l*, 705 F. Supp. 936, 938 (S.D.N.Y. 1989) (stating that "New York law ... restrict[s] plaintiffs who have suffered 'economic loss,' but not personal or property injury, to an action for the benefits of their bargains," and that "[i]f the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort" (footnote omitted) ); *Bristol-Myers Squibb, Indus. Div. v. Delta Star, Inc.*, 206 A.D.2d 177, 181 (4th Dep't 1994) ("The economic loss rule reflects the principle that damages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort."); *see also Hunt Constr. Grp., Inc. v. Brennan Beer Gorman/Architects, P.C.*, 607 F.3d 10, 14 (2d Cir. 2010) (explaining that Vermont's economic loss rule "is intended to maintain the distinction between tort law and

contract law"). New York law recognizes that "[d]amages from the diminished market value of real property as a result of public fear of exposure to a potential health hazard constitute consequential damages." *Cottonaro v. Southtowns Indus., Inc.*, 213 A.D.2d 993, 993 (4th Dep't 1995).

In support of its motion, Defendant relies upon *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280 (2001), arguing that "defendant landowners do not owe a duty to their neighbors to avoid purely economic losses." (*Id.* at 16); *see 532 Madison*, 96 N.Y.2d at 290 ("We have never held ... that a landowner owes a duty to protect an entire urban neighborhood against purely economic losses."). *532 Madison* involved consolidated appeals regarding "construction-related disasters in midtown Manhattan," where various businesses sought redress for their lost business and income. 96 N.Y.2d at 286, 293-94. Defendant contends that the diminished property values alleged in this case are akin to the financial losses incurred by the businesses in *532 Madison*. (Dkt. 13-1 at 16-17). Furthermore, Defendant argues that any diminution in property value is not recoverable in this case because Plaintiff has failed to allege any physical damage to his or the putative class members' properties. (*Id.* at 17).

In opposition, Plaintiff relies upon *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233 (N.D.N.Y. 2017). *Baker* is one of several toxic tort cases involving perfluorooctanoic acid ("PFOA") in sources of drinking water. The *Baker* plaintiffs alleged that they had sustained property damage as a result of PFOA contamination and "personal injury from their ingestion of PFOA." *Id.* at 240 (footnote omitted). Although the plaintiffs' alleged property damages "include[d] the cost to remediate the contamination of their property, the loss of their use and enjoyment of the property, and a loss in their quality of life," the "largest source of damages" stemmed from the alleged "loss in their property values." *Id.* at 240-41.

In arguing that the plaintiffs failed to allege a "property-based injury sufficient to maintain a negligence claim," the *Baker* defendants also relied upon *532 Madison. Id.* at 244. Nonetheless, the *Baker* court found *532 Madison* to be inapposite, stating that the New York Court of Appeals did not "announce a talismanic requirement for plaintiffs to allege physical injury to their property.... Instead, the decision concerned the existence of a legal duty between the plaintiffs and defendants." *Id.* In distinguishing *532 Madison*, the *Baker* court broadly defined a party's duty in pollution

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 16 of 64 PageID #: 579

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

cases, stating that "[s]ociety has a reasonable expectation that manufacturers avoid contaminating the surrounding environment, an expectation that extends to the pollution of an area's water supply." *Id.* at 245. The *Baker* court further noted that "nothing in *532 Madison* prevents a person whose water supply was contaminated by such conduct from recovering in tort, even if she seeks economic damages." *Id.* at 246.

**\*7**  *Baker* is more analogous to the instant matter than *532 Madison*. *Baker* and similar policies cases involved conduct directly impacting the plaintiffs' property and a diminution in value traceable to the defendants' actions. Here, Defendant owed Plaintiff and the putative class members, as adjacent landowners, a duty of care to operate the Landfill in a reasonable manner. *See Fitzgibbons v. City of Oswego*, No. 5:10-CV-1038 FJS/ATB, 2011 WL 6218208, at \*15 (N.D.N.Y. Dec. 13, 2011) (denying motion to dismiss negligence claim where the adjacent landowner alleged that the defendant "owed him a duty of care with regard to its operation of the [l]andfill").

Defendant's duty in this case is distinguishable from the more tenuous obligations and intangible losses asserted by the plaintiffs in *532 Madison*. While the financial loss suffered by the businesses in *532 Madison* fell outside the zone of danger reasonably expected to be guarded against, Plaintiff and the putative class members in this case have a reasonable expectation that the operator of an adjacent landfill will take reasonable measures to prevent the unreasonable contamination of the immediate air space permeating their properties. Indeed, in concluding that the plaintiffs in *532 Madison* could not sustain their negligence cause of action, the New York Court of Appeals juxtaposed *Dunlop Tire & Rubber Corp. v. FMC Corp.*, 53 A.D.2d 150, 154-55 (4th Dep't 1976) where an explosion caused "direct physical contact" with a nearby property as well as financial losses due to lost electrical power—resulting in recoverable damages— and *Beck v. FMC Corp.*, 53 A.D.2d 118, 121 (4th Dep't 1976), *aff'd*, 42 N.Y.2d 1027 (1977), where the plaintiffs merely "sought damages for lost wages caused by" the closure of a manufacturing plant, *see 532 Madison*, 96 N.Y.2d at 290. The lost wages arising from the plant's temporary closure are far more akin to a loss in bargained-for-consideration for which the economic loss rule undoubtedly applies than the loss-in-value-damages resulting from the actual pollution of Plaintiff's property.

Defendant's attempts to distinguish *Baker* are unpersuasive. Defendant appears to argue that because Plaintiff does not plead "any constant fear of health consequences related to the odor[s]," *Baker* is inapplicable. (Dkt. 16 at 12). However, "[s]tigma resulting from serious health concerns or other injury" is not required in order for a case to fall within the realm of damages envisioned by *Baker* and other New York courts. (*See id.*). Instead, the critical requirement is the "actual pollution" of a plaintiff's property. *See Donovan*, 2017 WL 3887904, at \*6. Whether the stigma results from odors, fears of electromagnetic radiation, or industrial chemicals, the resulting economic damages may be sought through a negligence claim so long as the stigma-causing pollutant or emission "directly affected" a plaintiff's property or imminently risks contamination. *See id.* at \*4; *Baker*, 232 F. Supp. 3d at 246 ("Such a fear or stigma ... must be traceable to the conduct of the defendant, and that conduct must in turn be connected with the property in question."); *see also Halliday*, 265 A.D.2d at 617; *Nalley*, 165 Misc. 2d at 810; *cf. Hanna*, 839 F. Supp. 2d at 680. Because Plaintiff alleges that the noxious odors permeate his property and the properties of the putative class members, the diminished market value of their respective properties may be pursued in a claim for ordinary negligence. *Cf. Donovan*, 2017 WL 3887904, at \*4 ("Because [the plaintiff] has not alleged contamination of his drinking water or the presence of PFOA on his property, the Court agrees with [d]efendants that [the plaintiff] has not adequately pleaded a claim of negligence or gross negligence for property damages. The Court reaches this conclusion because [the plaintiff] has not satisfied the duty prong, not, as [d]efendants urge, for failure to allege injury." (citation omitted) ).

**\*8**  Therefore, Plaintiff has plausibly stated a claim for ordinary negligence based upon Defendant's alleged breach of its duty by causing the airspace on and surrounding Plaintiff's property to be contaminated, resulting in a diminution in property values. Defendant's motion to dismiss this claim is denied.

### B. Gross Negligence

"Gross negligence ... differs in kind as well as degree from ordinary negligence." *Sutton Park Dev. Corp. Trading Co. Inc. v. Guerin & Guerin Agency Inc.*, 297 A.D.2d 430, 431 (3d Dep't 2002) (citing *Colnaghi, U.S.A., Ltd.*, 81 N.Y.2d at 823-24). "To constitute gross negligence, 'the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care.' " *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 204 F. Supp. 2d 639, 644 (S.D.N.Y. 2002) (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998) ).

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 17 of 64 PageID #: 580

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

"On a motion to dismiss, a claim for gross negligence will be sustained only if the plaintiff alleges facts plausibly suggesting that the defendant's conduct 'evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.' " *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 61 (2d Cir. 2012) (quoting *M+J Savitt, Inc. v. Savitt*, No. 08 Civ. 8535 (DLC), 2009 WL 691278, at *12 (S.D.N.Y. Mar. 17, 2009) ). "Recklessness in the context of a gross negligence claim means 'an extreme departure from the standards of ordinary care,' such that 'the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Id.* at 61-62 (quoting *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009) ); *see Mali v. British Airways*, No. 17 Civ. 685 (KPF), 2018 WL 3329858, at *8 (S.D.N.Y. July 6, 2018) ("As such, 'a party is grossly negligent when it fails to exercise even slight care or slight diligence.' " (quoting *Goldstein v. Cornell Assocs., Inc.*, 74 A.D.3d 745, 747 (2d Dep't 2010) ) ).

Plaintiff alleges that Defendant knew that it "improperly constructed, maintained and operated the [L]andfill and knew, or should have known upon reasonable inspection that such actions would cause Plaintiffs' property to be invaded by noxious odors." (Dkt. 4 at ¶ 48). According to Plaintiff, not only did Defendant fail "to exercise ordinary care," but it "knowingly allow[ed] conditions to exist which caused noxious odors to physically invade Plaintiffs' property...." (*See id.* at ¶¶ 49-50).

Despite these conclusory allegations, Plaintiff has failed to set forth facts that, accepted as true, allege "an extreme departure from the standards of ordinary care" or the absence of "even slight care or slight diligence." *See Bayerische Landesbank, N. Y. Branch*, 692 F.3d at 61-62; *Mali*, 2018 WL 3329858, at *8 (quotation marks omitted). Instead of providing factual allegations demonstrating a reckless disregard for Plaintiff's rights, Plaintiff simply asserts that Defendant knowingly and/or intentionally failed to operate, maintain, or construct the Landfill in a manner consistent with its obligations of ordinary care. (*See* Dkt. 4 at ¶¶ 47-50). Simply appending conclusory words or phrases, such as "knowingly" or "intentionally," to allegations of ordinary negligence does not satisfy the aggravated nature of a gross negligence claim. *See Bayerische Landesbank, N.Y. Branch*, 692 F.3d at 62 ("Simply adding the conclusory word 'reckless' to Aladdin's trading does not transform an ill-advised investment decision into something approaching intentional misconduct."); *Kinsey v. Cendant Corp.*, No. 04

Civ. 0582 RWS, 2005 WL 1907678, at *7 (S.D.N.Y. Aug. 10, 2005) (holding that allegations "sufficient to demonstrate ordinary negligence" do not necessarily allege a gross negligence claim without factual allegations sufficient to "meet the heightened standard necessary to state a claim for gross negligence"); *Sutton Park Dev. Corp. Trading Co. Inc.*, 297 A.D.2d at 431 ("Notably missing from this complaint are any factual averments alleging conduct of such aggravated character.").

**\*9** Plaintiff argues that he has sufficiently alleged a claim for gross negligence because the Amended Complaint establishes that Defendant was on notice of the Landfill emissions for some time, and yet it continues to allow the odors to permeate the surrounding properties and it "has not taken all reasonable steps to fix" this problem. (Dkt. 14 at 7-8). The Amended Complaint alleges that the noxious odors are a widespread and ongoing problem, and that Defendant recognizes these emissions as unacceptable. (*See* Dkt. 4 at ¶¶ 13-18). Nonetheless, the Amended Complaint does not allege that Defendant "has not taken all reasonable steps to fix" the problem. And, in any event, whether one has taken *all* reasonable steps to resolve an issue is not the appropriate standard by which to evaluate a claim for gross negligence. While the failure to pursue reasonable remedies may be sufficient to support a claim for ordinary negligence, it is only the absence of "even slight care or slight diligence" that rises to the degree of recklessness necessary to sustain this cause of action. The Amended Complaint simply fails to set forth sufficient factual allegations that satisfy the heightened standard required to sustain a gross negligence cause of action, and this claim must be dismissed.

Therefore, Plaintiff's gross negligence cause of action is dismissed without prejudice for failure to state a claim.

## IV. Plaintiff's Claims are Not Preempted by the Federal Clean Air Act

Defendant argues that even if Plaintiff has sufficiently stated New York common law causes of action, those claims are preempted by the federal Clean Air Act ("CAA"). (Dkt. 13-1 at 25-28). While the Second Circuit has not yet addressed this issue, the Third Circuit and the Sixth Circuit have both concluded that a *source state's* common law is not preempted by the CAA. *See Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 686 (6th Cir. 2015) ("This interlocutory appeal concerns whether the federal Clean Air Act preempts common law claims brought against an emitter based on the law of the state in which the emitter operates. The

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 18 of 64 PageID #: 581

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

Clean Air Act's text makes clear that the Act does not preempt such claims. This conclusion is further supported by the Act's structure and history, together with relevant Supreme Court precedents."); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 189-90 (3d Cir. 2013) ("On appeal, we are faced with a matter of first impression: whether the Clean Air Act preempts state law tort claims brought by private property owners against a source of pollution located within the state. Based on the plain language of the Clean Air Act and controlling Supreme Court precedent, we conclude that such source state common law actions are not preempted."). Furthermore, Defendant's reliance upon the Fourth Circuit's decision in *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291 (4th Cir. 2010) is misplaced because *Cooper* involved the application of an *affected state's* common law to regulate source-state pollution. For the following reasons, this Court holds that the CAA does not preempt a source state's common law causes of action that mandate the imposition of more stringent requirements respecting the regulation of air pollution.

The CAA "has been referred to as a 'model of cooperative federalism.' " *Black v. George Weston Bakeries, Inc.*, No. 07-CV-853S, 2008 WL 4911791, at *4 (W.D.N.Y. Nov. 13, 2008) (quoting *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 467 (6th Cir. 2004) ). Indeed, the CAA declares that "air pollution prevention ... and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). Accordingly, Congress enacted a "savings clause" permitting states to "adopt and enforce regulations limiting the emission of pollutants to the extent that such regulations are more stringent than the requirements of the Clean Air Act, subject to certain exceptions not relevant here." *Clean Air Mkts. Grp. v. Pataki*, 194 F. Supp. 2d 147, 157 (N.D.N.Y.2002) (footnote omitted), *aff'd*, 338 F.3d 82 (2d Cir. 2003); *see generally* 42 U.S.C. § 7416 (allowing states or their political subdivisions "to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution" so long as that standard or requirement is no less stringent than any standards or requirements mandated by federal law).

**\*10** In construing the CAA, courts have frequently referred to the federal Clean Water Act ("CWA") because "many provisions in the Clean Water Act—including the savings clauses—were modeled on the Clean Air Act...." *Merrick*, 805 F.3d at 692; *see Bell*, 734 F.3d at 196 ("Ultimately, as commentators have recognized, there is

little basis for distinguishing the Clean Air Act from the Clean Water Act—the two statutes feature nearly identical savings clauses and employ similar 'cooperative federalism' structures." (quotation omitted) ); *see generally Moran v. Vaccaro*, 684 F. Supp. 1201, 1204 (S.D.N.Y. 1988) (noting that "[t]he citizen suit provision of the Clean Air Act contains the same 'alleged to be in violation' language as the Clean Water Act"); *Friends of the Earth v. Eastman Kodak Co.*, 656 F. Supp. 513, 515 n.1 (W.D.N.Y.) ("Because the Clean Water Act section under which this action is brought is virtually identical to § 304 of the Clean Air Act, there is no reason not to interpret it in the same manner."), *aff'd*, 834 F.2d 295 (2d Cir. 1987). The CWA's "savings clause" also permits "any State or political subdivision thereof ... to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution" that is no less stringent than any applicable standard or requirement set forth under federal law. 33 U.S.C. § 1370. The similarities between these two statutes are notable because the Supreme Court has already determined in *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987), whether state common law claims are preempted by the CWA.

In *Ouellette*, "the Court was asked to determine whether the Clean Water Act preempted a Vermont common law nuisance suit filed in Vermont state court, where the source of the alleged injury was located in New York." *Bell*, 734 F.3d at 194. In other words, *Ouellette* involved a case of transboundary pollution; the source of the effluent was located in New York, but the pollution ended up on the Vermont-side of Lake Champlain. 479 U.S. at 483-84. Ultimately, the Supreme Court held that "the CWA precludes a court from applying the law of an affected State against an out-of-state source" because "if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference with the achievement of the 'full purposes and objectives of Congress.' " *Id.* at 493-94 (quoting *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) ). For example, "[i]f a New York source were liable for violations of Vermont law, that law could effectively override both the permit requirements and the policy choices made by the source State." *Id.* at 495. As such, "[a]pplication of an affected State's law to an out-of-state source also would undermine the important goals of efficiency and predictability in the permit system." *Id.* at 496.

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 19 of 64 PageID #: 582

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

However, the Supreme Court reached a different conclusion regarding the common law remedies recognized by a *source* State. *See id.* at 497 ("The saving clause specifically preserves other state actions, and therefore nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* State."). The Court indicated that the CWA's savings clause permitted states "to impose higher standards on their own point sources," and that "this authority may include the right to impose higher common-law as well as higher statutory restrictions." *Id.*; *see Merrick, 805 F.3d at 690* ("State courts are arms of the 'State,' and the common law standards they adopt are requirement[s] respecting control or abatement of air pollution." (quotation marks omitted) ). The "application of the source State's law does not disturb the balance among federal, source-state, and affected-state interests"; because "the Act specifically allows source States to impose stricter standards, the imposition of source-state law does not disrupt the regulatory partnership established by the permit system." *Ouellette*, 479 U.S. at 498-99. While acknowledging that "New York nuisance law may impose separate standards and thus create some tension with the permit system," *Ouellette* indicated that this source-state rule "prevents a source from being subject to an indeterminate number of potential regulations" because "a source only is required to look to a single additional authority, whose rules should be relatively predictable." *Id.*

**\*11** Since the CAA's savings clause permits States to "adopt or enforce ... *any requirement* respecting control or abatement of air pollution" that is no less stringent than any required by federal law, *see* 42 U.S.C. § 7416 (emphasis added), Plaintiff's source-state common law claims are not preempted by the CAA's comprehensive regulatory program, *see Ouellette*, 479 U.S. at 497-99; *see also Merrick, 805 F.3d at 690* ("An expansive reading of 'any requirement' is consistent, moreover, with the Court's historical tendency to treat common law standards as 'requirements' for purposes of a variety of statutes."); *see generally Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443 (2005) (stating that "the term 'requirements' in § 136v(b) [of the Federal Insecticide, Fungicide, and Rodenticide Act] reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties").

Defendant argues that the assertion of common law claims and the imposition of any corresponding injunctive relief would disrupt the regulatory framework set up by the CAA and its permitting system. (Dkt. 13-1 at 26-27). In this respect, Defendant contends that "if successful, Plaintiff's lawsuit

could force Waste Management to engage in actions that conflict with its permit" because Plaintiff "seeks injunctive relief above and beyond what is already required under Waste Management's Title V permit." (*Id.* at 28; *see* Dkt. 4 at 11 (demanding "[i]njunctive relief outside of that which is required by Defendant's Federal and State issued Air Permits") ).

However, *Ouellette*'s explanation as to why source-state common law claims do not undermine the CWA's comprehensive regulatory framework applies with equal force to Defendant's arguments in the CAA context. Defendant cites to one Northern District of New York decision for the proposition that state law requirements are preempted where the plaintiff "attempt[s] to require [the] defendant to conduct additional or different remediation than [the] state agency require[s]." (Dkt. 13-1 at 28 (citing *Bartlett v. Honeywell Int'l, Inc.*, 260 F. Supp. 3d 231, 246 (N.D.N.Y. 2017) ) ). However, *Bartlett* involved the provisions of the federal Comprehensive Emergency Response, Compensation and Liability Act ("CERCLA"), which pertains to a wholly different environmental statutory scheme from that structured by either the CAA or the CWA. In addition, the *Bartlett* plaintiffs sought to hold the defendant liable for actions "that were consistent with the Consent Decree" entered between the defendant and the NYSDEC. *Bartlett*, 260 F. Supp. 3d at 240. Had the defendant "engaged in any alternative remedial measures," it "would have violated CERCLA § 122(e)(6)." *Id.* In other words, the *Bartlett* court found the plaintiffs' claims were preempted because the plaintiffs were "attempting to hold [the d]efendant liable for activities consistent with the Consent Decree on the theory that [the d]efendant should have conducted additional remediation that would have violated CERCLA § 122(e)(6)." *Id.* at 243. *Bartlett* is distinguishable because unlike § 122(e)(6) of CERCLA, the CAA specifically preserves the States' authority to adopt and enforce more stringent standards than those imposed by federal law. *Compare* 42 U.S.C. § 9622(e) (6) ("When either the President, or a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation and feasibility study for a particular facility under this chapter, *no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President.*" (emphasis added) ), *with* 42 U.S.C. § 7416 (retaining the authority in any State or the political subdivisions thereof to "adopt or enforce" emissions standards and limitations or "any requirement respecting control or abatement of air pollution" so long as that standard

Case 1:25-cv-04295-EK-LKE Document 43-5 Filed 02/23/26 Page 20 of 64 PageID #: 583

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

or requirement is no less stringent than any required by federal law).

**\*12** Defendant also relies upon the Fourth Circuit's decision in *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291 (4th Cir. 2010). Like *Ouellette, Cooper* involved transboundary pollution issues. North Carolina sought an injunction to require the installation of pollution control devices in certain coal-fired power plants located in Alabama and Tennessee, whose air emissions were blown eastward into North Carolina and other states by prevailing winds. *See id.* at 296-97. And, as in *Ouellette*, the Fourth Circuit also concluded that the affected state's common law was preempted by the CAA. *See id.* at 308 ("The Supreme Court emphasized that only source state law, here that of Alabama and Tennessee, could impose more stringent emission rates than those required by federal law on plants located in those two jurisdictions. Yet exactly the opposite has happened. North Carolina explicitly stated that it wanted out-of-state entities, including [the Tennessee Valley Authority ("TVA") ], to follow its state rules." (citation omitted) ).[4] Accordingly, the result in *Cooper* is actually consistent with this Court's application of *Ouellette* to the CAA context at issue in this matter.

Therefore, in light of the CAA's statutory text, the holdings in *Merrick* and *Bell*, and reference to the analogous provisions of the CWA and the Supreme Court's decision in *Ouellette*, this Court concludes that Plaintiff's source-state common law causes of action are not preempted by the CAA.

## V. The Doctrine of Primary Jurisdiction

Defendant also argues that the doctrine of primary jurisdiction requires the Court to dismiss or stay Plaintiff's request for injunctive relief because the NYSDEC "is already directing and supervising an ongoing action plan related to the odors." (Dkt. 13-1 at 28; *see id.* at 28-30). At oral argument, the parties indicated that a community organization known as Fresh Air for the Eastside ("FAFES"),[5] which is composed of at least some of the putative class members, has filed a petition with the NYSDEC to modify Defendant's permit obligations. However, subsequent to the oral argument, the NYSDEC issued its response to FAFES' petition. *See High Acres Landfill*, Dep't of Envtl. Conservation, https://www.dec.ny.gov/chemical/113037.html (last visited Mar. 25, 2019). Because the NYSDEC has issued its response, several of Defendant's arguments in support of the application of this doctrine appear to be rendered inapplicable. *See, e.g., In re*

*Kind LLC "Healthy & All Natural" Litig.*, No. 15-MC-2645 (WHP), 2019 WL 542834, at \*2 (S.D.N.Y. Feb. 11, 2019) ("this Court also stayed the 'non-GMO' claims pursuant to the primary jurisdiction doctrine pending [the United States Department of Agriculture ("USDA") ] rulemaking. And ... the USDA promulgated 'non-GMO' rules ... on December 21, 2018, which [became] effective February 19, 2019. Accordingly, there is no longer a basis for staying the 'non-GMO' claims." (citations omitted) ); *Bhanusali v. Orange Reg'l Med. Ctr.*, No. 10-CV-6694 CS, 2013 WL 4828657, at \*3 (S.D.N.Y. Aug. 12, 2013) ("Because the [Public Health and Health Planning Council of the New York State Department of Public Health] made its ruling on March 2, 2012, the doctrine of primary jurisdiction no longer presents a bar to consideration of the merits of [p]laintiffs' antitrust claims." (citation omitted) (footnote omitted) ), *aff'd in part, vacated in part*, 572 F. App'x 62 (2d Cir. 2014); *Geo Grp., Inc. v. Cmty. First Servs., Inc.*, No. 11-CV-1711 CBA, 2012 WL 1077846, at \*10 (E.D.N.Y. Mar. 30, 2012) ("[D]efendants moved in the alternative for 'stay or dismissal pursuant to the doctrine of primary jurisdiction pending the resolution of [the plaintiff]'s bid protest.' As explained above, there is no longer any other pending legal action arising out of this dispute. Accordingly, stay or dismissal on this ground is not appropriate." (citation omitted) ).

**\*13** While it appears the NYSDEC has denied each and every one of FAFES' requests to modify Defendant's permit requirements, the NYSDEC's response is a bit more nuanced. The NYSDEC has also imposed additional obligations on Defendant that the agency anticipates will become enforceable permit requirements upon approval, and at least one of the FAFES' requests was denied "at this time, subject to a review" of an additional waste study. As such, some further action or assessment may still be required. The Court acknowledges that no briefing has been submitted regarding what impact the NYSDEC's response has on the Court's primary jurisdiction analysis. Nonetheless, the Court declines to invoke the doctrine of primary jurisdiction for the reasons that follow.

"The doctrine of primary jurisdiction 'comes into play whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.' " *Town of New Windsor v. Avery Dennison Corp.*, No. 10-CV-8611 (CS), 2012 WL 677971, at \*8 (S.D.N.Y. Mar. 1, 2012) (quoting *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122-23 (2d Cir. 1992) ). This doctrine serves two primary purposes:

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 21 of 64 PageID #: 584

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

"the desire for uniformity and the reliance on administrative expertise. Thus, in determining whether to apply the primary jurisdiction doctrine, [courts] must examine whether doing so would serve either of these purposes." *Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 (2d Cir. 2002) (footnote omitted); *see also Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) ("The doctrine's central aim is to allocate initial decisionmaking responsibility between courts and agencies and to ensure that they 'do not work at cross-purposes.' " (quoting *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996) ) ).

"Whether there should be judicial forbearance hinges therefore on the authority Congress delegated to the agency in the legislative scheme." *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d Cir. 1994); *see Gen. Elec. Co. v. MV Nedlloyd*, 817 F.2d 1022, 1026 (2d Cir. 1987) ("[W]hen Congress has entrusted the regulation of certain subject matter under a statute to an administrative agency, it is often counterproductive for a court to act upon that subject matter without the benefit of knowing what the agency has to offer."). "Recourse to the doctrine of primary jurisdiction is thus appropriate 'whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.' " *Ellis*, 443 F.3d at 81 (quoting *United States v. W. Pac. R. Co.*, 352 U.S. 59, 64 (1956) ).

Four factors must be weighed in determining whether the doctrine of primary jurisdiction should be invoked:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
>
> (2) whether the question at issue is particularly within the agency's discretion;
>
> (3) whether there exists a substantial danger of inconsistent rulings; and
>
> (4) whether a prior application to the agency has been made.

*Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222 (2d Cir. 1995). In a post-hearing submission, Defendant points to the analysis of these four factors in *Read v. Corning Inc.*, 351 F. Supp. 3d 342, 2018 WL 6710925 (W.D.N.Y. 2018), a recent decision that Defendant

believes supports its position that the doctrine of primary jurisdiction is applicable under the circumstances of this case (Dkt. 31). *Read* involved an action by property owners who asserted New York common law and CERCLA claims for damages and "response costs," respectively, for the alleged contamination of their property by "hazardous substances." *Read*, 2018 WL 6710925, at *1. However, the application of these four factors to the facts presented indicate that neither a stay nor a dismissal of Plaintiff's injunctive relief is appropriate, and that *Read* is inapposite.

**\*14** Here, the first factor weighs against the application of the primary jurisdiction doctrine because "Plaintiff's lawsuit is based on common law causes of action commonly adjudicated by courts, and will not require extensive interpretation of agency regulations." *Avery Dennison Corp.*, 2012 WL 677971, at *9; *see Sullivan v. Saint-Gobain Performance Plastics Corp.*, 226 F. Supp. 3d 288, 297 (D. Vt. 2016) ("The questions raised by [the p]laintiffs' state-law tort claims are all within the conventional expertise of judges."); *Martin v. Shell Oil Co.*, 198 F.R.D. 580, 585 (D. Conn. 2000) ("Although the resolution of the issues in this case undoubtedly will require some technical analysis, the claims—for example, whether Shell breached a duty to the plaintiffs, whether Shell trespassed or created a nuisance on the plaintiffs' property, whether Shell defrauded the plaintiffs, or whether Shell was willful, wanton or reckless in its actions toward the plaintiffs—are all of a type commonly adjudicated by the courts."); *Luckey v. Baxter Healthcare Corp.*, No. 95 C 509, 1996 WL 242977, at *6 (N.D. 111. May 9, 1996) ("[A]lthough the case will necessarily involve technical questions concerning the quality of plasma testing procedures and plasma products, this case ... is comparable to myriad tort actions that regularly require this Court to resolve complex technical issues."). "While NYSDEC of course has greater technical expertise than the Court in environmental matters, ... such expertise will [not] be required to determine liability in this case, and [this Court] decline[s] to defer to NYSDEC simply because this case touches upon technical environmental issues." *Avery Dennison Corp.*, 2012 WL 677971, at *9 (citations omitted); *see Martin*, 198 F.R.D. at 585-86 ("Although the [Connecticut Department of Environmental Protection (the "CTDEP") ] undoubtedly possesses expertise in the area of environmental pollution, the defendant has not persuaded this court that the CTDEP's expertise is essential in adjudicating the matters at hand.").

In contrast to the claims alleged in this case, the *Read* plaintiffs not only asserted common law causes of action

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

but also requested relief pursuant to CERCLA, a highly technical environmental statute that Congress enacted "in response to the serious environmental and health risks posed by industrial pollution," and which was intended "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (quotation omitted). Considering that the NYSDEC is "responsible ... for inactive hazardous waste disposal site remedial programs" in New York State, N.Y. Envtl. Conserv. Law § 27-1313(1) (a), it is not surprising that the *Read* court found those issues to involve "technical or policy considerations within the agency's particular field of expertise," *Read*, 2018 WL 6710925, at *7. Therefore, the first factor weighs against the application of primary jurisdiction.

With respect to the second factor, in evaluating whether the issues presented fall "particularly within the agency's discretion," the Court recognizes that the NYSDEC has been tasked with controlling air pollution throughout New York State. *See* N.Y. Envtl. Conserv. Law § 19-0301. Moreover, the United States Environmental Protection Agency "has delegated to [NYS]DEC the authority to issue and modify clean air permits under Title V of the Clean Air Act." *Glob. Cos. LLC v. N. Y. State Dep't of Envtl. Conservation*, 155 A.D.3d 93, 97 (3d Dep't 2017), *leave to appeal denied*, 30 N.Y.3d 913 (2018); *see* 42 U.S.C. § 7661a(d)(1); N.Y. Envtl. Conserv. Law § 19-0311(1).

Ensuring compliance with state and federal air pollution requirements falls squarely within the discretion of the NYSDEC. Indeed, it is NYSDEC's responsibility to "carry out the environmental policy of the state," *see* N.Y. Envtl. Conserv. Law § 3-0301(1), which requires that state agency to, among other things, "conserve, improve and protect its natural resources and environment and to prevent, abate and control water, land and air pollution, in order to enhance the health, safety and welfare of the people of the state and their overall economic and social well being," *id.* § 1-0101(1). However, the NYSDEC is not responsible for vindicating private property rights or providing remedies for landowner disputes. *See Lombardozzi v. Taminco US Inc.*, No. 3:15CV533/MCR/EMT, 2016 WL 4483856, at *2 (N.D. Fla. Aug. 24, 2016) (noting that while the Florida Department of Environmental Protection "is charged with enforcing Florida's environmental statutes," the agency "has no authority to vindicate individual property rights such as those asserted by [the p]laintiffs in this case"); *Martin*, 198

F.R.D. at 587 ("[T]he CTDEP is charged with protecting the environment for the public's health and safety. It does not have the purpose of vindicating individual property rights such as those asserted by the plaintiffs in this case."); *see also Massa v. Peabody Coal Co.*, 698 F. Supp. 1446, 1451 (S.D. Ind. 1988) (noting that the plaintiff's common law claims "suggest that even if [the defendant] is in compliance with the agency standards," it may still be acting "in violation of other standards arising out of the common law, wholly independently from the agency regulations").

**\*15** Plaintiff's Amended Complaint does not clearly set forth exactly what type of injunctive relief is contemplated by this action. The operative pleading merely requests injunctive relief "outside of that which is required by Defendant's Federal and State issued Air Permits." (Dkt. 4 at 11). At oral argument, Plaintiff's counsel indicated that Plaintiff generally requests the Landfill odors cease to pollute Plaintiff's and the putative class members' properties, but counsel declined to provide a more specific response until the case proceeded past discovery. Although Plaintiff is not preempted from asserting a New York common law claim that requests injunctive relief more stringent than that required by Defendant's CAA permit and federal law, any injunctive relief that might interfere with Defendant's compliance with those federal requirements could very well be precluded. Nonetheless, the mere possibility that a common law standard may require *different* injunctive relief than that currently prescribed by the CAA does not by itself place this issue within the NYSDEC's exclusive domain. *See Massa*, 698 F. Supp. at 1451 ("Although the possibility exists that some of Peabody's blasting and mining conduct may be subject to revision if these common law standards are breached, those changes would not properly fall within the exclusive authority of the Indiana regulatory agencies."). Therefore, given the limited definition of the injunctive relief sought by Plaintiff, the second primary jurisdiction factor does not weigh in favor of or against the application of the primary jurisdiction doctrine in this case.

In turning to the third primary jurisdiction factor, the Court is unpersuaded that there is a "substantial danger of inconsistent rulings" between this Court and the NYSDEC. Whether or not Defendant is in compliance with its regulatory responsibilities is not necessarily dispositive of whether Plaintiff and the putative class members are suffering property damage or are otherwise being deprived of their right to the use and enjoyment of their property. *See generally Avery Dennison Corp.*, 2012 WL 677971, at *10 ("[W]hile it is conceivable

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 23 of 64 PageID #: 586

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

that NYSDEC factual findings may help to inform this Court, I do not believe at this point that any are necessary for me to make legal rulings, nor will any such ruling necessarily conflict with any factual finding."); *Martin*, 198 F.R.D. at 586 ("The court is unaware, for example, of any minimum amount of a foreign substance that must be found on a plaintiff's property in order for that plaintiff to state a claim for trespass. A trespass is a trespass, and no ruling as to whether the defendants trespassed on the plaintiffs' property will necessarily conflict with any finding of the state agency."). Furthermore, that NYSDEC has rejected FAFES' requests to modify Defendant's permit obligations, presumably because many of the agency's concerns have been addressed to its satisfaction, does not preclude the imposition of additional abatement measures. *See generally Interfaith Cmty. Org. Inc. v. PPG Indus., Inc.*, 702 F. Supp. 2d 295, 312 (D.N.J. 2010) ("The fact that [the defendant] may be subject to a more stringent remediation standard than it is under the Consent Judgment is not a reason to invoke the primary jurisdiction doctrine."); *Maine People's All. v. Holtrachem Mfg. Co.*, No. CIV. 00-69-B-C, 2001 WL 1602046, at *8 (D. Me. Dec. 14, 2001) ("Extra burden is not what the doctrine is meant to circumvent; additional obligation is not incompatible with nor does it undermine the agency-driven process.").

Moreover, Plaintiff's claims are not based upon the CAA or the permits issued to Defendant. The federal requirements set forth by the CAA establish a regulatory floor, rather than a ceiling, upon which a source state may impose more stringent requirements to abate the emission of air pollution. Defendant takes the position that an award of any injunctive relief would be inconsistent with the NYSDEC's resolution of FAFES' petition. This is simply not so. That Plaintiff seeks injunctive relief different—i.e., more stringent—than that required by Defendant's permit requirements does not mean that such relief will necessarily be inconsistent with Defendant's federal obligations.

*Read* provides no additional support for Defendant's position. In *Read*, the NYSDEC issued a "Final Decision Document" that "set[ ] forth a remedy for the subject area." 2018 WL 6710925, at *2. Subsequently, the NYSDEC entered into an "Order on Consent and Administrative Settlement" that required the remedial activities set forth in the Final Decision Document to be implemented by the defendant. *Id.* Because the *Read* plaintiffs challenged the sufficiency of this remedy, the court determined that the defendant could find "itself whipsawed between two different remedies ordered by two different entities, each with jurisdiction over the matter." *Id.*

at *7. Again, since the regulatory framework set forth by the CAA is different from that established under CERCLA, *Read* is inapposite. Unlike CERCLA, the CAA specifically anticipates that source-state common law rules may impose more stringent regulatory requirements than those mandated by federal law. *See generally Bartlett*, 260 F. Supp. 3d at 240 (noting that a party that engages in "alternative remedial measures" from those set forth in a duly issued consent decree between that party and the NYSDEC would violate CERCLA). Indeed, that is the precise argument the court rejected in *Read*. *See Read*, 2018 WL 6710925, at *7 ("They want the Court to order a literally more extensive remedy. At oral argument, plaintiffs' attorney expressly stated that in plaintiffs' view, the remedy 'should be more' than what was approved by the [NYS]DEC."). Therefore, the third primary jurisdiction factor also weighs against the application of this doctrine.

**\*16** The last primary jurisdiction factor requires the Court to determine "whether a prior application to the agency has been made." Plaintiff seeks "[i]njunctive relief outside of that which is required by Defendant's Federal and State issued Air Permits." (Dkt. 1 at 10). Since FAFES' petition sought to modify Defendant's permit obligations, a "prior application" to obtain relief beyond that currently required by those permits has arguably already been made. Nevertheless, construing FAFES' petition as such does not warrant the application of the doctrine of primary jurisdiction. Whereas the *Read* court determined that recourse through the courts would serve no purpose after the NYSDEC "ha[d] actually approved a specific remedy," *Read*, 2018 WL 6710925, at *7 ("Late-in-the-day meddling by this Court would serve little if any useful purpose."), the NYSDEC's resolution of FAFES' petition does not prevent more stringent common law requirements from being imposed upon Defendant's operation of the Landfill, *see Merrick*, 805 F.3d at 690-91 (noting that "the Supreme Court has interpreted the word 'State' in the Clean Water Act states' rights savings clause ... to cover state courts and the common law rules they shape," and concluding that "[s]tate common law standards are ... 'requirements' adopted by 'States' " in the context of the CAA as well (citations omitted) ). Furthermore, the Court now has the benefit of the NYSDEC's response to that "prior application" in considering Plaintiff's request for injunctive relief. At this time, it does not appear that FAFES' petition or the NYSDEC's response will impede the Court's ability to craft an appropriate injunctive remedy should Plaintiff ultimately prevail in this matter. Additionally, "Plaintiff seeks damages here, and 'courts generally do not defer jurisdiction

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 24 of 64 PageID
#: 587

D'Amico v. Waste Management of New York, LLC, Not Reported in Fed. Supp. (2019)

where plaintiffs seek damages for injuries to their property or person.' " *Avery Dennison Corp.*, 2012 WL 677971, at *10 (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 175 F. Supp. 2d 593, 618 (S.D.N.Y. 2001) (applying this principle in declining to dismiss the plaintiff's claims requesting *both* injunctive relief and damages) ); *see also Martin*, 198 F.R.D. at 587 (finding that "an application to the CTDEP would not necessarily result in a vindication of the plaintiffs' rights," in part because the CTDEP "does not have the purpose of vindicating individual property rights such as those asserted by the plaintiffs in this case"). Therefore, the fourth factor also weighs against the application of the primary jurisdiction doctrine.

Finally, in addition to the four factors set forth above, "[c]ourts must also weigh 'the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings.' " *Avery Dennison Corp.*, 2012 WL 677971, at *9 (quoting *Nat'l Commc'ns Ass'n, Inc.*, 46 F.3d at 222). There is little if any benefit to be had from staying or striking Plaintiff's requested injunctive relief at this time. It is not entirely clear exactly what type of injunction Plaintiff seeks and how that remedy juxtaposes with the CAA's requirements. As Defendant's counsel acknowledged at oral argument, the NYSDEC has pursued no formal enforcement actions, outside its issuance of the initial Notice of Violation,[6] and at least one abatement action is apparently still outstanding. For these reasons, any advantage derived from the primary jurisdiction doctrine does not outweigh the potential for unnecessary delay that could result from its application to this case.

Based upon the foregoing, the Court declines to apply the doctrine of primary jurisdiction to stay or strike the request for injunctive relief in the Amended Complaint.

## VI. Political Question Doctrine

Lastly, Defendant argues that Plaintiff's state law claims raise a political question that is not justiciable before this Court. (Dkt. 13-1 at 30-32). "The political question doctrine calls for a careful and delicate analysis into whether a 'matter has been committed by the Constitution to another branch of government or whether the action of that branch exceeds whatever authority has been committed.' " *In re MTBE Prod. Liab. Litig.*, 438 F. Supp. 2d 291, 295 (S.D.N.Y. 2006) (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962) ). "The Judiciary is particularly ill suited to make such decisions, as courts are fundamentally underequipped to formulate national

policies or develop standards for matters not legal in nature." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) (quotation omitted). Political questions are those that "lie beyond the competence and proper institutional role of the federal courts." *Belgrade v. Sidex Int'l Furniture Corp.*, 2 F. Supp. 2d 407, 415 (S.D.N.Y. 1998).

**\*17** The Supreme Court has set forth six factors to evaluate in determining whether an issue is a nonjusticiable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217; *see Vieth v. Jubelirer*, 541 U.S. 267, 277-78 (2004) (stating that these are "six independent tests for the existence of a political question" and that they "are probably listed in descending order of both importance and certainty").

Defendant has failed to articulate how any of these factors demonstrate the existence of a political question in this case. The Third Circuit directly addressed a similar argument in *Bell*, where the court rejected the contention that the common law claims at issue were barred by the CAA under the political question doctrine. The *Bell* court explained that "[n]o court has ever held that such a constitutional commitment of authority regarding the redress of individual property rights for pollution exists in the legislative branch. Indeed, if such a commitment did exist, the Supreme Court would not have

decided *Ouellette* in the first place." *Bell*, 734 F.3d at 198. This rationale applies with equal force to the facts presented here.

Furthermore, Defendant's case citations are inapposite. Defendant primarily relies upon past attempts to combat global climate change through common law remedies. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 426 (2011) ("The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from power plants; the delegation is what displaces federal common law. Indeed, were EPA to decline to regulate carbon-dioxide emissions altogether at the conclusion of its ongoing § 7411 rulemaking, the federal courts would have no warrant to employ the federal common law of nuisance to upset the agency's expert determination."); *Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849, 864 (S.D. Miss. 2012) ("It is unclear how this Court or any jury, regardless of its level of sophistication, could determine whether the defendants' emissions unreasonably endanger the environment or the public without making policy determinations that weigh the harm caused by the defendants' actions against the benefits of the products they produce. Our country, this Court, and even the plaintiffs themselves rely on the products the defendants produce."), *aff'd*, 718 F.3d 460 (5th Cir. 2013). The regulation of greenhouse gases is a complex issue involving numerous policy decisions, including national questions of energy production and transportation infrastructure as well as personal choices of consumption. The blunt instruments of traditional common law may be inadequately refined to address such broad and pervasive issues in modern society. However, determining whether a landfill operator is liable for property damages arising from the emission of noxious odors is not an issue committed to one of the coordinate political branches; rather, it falls well within the traditional competency of the Judiciary to adjudicate.

**\*18**  Therefore, the Court rejects Defendant's assertion of the political question doctrine.

## VII. Request for Leave to Amend

Finally, in the last sentence of Plaintiff's opposition papers, he states that "should the Court grant any portion of Defendant's motion, Plaintiff respectively requests leave to amend his complaint." (Dkt. 14 at 15). Plaintiff does not explain why leave to amend is warranted or how any pleading defects would be cured.

Plaintiff's cursory request is procedurally defective under the Local Rules of Civil Procedure. *See Wi3, Inc. v. Actiontec Elecs.*, 71 F. Supp. 3d 358, 363 (W.D.N.Y. 2014) (finding request for leave to amend defective for failure to comply with Local Rules of Civil Procedure); *see also Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73, 76 (2d Cir. 2011) (finding district court did not abuse its discretion in denying leave to amend complaint when request to amend was made "on the final page of their brief in opposition to defendants' motion to dismiss, in boilerplate language and without any explanation as to why leave to amend was warranted" and collecting cases). Local Rule 15(a) provides that "[a] movant seeking to amend or supplement a pleading must attach an unsigned copy of the proposed amended pleading as an exhibit to the motion," and Local Rule 15(b) requires parties represented by counsel to identify the proposed amendments "through the use of a word processing 'redline' function or other similar markings...." L.R. Civ. P. 15(a), (b). Because Plaintiff has failed to comply with the Local Rules, the Court exercises its discretion in denying this "cursory or boilerplate request[ ] ... made solely in a memorandum in opposition to a motion to dismiss." *Malin v. XL Capital, Ltd.*, 312 F. App'x 400, 402 (2d Cir. 2009) (citation omitted). If Plaintiff wishes to seek leave to amend his Amended Complaint, he should do so through a procedurally-compliant motion.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (Dkt. 13) is granted to the extent that Plaintiff's nuisance and gross negligence causes of action are dismissed without prejudice for failure to state a claim, but it is otherwise denied.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2019 WL 1332575

# Footnotes

1    The following facts are taken from Plaintiff's Amended Complaint unless otherwise indicated. (Dkt. 4).

2    While the pollution alleged here entails the emission of gaseous particulate matter in the form of "odors" permeating Plaintiff's property, there is no meaningful distinction between the public's perception of more tangible impacts to land or water resources and the contamination of air space. *See generally Donavan v. Saint-Gobain Performance Plastics Corp.*, No. 1:16-CV-924 (LEK/DJS), 2017 WL 3887904, at *5 (N.D.N.Y. Sept. 5, 2017) (noting that allegations that the plaintiff's property "has been contaminated through air emissions ... would likely state a plausible claim for property damages"); *Criscuola v. Power Auth. of State of N.Y.*, 81 N.Y.2d 649, 651 (1993) (holding that the diminution in market value of property resulting from " 'cancer phobia' and the public's perception of a health risk from exposure to electromagnetic emissions from power lines" that run across the property should be considered in evaluating "just compensation" in the "takings" context; *Butler v. Frontier Tel. Co.*, 186 N.Y. 486, 491 (1906) ("The surface of the ground is a guide, but not the full measure [of real property], for within reasonable limitations land includes not only the surface but also the space above and the part beneath.").

3    The Second Circuit appears to have last discussed this issue in 2000, when it "question[ed] whether *Criscuola* and cases similar to it" were relevant to the issue of "whether diminution in the value of property, *without more*, can constitute an interference with use and enjoyment." *Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 299 (2d Cir. 2000). After suggesting that *Criscuola* may be limited to the context of just compensation in takings disputes, the Second Circuit stated:

Citing *Criscuola* for the proposition that stigma damages are available in a tort action, therefore, begs the question, which is rather whether, absent some other interference with plaintiffs' ability to use and enjoy their property, liability in nuisance exists. And this question seems not to be answered by the New York cases.

*Id.* at 300. *Mehlenbacher* is distinguishable from the present case because Plaintiff and the putative class have alleged an interference with their use and enjoyment of property as a result of the noxious odors and rely upon the diminution of property value as an additional injury. *Cf. id.* at 293 (noting that some of the plaintiffs seek to recover for the diminution of property values resulting simply from their residence being close in proximity to the salt mine). Furthermore, *Mehlenbacher* relates to a nuisance claim and does not address whether New York recognizes "stigma damages" in the context of a negligence claim.

4    In dicta, *Cooper* suggests that "even if the district court actually applied source state law from Alabama and Tennessee, it would be difficult to uphold the injunctions because TVA's electricity-generating operations are expressly permitted by the states in which they are located." 615 F.3d at 309. The Fourth Circuit stated that no public nuisance action exists under either Tennessee or Alabama common law for conduct that is authorized or permitted by law. *Id.* at 309-10. Under New York law, "[i]t is settled that an otherwise lawful business, even one operating in conformity with relevant statutory requirements, may be enjoined when it creates or contributes to a public nuisance because of the manner or circumstances in which it operates." *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 280 (E.D.N.Y. 2004); *see AcuSport, Inc.*, 271 F. Supp. 2d at 484-85 (same). While an exception to this New York rule exists "where the specific conduct at issue is 'fully authorized by statute, ordinance or administrative regulation,' " *Beretta U.S.C. Corp.*, 315 F. Supp. 2d at 281 (quoting *Restatement (Second) of Torts* § 821B, cmt. f), since the NYSDEC has issued a "Notice of Violation" and communicated with Defendant regarding odor abatement actions there is at least an unresolved question of fact as to whether this exception would apply in this case. In any event, a careful review of *Cooper* indicates that it is not in tension with the holdings in *Merrick, Bell*, or *Ouellette. See Cooper*, 615 F.3d at 306 ("There is no question that the law of the states where emissions sources are located, in

this case Alabama and Tennessee, applies in an interstate nuisance dispute. The Supreme Court's decision in *Ouellette* is explicit: a 'court must apply the law of the State in which the point source is located.' While *Ouellette* involved a nuisance suit against a source regulated under the Clean Water Act, *all parties agree its holding is equally applicable to the Clean Air Act.*" (citation omitted) (emphasis added) ).

5  FAFES subsequently filed an action concerning the Landfill's emissions that is currently pending before the undersigned. *See Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.*, Case No. 6:18-cv-06588, Dkt. 1 (W.D.N.Y. Aug. 14, 2018).

6  On February 2, 2018, the NYSDEC issued a Notice of Violation to Defendant, detailing various conditions and actions that the agency deemed necessary for Defendant to return to a state of regulatory compliance, and the NYSDEC continued to communicate with Defendant regarding the status of these emissions for a number of months. *See High Acres Landfill*, Dep't of Envtl. Conservation, https://www.dec.nv.gOv/chemical/113037.html (last visited Mar. 25, 2019). Nonetheless, the Notice of Violation is not an enforceable order. *See* N.Y. Envtl. Conserv. Law § 19-0505; *cf. Collins v. Olin Corp.*, 418 F. Supp. 2d 34, 46 (D. Conn. 2006) ("[B]ecause the [CT]DEP is actively overseeing the implementation of the consent order, the doctrine of primary jurisdiction counsels in favor of dismissal.").

---

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 28 of 64 PageID #: 591

Hunter v. Palisades Acquisition XVI, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 5513636
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Patricia HUNTER, Plaintiff,

v.

PALISADES ACQUISITION XVI, LLC, Sharinn
& Lipshe, P.C., and Harvey Sharinn, Defendants.

16 Civ. 8779 (ER)
|
Signed 11/16/2017

**Attorneys and Law Firms**

Matthew Austin Schedler, Divya Subrahmanyam, Camba
Legal Services Inc., Ahmad Keshavarz, Ahmad Keshavarz,
Law Offices, Brooklyn, NY, for Plaintiff.

Brett A. Scher, Adam Matthew Marshall, Kaufman Dolowich
& Voluck LLP, Woodbury, NY, Jonathan Justin Greystone,
Spector Gadon & Rosen, P.C., Philadelphia, PA, Amanda
Jennifer Moreno, Sharinn & Lipshie, P.C., Uniondale, NY, for
Defendants.

**OPINION AND ORDER**

Edgardo Ramos, U.S.D.J.

**\*1** Patricia Hunter ("Plaintiff") brings this action against
Defendants Palisades Acquisition XVI, LLC ("Palisades"),
Sharinn & Lipshie, P.C. ("S&L"), and Harvey Sharinn
("Sharinn") alleging violations of the Fair Debt Collection
Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and New
York General Business Law § 349 ("Section 349"). Before
the Court is Defendant Palisades' motion to dismiss the First
Amended Complaint ("FAC") in its entirety pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure and, in the
alternative, to strike Exhibits C and S from the FAC pursuant
to Rule 12(f) of the Federal Rules of Civil Procedure.

For the following reasons, Palisades' motion is DENIED.

**I. BACKGROUND** [1]
Palisades is a Delaware limited liability company that
purchases charged-off consumer debt in bulk or purchases the
right to collect consumer debts already in default and attempts

to collect on the debt. FAC (Doc. 30) ¶¶ 10, 150(c). In April
2007, Palisades sued Plaintiff, a home health aide, in Bronx
County Civil Court, claiming that Palisades had purchased a
debt of $2,572.21 from Direct Merchants Bank resulting from
Plaintiff's credit card debt. FAC ¶¶ 14-18; Ex. A. Palisades
was represented in that action (the "Collections Lawsuit")
by Wolpoff & Abramson, L.L.P. and filed an affidavit of service
sworn to by Loai F. Sarsour ("Sarsour"). *Id.* ¶¶ 21, 25. [2]

However, Plaintiff never had an account with Direct
Merchants Bank and believes she has fully paid off every
credit card she has ever owned. *Id.* ¶ 19. Plaintiff claims
she was unable to raise these points in the Collections
Lawsuit because she was never served with the summons and
complaint. *Id.* ¶ 22. The affidavit of service filed by Sarsour in
the Collections Lawsuit claimed that service was effectuated
on April 18, 2007 (a Wednesday) at 2:36 p.m. by leaving the
documents with a relative of Plaintiff named James Hunter,
who was described as "a 55-year old black man with black
hair who was approximately 6' tall and weighed around 210
pounds." *Id.* ¶¶ 25, 28; Ex. B. Plaintiff does not know and is
not related to anyone by the name of James Hunter. *Id.* ¶ 29.
Plaintiff's husband, who lived with her, was named Samuel
Hunter. *Id.* In 2007, he "worked every weekday" and did
not arrive home until 9:00 p.m. *Id.* ¶ 30. Mr. Hunter did not
match the physical description listed in Sarsour's affidavit.
*Id.* Plaintiff did not live with any other adult men. *Id.* ¶ 29.
Sarsour also attested that he mailed a copy of the summons
and complaint to the same address. *Id.* ¶ 27. [3] Neither Plaintiff
nor her husband, however, received any papers relating to the
Collections Lawsuit in the mail. *Id.* ¶ 31.

**\*2** In June 2007, Palisades moved for a default judgment
against Plaintiff. *Id.* ¶ 39. In doing so, one of Palisades'
employees swore to having "personal knowledge of the facts
of the case," including that Plaintiff had opened an account
with Direct Merchants Bank, incurred charges, and defaulted
on her debt. *Id.* ¶ 40. On June 19, 2007, Palisades obtained
a default judgment against Plaintiff for $2,834.13. *Id.* ¶ 45.
Plaintiff never received a copy of the judgment or any notice
that judgment had been entered against her. *Id.* ¶ 47.

In early 2014, nearly seven years later, Plaintiff first learned of
the Collections Lawsuit when she and her husband attempted
to modify the mortgage loan for their house. *Id.* ¶¶ 48-59.
At that point, they were informed that a judgment had been
entered against Plaintiff in the Collections Lawsuit. *Id.* She
filed a *pro se* Order to Show Cause in the Collections Lawsuit,
seeking to vacate the default judgment because she was never

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 29 of 64 PageID #: 592

Hunter v. Palisades Acquisition XVI, LLC, Not Reported in Fed. Supp. (2017)

served. *Id.* ¶ 50; Ex. E. A hearing on Plaintiff's Order to Show Cause was held on March 12, 2014. *Id.* ¶ 55. Palisades did not appear at the hearing; the presiding judge vacated the judgment and set a trial for April 21, 2014. *Id.* ¶ 56. Palisades also did not appear at the trial; at that point, the presiding judge dismissed the Collections Lawsuit. *Id.* ¶ 58. The order vacating the Collections Lawsuit is publicly accessible through the New York Unified Court System's eCourts website. *Id.* ¶ 71; Ex. I.

Over a year later, on November 11, 2015, Palisades, now represented by S&L,[4] sent an Information Subpoena and Restraining Notice (the "Notice") to JP Morgan Chase Bank ("Chase"). *Id.* ¶ 66; Ex. H. The Notice stated that Palisades had a judgment against Plaintiff for $2,834.13 and demanded that Chase restrain any bank accounts owned by Plaintiff. *Id.* Plaintiff had a consumer checking account and a savings account with Chase at that time. *Id.* ¶ 68. On November 16, 2015, Chase placed a hold on Plaintiff's checking account. *Id.* ¶ 69.

The Notice was signed by Defendant Sharinn and listed the index number for the vacated Collections Lawsuit. *Id.* ¶ 66.[5] The managing attorney of S&L, Amanda Moreno ("Moreno") explained, in a 2014 deposition, the process S&L attorneys undertake to review a consumer's file before commencing debt collection activities. *Id.* ¶ 81. Moreno explained that, when a different law firm litigated the underlying judgment, S&L's policy was not to undertake debt collection activity until S&L had copied the entire court file or been forwarded the pleadings. *Id.* ¶ 83; Ex. J. According to Moreno, S&L "review[s] what is done by other attorneys to make sure that [they]'re following in the correct footsteps." *Id.* ¶ 84; Ex. J.

S&L was not the law firm of record in the Collections Lawsuit. *Id.* ¶¶ 61-62, 86. The law firm of record, Wolpoff & Abramson, was accused in a 2010 lawsuit of "perpetrat[ing] a massive scheme of debt collection fraud" and subsequently "abandoned a huge volume of pending debt collection suits in New York." *Id.* ¶¶ 60, 87. The process server who signed an affidavit of service in the Collections Lawsuit, Sarsour, was accused in a 2013 lawsuit of perpetrating sewer service.[6] *Id.* ¶¶ 34-35, 74. That lawsuit was brought against Palisades' parent company, Asta Funding. *Id.*; Ex. C; Ex. S. Had Sharinn or another attorney working for S&L copied the court file or researched the Collections Lawsuit before issuing the Notice, they would have seen that the Collections Lawsuit had been vacated in 2014. *Id.* ¶ 71; Ex. I.

**\*3** On November 16, 2015, the same day Chase placed a hold on Plaintiff's account, $75.00 was debited from Plaintiff's checking account under the transaction heading "Nas-Coal 16 Nov15678." *Id.* ¶¶ 94-95; Ex. K. On November 25, 2015, Chase sent Plaintiff a letter explaining that there was a $5,668.26 hold placed on her account at the request of a judgment creditor. *Id.* ¶ 97. Chase also sent Plaintiff a copy of the Notice, as required by New York law. *Id.* ¶ 97-100; Ex. L. The letter Chase sent Plaintiff was labeled at the bottom left with the phrase "COAL-16Nov15-678." *Id.* Ex. L. The letter also explained that Chase "may charge [Plaintiff] a Legal Processing Fee of $75.00" for processing the Notice. *Id.*

Plaintiff never received a notice of assignment when Palisades purchased Plaintiff s alleged credit card debt from Direct Merchants Bank. *Id.* ¶ 91. Plaintiff also never received any notice of the Collections Lawsuit. *Id.* ¶ 31, The Notice forwarded to her by Chase was therefore the first communication she received from Palisades concerning the alleged debt. *Id.* ¶ 101. Plaintiff alleges that the Notice did not contain certain disclosures required by § 1692g(a) of the FDCPA. She also alleges that she did not receive those disclosures within five days of receiving the Notice. *Id.* ¶ 102.

When Plaintiff learned of the hold on her account, she was very upset. *Id.* ¶ 103. She needed the restrained money in order to pay her monthly bills, including her mortgage payment. *Id.* While Plaintiff's Chase account was restrained, she suffered emotional distress, including anger, frustration, and anxiety. *Id.* ¶ 136. She was afraid that late payments on her mortgage would increase her monthly mortgage to a level that she could not afford. *Id.* ¶ 140. Plaintiff also suffered from physical symptoms during this time period, including severe, recurring headaches, high blood pressure, a diminished appetite, and insomnia. *Id.* ¶¶ 142-43.

In November 2015, Plaintiff's daughter attempted to use the checking account to pay Plaintiff's monthly bills despite the hold; the payments did not go through and Plaintiff incurred additional "returned item fees" on her account. *Id.* ¶¶ 104, 109. Plaintiff went to a local Chase office multiple times to release the hold, but was told she needed to contact S&L. *Id.* ¶¶ 105-06. At one point, a Chase employee transferred $2,100 to Plaintiff's savings account for her use. *Id.* ¶ 107. This transfer caused an insufficient funds fee to be charged to Plaintiff's account. *Id.* ¶ 109. The Chase employee also used funds from Plaintiff's savings account to pay her mortgage bill. *Id.* ¶ 107. Although the bill was paid, it was late, and Plaintiff incurred a late fee from her mortgage

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 30 of 64 PageID #: 593

Hunter v. Palisades Acquisition XVI, LLC, Not Reported in Fed. Supp. (2017)

lender. *Id.* ¶ 110. Plaintiff was able to pay the remainder of her bills without using her bank account by using, among other methods, a Western Union wire transfer. *Id.* ¶ 111. Plaintiff alleges that this resulted in additional charges to her accounts. *Id.* On December 2, 2015, Chase debited an additional $937.01 from Plaintiff's account in a transaction labeled "NAS-COAL." She incurred an extended overdraft fee and a service fee from that debit. *Id.* ¶ 112.

Seeking to lift the hold on her account, Plaintiff retained CAMBA Legal Services, Inc. ("CAMBA") for assistance. *Id.* ¶ 114. On December 15, 2015, Plaintiff sent a letter to S&L informing them that the judgment in the Collections Lawsuit had been vacated and demanding the release of the restraint on her account. *Id.* ¶ 115; Ex. M. Plaintiff demanded that the S&L Defendants provide her with documentation and information on the alleged debt pursuant to the FDCPA and New York City laws. *Id.* Plaintiff also informed S&L that they should contact CAMBA regarding the debt in the future. *Id.* However, neither Palisades nor S&L responded to Plaintiff's letter. *Id.* ¶ 117. Because the hold remained on her Chase account, Plaintiff again paid her monthly bills "using unconventional means," which she alleges resulted in additional fees being charged to her accounts. *Id.*

**\*4** On December 23, 2015, Chase sent Plaintiff a letter informing her that her account was overdrawn by $238.00 and that she needed to make a deposit in that amount to keep her account open. *Id.* ¶ 127. Chase sent another letter informing Plaintiff of her account status on or around January 5, 2016. *Id.* Plaintiff did not deposit any money into her account because she believed that any additional funds she deposited would be frozen by Defendants. *Id.* ¶ 130. For this same reason, Plaintiff cashed her paychecks instead of depositing them at Chase, and was required to pay $6 for every check she needed to cash. *Id.* ¶ 135. She also believed that the overdraw was caused by the "NAS-COAL" debits of almost $1,000, the hold on her checking account, and the returned item and late fees incurred as a result of Plaintiff's attempts to remain in timely payment of her bills despite the hold on her account. *Id.* ¶ 130.

On January 8, 2016, Plaintiff checked her Chase account and saw that the hold remained. *Id.* ¶ 118. That day, a CAMBA employee called S&L and spoke with an attorney there, Mike Ponzio ("Ponzio"). Ponzio requested that CAMBA send S&L a copy of the vacatur of the Collections Lawsuit judgment. *Id.* ¶ 119. An attorney at CAMBA sent the letter on January 11, 2016, again demanding that S&L lift the restraint and return

the funds to Plaintiff's Chase account. *Id.* ¶ 120. On January 13, 2016, an employee working for S&L faxed a letter to CAMBA informing them that S&L had reached out to Chase to withdraw the restraint on Plaintiff's account. *Id.* ¶ 122; Ex. P.

On January 27, 2016, S&L mailed CAMBA a letter enclosing a check to Plaintiff for $830.16, which they stated represented "monies received from the Marshal in connection with a levy at JP Morgan Chase Bank." *Id.* ¶ 124. S&L also informed CAMBA that an additional check for $106.85 would be sent to Plaintiff from the Marshal's office for additional Marshal fees. *Id.* On February 3, 2016, Plaintiff received a check for $106.85. *Id.* ¶ 126.

At some point after January 8, 2016, Chase closed Plaintiff's checking and savings accounts because Plaintiff's accounts remained overdrawn. *Id.* ¶ 131. After receiving the checks from the Marshal's office and S&L, Plaintiff opened a new checking account at a different bank. *Id.* ¶ 132.

Plaintiff filed this lawsuit on November 11, 2016. Complaint (Doc. 1). Plaintiff filed the FAC on February 24, 2017 (Doc. 30). Plaintiff asserts three causes of action: (1) violations of the FDCPA, 15 U.S.C. §§ 1692c, 1692e, 1692f, and 1692g based on Defendants' Notice and restraint of Plaintiff's Chase account; (2) violations of New York General Business Law § 349 based on Defendants' conduct in connection with the Collections Lawsuit as well as the subsequent Notice and restraint of Plaintiff's Chase account; and (3) conversion based on Defendants' restraint of Plaintiff's Chase account. FAC ¶¶ 146-79.

Palisades filed its motion to dismiss or to strike on March 30, 2017. *See* Memorandum of Law in Support of Defendant Palisades' Motion to Dismiss and Motion to Strike ("Def.'s Mem.") (Doc. 32).

## II. MOTION TO DISMISS

Palisades moves to dismiss the FAC on the following grounds: (1) Plaintiff failed to state a claim under the FDCPA because she did not allege that she was a "consumer" and that the alleged debt "meets the FDCPA definition," Def.'s Mem at 10; (2) Plaintiff failed to plausibly plead her FDCPA claim, Def.'s Mem. at 5; (3) Plaintiff failed to state a claim under Section 349, Def.'s Mem. at 6; and (4) Plaintiff failed to state a claim for conversion, Def.'s Mem. at 7. [7]

Case 1:25-cv-04295-EK-LKE  Document 43-5  Filed 02/23/26  Page 31 of 64 PageID #: 594

Hunter v. Palisades Acquisition XVI, LLC, Not Reported in Fed. Supp. (2017)

### A. Legal Standard

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Twombly,* 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570.

**\*5** The question in a Rule 12 motion to dismiss " 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Sikhs for Justice v. Nath,* 893 F.Supp.2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.' " *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir. 2006)).

### B. FDCPA

Congress enacted the FDCPA in 1977 in order to check "abusive, deceptive, and unfair" practices employed by debt collectors. *Wiener v. Bloomfield,* 901 F. Supp. 771, 774 (S.D.N.Y. 1995). The FDCPA was also meant to "eliminate the recurring problem of debt collectors dunning the wrong person." *Bodur v. Palisades Collection, LLC,* 829 F. Supp. 2d 246, 251 (S.D.N.Y. 2011) (quoting S. Rep. No. 95-382, at 4, *reprinted in* 1977 U.S.C.C.A.N. at 1699). The FDCPA generally prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. [8] The Act also proscribes debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt." *Id.* § 1692f. Debt collectors are prohibited from communicating with third parties about the debt unless they meet the requirements of Sections 1692b or 1692c of the FDCPA. *Id.* §§ 1692b, 1692c(b). The FDCPA also requires that, within five days after the initial communication with a consumer in connection with the collection of any debt, debt collectors send the consumer a validation notice which provides certain information regarding the debt. *Id.* § 1692g.

Plaintiff argues that Defendants' actions violate Sections 1692c, 1692e, 1692f, and 1692g of the FDCPA. FAC ¶ 151; Plaintiff's Memorandum of Law in Opposition to Palisades' Motion to Dismiss ("Pl.'s Mem.") (Doc. 42), at 10-17. Palisades does not argue that Plaintiff has failed to state a claim for any violation in particular; instead, Palisades argues that all of Plaintiff's FDCPA claims should be dismissed for the same two reasons: (1) Plaintiff did not adequately allege that she was a consumer; and (2) Plaintiff did not properly plead her FDCPA claims.

### 1. Whether Plaintiff is a Consumer

"To state a[n] FDCPA claim, a plaintiff must show that: (1) she has been the object of collection activity arising from consumer debt, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant has engaged in an act or omission prohibited by the FDCPA." *Ogbon v. Beneficial Credit Servs., Inc.,* No. 10 Civ. 3760 (GBD), 2011 WL 347222, at \*4 (S.D.N.Y. Feb. 1, 2011) (quoting *Carrington v. Chrysler Fin.,* No. 10 Civ. 1024 (NGG), 2010 WL 1371664, at \*1 (E.D.N.Y. Apr. 6, 2010)).

**\*6** Palisades argues that the FAC should be dismissed because the FAC does not specifically allege that Plaintiff is a consumer and does not state that the debt in question is consumer debt. Def.'s Mem. at 10. Palisades is incorrect. Plaintiff alleges that she is a consumer as defined by the FDCPA and that her alleged debt "derives from a credit card account that was used primarily for family, personal or household purposes." FAC ¶ 150(a)-(b). Plaintiff's allegations against Palisades are based on Plaintiff's alleged obligation to pay the debt subject to the Collections Lawsuit, and the FAC's

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 32 of 64 PageID #: 595

Hunter v. Palisades Acquisition XVI, LLC, Not Reported in Fed. Supp. (2017)

allegations are sufficient to show that Plaintiff has standing to sue under the FDCPA. *See also Marx v. General Revenue Corp.,* 568 U.S. 371, 374 n.1 (2013) ("The FDCPA's private-enforcement provision, § 1692k, authorizes any aggrieved person to recover damages from 'any debt collector who fails to comply with any provision' of the FDCPA.") (quoting 15 U.S.C. § 1692k(a)).

**2. Whether Plaintiff Properly Plead her FDCPA Claims**

Next, Palisades argues that Plaintiff failed to properly plead her FDCPA cause of action because she did not specify which factual allegations supported each alleged FDCPA violation. Def.'s Mem. at 11. To comply with the requirements of Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.,* 135 S. Ct. 346, 346 (2014). Dismissal of a complaint for failure to comply with Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Shomo v. State of New York,* 374 Fed.Appx. 180, 182 (2d Cir. 2010) (quoting *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1988)). Instead, "the key to Rule 8(a)'s requirements is whether adequate notice is given." *Wynder v. McMahon,* 360 F.3d 73, 79 (2d Cir. 2004).

Palisades argues that Paragraph 151 "claims that the Defendants violated the FDCPA §§ 1692c, 1692e, 1692f, and 1692g ... and then alleges nothing more than descriptive language from the aforementioned sections of the FDCPA." Def.'s Mem. at 11. Paragraph 151, in its entirety, states:

> Defendants materially violated the following sections of the FDCPA: 15 U.S.C. §§ 1692c, 1692e, 1692f, 1692g. By way of example and not limitation Defendants violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: failing to provide Ms. Hunter with required information about an alleged debt in response to her request

> for verification; using false, deceptive, or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; making the false representation or implication that any individual is an attorney or that any communication is from an attorney; threatening to take and actually taking an action prohibited by law; using any false, deceptive, or misleading representations or means; using unfair or unconscionable means; communicating improperly with a third party; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

FAC ¶ 151. The first of Plaintiff's "example[s]"—that Defendants failed to provide Plaintiff with information in response to her request for verification—is the only example that includes any sort of factual allegation. The other allegations provide a mere "recitation of behavior prohibited by various sections of the FDCPA." *Okyere v. Palisades Collection LLC,* 961 F. Supp. 2d 508, 515 (S.D.N.Y. 2013). Where complaints go no further than those sorts of "threadbare recitals of the elements of a cause of action," they should be dismissed. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *see also Oliver v. U.S. Bancorp,* No. 14 Civ. 8948 (PKC), 2015 WL 4111908, at *5 (S.D.N.Y. July 8, 2015) (dismissing FDCPA complaint where the plaintiff provided only "a formulaic recitation of acts prohibited by the FDCPA, without any alleged factual content" in support of her claim).

**\*7** However, taken as a whole, the FAC contains allegations that meet Rule 8's notice pleading requirements. The FAC alleges in the FDCPA section itself that even after Plaintiff vacated the Collections Lawsuit judgment, Palisades continued to attempt to collect the debt by securing a restraint on Plaintiff's Chase account and refusing to release the restraint after being notified of the error. *See* FAC ¶ 147; *see also id.* ¶¶ 66-93; 100-02; 115-22 (providing a more

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 33 of 64 PageID #: 596

Hunter v. Palisades Acquisition XVI, LLC, Not Reported in Fed. Supp. (2017)

detailed factual overview of Plaintiff's claims.[9] Further, in Plaintiff's opposition, she explained the legal theory (and supporting factual allegations) behind each of her claims for violations of Sections 1692c, 1692e, 1692f, and 1692g. Pl.'s Mem. at 10-17; *see also Okyere*, 961 F. Supp. 2d at 515 (finding a similarly constructed complaint satisfied Rule 8 requirements when read in conjunction with the plaintiff's brief in opposition to a motion to dismiss). These allegations, although not presented with perfect clarity in the FAC, are not so confusing that their "true substance ... is well disguised." *Shomo*, 374 Fed.Appx. at 182; *see also Carlson v. Long Island Jewish Med. Ctr.*, 378 F. Supp. 2d 128, 133 (E.D.N.Y. 2005) ("While Plaintiff's certainly could have pled their claim with greater specificity, there is no requirement that they do so, and in the context of this motion to dismiss, the court declines to hold the pleading deficient").

Finally, Palisades argues that Plaintiff's allegations do not state a claim upon which relief can be granted because "so much of the substance of Plaintiff's Complaint is devoted to events which occurred prior to November 11, 2015 ... [h]owever the specific facts violating specific sections/ subsections of the FDCPA are unknown" Def.'s Mem. at 11. In the section outlining Plaintiff's FDCPA causes of action, Plaintiff succinctly presented her allegations with respect to the FDCPA claims: "Defendants attempted to collect on a judgment against Ms. Hunter that had been vacated in a debt collection lawsuit that had been dismissed, by restraining and garnishing her bank account, and then ignoring her demand that her funds be released. In doing so, Defendants violated multiple sections of the FDCPA." FAC ¶ 147. According to the FAC, Defendants' collection activities began on November 11, 2015—a date both parties agree is within the relevant statute of limitations. *See* FAC ¶ 66; Def.'s Mem. at 11-12; Pl.'s Mem at 17. Thus, the FAC adequately put Palisades on notice of which alleged conduct supported Plaintiff's FDCPA violation.

Because Palisades' only arguments with respect to the FDCPA claim concern whether Plaintiff was the object of collection activity and whether Plaintiff adequately pled her theories of liability, this Court DENIES Palisades' motion to dismiss Plaintiff's cause of action under the FDCPA.

### C. Section 349

To state a Section 349 claim, a plaintiff must allege three elements: (1) "that the challenged act or practice was consumer-oriented;" (2) "that it was misleading in a material

way;" and (3) "that the plaintiff suffered injury as a result of the deceptive act." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (quoting *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000)). Palisades argues that Plaintiff's Section 349 claim should be dismissed because Plaintiff has not adequately alleged facts supporting the "consumer-oriented" and "materially misleading" elements.

### 1. Whether Plaintiff Alleged Consumer-Oriented Conduct

Palisades argues that the FAC should be dismissed because Plaintiff did not specify that the debt at issue was a "consumer debt" as required under Section 349 in order for her to have standing to bring an action. Def.'s Mem. at 13. "[A]s a threshold matter, plaintiffs claiming the benefit of Section 349 —whether individuals or entities ... must prove that the conduct of the defendant is consumer-oriented." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995). Claims arising under Section 349 need not allege "a repetition or pattern of deceptive behavior" so long as the conduct alleged "potentially affect[s] similarly situated consumers." *Id.* at 25, 26-27. This requirement "has been construed liberally" and the "critical question" is whether the conduct alleged in the complaint "affects the public interest in New York." *Agheepour v. N. Leasing Systems, Inc.*, 14 Civ. 5449 (NSR), 2015 WL 7758894, at *14-15 (S.D.N.Y. Dec. 1, 2015), *order corrected by* 2016 WL 828130 (S.D.N.Y. Feb. 25, 2016).

**\*8** In the FAC, Plaintiff alleged that Palisades "obtained a judgment against [her] via sewer service,"[10] "attempted to collect on a judgment that had been vacated," "refused to release [her] bank account despite having been provided with incontestable evidence that the judgment had been vacated," and that Palisades and the other co-Defendants "have engaged in a pattern of attempting to collect on judgments ... with no prior review and no meaningful attorney review." *See* FAC ¶¶ 157-164.[11] Numerous courts in the Southern District of New York have held "that the persistent filing of fraudulent debt collection lawsuits against New York consumers does fall within the scope of Section 349." *Agheepour*, 2015 WL 7758894, at *15 (citing *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 700 (S.D.N.Y. 2015); *Sykes v. Mel Harris &Assocs., LLC*, 757 F. Supp.2d 413, 428 (S.D.N.Y. 2010); *Midland Funding v. Giraldo*, 961 N.Y.S.2d 743, 752 (Sup. Ct. 2013); *White v. Fein, Such & Crane, LLP*, No. 15 Civ. 438 (JTC), 2015 WL 6455142, at *6 (W.D.N.Y. Oct. 26, 2015)).

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 34 of 64 PageID #: 597

Hunter v. Palisades Acquisition XVI, LLC, Not Reported in Fed. Supp. (2017)

Here, Plaintiff's allegation that Palisades' prior law firm "had been accused of fraudulent debt collection, and further had abandoned tens of thousands of debt collection lawsuits" supports her argument that Palisades' alleged conduct did affect or could affect a larger group of New York consumers. FAC ¶ 162. Thus, Plaintiff has adequately alleged "consumer-oriented" conduct under Section 349.

### 1. Whether Plaintiff Alleged Materially Misleading Conduct

Palisades further argues that Plaintiff alleges conduct that is neither materially misleading nor deceptive because "when Plaintiff received a letter ... informing her that a hold had been placed on her checking account ... she knew, or should have known, that the documents were related to the Judgment Collection Lawsuit which she successfully vacated." Def.'s Mem. at 14. [12] New York courts use an objective definition of "deceptive," which is "limited to those [acts] likely to mislead a reasonable consumer acting reasonably under the circumstances." Oswego, 85 N. Y.2d at 26. As discussed above, Plaintiff's allegations encompass more than the allegedly unlawful restraint on her bank account: Defendants are accused of obtaining a judgment against Plaintiff by "filing a false affidavit of service with the Court," FAC ¶ 23, and later of issuing a restraint on Plaintiff's bank account on the basis of a judgment that had been vacated. Id. ¶¶ 86-92. In short, Plaintiff alleges that Defendants held themselves out as creditors of Plaintiff, when they knew or should have known that they were not. This is precisely the type of conduct "likely to mislead a reasonable customer acting reasonably under the circumstances." Even if Plaintiff herself thought she successfully vacated the judgment in 2014, seeing a hold on her account due to the Collections Lawsuit judgment would likely mislead her, or a reasonable consumer standing in her shoes, into believing the debt was still due. The restraint "purport[s] to collect a valid legal judgment when, in fact, the judgment had already been vacated.... A reasonable consumer reading such a notice would likely be misled into believing that a valid court judgment existed and this belief could coerce a reasonable consumer into paying the judgment under the mistaken belief that they could be subject to even harsher penalties for failing to pay a valid legal judgment." Martinez v. Lvnv Funding, LLC, No. 14 Civ. 00677 (RRM) (ST), 2016 WL 5719718, at *3 (E.D.N.Y. Sept. 30, 2016). Thus, Palisades' Motion to Dismiss with respect to Plaintiff's Section 349 claim is DENIED. [13]

### D. Conversion

**\*9** To state a claim for conversion in New York, a plaintiff must assert that she has a "possessory right or interest in the property" and that the defendant asserted "dominion over the property or interference with it, in derogation of plaintiff's rights." Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 50 (2006). Palisades challenges the second element, arguing that Plaintiff's claim for conversion should be dismissed against it because "Palisades Acquisition is not vicariously liable for actions of its counsel in alleged violation of the law on conversion." Def.'s Mem. at 15. Under New York law, "from the nature of the attorney-client relationship itself, an attorney derives authority to manage the conduct of litigation on behalf of a client, including the authority to make certain procedural and tactical decisions." Hallock v. State of New York, 64 N.Y.2d 224, 230 (1984) (concluding that a client was bound by her attorney's decision to enter into a settlement without her consent because he had the apparent authority to act on her behalf). Lawyers are generally regarded as agents of their clients in pursing litigation and other legal activities. See Restatement (Third) of the Law Governing Lawyers § 26 cmt. B (2000). Under traditional principles of agency, a principal is liable for the actions of his agent "when the agents are acting 'in the scope of their authority.' " Plummer v. Atlantic Credit & Finance, Inc., 66 F. Supp. 3d 484, 493 (S.D.N.Y. 2014) (quoting Okyere v. Palisades Collection, LLC, 961 F. Supp. 2d 508, 515-16 (S.D.N.Y. 2013)).

Here, although Plaintiff's factual allegations are sparse, she has made a plausible claim that Palisades is vicariously liable for the actions of S&L in its collection activities against her. The FAC alleges that the basis for the restraint placed on Plaintiff's account was the default judgment Palisades had obtained in the Collections Lawsuit. FAC ¶ 66; Ex. H. The FAC also alleges that S&L purports to be "the attorney for Palisades in the collections lawsuit." Id. ¶ 63. Most importantly, it alleges that "Palisades Acquisition acts through the S&L Defendants for the collection of ... judgments." Id. ¶ 13. The FAC, therefore, sufficiently alleges that S&L's actions were done within the scope of S&L's authority as an agent for Palisades. See also Plummer, 66. F. Supp. 3d at 493-94 (finding a debt collector could be vicariously liable for the unlawful debt collection activities of its agent); Okyere, 961 F. Supp. 2d at 515-17 (collecting cases on vicarious liability of debt collectors and finding that debt collectors may be vicariously liable for the actions of their attorneys). Therefore, Palisades' motion to dismiss the conversion claim against it is DENIED.

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 35 of 64 PageID #: 598

Hunter v. Palisades Acquisition XVI, LLC, Not Reported in Fed. Supp. (2017)

Separately, Palisades seeks to dismiss Plaintiff's claim for punitive damages under her cause of action for conversion, claiming that "nothing the Defendants did can be described as having a fraudulent or evil motive or wanton disregard for Plaintiff's rights." [14] Def.'s Mem. at 16. Because punitive damages are a form of damages, not an independent cause of action, a motion to dismiss a prayer for relief in the form of punitive damages is "procedurally premature." *Okyere v. Palisades Collection, LLC,* 961 F. Supp. 2d 522, 536 (S.D.N.Y. 2013); *see also Denton v. McKee,* 332 F. Supp. 2d 659, 667 (S.D.N.Y. 2004) (same).

### III. MOTION TO STRIKE

#### A. Rule 12(f) Legal Standard

Rule 12(f) of the Federal Rules of Civil Procedure provides that a court may strike from a pleading any redundant, immaterial, impertinent, or scandalous matter. Fed. R. Civ. P. 12(f). Allegations may be stricken "where they have no bearing on the parties' claims or defenses, will likely be prejudicial, or where they have criminal overtones." *Restis v. Am. Coal. Against Nuclear Iran, Inc.,* 53 F. Supp. 3d 705, 731 (S.D.N.Y. 2014) (citing *Aventis Envtl. Sci. USA LP v. Scotts Co.,* No. 99 Civ. 4015 (LAP) (THK), 2003 WL 1787295, at *2 (S.D.N.Y. Apr. 3, 2003)). However, "the standard that must be met in order to strike material is 'a stringent one.' " *TouchTunes Music Corp. v. Rowe Int'l Corp.,* No. 07 Civ. 11450 (RWS), 2010 WL 3910756, at *4 (S.D.N.Y. Oct. 5, 2010) (quoting *Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano,* No. 03 Civ. 15 (RWS), 2007 WL 1687044, at *3 (S.D.N.Y. June 11, 2007)). "[I]t is settled that the motion [to strike] will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir. 1976); *see also TouchTunes Music Corp.,* 2010 WL 3910756, at *4 ("A motion to strike immaterial or impertinent matter from a pleading will ordinarily not be granted unless the matter sought to be stricken clearly can have 'no possible relation' to the matter in controversy.") (quoting *Gleason v. Chain Serv. Rest.,* 300 F. Supp. 1241, 1257 (S.D.N.Y. 1969), *aff'd* 422 F.2d 343 (2d Cir. 1970)).

#### B. Discussion

**\*10** Palisades moves to strike Exhibits C and S to the FAC. Exhibit C is the amended class action complaint in *Bernhart v. Asia Funding, Inc.,* 13 Civ. 2935 (RPP). Exhibit S is a Form 10-K Annual Report submitted by Asta Funding, Inc. for the

fiscal period that ended on September 30, 2010. Palisades argues that Exhibit C "is completely irrelevant to Plaintiff's [sic] liability and damages claims" and notes that there is no overlap in parties between the instant matter and *Bernhart.* Def.'s Mem. at 17. With respect to Exhibit S, Palisades argues that the annual report is irrelevant to Plaintiff's allegation that Defendants unlawfully attempted to execute a vacated judgment against Plaintiff. *Id.* at 18. Plaintiff responds that both documents "show that Palisades is part of a corporate apparatus with a history of perpetrating sewer service against numerous consumers, in conjunction with the very process server who falsely swore to serving Ms. Hunter with the papers in the collections lawsuit," which she argues supports the consumer-oriented prong of her Section 349 claim. Pl.'s Mem. at 29.

Although Rule 12(f) allows a Court to strike "immaterial" matters from a pleading, "[c]ourts should not tamper with the pleadings unless there is a strong reason for doing so." *Lipsky,* 551 F.2d at 893. Because "the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial," courts should be especially reticent to wade into evidentiary issues on the basis of the pleadings alone. *Id.* In this case, both the FAC and Exhibit C contain allegations of sewer service perpetrated by Sarsour. *See* FAC ¶¶ 22-36; Ex. C ¶¶ 381-89. The *Bernhart* complaint was filed in 2013, eighteen months before Defendants allegedly unlawfully restrained Plaintiff's bank account. Exhibit S shows that Palisades is the subsidiary of Asta Funding, and related to Palisades Collections LLC, two of the defendants in *Bernhart.* The existence of allegations of impropriety against a process server used by Palisades (and related entities) may ultimately be relevant in three respects: (1) Palisades' knowledge of allegations of impropriety against one of its process servers could bear on the level of review required under 15 U.S.C. § 1692e(3) before issuing a restraint; (2) Palisades' knowledge of allegations of impropriety against one of its process servers and against similar entities could inform whether or not their actions in this case were "reckless" or "willful," as required for the award of punitive damages Plaintiff seeks under both her Section 349 and conversion claims; and (3) the existence of similar allegations of misconduct could support Plaintiff's argument that Palisades' actions in this case had the "potential to affect similarly situated consumers," as required for Plaintiff's Section 349 claim. The Court declines to rule on the eventual admissibility of Exhibit C, Exhibit S, or similar evidence at this time; however, because striking part of a pleading requires a finding that "no evidence in support of the allegation would be admissible," the Court will not strike the

Case 1:25-cv-04295-EK-LKE     Document 43-5     Filed 02/23/26     Page 36 of 64 PageID #: 599

Hunter v. Palisades Acquisition XVI, LLC, Not Reported in Fed. Supp. (2017)

exhibits at this time. *See In re OSG Sec. Litig.,* 12 F. Supp. 3d 619, 621-22 (S.D.N.Y. 2014) ("While allegations from another lawsuit are not evidence ... plaintiffs need not provide admissible proof at [the pleadings] stage."). Palisades' motion is DENIED.

## IV. CONCLUSION

Palisades' motion to dismiss pursuant to Rule 12(b)(6) or to strike pursuant to Rule 12(f) is DENIED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 31.

It is SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5513636

---

## Footnotes

1    The following facts are based on the allegations in the FAC, which the Court accepts as true for purposes of the instant motion. *See Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012).

2    In 2010, Wolpoff & Abramson, L.L.P. was shut down as a result of a lawsuit filed against the firm by the Minnesota attorney general. *Id.* ¶ 60. However, Plaintiff alleges that Wolpoff & Abramson never withdrew from the Collections Lawsuit, and no other attorney ever appeared in the case. *Id.* ¶ 62. In fact, Wolpoff & Abramson is still listed as the attorney of record for Palisades. *Id.* Ex. G.

3    According to the FAC, Sarsour attested that he served and subsequently mailed the summons and complaint to 2375 Bruner Ave, 1st Fl., Bronx, NY 10466. *Id.* ¶¶ 25, 27. However, the Court notes that Sarsour's affidavit states that he visited 4375 Bruner Ave. and mailed a copy of the summons and complaint to the same address. *Id.* Ex. B.

4    S&L is a debt collection law firm that regularly sends collection letters, files lawsuits, and uses post-judgment remedies to collect consumer debt. *Id.* ¶¶ 11, 150(d).

5    Sharinn is the president of S&L. *Id.* ¶¶ 12, 150(f).

6    "Sewer service" is the term used when a process server "fail[s] to serve the summons and complaint but still submit[s] proof of service to the court." *Sykes v. Mel S. Harris and Assocs. LLC,* 780 F.3d 70, 76 (2d Cir. 2015). The Second Circuit has described sewer service as "an ignominious practice which ... provide[s] a fertile field for the fleecing of the poor and the disadvantaged." *Velazquez v. Thompson,* 451 F.2d 202, 204 (2d Cir. 1971).

7    Palisades also asserts that Plaintiff has failed to allege a basis for recovery of punitive damages in connection with her claim for conversion. Def.'s Mem. at 7.

8    For example, the Second Circuit has held that it is "false and misleading" for an attorney to send a collection letter using her professional letterhead or signature if she was not meaningfully involved in the determination that the letter should be sent. *See Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 301 (2d Cir. 2003); *see also Clomon v. Jackson,* 988 F.2d 1314, 1320-21 (2d Cir. 1993) (same).

9    Additionally, Plaintiff specifically invoked Palisades' failure to fulfill the requirements of an "initial communication" under § 1692(g) and the lack of "meaningful review" conducted by Palisades' attorneys of the Collections Lawsuit, in violation of § 1692e(3). *Id.* ¶¶ 78-92; 100-02.

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 37 of 64 PageID #: 600

Hunter v. Palisades Acquisition XVI, LLC, Not Reported in Fed. Supp. (2017)

10    Palisades argues that Plaintiff did not allege "sewer service" in connection with her Section 349 claim and seeks to preclude Plaintiff from making any arguments about sewer service with respect to Section 349. Reply Memorandum of Law in Support of Palisades' Motion to Dismiss ("Reply Mem.") (Doc. 43) at 9. Palisades is wrong. Paragraph 157, under the heading "Second Claim for Relief: Violations of N.Y. Gen. Bus. Law § 349," reads: "Defendants Palisades Acquisition obtained a judgment against Ms. Hunter via sewer service, by making false representations in sworn affidavits submitted to the court." FAC ¶ 157.

11    Section 349 has a three-year statute of limitations. *Gaidon v. Guardian Life Ins. Co. of Am.,* 96 N.Y.2d 201, 210 (2001). Plaintiff's allegation that Defendant obtained a default judgment against her via sewer service in 2007 falls well outside the statute of limitations. FAC ¶¶ 15-45, 154. However, the Court finds that equitable tolling applies to those allegations. Equitable tolling is appropriate where "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch v. Christie's Intern. PLC,* 699 F.3d 141, 157 (2d Cir. 2014) (internal quotations omitted). In this case, Plaintiff has alleged that Palisades concealed their debt collection activities from her through the use of sewer service. *See e.g.,* FAC ¶ 154. "Because sewer service purposefully ensures that a party is never served, it is plausible that defendants' acts were 'of such character as to conceal [themselves]' to warrant equitable tolling." *Sykes v. Mel Harris and Assocs., LLC,* 757 F. Supp. 2d 413, 427 (S.D.N.Y. 2010) (quoting *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 349-50 (1874)). Because Plaintiff discovered the default judgment shortly before February 24, 2014, FAC ¶¶ 47-52, and her initial complaint was filed on November 11, 2016, her claim under Section 349 is timely under equitable tolling.

12    Palisades also notes that Plaintiff's allegation that her discovery of the hold on her Chase account on November 25, 2015 "was the first time [Plaintiff] knew or could have reasonably known that the Collections Lawsuit was filed against her or that a default judgment was entered against her" is inconsistent with Plaintiff's other allegation that she learned of the Collections Lawsuit in 2014. *Compare* FAC ¶ 99 *with id.* ¶ 48-53; *see also* Def.'s Mem. at 14. The Court agrees that the FAC is internally inconsistent on this point. A court is not obliged to reconcile and accept as true "pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference ..." *Xi Wei Lin v. Chinese Staff & Workers' Ass'n,* No. 11 Civ. 3944 (RJS), 2012 WL 5457493, at *4 (S.D.N.Y. Nov. 8, 2012) (quoting *Fisk v. Letterman,* 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005)). Thus, in determining whether Plaintiff plead materially misleading conduct, the Court will not consider Plaintiff's allegation that she first learned of the Collections Lawsuit when she first learned of the hold on her account.

13    Palisades seems to argue, in its Reply Memorandum, that "Plaintiff has not plead that Palisades ... would be liable for violations of the NYGBL § 349 if the S&L Defendants were held liable." Reply Mem. at 7. To the extent that Palisades moves to dismiss Plaintiff's Section 349 cause of action on the grounds that it is not vicariously liable for its attorneys' debt collection activities on its behalf, such an argument was raised for the first time on reply and will not be considered. *See Mohamed v. Nolan Law Group,* 574 Fed.Appx. 45, 46 n.1 (2d Cir. 2014) ("[W]e will not consider an argument raised for the first time in a reply brief....") (quoting *United States v. Yousef,* 327 F.3d 56, 115 (2d Cir. 2003)).

14    On page 7 of its opening memorandum, Palisades states that Plaintiff "failed to sufficiently allege a basis to recover punitive damages under the NYGBL § 349 and/or Conversion." Def.'s Mem. at 7. However, in Palisades' further discussion of punitive damages in its opening and reply briefs, Palisades only mentions punitive damages in connection with conversion. *See* Def.'s Mem. at 16; Reply Mem. at 10. To the extent that Palisades still seeks to prevent Plaintiff from seeking punitive damages with respect to her Section 349 claim, that is denied for the same reasons stated above with respect to Plaintiff's conversion claim.

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 38 of 64 PageID #: 601

**Hunter v. Palisades Acquisition XVI, LLC, Not Reported in Fed. Supp. (2017)**

---

**End of Document**                                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Mali v. British Airways, Not Reported in Fed. Supp. (2018)

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 39 of 64 PageID #: 602

2018 WL 3329858
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dr. Amol D. MALI, Plaintiff,
v.
BRITISH AIRWAYS, Defendant.

17 Civ. 685 (KPF)
|
Signed 07/06/2018

**Attorneys and Law Firms**

Amol D. Mali, Shorewood, WI, pro se.

Anthony U. Battista, Jean Marie Cooper Rose, Marissa Nicole
Lefland, Condon and Forsyth LLP, New York, NY, for
Defendant.

OPINION AND ORDER

KATHERINE POLK FAILLA, United States District Judge

**\*1** This suit arises from the unfortunate stranding of
Plaintiff, Dr. Amol D. Mali, outside the Mumbai airport
for one night in January of 2015, and his subsequent
frustration with the response he received from Defendant
British Airways. In brief, Plaintiff purchased a round-trip
ticket from Chicago to Mumbai, with layovers in London
in each direction. On his way to India, Plaintiff flew from
Chicago to London and from London to Mumbai without
incident, but he was not permitted to board his return flight
from Mumbai to London. Though Plaintiff is, and was at the
time, a lawful permanent resident of the United States, he was
told by Defendant's representatives in Mumbai that he did
not possess the proper American immigration records to pass
through the United Kingdom. After an anxious night spent
outside the airport waiting to contact his wife, Plaintiff was
able to purchase a ticket on another airline that would take him
directly from Mumbai to the United States. Upon his return
home, Plaintiff researched whether he had properly been
denied boarding in Mumbai. After arriving at the conclusion
that he had not, Plaintiff submitted at least two complaints
to Defendant. Though he was refunded a portion of his
ticket price and given a voucher for future travel, Plaintiff
remained dissatisfied with the result and initiated this lawsuit

on January 25, 2017, exactly two years after he was stopped
in Mumbai.

Defendant now moves under Federal Rule of Civil Procedure
12(b)(2) to dismiss the case for lack of personal jurisdiction
and under Rule 12(b)(6) for failure to state a claim. For
the reasons set forth in this Opinion, Defendant's motion is
granted in part under Rule 12(b)(2) and in part under Rule
12(b)(6), such that Plaintiff's claims are dismissed in their
entirety.

BACKGROUND [1]

**A. Factual Background**

**1. The Parties**
Plaintiff, who is proceeding *pro se*, is an Associate Adjunct
Professor of Clinical and Translational Science who resides
in Wisconsin. (Am. Compl., Ex. 16). Plaintiff arrived in the
United States in 1995, and has maintained lawful permanent
resident status since 2004. (Am. Compl. 15; *id.* at Ex. 4).
Defendant is a foreign air carrier "duly organized and existing
under the laws of England and Wales." (O'Rourke Decl. ¶ 4).
The company is headquartered in Harmondsworth, England.
(*Id.*).

**2. Plaintiff's Immigration Documentation**
**\*2** At the time of the events at issue in this action,
Plaintiff was in possession of a legal permanent resident
card (commonly known as a "Green Card") and a Form I-797C,
in addition to his Indian passport. (Am. Compl. 9). The
Form I-797C is not itself a confirmation of any particular
immigration status; it reflects that Plaintiff had applied to
replace his Green Card and, toward that end, had received an
appointment at the United States Citizenship and Immigration
Services ("USCIS") office in Milwaukee, Wisconsin, on
October 6, 2014. (*Id.* at Ex. 7). Plaintiff's I-797C displays
an endorsement stamp that reflects that he appeared at the
appointment as required. (*Id.*).

Plaintiff first received permanent resident status on May 10,
2014. (Am. Compl., Ex. 4). Plaintiff's Green Card was due
to expire on January 8, 2015, so when Plaintiff appeared for
his appointment at USCIS in October 2014, USCIS affixed
a sticker to the back of it, which sticker served to extend the
card's validity through the end of July 2015. (*Id.*; *see also* Am.
Compl. 12).

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 40 of 64 PageID #: 603

Mair v. British Airways, Not Reported in Fed. Supp. (2018)

Plaintiff has appended to his Amended Complaint and opposition brief numerous communications with immigration attorneys and foreign consular employees regarding the reliance on certain paperwork for international travel. (*See* Am. Compl., Ex. 18; Pl. Opp., Ex. A). As the Court offers no view on the sufficiency of Plaintiff's immigration documents, the significance of the opinions offered by those individuals is not evaluated herein.

### 3. Plaintiff's Travel to Mumbai

On December 13, 2014, Plaintiff booked a round trip flight with Defendant from Chicago, Illinois, to Mumbai, India. (Pl. Opp., Ex. B at 2). As scheduled, Plaintiff traveled from Chicago to Mumbai on January 14, 2015, stopping for a layover at London's Heathrow Airport. (Am. Compl. 8). He was due to return to Chicago, via the same route and airline, on January 25, 2015. (*Id.* at 8-9).

The U.K. imposes certain documentation requirements on air passengers who have stopovers in U.K. airports. (Am. Compl., Ex. 12). These requirements include both a valid passport and a transit visa. (*Id.* at 1 ("You'll need a visa to pass through the UK in transit (unless you're exempt).") ). However, there are certain exemptions to the transit visa requirement. [2] Passengers who are not subject to an articulated visa exemption are required to obtain a transit visa to pass through a U.K. airport, even if their stop is simply a layover.

Upon arriving at the Mumbai airport on January 25, 2015, Plaintiff was informed by Defendant's agents that he would not be allowed to board his scheduled flight to London because he did not have a U.K. transit visa. (Am. Compl. 9-10). Having presented his Green Card and I-797C letter at the Chicago airport prior to the first leg of his journey—and having been permitted to board that flight to the U.K.—Plaintiff was understandably frustrated and confused. (*See id.* at 9 ("My travel documents ... were considered valid and sufficient for the entire journey from Chicago to Mumbai, including UK transit."); Pl. Opp. 2 ("I didn't need [a] visa for [ ] UK transit on the way to Mumbai from Chicago.") ). Nonetheless, Defendant's agents in Mumbai told Plaintiff that his immigration papers were insufficient to qualify him for an exemption to the U.K. transit visa requirement, and that he could not travel through London without one. (Am. Compl. 10). Plaintiff was advised that because his Green Card had expired, he "needed an I-797 letter stating that the validity of

[his] U.S. permanent resident card had been extended by one year." (*Id.*).

**\*3** Because Defendant would not permit Plaintiff to board the plane, and because he had no other valid ticket, Plaintiff had to leave the airport. (Am. Compl. 16-18). He spent the night waiting outside before he was able, with the assistance of his wife in Wisconsin, to arrange alternate transportation to the United States the next morning. (*Id.* at 18-20). This second ticket was booked with United Airlines on a flight that took him directly to Newark, New Jersey, without requiring a stop in the U.K. (*Id.* at Ex. 2). Once he was able to purchase and produce another ticket, Plaintiff was allowed to reenter the Mumbai airport—approximately nineteen hours after he was initially forced to leave. (*Id.* at 19-22). From Newark, Plaintiff traveled on to Chicago. (*Id.* at Ex. 2). This ticket came at a significant expense to Plaintiff of more than $800. (*Id.*).

### 4. Plaintiff's Complaints and Defendant's Responses

Upon his successful return to the United States, Plaintiff lodged complaints with the Better Business Bureau ("BBB") and the Department of Transportation ("DOT"). (Am. Compl., Ex. 8-9; Pl. Opp., Ex. G). Though neither party provided the Court with copies of Plaintiff's submissions, the responses he received from Defendant are in the record and reflect that Plaintiff's complaints were transmitted by the BBB and the DOT to Defendant for a response. Defendant's responses indicate that Plaintiff disputed whether he was properly denied boarding in Mumbai, and that he requested compensation or a refund. (*See* Am. Compl., Ex. 8 ("[O]ur staff in Mumbai were correct in advising you that you were unable to travel ... taking into account [that information] I would be unable to meet your request for compensation."); Pl. Opp., Ex. G ("[W]e were correct in denying you boarding on our flight to London Heathrow[,] 25 January, 2015 ... The ticket you had purchased is non-refundable."); Am. Compl., Ex. 9 ("The ticket you had purchased ... is [ ] non-refundable.") ).

Defendant's August 17, 2015 reply to Plaintiff's complaint to the DOT enumerates the reasons why he was denied boarding. (Am. Compl., Ex. 8). In Defendant's response to Plaintiff's BBB complaint, Defendant issued Plaintiff a $350 eVoucher "to offset the loss of your return [tickets]" and refunded the "refundable taxes" paid on those tickets. (Pl. Opp., Ex. G; Am. Compl., Ex. 9). Defendant's further responses to Plaintiff's follow-up questions and complaints simply restate Defendant's belief that its agents correctly denied Plaintiff

boarding and reiterated the reasoning behind the agents' actions. (*Id.*).

**B. Procedural Background**
Plaintiff filed the initial complaint in this action on January 25, 2017. (Dkt. #1). On June 1, 2017, Defendant filed a letter requesting a pre-motion conference and seeking leave to file a motion to dismiss the complaint. (Dkt. #7). Plaintiff and Defendant both appeared for the initial conference on August 9, 2017. (*See* Dkt. #22). At that conference, Plaintiff was ordered to file either his amended complaint or a letter advising the Court that he did not intend to amend his complaint. (*Id.*). Plaintiff ultimately amended his pleadings on October 16, 2017. (Dkt. #27). Defendant filed its motion to dismiss on December 1, 2017. (Dkt. #31-33). Following an extension of his time to respond (Dkt. #35), Plaintiff filed his opposition on February 9, 2018 (Dkt. #37), and Defendant replied on March 2, 2018. (Dkt. #42).

**DISCUSSION**

**A. Plaintiff's *Pro Se* Status**
It is a credit to Plaintiff that his submissions to the Court have been comprehensive and thoughtful. "[A] pro se complaint, 'however inartfully pleaded,' [is] held to 'less stringent standards than formal pleadings drafted by lawyers.' " *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (quoting *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) ). In light of Plaintiff's *pro se* status, the Court "afford[s] [him] a special solicitude[,]" and, in this regard, will liberally construe his pleadings and motion papers. *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). Under this directive, the Court is to read Plaintiff's " 'submissions to raise the strongest arguments they suggest.' " *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (quoting *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) ).

**\*4** The Court applies this special solicitude by looking to Plaintiff's opposition to the motion and the documents attached thereto, in addition to the Amended Complaint and its well-pleaded allegations. Any concern over "harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered," and is negated when the plaintiff "relie[s] heavily upon these documents in framing the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949

F.2d 42, 47-48 (2d Cir. 1991) ). As Plaintiff had "actual notice of all the information" in these documents, the Court will consider them in assessing the sufficiency of Plaintiff's claims. *Id.*; *see also Washington v. James*, 782 F.2d 1134, 1138-39 (2d Cir. 1986) (admonishing that the district court "should have given [the *pro se* plaintiff] the benefit of the doubt ... treating the complaint as if it had been amended.").

**B. Plaintiff's Claims**
In his Amended Complaint, Plaintiff makes many factual allegations, not all of which are specifically linked to his legal claims. The Court considers Plaintiffs' allegations with the liberality the law requires, and thus construes the Amended Complaint to raise the following claims:

i) *Breach of Contract*: Plaintiff brings a breach of contract claim, and the Court understands his allegation to be that Defendant was contractually obligated to allow him onto the flights for which he had tickets, and it breached that obligation when he was denied boarding in Mumbai. (*See* Am. Compl. 1, 10).

ii) *Negligence*: The Court reads Plaintiff's negligence claim (Am. Compl. 1) to stem from the night that Plaintiff spent outside the Mumbai airport after Defendant's employees forced him to exit because he did not have the correct documentation. (*Id.* at 16-18). Plaintiff alleges that his treatment has resulted in "undesirable physical changes," though he gives no further detail. (*Id.* at 30).

iii) *Gross Negligence*: Plaintiff next alleges gross negligence on the part of Defendant. (Am. Compl. 1). The Court understands this to be an extension of his negligence claim arising out of his night on the sidewalk outside the Mumbai airport. (*Id.* at 16-18).

iv) *Negligent Infliction of Emotional Distress* [3] : Plaintiff's negligent infliction of emotional distress claim also relates to his night outside the airport. Plaintiff details the experience as a harrowing one, and states that "[t]his trauma continues to subject [him] ... to significant suffering." (Am. Compl. 23). Plaintiff attributes this trauma to the actions of Defendant's representatives in Mumbai and the repercussions flowing therefrom, and states that the agents were "derogatory" toward him before forcing him "to exit the airport in the thick of the night." (*Id.* at 17-18).

v) *Fraud*: The Court construes Plaintiff's claim for "[m]aking bogus statements" as an allegation of fraud

relating to Defendant's customer service representatives' statements to Plaintiff after the events in Mumbai. (Am. Compl. 1, 25-26 ("[s]taff of British Airways has repeatedly provided false immigration information to me") ). Plaintiff attaches to his papers three such communications, each of which addresses the sufficiency of his extended Green Card and I-797C letter with respect to U.K. transit visa requirements. (*Id.* at Ex. 8-9; Pl. Opp., Ex. G).

vi) *Federal Statutory Claims*: Finally, Plaintiff seeks to bring four claims under federal statutes and regulations. (Am. Compl. 1-2). Though Plaintiff sources these claims to the same facts as his contract and tort claims, there is no private right of action under any of these statutes or regulations, and these claims therefore fail as a matter of law. [4]

## C. Defendants Motion to Dismiss Under Rule 12(b)(2) Is Granted in Part and Denied in Part

**\*5** Defendant moves to dismiss Plaintiff's claims for lack of personal jurisdiction pursuant to Rule 12(b)(2). (Def. Br. 11-13). [5] When evaluating a motion to dismiss pursuant to Rule 12(b)(2), a district court may "consider[ ] materials outside the pleadings ... without converting a motion to dismiss for lack of personal jurisdiction into a motion for summary judgment." *Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013); *see also Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990) (discussing procedure for challenging personal jurisdiction).

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). Plaintiff must provide "legally sufficient allegations of jurisdiction." *Id.* These allegations are viewed in the "light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]" *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 341 (S.D.N.Y. 2015) (quoting *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993) ).

To determine whether the exercise of personal jurisdiction is proper, the Court engages in a two-part inquiry. *First*, the Court looks "at whether there is a basis for personal jurisdiction under the laws of the forum state." *Clemmons v. Hodes*, No. 15 Civ. 8975 (KPF), 2017 WL 4326111, at

\*7 (S.D.N.Y. Sept. 26, 2017) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) ). Plaintiff in this case argues that the Court can exert both general jurisdiction, due to Defendant's "systematic and continuous ties" with New York, and specific jurisdiction under New York's long-arm statute. (Pl. Opp. 5, 8-9). *See also* N.Y. C.P.L.R. §§ 301-02. *Second*, if personal jurisdiction may be properly exercised under the first prong, the Court then evaluates whether the assertion of jurisdiction is compatible with constitutional due process requirements. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007); *see also Int'l Shoe Co. v. Washington*, 325 U.S. 310, 315 (1945). These due process considerations require that the defendant have "certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Licci*, 732 F.3d at 169 (internal brackets omitted) (quoting *Int'l Shoe*, 326 U.S. at 316).

### 1. The Court Lacks General Jurisdiction over Defendant

A court's exercise of general jurisdiction under New York Civil Practice Law and Rules § 301 requires that "a company has engaged in such a continuous and systematic course of doing business in New York that a finding of its presence in New York is warranted." *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014) (internal quotation marks and brackets omitted) (quoting *Landoil Res. Corp. v. Alexander & Alexander Servs.*, 77 N.Y.2d 28, 33 (1990) ). Defendant's "continuous activity of some sort[ ] within a state ... is not enough to support the demand that the corporation be amendable to suits unrelated to that activity." *Goodyear Dunlop Tires Ops. v. Brown*, 564 U.S. 915, 927 (2011) (internal quotation marks omitted) (quoting *Int'l Shoe*, 326 U.S. at 318). Rather, a corporation's "affiliations with the State" must be "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* at 919 (quoting *Int'l Shoe*, 326 U.S. at 317).

**\*6** Defendant contends that general jurisdiction can be exercised over a party only "where it is incorporated or where it maintains its principal place of business[,]" and though Defendant's argument overstates the relevant case law, the Court nonetheless finds that it lacks general jurisdiction over Defendant. (Def. Br. 12). To be sure, Defendant is correct that, broadly speaking, general jurisdiction does not lie over a party in a forum where that entity is neither incorporated nor maintains its principal place of business. *Goodyear*, 564 U.S. at 924. Even still, "*Goodyear* did not hold that a corporation

may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums." *Daimler AG v. Bauman*, 571 U.S. 117, 137-38 (2014) (alteration in original).

Plaintiff argues that due to the "very high numbers" of Defendant's "gross revenue from its New York and US business" the Court can exercise general jurisdiction over Defendant. (Pl. Opp. 5). While it appears that Defendant maintains at least one office in New York (*see* Am. Compl., Ex. 8, 19), and the airline operates flights in to and out of New York airports, these contacts do not rise to the level required to "render [Defendant] essentially at home in [New York]." *Goodyear*, 564 U.S. at 919. Such "high numbers" must be viewed relative to Defendant's overall activity "nationwide and worldwide," a view that minimizes their magnitude considerably. *Daimler*, 571 U.S. at 139 n.20.

Even accepting the figures that Plaintiff presents to the Court, it cannot be said with any certainty that these derive substantially from activities in New York, and if these activities "sufficed to allow adjudication of this [India]-rooted case in [New York], the same global reach would presumably be available in every other State in which [Defendant's] sales are sizable." *Daimler*, 571 U.S. at 139; *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 640 (2d Cir. 2016) ("In *Daimler*, the Court rejected the idea that a corporation was subject to general jurisdiction in every state in which it conducted substantial business."). It is only in the "exceptional case" that general jurisdiction lies over a corporation "in a forum other than its formal place of incorporation or principal place of business" and the corporation's contacts with that forum must "be so substantial and of such a nature as to render the corporation at home in that State." *Daimler*, 571 U.S. at 139 n.19. Plaintiff does not, and cannot, support an argument that Defendant's relatively limited activities in New York amount to such an exceptional case, and the Court therefore cannot exercise general jurisdiction over Defendant. *See Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016) (holding that there was no "exceptional" general jurisdiction where as "[t]he [defendants] have not transported their princip[al] 'home' to the United States, even temporarily"); *Reich v. Lopez*, 38 F. Supp. 3d 436, 455, 457 (S.D.N.Y. 2014) (holding that defendant's use of New York office space and New York banks, among other factors, "is not one of those rare instances" in which a defendant "is subjected to

a state's general jurisdiction irrespective of where they are domiciled").

### 2. The Court Lacks Specific Jurisdiction Under New York Law over Plaintiff's Claims Arising out of Events in Mumbai

"Specific jurisdiction is available when the cause of action sued upon arises out of the defendant's activities in a state." *Brown*, 814 F.3d at 624. New York's long-arm statute permits the exercise of personal jurisdiction over a non-domiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). The inquiry under Section 302(a)(1) of the statute is twofold: "[i] [t]he defendant must have transacted business within the state; and [ii] the claim asserted must arise from that business activity." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006). The Court must have such specific jurisdiction over each of Plaintiff's individual claims. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) ("A plaintiff must establish the court's jurisdiction with respect to *each* claim asserted.").

**\*7** Thus, while jurisdiction may be "proper even though the defendant never enters New York," a defendant must have engaged in purposeful activities in the state and there must be a "substantial relationship between the transaction and the claim[s] asserted." *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 (2016) (quoting *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) ). Though Defendant inarguably engages in purposeful activities targeting airports and travelers located in New York, there exists no "substantial relationship" between that business activity and Plaintiff's claims in this lawsuit.

Even on a liberal reading of Plaintiff's pleadings, it is evident that his tort claims arise almost entirely out of Defendant's conduct in Mumbai. (Pl. Opp. 1 ("Denied boarding and the treatment I got from the Defendant over many following months led to this lawsuit.") ). [6] As laid out above, Plaintiff brings claims for negligence, gross negligence, negligent infliction of emotional distress, and breach of contract. (Am. Compl. 1). While he correctly states that "there is no bright-line test for determining whether the nexus between [P]laintiff's claims and [D]efendant's transaction in New York is present," Plaintiff ascribes undue reliance on Defendant's bank transactions in New York. (*See* Pl. Opp. 9, 11). The majority of his tort claims arise out of Defendant's conduct in the Mumbai airport, and while his ticket purchase transaction

may have passed through or occurred in New York, such facts are insufficient to warrant the exercise of specific jurisdiction over these claims. (*See* Pl. Opp., Ex. B at 2).

### a. The Court Lacks Specific Jurisdiction over Plaintiff's Breach of Contract Claim

Plaintiff's breach of contract claim arises out of his denied boarding and Defendant's concomitant failure to transport him from Mumbai to Chicago. A plaintiff must allege four elements to state a claim for breach of contract under New York law: "[i] formation of a contract, [ii] performance by the plaintiff, [iii] breach[,] and [iv] 'resulting damage.' " *McCormick v. Favreau*, 929 N.Y.S.2d 572, 572 (3d Dep't 2011) (quoting *Clearmont Prop., LLC v. Eisner*, 872 N.Y.S.2d 725, 728 (3d Dep't 2009) ). The breach that Plaintiff alleges occurred in Mumbai when he was not allowed to board the plane to London. (Am. Compl. 16-18). There is no "substantial relationship" between Defendant's business transactions in New York and the conduct that gives rise to Plaintiff's breach of contract claim. The Court does not have personal jurisdiction over Defendant with respect to the breach of contract claim.

### b. The Court Lacks Specific Jurisdiction over Plaintiff's Negligence Claim

Plaintiff next brings a claim for negligence stemming from his treatment by Defendant's employees in Mumbai insofar as they forced him to remain outside the airport until he was able to purchase another ticket. (Am. Compl. 16-18). "Under New York law, a plaintiff must establish the following elements for a negligence claim: [i] defendant owed plaintiff a duty of care; [ii] defendant breached that duty; and [iii] the breach proximately caused plaintiff's injury." *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007). Moreover, in general, a plaintiff, cannot recover purely economic losses on a claim of negligence. *See Am. Tel. & Tel. Co. v. N.Y.C. Human Res. Admin.*, 833 F. Supp. 962, 982-83 (S.D.N.Y. 1993) (upholding dismissal of negligence claim because there was "no contention [that the] alleged negligence resulted in personal injury or property damage.").

**\*8** As with Plaintiff's claim for breach of contract, the events giving rise to this claim occurred in Mumbai. (Am. Compl. 16-18). There is no "substantial relationship" between Defendant's activities in New York and Plaintiff's negligence

### c. The Court Lacks Specific Jurisdiction over Plaintiff's Gross Negligence Claim

Plaintiff's gross negligence claim also flows from the lack of care shown to him by Defendant's employees in Mumbai. Gross negligence "differs in kind as well as degree from ordinary negligence." *Kinsey v. Cendant Corp.*, No. 04 Civ. 582 (RWS), 2005 WL 1907678, at \*7 (S.D.N.Y. Aug. 10, 2005) (quoting *Sutton Park Dev. Corp. Trading Co. Inc. v. Guerin & Guerin Agency, Inc.*, 745 N.Y.S.2d 622, 624 (3d Dep't 2002) ). To state a claim for gross negligence, Plaintiff must allege conduct by Defendant that " 'smacks of intentional wrongdoing' " or "evinces a reckless disregard for the rights of others." *Purchase Partners, LLC v. Carver Fed. Sav. Bank*, 914 F. Supp. 2d 480, 497 (S.D.N.Y. 2012) (quoting *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 367-68 (S.D.N.Y. 2008) ). As such, "a party is grossly negligent when it fails to exercise even slight care or slight diligence." *Goldstein v. Carnell Assocs., Inc.*, 906 N.Y.S.2d 905, 905-06 (2d Dep't 2010) (internal quotations omitted). Once again, even assuming that Plaintiff has alleged facts sufficient to satisfy the stringent requirements of a gross negligence claim, the offending conduct occurred in Mumbai. As with Plaintiff's negligence claim, this Court does not have specific jurisdiction over Defendant.

### d. The Court Lacks Specific Jurisdiction over Plaintiff's Negligent Infliction of Emotional Distress Claim

Plaintiff's next claim, for negligent infliction of emotional distress, stems as well from the time that he was forced to spend outside the Mumbai airport until he could secure a new ticket. A successful claim for negligent infliction of emotional distress in New York may be made "by showing 'a breach of a duty of care resulting directly in emotional harm ... even though no physical injury occurred,' as long as 'the mental injury [is] a direct, rather than a consequential, result of the breach, and the claim ... possess[es] some guarantee of genuineness." *Mortimer v. City of New York*, No. 15 Civ. 7186 (KPF), 2018 WL 1605982, at \*27 (S.D.N.Y. Mar. 29, 2018) (alterations in original) (quoting *Taggart v. Costabile*, 14 N.Y.S.3d 388, 397 (2d Dep't 2015) ). Nonetheless, "New York courts have expressed a 'longstanding reluctance to recognize causes of action for negligent infliction of emotional distress,

especially in cases where the plaintiff suffered no independent physical or economic injury.' " *Colo. Capital Invs., Inc. v. Owens,* 304 Fed.Appx. 906, 908 (2d Cir. 2008) (summary order) (quoting *Broadnax v. Gonzalez,* 2 N.Y.3d 148, 153 (2004) ).

While Plaintiff alleges that he "continues to [be] subject ... to significant suffering" as a consequence of his distress at being forced to wait outside the airport overnight, such impact stems from his treatment in Mumbai. (Am. Compl. 20-21, 23). Those activities that tie Defendant to New York are unrelated to the actions that give rise to Plaintiff's claim for negligent infliction of emotional distress; the Court therefore does not have specific jurisdiction over claims, like this one, that arise from such conduct. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 58 (2d Cir. 2012) ("[n]o articulable nexus or substantial relationship exists between [Defendant's] general use of its ... account for wire transfers through New York and the specific ... activities ... underlying [Plaintiff's] claims." (alterations in original) ).

### 3. The Court Has Specific Jurisdiction Under New York Law as to Plaintiff's Claims Arising out of Events in New York

**\*9** Unlike Plaintiff's other claims, his allegations of fraud have a substantial relationship with Defendant's purposeful activities in New York. This claim stems from the conduct of Defendant's customer service employees based in New York, and thus "the cause of action sued upon arises out of the defendant's activities in [the] state." *Brown,* 814 F.3d at 624; (*see also* Am. Compl., Ex. 8 (response to Plaintiff's DOT complaint from a customer relations manager based in Manhattan); Pl. Opp., Ex. G at 2-3 (response to Plaintiff's BBB complaint from a customer relations employee based in the New York City area); Am. Compl., Ex. 9 (response to Plaintiff's BBB complaint from the same customer relations employee at issue in the first BBB communication) ). Thus, as Defendant has "transacted business within the state" and Plaintiff's fraud claim "arises[s] from that business activity," the Court may properly exert personal jurisdiction over that claim pursuant to New York's long-arm statute. *Sole Resort,* 450 F.3d at 103.

As Plaintiff has made the requisite statutory showing with respect to this claim, the Court turns to the second prong of the personal jurisdiction inquiry—whether it is compatible with due process. *See Best Van,* 490 F.3d at 242. The due process requirement of jurisdiction requires "[i] that a defendant has certain minimum contacts with the relevant forum, and [ii]

that the exercise of jurisdiction is reasonable [under] the circumstances." *In re Terrorist Attacks on Sept. 11, 2001,* 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Int'l Shoe,* 326 U.S. at 316); *see also Ehrenfeld v. Mahfouz,* 489 F.3d 542, 547 (2d Cir. 2007) ("[E]ven if ... personal jurisdiction is proper under § 302(a)(1) of the New York long-arm statute, this Court must make the ultimate determination whether this jurisdiction satisfies constitutional due process."). The reasonableness analysis looks at "[i] the burden that the exercise of jurisdiction will impose on the defendant; [ii] the interests of the forum state in adjudicating the case; [iii] the plaintiff's interest in obtaining convenient and effective relief; [iv] the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and [v] the shared interest of the states in furthering substantive social policies." *Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 164 (2d Cir. 2010).

As the Second Circuit has noted, "[i]t would be unusual, indeed, if a defendant transacted business in New York and the claim asserted arose from that business activity within the meaning of section 302(a)(1), and yet, in connection with the same transaction of business," "the assertion of specific jurisdiction would somehow otherwise 'offend traditional notions of fair play and substantial justice.' " *Licci,* 732 F.3d at 170 (quoting *Int'l Shoe,* 326 U.S. at 316). This case does not present such a "rare" exception, and this Court's exercise of jurisdiction comports with due process. *Id.*

#### a. The Burden on Defendant

Defendant, which regularly transacts business in and appears to maintain several offices in New York, is not likely to be unduly burdened by this Court's exercise of jurisdiction. Indeed, Defendant makes no such argument in its motion to dismiss briefing. (*See* Def. Br. 12 (addressing due process only with respect to the exercise of general jurisdiction) ). In addition, the Court is inclined to give this factor less weight than it might give others, as it can work to lessen any such burden. *See Ahmed v. Purcell,* No. 14 Civ. 7491 (KPF), 2016 WL 1064610, at \*11 (S.D.N.Y. Mar. 14, 2016); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 129-30 (2d Cir. 2002). On balance, this factor favors the exercise of specific jurisdiction.

#### b. The Forum State's Interest

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 46 of 64 PageID #: 609

Mali v. British Airways, Not Reported in Fed. Supp. (2018)

As neither party is a citizen of New York, the state has a presumptively minimal interest in adjudicating this claim. *See Metro. Life Ins. Co.*, 84 F.3d at 574. However, the acts that serve as the basis for Plaintiff's fraud claim occurred in New York, and the Second Circuit has found that this weighs in favor of a state's interest in asserting specific jurisdiction. *See Bank Brussels*, 305 F.3d at 130 (finding that, "as the center" of several actions giving rise to the dispute, New York had an interest in adjudicating the plaintiff's claim). Plaintiff alleges that "[t]he activities of denying and delaying refund and offering negligible refund ... occurred in New York." (Pl. Opp. 8). These actions, which establish the "nexus" with New York, weigh in favor of the Court's exercise of jurisdiction.

### c. Plaintiff's Interest

**\*10** Plaintiff makes no clear argument with respect to his interest in adjudicating his claims before this Court specifically. However, he does suggest that "[d]ismissing my FAC and not giving me a chance to amend it and not transferring this lawsuit to another district in [the] USA will eliminate all of my options to sue the Defendant because of the two-year statute of limitations." (Pl. Opp. 2). Though Plaintiff is addressing his fear that his claims may be time-barred, it is perhaps more compelling as a jurisdictional argument. It is not clear that there is another forum in which Plaintiff could bring his claims against Defendant. Defendant is based in the U.K. (O'Rourke Decl. ¶ 4); Plaintiff resides in Wisconsin (Am. Compl., Ex. 16); and the events underlying the majority of Plaintiff's claims occurred in India. However, the theory of "jurisdiction by necessity" is not a recognized theory of jurisdiction, and the Court will not adopt it here. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 419 n.13 (1984) ("We decline to consider adoption of jurisdiction by necessity—a potentially far-reaching modification of existing law—in the absence of a more complete record."). As such, this factor is neutral in the Court's due process analysis.

### d. The Interstate Judicial System's Interest

This factor weighs little in the Court's due process analysis. Courts generally look at simultaneous litigation in other forums between the parties and the location of witnesses and documents. *Ahmed*, 2016 WL 1064610, at \*11; *Metro. Life Ins. Co.*, 84 F.3d at 574. Relevant documents and witnesses are likely to be found in various locations outside New York,

and Plaintiff has not made a showing that any critical mass of evidence is located here. This factor favors Defendant.

### e. The Interest in Substantive Social Policies

The parties have not identified any social policies that will be affected by litigating this action in a New York forum, nor is the Court aware of any such considerations. Plaintiff suggests that Defendant is "known for denying and delaying compensation and offering [ ] unfair compensation that people will not want to accept," but such a conclusory allegation does not relate to his claim for fraud, and the Court does not consider it persuasive or relevant to this factor. (Am. Compl. 27).

Because the Court concludes that it lacks personal jurisdiction over Defendant with respect to all but one of Plaintiff's claims, it will not engage in consideration of Defendant's motion pursuant to Rule 12(b)(6) except as to the Plaintiff's fraud claim.

### D. Defendant's Motion to Dismiss Plaintiff's Fraud Claim Under Rule 12(b)(6) Is Granted

Defendant moves to dismiss the complaint, pursuant to Rule 12(b)(6), for failure to state a claim upon which relief may be granted. In order for Plaintiff's remaining fraud claim "[t]o survive a motion to dismiss, [the] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). Though "all reasonable inferences" should be drawn in Plaintiff's favor, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011); *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). The Court may consider "facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint" when deciding a motion to dismiss pursuant to Rule 12(b)(6). *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). As noted earlier, the Court review's the sufficiency of Plaintiff's claims with the deference given to a *pro se* litigant.

Plaintiff's sole claim over which this Court can exercise jurisdiction is his claim for fraud arising out of

Mair v. British Airways, Not Reported in Fed. Supp. (2018)

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 47 of 64 PageID #: 610

his communications with Defendant's customer relations employees based in New York.[7] A prima facie case for fraud requires allegations of "[i] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [ii] made for the purpose of inducing the other party to rely upon it, [iii] justifiable reliance of the other party on the misrepresentation or material omission, and [iv] injury." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996) ).

**\*11** Additionally, in this federal diversity action, Plaintiff must plead his fraud claim with the particularity required by Rule 9(b). *Premium Mortg. Corp.*, 583 F.3d at 108. Specifically, "the [claim] must: [i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks and citation omitted). Additionally, to satisfy Rule 9(b), a claim must "allege facts that give rise to a strong inference of fraudulent intent." *Berman v. Morgan Keenan & Co.*, 455 Fed.Appx. 92, 95 (2d Cir. 2012) (summary order) (internal quotation marks omitted) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) ). "The requisite 'strong inference' of fraud may be established either [i] by alleging facts to show that defendants had both motive and opportunity to commit fraud, or [ii] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 290-91 (internal quotation marks and citations omitted). The pleading standard under Rule 9(b) "serves to 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.' " *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) ).

Plaintiff's belief that Defendant's statements were "bogus," however sincerely held, does not a fraud claim make, insofar as the Amended Complaint does not identify a misrepresentation or a material omission of fact that was known to be false by Defendant. Rather, Plaintiff states that "[s]taff of British Airways ha[ve] repeatedly provided

false immigration information to me." (Am. Compl. 25-26). While he may understand the exemptions to the U.K. transit visa requirement differently than Defendant's representatives, such a difference of opinion or interpretation is insufficient to satisfy this requirement. (*See* Am. Compl., Ex. 12 (reflecting Plaintiff's own annotations) ). The Court is not bound to accept Plaintiff's "conclusory allegations" that Defendant knowingly made false representations to him. More importantly, Plaintiff has alleged neither his justifiable reliance on any of these putative misstatements, nor injury resulting from such reliance. And Plaintiff has fallen short of satisfying the rigorous pleading standard of Rule 9(b). For all of these reasons, Plaintiff has failed to state a claim against Defendant for fraud.

## CONCLUSION

Defendant's motion to dismiss pursuant to Rule 12(b)(2) is GRANTED as to Plaintiff's claims for breach of contract, negligent infliction of emotional distress, negligence, and gross negligence. Defendant's motion to dismiss pursuant to Rule 12(b)(6) is GRANTED as to Plaintiff's claim of fraud. Though Plaintiff has asked for leave to amend his pleadings, the Court believes, given the analysis outlined above, that any amendment would be futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (affirming denial of motion to amend pro se complaint where complaint's deficiencies were "substantive" and thus repleading was futile).

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2018 WL 3329858

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 48 of 64 PageID #: 611

Mair v. British Airways, Not Reported in Fed. Supp. (2018)

## Footnotes

1    The well-pleaded allegations in the Amended Complaint are taken as true for purposes of this motion, and the Court will refer to Plaintiff's pleading as "Am. Compl." (Dkt. #27) and to the exhibits attached thereto as "Am. Compl., Ex. [X]." Because Plaintiff does not use numbered paragraphs in the Amended Complaint, all citations are to page numbers. For ease of reference, the Court refers to Defendant's Memorandum of Law in Support of British Airways' Motion to Dismiss as "Def. Br." (Dkt. #32); to the Declaration of Carol O'Rourke in Support of Defendant British Airways' Motion to Dismiss as "O'Rourke Decl." (Dkt. #33); to Plaintiff's Memorandum of Law in Opposition of British Airways' Motion to Dismiss the First Amended Complaint as "Pl. Opp." (Dkt. #37); and the exhibits attached thereto as "Pl. Opp., Ex. [X]"; and to Defendant's Reply Memorandum of Law in Further Support of British Airways' Motion to Dismiss as "Def. Reply" (Dkt. #42).

2    Of the several exemptions to the U.K. transit visa requirement, two are relevant to Plaintiff's claims. The government website titled "Check if you need a UK visa" states that "You don't need a visa if you have one of the following: ... a valid USA permanent residence card issued by the USA on or after 21 April 1998 [or] an expired USA I-551 Permanent Residence card issued by the USA on or after 21 April 1998, with a valid I-797 letter authorising extension." (Am. Compl., Ex. 12).

3    In addition to those claims detailed here, Plaintiff makes a tenth claim for "[p]utting me in [the] zone of danger." (Am. Compl. 1). As this is a theory of recovery for negligence claims rather than its own cause of action, the Court does not address it independently. *See Bovsun v. Sanperi*, 61 N.Y.2d 219, 228 (1984) ("[t]he zone-of-danger rule ... allows one who is himself or herself threatened with bodily harm in consequence of the defendant's negligence to recover for emotional distress resulting from viewing the death or serious physical injury of a member of his or her immediate family").

4    These include: (i) 49 U.S.C. § 40127, which bars discrimination by air carriers and in the use of private airports; (ii) 49 U.S.C. § 1374(b) (named in the Complaint as FAA § 404(b) ), which similarly prohibits discrimination by air carriers; (iii) 14 C.F.R. § 250.9, which requires that an airline provide a written explanation to any ticketed passenger denied boarding; and (iv) 14 C.F.R. § 259.7, which requires that airlines provide passengers with contact information for the filing of complaints. (Am. Compl. 1-2). *See Shin v. Am. Airlines Grp., Inc.*, No. 17 Civ. 2234 (ARR) (JO), 2017 WL 3316129, at *2 (E.D.N.Y. Aug. 3, 2017) ("[D]istrict courts in this circuit have repeatedly held[ that] there is no private right of action under 49 U.S.C. § 40127(a).") (internal quotation marks omitted); *Dennis v. Delta Air Lines, Inc.*, No. 10 Civ. 973 (DLI) (LB), 2011 WL 4543487, at *5 (E.D.N.Y. Sept. 29, 2011) ("Congress repealed the relevant provision of Section 404(b) and enacted 49 U.S.C. § 40127(a) to replace it."); *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 34 (1st Cir. 2007) (collecting circuit decisions finding that the Airline Deregulation Act (of which 14 C.F.R. § 250.9 is one section) does not provide for a private right of action). Because the fourth claim (14 C.F.R. § 259.7) arguably arises from Defendant's conduct in New York, it is discussed further in the analysis of Defendant's Rule 12(b)(6) motion below.

5    The Court considers first Defendant's motion to dismiss pursuant to Rule 12(b)(2), as the grant of such a motion would obviate the need for consideration of Defendant's motion pursuant to Rule 12(b)(6). *See Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 386 (S.D.N.Y. 2002).

6    This is true with the exception of Plaintiff's fraud claim, which the Court addresses separately below.

7    One of Plaintiff's statutory claims alleges that Defendant failed to provide required contact information for the filing of complaints, in violation of 14 C.F.R. § 259.7(b). (Am. Compl. 2, 33-34). *See* 14 C.F.R. § 259.7(b) (2011) (requiring that air carriers provide contact information "on the ... foreign carrier's website (if marketed to U.S. consumers), on all e-ticket confirmations and, upon request, at each ticket counter and boarding gate staffed by the carrier."). This regulation offers no enforcement mechanism for individual passengers. *See* 14

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 49 of 64 PageID #: 612

C.F.R. § 259.4(f); Timothy M. Ravich, *National Airline Policy*, 23 U. MIAMI BUS. L. REV. 1, 16-17 (2014) ("despite its creation of rights for passengers ... the rule made clear that no enforcement mechanism by passengers themselves existed."). Plaintiff's claim of violation of this provision—which the Court understands to be connected to his fraud claim—is therefore dismissed.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5577730
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Kimie MIYAMOTO, Plaintiff,

v.

BANK OF AMERICA, N.A., Mr. Cooper f/k/a
Nationstar Mortgage, LLC d/b/a Champion Mortgage,
Reverse Mortgage Solutions, Inc., and Department
of Housing and Urban Development, Defendants.

Case No. 19-CV-445 (FB) (ST)
|
Signed 09/17/2020

**Attorneys and Law Firms**

For the Plaintiff: CHARLES A. HIGGS, 450 Lexington
Avenue, 4th Floor, New York, New York 10010.

For Defendant Mr. Cooper f/k/a, Nationstar Mortgage,
LLC d/b/a, Champion Mortgage, MICHAEL T. MADAIO,
Sandelands Eyet LLP, 112 West 34th Street, 18th Floor, New
York, New York 10120.

**MEMORANDUM AND ORDER**

BLOCK, Senior District Judge:

 **\*1** Kimie Miyamoto lost her home in foreclosure. The
question in this diversity case is whether that foreclosure
occurred because of the actions or omissions of Mr. Cooper
f/k/a Nationstar Mortgage, LLC d/b/a Champion Mortgage
("Champion"). [1] Arguing that it did not, Champion moves to
dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).
For the following reasons, the motion is granted in part and
denied in part.

**I**

The following facts are taken from the allegations of the
complaint. For purposes of this motion, they are accepted as
true, with all inferences drawn in the plaintiff's favor. *See Biro
v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015).

In 2000, Miyamoto and her husband obtained a loan of
$110,000 from Lincoln Equities Credit Corp. ("Lincoln").

The loan was secured by a mortgage ("the Lincoln
Mortgage") on Miyamoto's home in Forest Hills, Queens.
Within a few months, Lincoln filed a state-court foreclosure
action alleging that Miyamoto had defaulted on the loan.

In 2009, Miyamoto obtained a "reverse mortgage" from
Bank of America, N.A. ("BOA"). As is typical of such
arrangements, BOA advanced Miyamoto a loan (in this case,
up to $915,000) without any monthly repayment obligation.
Instead, BOA expected to be repaid from the proceeds of a
sale of the property, or by taking title to the property upon
Miyamoto's death.

BOA was aware of the Lincoln Mortgage and, in preparing
to close the reverse mortgage, received what purported to
be a copy of a satisfaction of the Lincoln Mortgage. It is
not clear from the complaint or the parties' submissions, but
apparently the Lincoln Mortgage was not, in fact, properly
satisfied during the reverse mortgage closing.

As a result, the foreclosure proceeding continued. The state
court entered a judgment of foreclosure in 2014 and the
property was sold at auction in June 2016; Miyamoto was
evicted in 2018.

BOA assigned the note and mortgage to Champion in
October 2012. In May 2016, Champion reconveyed the note
and mortgage to BOA, which retained Reverse Mortgage
Solutions, Inc. ("RMS"), to service the loan. Because the
foreclosure action predated the reverse mortgage by more
than nine years, BOA, Champion and RMS were not named
as defendants in that action.

The complaint alleges that, despite knowledge of the
foreclosure proceeding, "Defendants assured Plaintiff both in
writing and verbally that Plaintiff's Reverse Mortgage was
in good standing and that she could remain at her home."
Compl. ¶ 50. The complaint does not distinguish among the
three defendants or provide any details about the alleged
reassurances.

**II**

Miyamoto's allegations, if proven, may well be sufficient to
establish BOA's liability for the foreclosure. *Cf. Podesta v.
Assumable Homes Dev. II Corp.*, 31 N.Y.S.2d 74, 77 (2d Dep't
2016) (title agent liable for incorrect property description in
partial mortgage release). Indeed, she concedes that "Bank of

Case 1:25-cv-04295-EK-LKE Document 43-5 Filed 02/23/26 Page 51 of 64 PageID #: 614

Miyamoto v. Bank of America, N.A., Not Reported in Fed. Supp. (2020)

America is the Defendant that is likely most responsible for the damages to Plaintiff." Pl.'s Mem. of Law 4.

**\*2** But this is Champion's motion to dismiss, not BOA's. Miyamoto's theory of Champion's liability is harder to discern, but it appears to be based on misrepresentations and omissions during the time Champion serviced the reverse mortgage. Miyamoto argues that she was harmed, not only by BOA's failure to obtain a proper satisfaction of the Lincoln Mortgage, but also by Champion's "continued misrepresentations" that "everything was fine" despite knowledge of the foreclosure proceeding. *Id.* at 2. She further argues Champion "took no steps to correct the issues with the loan, took no steps to mitigate damages to the Plaintiff, or to alert Plaintiff to the issues with the Reverse Mortgage." *Id.* at 3.

That theory of liability is asserted in six of the eight causes of action in the complaint. [2] The Court addresses each, though not in the order they are presented in the complaint.

### A. Breach of Contract

Champion argues that is was not in contractual privity with Miyamoto because it merely "serviced" BOA's loan. The complaint, however, alleges an assignment of the reverse mortgage. At this stage, the Court must accept that allegation as true.

Even assuming contractual privity, the complaint "must identify the specific provision of the contract that was breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003). Miyamoto has not identified a specific provision or even attached a copy of the reverse mortgage agreement to the complaint. Thus, she has failed to allege that Champion was under any contractual duty to apprise her of or correct any problems with the closing.

### B. Fraud

Federal Rule of Civil Procedure 9(b) requires a plaintiff to state allegations of fraud to "with particularity." That means the plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted).

Miyamoto's alleges that "Defendants ... knowingly misrepresented ... the status of her loan," Compl. ¶ 2, and that "Defendants ... assured Plaintiff both in writing and verbally that Plaintiff's Reverse Mortgage was in good standing," *id.* ¶ 50. Those allegations do not identify any specific statements by Champion or explain how they were false. Any statements regarding the status or good standing of the loan were not false because the problem was with the Lincoln Mortgage, not the reverse mortgage.

Miyamoto alleges that "Bank of America, its successor and assigns, have continually represented to Plaintiff that the Reverse Mortgage is the first lien on the Property." *Id.* ¶ 43. That allegation provides some particularly—assuming that Champion is one of BOA's assigns and knew that the Lincoln Mortgage had not been satisfied—yet it does not specify the timing, content or format of the statements attributable to Champion.

In sum, Miyamoto's allegations of fraud fall short of the standard required by Rule 9(b).

### C. Intentional Infliction of Emotional Distress

The elements of intentional infliction of emotional distress are: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993). The conduct must be "intentionally directed at the plaintiff and lack any reasonable justification." *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985).

**\*3** Champion's actions probably do not qualify as "extreme and outrageous." *See Howell*, 81 N.Y.2d at 122 ("[O]f the intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous."). But even if they did, there is no plausible inference that they were motivated by a specific intent to cause Miyamoto emotional distress.

Moreover, the statute of limitations for intentional infliction of emotional distress is one year. *See Jemison v. Crichlow*, 531 N.Y.S.2d 919, 922 (2d Dep't 1988) (citing N.Y.C.P.L.R. § 215(3)). The complaint was filed almost three years after Champion reconveyed the reverse mortgage to BOA.

### D. Unjust Enrichment

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 52 of 64 PageID #: 615

Miyamoto v. Bank of America, N.A., Not Reported in Fed. Supp. (2020)

Miyamoto alleges that all defendants, including Champion, were unjustly enriched "because Plaintiff paid taxes and insurance on the Property pursuant to the terms of the Reverse Mortgage for purposes of benefiting the Defendants by protecting the Defendants' lien interest in the Property." Compl. ¶ 114. Those payments did not enrich Champion, however, because they were remitted to others and would have been required in any event as long as Miyamoto owned the property. [3]

Nor did Miyamoto's tax and insurance payments protect Champion's lien during the time it held the reverse mortgage. The lien was impaired from its inception by the improperly satisfied Lincoln Mortgage, and was eventually foreclosed despite Miyamoto's compliance with her obligations.

### E. Negligence and Negligent Infliction of Emotional Distress

The cornerstone of a negligence cause of action is a duty of care, and Miyamoto concedes that "a mortgage servicer generally does not owe a duty of care to a borrower." Pl.'s Mem. of Law 1. Neither party mentions the duties of a mortgage *holder*—as Champion was alleged to be—but it is "well settled under New York law that a lender is not in a fiduciary relationship with a borrower, and thus a lender does not owe a borrower any special duties." *Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 236 (E.D.N.Y. 2013).

Thus, Miyamoto does not premise her negligence claim on a general tort duty. Instead, she argues that Champion voluntarily assumed a duty of care to her.

The assumption-of-duty doctrine has a venerable pedigree in New York. In 1922, Judge Cardozo said, "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Glanzer v. Shepard*, 233 N.Y. 236 (1922). He later explained that "[t]he query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good." *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 167 (1928). Seventy years later, the Second Circuit summarized New York's formulation of the doctrine: "Assumed duties arise only where (1) the failure to exercise due care increases the risk of harm to the plaintiff or (2) the harm is suffered because of the plaintiff's reliance on the undertaking." *Tavarez*

*v. Lelakis*, 143 F.3d 744, 747 (2d Cir. 1998) (citing *Heard v. N.Y.C.*, 82 N.Y.2d 66, 72 (1993), and *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 522 (1980)). Moreover, while the existence of a duty is usually a question of law, "where there is evidence that a defendant's continued conduct either placed a plaintiff in a more vulnerable position or caused the plaintiff to detrimentally rely on the defendant, courts have found the question of duty to involve triable issues of fact." *Kloner v. United States*, 196 F. Supp. 3d 375, 387 (E.D.N.Y. 2016).

**\*4** The risk of foreclosure began when Miyamoto (allegedly) defaulted on the Lincoln Mortgage. Champion and the other defendants may not have assuaged that risk, but nor did they do anything to increase it. Acknowledging this, Miyamoto argues that her "harm and damages were largely caused because of [her] *reliance* on the continued misrepresentations by Champion Mortgage and the other Defendants in this action." Pl.'s. Mem. of Law 2 (emphasis added). If true, that is a valid application of the assumption-of-duty doctrine.

To be sure, Miyamoto's theory is not airtight. First, she must establish that Champion, in fact, voluntarily undertook to inform her of the status of the *Lincoln Mortgage.* As noted, the focus of the complaint is on representations about the status of the reverse mortgage, which was not the basis of foreclosure that led to the loss of her property. Nevertheless, Miyamoto does allege that Champion "continually represented to [her] that the Reverse Mortgage is the first lien on the Property." *Id.* ¶ 43. While that allegation lacks the particularity required for a fraud claim under Rule 9(b), negligence claims "fall under Rule 8(a), and thus require only a 'short and plain statement of the claim.' " *Bayerische Landesbank v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 64 (2d Cir. 2012).

Second, Miyamoto must establish that she reasonably and detrimentally relied on Champion's representations. That will not be an easy task because she was obviously aware of the foreclosure action, which had been pending for over a decade when Champion took over the reverse mortgage. Yet closing the reverse mortgage was supposed to satisfy the Lincoln Mortgage and terminate the foreclosure proceeding. The Court cannot say, based solely on the allegations of the complaint, that Miyamoto did not reasonably rely on statements allegedly made by Champion if they confirmed her belief that the reverse mortgage had negated the risk of losing her home.

As a final matter, the complaint contains a standalone cause of action for negligent infliction of emotional distress. That cause of action generally requires a risk of physical injury to the plaintiff. *See Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996) (citing *Bovsun v. Sanperi*, 61 N.Y.2d 219, 230-31 (1984), and *Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 504 (1983)). There are exceptions, but in *Pirrelli v. OCWEN Loan Serv., LLC*, 12 N.Y.S.3d 110, 116 (2d Dep't 2015), the Second Department held that a loan servicer and its attorneys were not liable for negligent infliction of emotional distress in connection with a mortgage refinancing. The factual similarities between *Pirrelli* and this case lead the Court to conclude that the New York Court of Appeals would not recognize a cause of action for negligent infliction of emotional distress in this context. *See Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994) ("Where there is "no decision by the state's highest court then federal authorities must apply what they find to be the state law after giving proper regard to relevant rulings of other courts of the State." (internal quotation marks and alterations omitted)).

## III

For the foregoing reasons, Champion's motion to dismiss is granted in part and denied in part. Miyamoto's cause of action for negligence shall proceed. The remaining causes of action (breach of contract, fraud, intentional infliction of emotional distress, unjust enrichment, and negligent infliction of emotional distress) are dismissed with prejudice as to Champion only.

**\*5  SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2020 WL 5577730

---

## Footnotes

1    A copy of the complaint was served on "Champion Mortgage, LLC." Although it may have been a separate entity at some point, it has been a division of Nationstar Mortgage, LLC, since 2007. Miyamoto does not dispute that the entity named in the complaint is the proper defendant.

2    Miyamoto's first cause of action alleges violations of the Real Estate Settlement Procedures Act by RMS only. Her eighth cause of action seeks declaratory and injunctive relief requiring "any of the Defendants with an equitable right of redemption" to exercise that right, Compl. 24; Having no current interest in the reverse mortgage, Champion has no such right.

3    Tax and insurance payments made by Miyamoto after the foreclosure sale are more problematic, but the benefit would have inured to the new owner. In any event, Champion's involvement with the reverse mortgage ended prior to the sale.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

M+J Savitt, Inc. v. Savitt, Not Reported in Fed. Supp. (2009)

2009 WL 691278
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

M+J SAVITT, INC. and Wynne Savitt Weiner, Plaintiffs,
v.
Janis SAVITT, Designs by Janis Savitt,
Inc., Michelle Savitt Donahower, Mildred
Savitt and Paul Savitt, Defendants.

No. 08 Civ. 8535(DLC).
|
March 17, 2009.

**Attorneys and Law Firms**

Robert E. Seaman III, Peter J. Glantz, New York, NY, for
Plaintiffs.

G. Roxanne Elings, David Saenz, New York, NY, for
Defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.

 **\*1**  Defendants have moved to dismiss plaintiffs' second
amended complaint. Defendants contend that the claims
asserted derivatively on behalf of plaintiff M+J Savitt should
be dismissed for failure to plead demand or demand futility
adequately, and that certain of plaintiff Wynne Savitt's
individual claims against defendants should be dismissed
for failure to state a claim. For the reasons that follow,
defendants' motion to dismiss the derivative claims is granted.
Defendants' motion to dismiss Wynne's individual claims is
granted as to all claims except Wynne's claim for defamation
against defendant Janis Savitt.

BACKGROUND
M+J Savitt, Inc. ("M+J Savitt") is a privately held corporation
organized under the laws of the State of New York, with its
principal place of business located in New York City. Three
siblings—Wynne Savitt, Janis Savitt, and Michelle Savitt—
each own 27% of M+J Savitt. Their mother, Mildred Savitt
owns the other 19%.

At the time the original complaint in this action was filed,
the Board of Directors of M+J Savitt consisted of Wynne
and Mildred (the "Old Board"). Following a November 18,
2008 Special Shareholder Meeting ("Special Meeting"), a
new Board of Directors was chosen: Paul Savitt (Mildred's
husband and the siblings' father), Janis, and Michelle
(collectively the "New Board"). The New Board was in place
when the first and second amended complaints were filed.

Plaintiffs withdrew their original complaint in the face of
a motion to dismiss, and they filed an amended complaint
("first amended complaint") on December 22, 2008. On
February 4, 2009, this Court addressed defendants' motion
to dismiss the first amended complaint at a conference with
the parties. The Court addressed only the part of the motion
that pertained to requirements for derivative claims; it did not
address defendants' other arguments for dismissing certain
causes of action. Plaintiffs' brief in opposition to that motion
stated that when the first amended complaint was filed, "the
Corporation's Board was comprised of three (3) members:
Janis, Paul and Michelle Savitt (the 'New Board') ." Plaintiffs
argued in that brief that "[t]he Board that is in place at the
time the operative pleading is filed is the one that must be
considered in determining whether a demand is excuse [sic]."
As such, this Court addressed whether Wynne had met the
pleading requirements of Fed.R.Civ.P. 23.1 and New York
State law for bringing her derivative claims in relation to the
"New Board."

The Court found that the first amended complaint's
allegations were "far too conclusory to meet either the
demand requirement or the futility requirement, either of
which has to be pleaded with particularity." Specifically, the
Court found that while the complaint could be read in its
entirety to plead that demand would be futile because Janis
was "an interested director with respect to the transactions
that are at issue," plaintiffs had not adequately pled that either Paul
or Michelle were interested "with respect to the transactions
that are at issue here." The Court therefore granted this part of
defendants' motion to dismiss, and granted leave to plaintiffs
to file an amended pleading to cure the defects the Court
noted. The Court informed plaintiffs' that this was their final
opportunity to amend, and that the purpose of this permitted
amendment was to address whether the defects the Court
noted in the pleading as to demand and demand futility could
be cured. [1]

 **\*2**  Plaintiffs' then filed the instant complaint, their second
amended complaint, which contains many entirely new

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 55 of 64 PageID #: 618

M+J Savitt, Inc. v. Savitt, Not Reported in Fed. Supp. (2009)

allegations. Most of the new allegations pertain to alleged misconduct on the part of Michelle and her husband Sepp Donahower that is distinct from the allegations that had previously been the core of the Wynne's derivative claims (which had primarily concerned alleged misconduct on the part of Janis). With these new allegations of wrongdoing, the plaintiffs added Michelle and other defendants to many of the claims previously pleaded. Plaintiffs' claims that are asserted against new defendants Sepp Donahower and Seppe1, Inc. are outside the scope of the permitted amendment, which was allowed solely to cure defects in the pleading of demand and demand futility as to the actions challenged in the claims of the first amended complaint, and will be stricken. Similarly, any claims newly asserted against the defendants named in the first amended complaint are also beyond the scope of the permitted amendment. For example, the second amended complaint asserts nine causes of action against Michelle that were not previously asserted against her (as well as three new claims against Mildred and one new claim against Paul). These new allegations of liability as to these defendants will be considered only insofar as the facts relating to these new allegations bear upon the issues of demand and demand futility as to the transactions plaintiffs challenged in their claims in the first amended complaint. Additionally, the second amended complaint's 17th cause of action for negligence and 18th cause of action for gross negligence are now pleaded on behalf of both Wynne and M+J Savitt, whereas previously the negligence claim was only asserted on behalf of the corporation and the gross negligence claim was only asserted on behalf of Wynne. These amendments are also outside the scope of the permitted amendment and will be stricken. To the extent that the second amended complaint added new factual allegations to cure defects identified in the motion to dismiss the claims that were pleaded in the first amended complaint, these allegations have been considered and are addressed below.

The following facts are drawn from the second amended complaint and attached exhibits, and are assumed to be true for the purposes of deciding the motion to dismiss. M+J Savitt is engaged in the business of designing, manufacturing, and wholesaling fine and semi-precious designer jewelry. M+J Savitt sells its products to stores such as Neiman Marcus and Saks Fifth Avenue.

The main allegation in the second amended complaint is that Janis Savitt used and is using M+J Savitt's trademarks and intellectual property for her own personal benefit without the authorization of the corporation. The complaint alleges that

Janis, on or about December 31, 2007, formed a company called "Designs by Janis Savitt, Inc." which uses M+J Savitt's word mark SAVITT within its name. Janis is using this entity to compete with M+J Savitt. These actions have created confusion among consumers who do not realize that Designs by Janis Savitt is not affiliated with M+J Savitt.

**\*3** M+J Savitt sent Janis cease and desist letters concerning her conduct on May 11, 2007 and February 26, 2008. The May 2007 letter was signed by Wynne and Michelle Savitt. Also in May 2007, Wynne sent Paul and Mildred a note informing them that cease and desist letters were sent to Janis. Wynne's note said that Janis should respond to these letters and that the letters "should serve as a formal document to bring discussions to the table, *formally."*

The second amended complaint also alleges that Michelle, along with her husband Sepp, are using M+J Savitt "Marks, Copyrights and designs" for their own interest and in competition with M+J Savitt without authorization. It further alleges that Michelle and Sepp created a corporate entity, Seppe1, Inc., that is competing with M+J Savitt and selling jewelry that Michelle stole from M+J Savitt. The complaint also alleges that Michelle, upon information and belief, is incapacitated. Michelle would frequently fail to show up for work at M+J Savitt or work for only a few hours, and she improperly paid personal expenses on her corporate credit card from M+J Savitt funds. In addition, Michelle falsely represented to Wynne that Michelle was not going to attend the Special Meeting.

The second amended complaint also describes additional wrongdoing relating to the operation of M+J Savitt, including the following: Janis failed to sign certain factoring agreements that would allow M+J Savitt to generate capital, as well a settlement agreement between M+J Savitt and the State of New York regarding past due M+J Savitt taxes; Janis signed certain documents as "President" of M+J Savitt when she had represented to plaintiffs that she would sign them as "Secretary"; Janis verbally abused and defamed Wynne and other M+J Savitt employees, using foul language and profanity—specifically, Janis accused Wynne of "fucking the bookkeeper" in front of M+J Savitt employees during business hours; Janis forged Michelle's signature on a check, and accessed and changed Wynne's personal email account; and Michelle and Janis failed to keep adequate M+J Savitt inventory and financial records, purchased the wrong inventory, and used M+J Savitt petty cash for personal

expenses. In addition to the items of inventory that Michelle stole from M+J Savitt, Janis stole various other items.

As to Paul Savitt, he originally funded M+J Savitt, and was the inspiration for many of its jewelry designs. He was an "absentee" officer who was not compensated and did not sign corporate tax returns. Both Paul and Mildred provided Janis and Designs by Janis with financial aid, including a home office in Westhampton, New York and certain antiques. In addition, Paul and Mildred gave Janis and Designs by Janis jewelry designs, inventory, and customer information.

As for allegations against all individual defendants, the complaint states that all defendants are assisting one another in selling products that bear M+J Savitt marks to compete with M+J Savitt. In addition, all defendants are providing each other with the jewelry Janis stole, the jewelry Michelle stole, and other inventory and merchandise.

**\*4** The second amended complaint alleges 21 causes of action against various combinations of defendants. Claims 1–9, 12–14, 17 and 20 are brought only on behalf of M+J Savitt to redress injuries to M+J Savitt; [2] claims 10–11 and 15–16 are brought on behalf of both Wynne and M+J Savitt. Claims 18 and 19 are brought on behalf of Wynne alone. [3]

## DISCUSSION

A. *Derivative Claims*
At the outset, it is well-settled that "[a]n action to redress injuries to a corporation cannot be maintained by a shareholder in his own name but must be brought in the name of the corporation through a derivative action." *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1101 (2d Cir.1988) (citation omitted). Thus, despite the fact that only the 21st cause of action in the second amended complaint is styled as a derivative claim, the claims described above that are asserting injury to M+J Savitt cannot be brought by Wynne as plaintiff except via a derivative action. [4]

"The derivative form of action permits an individual shareholder to bring suit to enforce a *corporate* cause of action against officers, directors, and third parties." *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (citation omitted). Under Fed.R.Civ.P. 23.1, the complaint of a shareholder bringing a derivative action must, *inter alia,* "state with particularity ... any effort by the plaintiff to obtain the desired action from the

directors or comparable authority" and "the reasons for not obtaining the action or not making the effort." Fed.R.Civ.P. 23.1(b)(3). The Supreme Court has stated that this rule is one of procedure that "speaks only to the adequacy of the shareholder representative's pleadings," *Kamen,* 500 U.S. at 96, and therefore the substance of the demand requirement and any exception for demand futility is analyzed by looking to state law. *Id.* at 108–09; *see also Scalisi v. Fund Asset Mgmt., L.P.,* 380 F.3d 133, 138 (2d Cir.2004) ("The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief."); *Kalin v. Xanboo, Inc.,* 526 F.Supp.2d 392, 409 (S.D.N.Y.2007) ("adequacy of the demand is governed by state law").

Under New York law, Business Corporation Law § 626(c) similarly states that "the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort." This statute "codified a rule of equity developed in early shareholder derivative actions requiring plaintiffs to demand that the corporation initiate an action, unless such demand was futile, before commencing an action on the corporation's behalf." *Marx v. Akers,* 88 N.Y.2d 189, 193–94, 644 N.Y.S.2d 121, 666 N.E.2d 1034 (1996) (citation omitted). "On the one hand, derivative actions are not favored in the law because they ask courts to second-guess the business judgment of the individuals charged with managing the company." *Bansbach v. Zinn,* 1 N.Y.3d 1, 8, 769 N.Y.S.2d 175, 801 N.E.2d 395 (2003). "On the other hand, derivative actions serve the important purpose of protecting corporations and minority shareholders against officers and directors who, in discharging their official responsibilities, place other interests ahead of those of the corporation." *Id.*

> **\*5** The purposes of the demand requirement are to (1) relieve courts from deciding matters of internal corporate governance by providing corporate directors with opportunities to correct alleged abuses, (2) provide corporate boards with reasonable protection from harassment by litigation on matters clearly within the discretion of directors, and (3) discourage "strike suits" commenced by shareholders for personal gain

rather than for the benefit of the corporation.

*Marx,* 88 N.Y.2d at 194, 644 N.Y.S.2d 121, 666 N.E.2d 1034; *see also Kamen,* 500 U.S. at 96 ("The purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." (citation omitted)).

In New York, demand is excused for futility under the following circumstances:

(1) Demand is excused because of futility when a complaint alleges with particularity that a majority of the board of directors is interested in the challenged transaction. Director interest may either be self-interest in the transaction at issue (*see, Barr v. Wackman,* [36 N.Y.2d 371,] 376 [1975] [receipt of "personal benefits"] ), or a loss of independence because a director with no direct interest in a transaction is "controlled" by a self-interested director. (2) Demand is excused because of futility when a complaint alleges with particularity that the board of directors did not fully inform themselves about the challenged transaction to the extent reasonably appropriate under the circumstances. The long-standing rule is that a director "does not exempt himself from liability by failing to do more than passively rubber-stamp the decisions of the active managers. (3) Demand is excused because of futility when a complaint alleges with particularity that the challenged transaction was so egregious on its face that it could not have been the product of sound business judgment of the directors.

*Marx,* 88 N.Y.2d at 200–01, 644 N.Y.S.2d 121, 666 N.E.2d 1034 (citation omitted).

"Directors are self-interested in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally." *Id.* at 202, 644 N.Y.S.2d 121, 666 N.E.2d 1034. "A charge of interest must be made with particularity. Simply naming a majority of the board as defendants with conclusory allegations of wrongdoing or control is insufficient to circumvent the requirement of demand." *Bansbach,* 1 N.Y.3d at 11, 769 N.Y.S.2d 175, 801 N.E.2d 395. Likewise, "[t]he bare claim that the directors ... should be viewed as interested because they are substantially likely to be held liable for their actions is not enough." *Wandel ex rel. Bed Bath &*

*Beyond, Inc. v. Eisenberg,* 871 N.Y.S.2d 102, 105 (1st Dep't 2009) (citation omitted). "[A]bsent specific allegations of self-dealing or bias on the part of a majority of the board, mere approval and acquiescence [in the dealings complained of] are insufficient to render demand futile," *Lewis v. Graves,* 701 F.2d 245, 248 (2d Cir.1983) (interpreting Fed.R.Civ.P. 23.1), though "[p]articular allegations of formal board participation in and approval of active wrongdoing may ... suffice to defeat a motion to dismiss." *Barr v. Wackman,* 36 N.Y.2d 371, 381, 368 N.Y.S.2d 497, 329 N.E.2d 180 (1975); *see also Brewster v. Lacy,* 24 A.D.3d 136, 805 N.Y.S.2d 56, 57 (1st Dep't 2005) (finding demand not futile and distinguishing situation where "board members ... were clearly aware of alleged practices, including illegal ones, that were complained of over a lengthy period, and consciously chose to refrain from taking action over an inordinate amount of time").

**\*6** In applying these standards to the instant motion, the parties seem unclear as to whether to look to the Old or New Board. As discussed above, plaintiffs' prior briefing conceded that the proper board to look to is the one in place at the time the operative pleading is filed, which in this case is the New Board. *See also Brody v. Chemical Bank,* 517 F.2d 932, 934 (2d Cir.1975) (when board in place changed between the filing of first and second complaint, proper board for assessing demand and demand futility of the new operative complaint was the new board). [5] Thus, on the instant motion, the issues of demand and demand futility must be addressed with respect to the New Board. [6]

In finding that plaintiffs' first amended complaint did not adequately plead demand futility, this Court found that that complaint, taken as a whole, could be read to show that Janis was an interested director in the transactions at issue in this litigation under the standards discussed above, but that such a showing had not been pled with particularity as to Michelle or Paul. Upon amendment, plaintiffs add new allegations describing Michelle's use of M+J Savitt's intellectual property and inventory for her own benefit. These new allegations, however, do not adequately show how Michelle is an interested director with respect to the transactions the litigation seeks to challenge involving Janis's use of M+J intellectual property to benefit herself and compete with the corporation. Plaintiffs' efforts to link these two separate sets of transactions are entirely conclusory (*e.g.,* the allegation that all defendants are "assisting" one another in selling products that compete with M+J Savitt), and simply do not allege with sufficient particularity how Michelle is an interested director as to Janis's alleged misuse of M+J Savitt

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 58 of 64 PageID #: 621

M+J Savitt, Inc. v. Savitt, Not Reported in Fed. Supp. (2009)

intellectual property and inventory, which is the conduct this litigation seeks to challenge. Additionally, plaintiffs also do not allege with sufficient particularity that Michelle is an interested director by virtue of her being under another director's control.

As for the third member of the Board, plaintiffs have alleged no facts demonstrating that Paul is deriving any personal financial benefit from any of Janis's actions, nor any facts that he is under the control of anyone else. As such, plaintiffs have not pled with particularity that Paul is "interested" in the transactions that plaintiffs seek to have the corporation challenge. Plaintiffs' brief in opposition fails to even argue that Paul was an interested director. Thus, Wynne has simply not pled with the requisite particularity that a majority of the New Board was interested with respect to the conduct that she seeks to challenge via this derivative suit, *i.e.,* Janis's misuse of the corporation's intellectual property for personal gain. Simply naming Paul as a defendant and alleging claims of breach of fiduciary duty and negligence for not stopping this conduct are insufficient to establish interest.

**\*7** Plaintiffs have also failed to show that demand is excused because "the board of directors did not fully inform themselves about the challenged transaction to the extent reasonably appropriate under the circumstances." *Marx,* 88 N.Y.2d at 200, 644 N.Y.S.2d 121, 666 N.E.2d 1034. The second amended complaint conclusorily asserts that various defendants, including members of the New Board, did not inform themselves of the transactions alleged in the complaint. This contention, however, is not pled with particularity; there are no specific allegations in the complaint that demonstrate that board members simply "rubber-stamped" the decisions of more active managers by failing to inform themselves of the relevant dealings. *Id.; see also Lewis,* 701 F.2d at 249 ("bald charges of mere failure to take corrective action are ... inadequate to demonstrate futility"). Vague allegations that the board was willfully blind do not fill this void. Plaintiffs have not pleaded with any particularity how the board failed to inform itself to the proper extent of the complained of conduct. In fact, plaintiffs' brief in opposition to the instant motion does not even address this prong of the *Marx* test as to Paul, but only claims that Michelle failed to inform herself, despite this prong's focus on actions of the board as a whole.

Additionally, plaintiffs' claims as to this prong of the demand futility test are belied by the other claims in the complaint. As to the core transactions that Wynne seeks to challenge on the

corporation's behalf—Janis's use of M+J Savitt intellectual property and inventory to compete with the corporation —the complaint alleges that the defendants, including the New Board members, induced and encouraged such actions with full knowledge of "M+J Savitt's rights in and to" the intellectual property. Thus, plaintiffs' argument that the Board failed to inform themselves fully to the appropriate extent fails.

Finally, plaintiffs have not alleged with particularity that demand should be excused because "the challenged transaction[s were] so egregious on [their] face that [they] could not have been the product of sound business judgment of the directors." *Marx,* 88 N.Y.2d at 200–01, 644 N.Y.S.2d 121, 666 N.E.2d 1034 (citation omitted). Plaintiffs' brief argues that certain of Michelle's conduct, such as stealing inventory, was so egregious that it could not be the product of sound business judgment. Plaintiffs' argument misses the point. The inquiry is not whether Michelle's individual conduct was egregious, but rather it is whether the board's action (or inaction) in response to the conduct this litigation seeks to challenge—Janis's misuse of M+J Savitt's intellectual property and inventory—could not be the product of business judgment. *See, e.g., Wandel,* 871 N.Y.S.2d at 106 (describing case where demand found futile where "factual allegations drew a picture of a backdating process so open and egregious as to preclude the possibility that issuance and approval of those options could constitute an appropriate exercise of business judgment on the part of the board of directors" (citation omitted)); *see also Marx,* 88 N.Y.2d at 202, 644 N.Y.S.2d 121, 666 N.E.2d 1034 (finding that "[t]he complaint does not allege particular facts in contending that the board failed to ... exercise its business judgment in" taking challenged action). Plaintiffs do not plead with sufficient particularity facts demonstrating that the board's failure to take action was not the product of sound business judgment. Ultimately, plaintiffs have not shown that demand on the New Board would have been futile. [7]

## 2. *Plaintiffs' Alleged Demands*
**\*8** Plaintiffs allege in their second amended complaint that they made demands on the Old and New Board. This bare allegation, however, is completely insufficient to satisfy the heightened pleading standards of Fed.R.Civ.P. 23.1 and N.Y. BCL § 626(c), which both require plaintiffs to plead their demand efforts with particularity. The only specific communication to which the plaintiffs point is a May 17, 2007 letter from Wynne to Mildred and Paul alerting them

to certain of Janis's alleged misdeeds and stating that the letter was a formal document to "bring discussions to the table." Even assuming this letter was sent to all of the board members, the letter simply asks to raise issues for discussion, and states that a response is requested only from Janis. This letter cannot be construed as an attempt to get the board to initiate this action, and therefore plaintiffs' have not pled that a demand was made on the board with sufficient particularity. [8] Because plaintiffs have not pled demand or demand futility with sufficient particularity, the claims brought derivatively by Wynne to redress injury to M+J Savitt are dismissed. [9]

B. *Wynne's Individual Claims*

The complaint contains six causes of action asserted by Wynne for injuries to herself, as opposed to M+J Savitt: breach of contract, unjust enrichment, defamation, fraud, gross negligence, and intentional infliction of emotion distress. Defendants move to dismiss these claims for failure to state a claim upon which relief can be granted. While the federal claims in this action have been dismissed as discussed above, this case is on the eve of trial, discovery has been completed, and the remaining state law claims do not present novel issues of state law. Thus, this Court will exercise its discretion to exercise supplemental jurisdiction over these remaining state law claims. *See Adams v. Suozzi,* 517 F.3d 124, 129 (2d Cir.2008); *Kolari v. New York–Presbyterian Hosp.,* 455 F.3d 118, 122–23 & n. 6 (2d Cir.2006).

A trial court considering a Rule 12(b)(6) motion must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006) (citation omitted).

Under the pleading standard set forth in Rule 8(a)(2), complaints must include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "[A] plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests." *Leibowitz v. Cornell Univ.,* 445 F.3d 586, 591 (2d Cir.2006). Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff." *Dura*

*Pharms., Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

**\*9** A court considering a Rule 12(b)(6) motion applies a "flexible plausibility standard," which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Boykin v. KeyCorp,* 521 F.3d 202, 213 (2d Cir.2008) (citation omitted). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

1. *Breach of Contract*

The elements of a breach of contract claim under New York law are as follows: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 177 (2d Cir.2004); *see also Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996). "[A] company's certificate of incorporation and by-laws in substance are a contract between the corporation and its shareholders and among the shareholders *inter se." Management Techs., Inc. v. Morris,* 961 F.Supp. 640, 646 (S.D.N.Y.1997).

In the first amended complaint, Wynne asserted that Janis and Paul were liable to her for breach of contract. [10] She claimed that M+J Savitt's certificate of incorporation and bylaws were contracts between M+J Savitt shareholders, that she had performed under the contracts, and that by the acts described in the complaint Janis and Paul had breached these contracts. Wynne's allegations fail to state a claim for breach of contract, as they do not allege what provision or provisions of the contracts the defendants breached by virtue of their actions. Simply conclusorily alleging that all of the actions described previously in the complaint were a breach of these contracts generally is insufficient to plead the element of breach beyond a speculative level.

Wynne's new allegation in the second amended complaint that Janis and Paul breached the contract by breaching the implied covenant of good faith and fair dealing cannot save this claim. "Integral to a finding of a breach of the implied covenant [of good faith and fair dealing] is a party's action that directly violates an obligation that may be presumed to have been intended by the parties." *M/A–COM Sec. Corp. v. Galesi,* 904

F.2d 134, 136 (2d Cir.1990); *see also Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 407–08 (2d Cir.2006). The implied covenant of good faith and fair dealing "can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.,* 418 F.3d 187, 198–99 (2d Cir.2005) (citation omitted). Plaintiffs have not described the provisions of the contracts that allegedly were breached, nor have they pled what obligations and rights can be presumed to have been intended from the contracts' substantive provisions. As such, plaintiffs' fail to state a claim for breach on this theory, and defendants' motion to dismiss this claim is granted.

### 2. *Unjust Enrichment*

**\*10**  "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.,* 448 F.3d 573, 586 (2d Cir.2006) (citation omitted). "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement." Id.* (citation omitted). The essence of an unjust enrichment claim "is that one party has received money or a benefit at the expense of another." *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000) (citation omitted). To bring such a claim, the plaintiff must have bestowed the benefit on the defendant. *See Aymes v. Gateway Demolition Inc.,* 30 A.D.3d 196, 817 N.Y.S.2d 233, 234 (1st Dep't 2006). It is not sufficient for defendant to receive some indirect benefit—the benefit received must be "specific and direct" to support an unjust enrichment claim. *Kaye,* 202 F.3d at 616.

In the first amended complaint, Wynne alleged that Janis was unjustly enriched by her use of M+J Savitt intellectual property and inventory. Wynne claims in the second amended complaint that she personally lent M+J Savitt hundreds of thousands of dollars, and that Janis was unjustly enriched by not having to make such payments .[11] The benefit conferred by Wynne in this situation, however, went directly to M+J Savitt; Wynne does not assert that her loans were made to Janis. Moreover, she does not allege that Janis was under any obligation to make similar payments to M+J Savitt such that Wynne's loan relieved her of those obligations and thereby conferred a benefit on them for which equity requires restitution. *See id.* (overturning verdict finding unjust enrichment where plaintiff "offered no evidence

demonstrating that [defendant] actually received any portion of the loan, nor did she show that the loan relieved [defendant] of any financial obligations for which she otherwise would have been responsible")

Wynne's additional allegations on this claim in the second amended complaint state that Janis improperly used M+J Savitt property and money for her personal use, while Wynne did not engage in such acts. The fact that Wynne did not engage in this conduct, however, is insufficient to plead that Wynne herself conveyed some sort of benefit on defendants that in equity should be hers. Finally, Wynne's claims that Janis's use of M+J Savitt's intellectual property and inventory hurt the value of Wynne's stock and that she was unjustly enriched by such use again do not allege any benefit that Wynne, as opposed to M+J Savitt, conferred upon Janis. Thus, Wynne has failed to state a claim for unjust enrichment.

### 3. *Defamation*

"Under New York law, the elements of a defamation claim are a false statement, published without privilege or authorization to a third party, constituting fault and it must either cause special harm or constitute defamation per se." *Peters v. Baldwin Union Free School Dist.,* 320 F.3d 164, 169 (2d Cir.2003) (citation omitted); *see also Albert v. Loksen,* 239 F.3d 256, 265–66 (2d Cir.2001) (spoken defamation is slander and "[t]he elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege" (citation omitted)).

**\*11**  Wynne alleges that Janis defamed her by falsely accusing Wynne of "fucking the bookkeeper" in front of M+J Savitt employees on "several occasions" during normal business hours.[12] Defendants move to dismiss the claim on two grounds: that it is outside of the one year statute of limitations and that it was not sufficiently pleaded with specificity as to the time, manner, and persons to whom it was published.

As for the first contention, plaintiffs argue that the statement was made on multiple occasions and that defendants "know[ ]" it was made within the statute of limitations. It is unclear from the complaint when the statement was made and therefore whether it was within the statute of limitations. A

statute of limitations defense is an affirmative defense upon which the defendants bear the burden of proof. *See Overall v. Estate of Klotz,* 52 F.3d 398, 403 (2d Cir.1995). Because the allegations of the complaint do not clearly demonstrate the claim is time-barred, it will not be dismissed on this ground.

As for the second contention, while it is true that defamation plaintiffs in New York must plead the particular words complained of and "must allege the time, place and manner of the false statement and ... specify to whom it was made," *Dillon v. City of New York,* 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (1st Dep't 1999), "a defamation action brought in federal court is governed by Fed.R.Civ.P. 8, which requires averments to be simple, concise, and direct, and not by such a state pleading requirement ...." *Odom v. Columbia Univ. .,* 906 F.Supp. 188, 196 (S.D.N.Y.1995) (citation omitted); *see also Hogan v. Wal–Mart Stores, Inc.,* 167 F.3d 781, 783 (2d Cir.1999) (federal law governs matters of procedure). Wynne's allegation that Janis made her statement on several occasions, in front of M+J Savitt employees during business hours, is sufficient to put defendants on notice of the claim. Therefore, the motion to dismiss Wynne's defamation claim against Janis is denied.

### 4. *Fraud*
"The elements of fraud under New York law are: (1) a misrepresentation or a material omission of material fact which was false and known by defendant to be false, (2) made for the purpose of inducing the plaintiff to rely on it, and (3) justifiably relied upon by the plaintiff, (4) who then suffered an injury as a result of such reliance." *City of New York v. Smokes–Spirits.Com, Inc.,* 541 F.3d 425, 454 (2d Cir.2008) (citation omitted). "[A]llegations of third-party reliance ... are insufficient to make out a common law fraud claim under New York law." *Id.* Additionally, a claim for fraud "may be predicated on acts of concealment where the defendant had a duty to disclose material information." *Id.* (citation omitted).

"Federal Rule of Civil Procedure 9(b) sets forth a heightened pleading standard for allegations of fraud: 'In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.' " *Lerner v. Fleet Bank, N.A .,* 459 F.3d 273, 290 (2d Cir.2006). Under Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (citation omitted). While, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred

generally," courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations.... [P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Id.* (citation omitted).

**\*12** Most of the allegations in the second amended complaint allege conduct that purportedly defrauded M+J Savitt, causing injuries to the corporation. Wynne cannot assert such claims in this action for the reasons discussed above. In addition, most of the allegations simply allege wrongful conduct on the part of defendants, such as the claims that defendants have converted M+J Savitt inventory and are competing with M+J Savitt, and are completely devoid of any alleged misrepresentations and reliance, and as such fail to state a claim for fraud. The allegation that "[d]efendants, in concert and cooperation with one another, made material misrepresentations and omissions to Plaintiffs with respect to their abilities and intentions on acting and serving as shareholders and corporate officers" falls far short of the heightened pleading requirements for fraud discussed above.

The only statement alleged that comes close to fulfilling the pleading requirements for defrauding Wynne is the allegation that Michelle falsely represented to Wynne that Michelle was not going to attend the Special Meeting, and that Wynne relied on this representation to her detriment in believing that without Michelle, no quorum would be constituted. Even this statement, however, fails to meet the pleading requirements for fraud, as it does not allege when and where Michelle made this statement, nor does it allege facts that give rise to a strong inference of fraudulent intent. Thus, defendants' motion to dismiss the claim for fraud is granted.

### 5. *Gross Negligence*
"To establish a prima facie case of negligence under New York law, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Id.* at 286 (citation omitted). Gross negligence is "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *American Telephone and Telegraph Co. v. City of New York,* 83 F.3d 549, 556 (2d Cir.1996) (citation omitted).

In the first amended complaint, Wynne's claim for gross negligence simply alleged that defendants' actions that had been described earlier in the complaint were "wanton,

reckless, malicious and grossly negligent." The second amended complaint newly alleges that defendants owed fiduciary duties to Wynne as a minority shareholder that were breached.

 "[A] shareholder, even a sole shareholder or one in a closely held corporation, typically does not have standing to sue for injuries to the corporation itself. However, *where a defendant owes an independent duty to the shareholder* and the shareholder and the defendant are in privity, *the shareholder may sue for* damages caused by the *defendant's negligence which results in injury that is personal to the shareholder and independent of the damage caused to the corporation.* Often, such damages consist of loss in value of the plaintiff's shares in the corporation."

 **\*13** *Lawrence Ins. Group, Inc. v. KPMG Peat Marwick L.L.P.,* 5 A.D.3d 918, 773 N.Y.S.2d 164, 166 (3d Dep't 2004) (citation omitted) (emphasis supplied); *see also Barbour v. Knecht,* 296 A.D.2d 218, 743 N.Y.S.2d 483, 491 (1st Dep't 2002) ("Majority shareholders and directors of a close corporation stand in a fiduciary relationship with the corporation and minority stockholders and are required to exercise the utmost good faith. Since defendant ... is a close corporation, plaintiff's complaint that she and the other minority shareholders have been frozen out of the management of the corporation asserts a cognizable wrong." (citation omitted)).

Even assuming plaintiffs have adequately pled an independent duty owed by defendants to Wynne by virtue of her status as a minority shareholder, the second amended complaint is still deficient as to this cause of action. Plaintiffs simply state that all of the "Challenged Transactions" that are listed later in the second amended complaint (and the failure to address those transactions) demonstrate gross negligence on the part of defendants. Simply referring to 37 asserted wrongful actions, taken by different defendants and at different times, does not adequately plead how each or any of these actions (or failure to act in response) breached a specific duty, and furthermore how that particular breach meets the high standard for gross negligence. Additionally, the "Challenged Transactions" are generally the same wrongful acts upon which plaintiffs based their claims of injury to M +J Savitt. Plaintiffs have not adequately pleaded which of these acts that caused injury to M+J Savitt also caused an "injury that is personal to [Wynne] and independent of the damage caused to the corporation." *Lawrence,* 773 N.Y.S.2d at 166. As such, plaintiffs have failed to state a claim for gross negligence, and the motion to dismiss the claim is granted.

 6. *Intentional Infliction of Emotional Distress*
"Under New York law, a claim of intentional infliction of emotional distress requires: (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Conboy v. AT & T Corp.,* 241 F.3d 242, 258 (2d Cir.2001) (citation omitted). "[T]he standard for stating a valid claim of intentional infliction of emotional distress is rigorous, and difficult to satisfy." *Id.* (citation omitted). "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (citation omitted).

Courts have sustained claims of intentional infliction of emotional distress where the claims "involved some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy." *Stuto v. Fleishman,* 164 F.3d 820, 828 (2d Cir.1999); *see also Eves v. Ray,* 42 A.D.3d 481, 840 N.Y.S.2d 105, 106–07 (2d Dep't 2007) (claim sustained where evidence showed a "deliberate and malicious campaign of harassment or intimidation" including threatening the defendant both physically and financially, and stalking him "despite the fact that the defendant had obtained a temporary order of protection" (citation omitted)). The New York Court of Appeals, however, has indicated that it is unlikely to recognize claims for intentional infliction of emotional distress where other tort remedies are available. *See Fischer v. Maloney,* 43 N.Y.2d 553, 557–58, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978); *see also Herlihy v. Metropolitan Museum of Art,* 214 A.D.2d 250, 263, 633 N.Y.S.2d 106 (1st Dep't 1995) ("plaintiff's cause of action for intentional infliction of emotional distress must ... fail because it falls within the ambit of other traditional tort liability which, in this case, is reflected in plaintiff's causes of action sounding in defamation").

 **\*14** Wynne asserts this cause of action against Janis and Paul. As to Janis, Wynne alleges, as described above, that Janis told Wynne that she was "fucking the bookkeeper" in front of M+J Savitt employees. Wynne also states that Janis has repeatedly "communicated to Wynne Savitt and her family members her intention to cause them severe bodily injury to such an extent that Wynne Savitt has sought to file

Case 1:25-cv-04295-EK-LKE    Document 43-5    Filed 02/23/26    Page 63 of 64 PageID #: 626

a criminal restraining order against Janis." As for Paul, he told Wynne she was "out of his estate" and has prevented Wynne from visiting her mother. The complaint alleges generally that both Paul and Janis have made "vile, offensive, defamatory, lewd and morally reprehensible statements and representations about" Wynne.

The statements and actions attributed to Paul regarding his estate and Mildred do not meet the rigorous standard for asserting a claim for intentional infliction of emotional distress as a matter of law. Wynne's contention that Janis and Paul made certain unspecified vile and morally reprehensible statements about Wynne is too vague and conclusory to state a claim for intentional infliction of emotional distress. As such, defendants' motion to dismiss this claim will be granted as to Paul.

As for Janis's actions, the statement regarding the bookkeeper, as discussed above, falls within the ambit of her claim for defamation, and thus Wynne's intentional infliction of emotional distress claim based on that statement fails. Additionally, the statement, while offensive, is not so outrageous as to satisfy the rigorous standard for asserting this claim. Wynne's allegations of Janis's threats of bodily harm are too vague and conclusory, in the context of this heated dispute between family members who are involved in a close corporation, to be said to be so outrageous and extreme such as to constitute intentional infliction of emotional distress. Thus, defendants' motion to dismiss Wynne's claim for intentional infliction of emotional distress as to Janis is also granted.

CONCLUSION

Defendants' February 14, 2009 motion to dismiss is denied as to plaintiff Wynne Savitt's claim for defamation against Janis Savitt, and it is granted with prejudice as to all other claims. A scheduling order shall govern further proceedings on the remaining defamation claim.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2009 WL 691278

---

## Footnotes

1    An April 2009 trial date had been chosen on December 9, 2008 in response to the plaintiffs' request for an expedited schedule for this litigation. As a result, discovery was ongoing as the parties litigated the adequacy of the complaint; fact discovery was due to close on February 27, 2009. There was no suggestion at the conference therefore that the plaintiffs would be able to bring new claims or add new defendants at this late date, and no request by the plaintiffs that they be able to do so.

2    As discussed above, while the second amended complaint seeks to newly assert Claim 17 on behalf of Wynne individually as well, that amendment is outside the scope of the permitted amendment and is stricken.

3    As discussed above, while the second amended complaint seeks to newly assert Claim 18 on behalf of M+J Savitt as well, that amendment is outside the scope of the permitted amendment and is stricken.

4    The second amended complaint newly alleges that Wynne has authority to initiate a direct lawsuit on behalf of M+J Savitt. This allegation is outside the scope of the permitted amendment and will be stricken.

5    While *Harris v. Carter,* 582 A.2d 222, 230–31 (Del.Ch.1990), cast doubt on this aspect of *Brody,* the circumstances at issue in *Harris* do not apply in this case. For one, this case involves New York law, not Delaware law. More significantly, the Delaware courts have explained that the exception described in *Harris* that would excuse a derivative plaintiff from having to make a new demand (or show it would be futile) when filing an amended derivative complaint after a new board of directors is installed applies only if "first, the original complaint was well pleaded as a derivative action; second, the original complaint satisfied the legal test for demand excusal; and third, the act or transaction complained of in the amendment is essentially the

same as the act or transaction challenged in the original complaint." *Braddock v. Zimmerman,* 906 A.2d 776, 786 (Del.Super.Ct.2006). Additionally, "where a complaint is amended with permission following a dismissal without prejudice, even if the act or transaction complained of in the amendment is essentially the same conduct that was challenged in the original dismissed complaint, the Rule 23.1 demand inquiry must be assessed by reference to the board in place at the time when the amended complaint is filed." *Id.* In the instant case, there has been no previous well-pleaded derivative complaint, and as such, the relevant board for assessing the demand inquiry is the one in place at the time of the filing of the second amended complaint.

6   Plaintiffs' allegations in the second amended complaint that because the Special Meeting was invalid, the Old Board was actually in place at the time of the filing of the second amended complaint, are outside the scope of the permitted amendment and will not be considered.

7   Plaintiffs seem to recognize that they did not plead demand futility adequately, as they explain in papers on a separate motion that they attempted to voluntarily dismiss this action without prejudice "based upon an independent analysis of the challenged futility issue, as well as considering whether the demand, required for the shareholder derivative action, was proper."

8   While the instant motion to dismiss was pending, plaintiffs advised the Court that Wynne had made a formal demand on the New Board dated March 4, 2009. This demand, however, does not help their position on the instant motion to dismiss, because, as discussed above, the purpose of the demand requirement is to give the corporation the opportunity to respond to the challenged actions prior to filing suit. *See Bansbach,* 1 N.Y.3d at 4, 769 N.Y.S.2d 175, 801 N.E.2d 395 ("Because a derivative action is brought on the corporation's behalf, the law generally requires that demand *first* be made on the board of directors to pursue the claim." (Emphasis supplied)); *see also In re Omnicom Group Inc. S'holder Derivative Litig.,* 43 A.D.3d 766, 842 N.Y.S.2d 408, 410 (1st Dep't 2007) (explaining that Court of Appeals in *Marx* "emphasized that *pre-suit* demand is the rule, that excusing demand is the exception, and that the exception should not be permitted to swallow the rule" (emphasis supplied)).

9   Because the derivative claims are dismissed on this ground, it is unnecessary to reach defendants' argument that dismissal is appropriate because of inadequate verification of the pleadings.

10  Wynne's assertions of this claim in the second amended complaint against additional defendants are beyond the scope of the permitted amendment and are stricken.

11  Plaintiffs' assertion of this claim against additional defendants is outside the scope of the permitted amendment.

12  The additional allegations of defamation are asserted on behalf of, and for injury to, M+J Savitt, and therefore cannot be brought derivatively by Wynne for the reasons discussed above.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.