**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

**LORETTA WATKINS** **Case No.: 1:25-cv-04295-EK -LKE**

**Plaintiff,**

**-against-**

**MALEN & ASSOCIATES, P.C.,**
**HASHEM HUSSEIN, A & F PROCESS SERVICE, INC.**
**d/b/a ALLIED PROCESS SERVICE,**
**ANTHONY MONDRONE; and FRANCES MONDRONE**

**Defendants.**

-------------------------------------------------------------------X

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR LEAVE TO AMEND HER COMPLAINT

The Law Office of Ahmad Keshavarz
16 Court Street, 26th Floor
Brooklyn, NY 11241-1026
(718) 522-7900
*Co-Counsel for Plaintiff Loretta Wakins*

CAMBA LEGAL SERVICES, INC.
Matthew Schedler, Of Counsel
Divya Subrahmanyam, Esq., Of Counsel
Pooja Patel, Of Counsel
Elizabeth Miller, General Counsel
20 Snyder Ave.
Brooklyn, NY 11226
Phone: (718) 940-6311
*Matthew.Schedler@camba.org*

## Contents

TABLE OF AUTHORITIES .......... ii

A. PRELIMINARY STATEMENT .......... 1

B. PROCEDURAL HISTORY .......... 3

C. FACTUAL ALLEGATIONS .......... 3

D. LEGAL STANDARD .......... 10

E. ARGUMENT .......... 11

*1. Plaintiff's Proposed Amendment as to Anthony Mondrone Is Not Futile* .......... 11

*2. Proposed Amendment Is Not In Bad Faith, Unduly Delayed, or Unduly Prejudicial* .......... 13

*3. Plaintiff's Proposal To Amend Her Complaint To Add Claims Against Frances Mondrone Of Negligence, Negligence Per Se, And Notarial Misconduct Under Executive Law `35 Is Meritorious And Not Futile.* .......... 14

F. CONCLUSION .......... 16

# TABLE OF AUTHORITIES

## Cases

*Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 177 (2d Cir. 2013 .......................... 13
*Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993). ............................................... 15
*Burnett v. Andrews-Dyke*, 185 A.D.3d 1196, 1197 (2020)....................................................... 16
*Calixto v. A. Balsamo Rosenblatt, P.C.,* 244 A.D. 3d at 677 (App. Div. 2nd Dep't. 2025) .......... 13
*Damian Batista and Sandra Batista v. Edelman Schwartz PLLC, et. al*., 2026 WL 2905776 (September 28, 2026);........................................................................................................ 13
*Feinstein v. Bergner*, 48. N.Y. 2d 234 (1979) ............................................................................. 1
*Guzman v. Mel S. Harris & Assocs., LLC*, 2018 WL 1665252, at *8-9 (S.D.N.Y. Mar. 22, 2018) ........................................................................................................................ 3, 12, 14
*Miller v. United States ex rel. Miller*, 110 F.4th 533, 550 (2d Cir. 2024) ................................... 10
*New York Department of State*, Notary Public License Law (Sept. 2026) .................................. 16
*Richardson Greenshields Securities, Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) ............ 11
*Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008)................................................. 11
*Ryan v. IM Kapco, Inc.*, 88 A.D. 3d 682, 683 (App. Div. 2d Dep't 2011)................................. 13
*Sanchez v. Ehlrich*, 2018 WL 2084147, at *6 (S.D.N.Y. March 29, 2018)................................ 13
*State Farm Ins. Cos. v. Kop-Coat, Inc.*, 183 Fed. Appx. 36, 38 (2d Cir. 2006) (unpublished).... 11
*State Teachers Ret. Bd. V. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) .......................... 11, 15
*TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ..................................... 10
*Texidor v. Tromberg, Morris, & Poulin, PLLC,* 2023 WL 8043067 (E.D.N.Y. Nov. 20, 2023). 14
*Velocity Investments, LLC v. McCaffrey*, 31 Misc. 3d 308 (Dist. Ct., Nassau County 2011) ...... 10
*Wilson v. Selip & Stylianou, LLP*, No. 24-CV-4108 (ALC), 2026 WL 851338, at *8 (S.D.N.Y. Mar. 27, 2026)........................................................................................................... 13

## Statutes

19 NYCRR § 182.3.................................................................................................................... 16
19 NYCRR Part 182 .................................................................................................................. 17
6 RCNY § 2-233b ........................................................................................................................ 5
6 RCNY § 2-234a (b)(2)(ii) ....................................................................................................... 14
CPLR § 2309(b).......................................................................................................................... 16
CPLR § 308.................................................................................................................................. 4

## A. PRELIMINARY STATEMENT

New York's rules of service are rooted in the right to due process and exist to ensure that people know about the lawsuits against them. *Feinstein v. Bergner*, 48. N.Y. 2d 234 (1979). Over the last 20 years, however, defendants in consumer credit collection actions have been systemically denied the right to be heard because of purposefully improper service. The practice is so widespread it has been given its own term, "sewer service," likening it to the act of process servers throwing papers into the sewer rather than delivering them to defendants. The reason purposeful improper service is so widespread is because it allows plaintiffs to obtain default judgments, which are extremely valuable. On default, a plaintiff can get a judgment for any amount they chose to demand in a complaint. And once they have a default judgment, a plaintiff can garnish wages, freeze a bank account, or put a lien against property. Plaintiffs and their law firms can use these enforcement tools to coerce defendants to pay debts they do not owe, or pay more than they believe they owe, all without having to prove their case in court.

Ms. Watkins is the victim of one such scheme. Capital One took a default judgment against Ms. Watkins based on a false affidavit from process server Hashem Hussein ("Mr. Hussein"). Hussein served process for Allied Process Service ("Allied"), a process serving agency, operated by Anthony Mondrone ("Mr. Mondrone"). Mr. Mondrone makes the business decisions, is the sole employee of the company, hires the process servers, is in charge of record keeping and fulfills many of the day to day duties for the company. He personally takes all the actions and makes all the decisions for Allied Process Service other than those delineated to Frances Mondrone. Frances Mondrone ("Ms. Mondrone") works for Allied and at the time of the events in the complaint was an employee and purported to notarized Allied's affidavits of service.

The affidavit of service in Ms. Watkins' case described service on a fictional relative made at a time that could not have been possible based on Mr. Hussein's sworn affidavits of service in other cases. In addition to that impossibility, the affidavits of service filed by Mr. Hussein are false in multiple additional ways. For example, Hussein does not in fact mail a copy of the summons and complaint to consumers as he alleges in the affidavit. Ex C Hussein Dep. 128:18-25, 129:1-4 (Sept. 1, 2026). Further, on information and belief, Hussein in fact does not sign the affidavits of service, nor does he have it notarized in front of a notary. At his deposition, Hussein testified that his only interaction with Frances Mondrone ("Ms. Mondrone"), Allied's sole notary public, is getting service assignments and information about cases. Ex C 55-57 (Sept. 1, 2026). He testified does not have any other interactions with her, much less signing hundreds of affidavits of service in front of her to notarize. *Id*. In response to direct questions about the notarization process Hussein asserted his Fifth Amendment right against self-incrimination, when he was asked if his signatures were on any of the affidavits of service, his he pled the fifth again and when asked if Frances Mondrone's signature was on the notary line he again pled the fifth. Ex. C 176:13-16, 190-202 (Sept. 2, 2026) When asked about the notarization process generally in his deposition, Mr. Hussein asserted his Fifth Amendment right against self-incrimination.

Plaintiff seeks leave to amend her complaint to add Anthony Mondrone as a defendant and assert claims against him for violating the Fair Debt Collection Practices Act ("FDCPA") as well as for negligence, negligent hiring/retention/supervision, negligence *per se* and gross negligence, and to add Frances Mondrone as a defendant and assert claims against her for notarial misconduct in violation of NY Exec. L. § 135; negligence; and negligence *per se.* Notary fraud and illegal service schemes are unfortunately common in New York, and courts

have held the principals of process serving agencies are liable under the FDCPA. *Guzman v. Mel S. Harris & Assocs., LLC*, 2018 WL 1665252, at *8-9 (S.D.N.Y. Mar. 22, 2018).

Because the claims she seeks to add are meritorious and because her proposed amendment is not in bad faith, unduly delayed, or unduly prejudicial, Ms. Watkins respectfully asks the Court to grant her Motion for Leave to Amend.

## B. PROCEDURAL HISTORY

This action was filed on August 2025. Defendants appeared in the action and Capital One filed a Motion to Dismiss. While that motion was under consideration Capital One and Ms. Watkins settled. The case proceeded against the Malen, Hussein, and Allied Defendants. The parties have exchanged initial paper discovery. Plaintiff deposed Hussein on September 1, 2026 and September 2, 2026, and Plaintiff deposed Anthony Mondrone as Allied's 30(b)(6) representative and Francis Mondrone on September 23, 2026.. Plaintiff has obtained the transcripts of Hussein's deposition, and annexes them to this motion, but has not yet obtained the transcripts of the Mondrones' depositions. Per the most recent scheduling order in the case Ms. Watkins' deadline to move to add new parties and amend her complaint is September 30, 2026.

## C. FACTUAL ALLEGATIONS

Ms. Watkins seeks to amend to add facts that she learned in discovery and claims related to those facts. These facts include but are not limited to Anthony Mondrone's role as Allied's owner, record keeper, and sole decisionmaker, details of Hussein's methods of improper service, and Frances Mondrone's role as a notary and the sham notarization process.

### *Hussein's Improper Service*

As detailed in the original complaint, Hussein engages in widespread improper service. Hussein claims he traveled to the locations he allegedly serves via bicycle. He then drives to the

first location to effect service, unpacks a foldable bike he keeps in his trunk, and physically pedals to the remaining locations he is supposed to serve. Ex. C Hussein Dep. 111 (Sept. 1, 2026). Allied only paid Mr. Hussein $14 or $15 for successful completion of service. He was not paid anything for an unsuccessful attempt at service. So if Mr. Hussein went to a location and no one was home, he would not get paid. Instead, to get paid, he would have had to go back to the address on another occasion until he met the due diligence requirement of CPLR § 308 Ex. C Dep. 72-76 (Sept. 1, 2026). For this reason, it is much more lucrative and efficient if Mr. Hussein is able to report that he successfully performed process on the first try.

To that end, Hussein claims that he is able to perform substitute service on virtually every attempt. This means that he always finds someone home, but that person is never the defendant. Near universal claims of substitute service are frequent in sewer service schemes because it is harder to challenge. Unlike personal service where you can compare the description to the defendant of affix and mail where there will be three GPS records disputes of substitute service are a more difficult factual inquiry and harder for defendants to dispute.

In addition to the near universal claims of substitute service Hussein alleges service at times and locations that are impossible. For example, on April 11, 2023, beginning at 6:00:03 AM and ending at 6:41:22 AM, Hussein claims to have served 35 defendants in the sprawling, multi-block, multi-building Flatbush Gardens complex (formerly Vanderveer Estates) in 41 minutes, supposedly serving a new defendant every one minute and eleven seconds. For this to be true, in each instance of service, Hussein would have had to have traveled to the correct apartment, often in a different building and/or on a different floor from the previous apartment served; knocked on the door; waited for someone to come to the door; had a brief conversation with the person answering the door (who in every instance is not the defendant) in which he assessed that they

were of suitable age and discretion; left papers with the person answering the door; and made his logbook entry, all in one minute and eleven seconds.

***Hussein's false GPS recordings***

Process servers licensed to serve in New York City are required to use a GPS, or Global Positioning System, device to record their location contemporaneously at the alleged time of service. This is to ensure that they are actually at the locations where and when they are claiming to serve process. 6 RCNY § 2-233b.

While Hussein uses a GPS system, he does not make his location recordings at the actual address of service and a close inspection of his records confirms that he is not going to those addresses. Despite this, Allied employs a GPS recording and printout system that is used to falsely claim that process servers like Hussein are actually serving process. Allied Process Service uses a proprietary website that incorporates GPS recording, and whose data is accessible by Allied and its law firm clients but not by the general public. When a process server performs service, he clicks a button on the website that says "record my location" and a GPS recording is made. The process server is also able to type in information related to how service was performed such as the name and description of the person served and, based on what the process server inputs, an affidavit of service is later generated.

Users of Allied's website, like a law firm, can search for an instance of service and receive a record that shows a Google map of a marked location at the longitude and latitude coordinates recorded by the process server, the time of service, the name of the person served, the name of the process server, and other case identifying information. The record does *not* include the address of service and does not show the address of service on the map. Exhibit D (Watkins Record and Maps). This record gives the impression that a GPS recording was made at the service address,

and Allied, Malen, and other law firms routinely submit printouts of these records to courts as evidence of proper service. That is exactly what happened here: Allied generated a compelling-looking GPS record of Hussein's location at the alleged time of service on Ms. Watkins that gives the impression that Mr. Hussein went to her address. Ex. D.

But in truth, Hussein did not attempt service at Ms. Watkins' home. Instead, the GPS coordinates (recorded by Mr. Hussein himself) are for a parking lot about 1.7 miles away from Ms. Watkins' home, as shown by the Google maps printout showing both Ms. Watkins' home and the coordinates on Allied's GPS record. Ex D.

The misleading record in Ms. Watkins' case was not an isolated instance. Mr. Hussein routinely makes GPS recordings at locations far away from where he is allegedly performing service. For example, on April 7, 2023, the day he served Ms. Watkins, Mr. Hussein's logbook shows that he allegedly performed service on nine separate addresses in the 37 minutes between 6:00 A.M and 6:37 A.M.

A Google Maps printout of the bicycle route through all these addresses (used because Hussein testified that he bicycles between service locations), in the order alleged by Mr. Hussein, shows the travel time it takes to bike between these locations is about an hour and 26 minutes. Ex E (April 7, 2023 service addresses map). Given the distance between these locations, service at the times alleged by Mr. Hussein is impossible.

Mr. Hussein's own GPS records support this: although there are GPS recordings made for each attempt, they do *not* follow the locations of service. This can be seen by comparing by the map of the route through longitude and latitude coordinates for the GPS recordings made on April 7, 2023, attached as Exhibit F, with the map of the route through the addresses he was supposed to be serving, Ex E.

As the GPS map at Exhibit F shows, Mr. Hussein made a series of GPS entries in an almost straight line that excludes many of the addresses he was supposed to perform service. And it is visibly different from the route he would have had to take to actually effect service, shown in Exhibit C, which zigs and zags through various locations.

In other words, Mr. Hussein was not making GPS recordings at the locations where he was supposed to be performing service or even traveling to these addresses.

***Allied's Sham Notarization Process***

Hussein's false affidavits of service are enabled, in part, by a sham notarization process. Frances Mondrone is the notary for Allied Process Service, and she allegedly notarizes the affidavits of service executed by Allied Process Service's process servers. Ms. Mondrone does not keep a record of her notarizations. Worse, Ms. Mondrone also does not administer an oath or affirmation to the process server to ensure the affidavit of service is accurate, and she does not notarize the affidavits of service in the physical presence of the person who is signing them.

Hussein testified in his deposition that he was not sure what Frances Mondrone's role at Allied Process Service was, that he communicated with her via text, email, and on the phone but their interactions only involved her giving him process to serve and general office help and did not involve notarizing his affidavits of service. Ex C. 55-57 (Sept. 1, 2026). On this point Hussein was specific:

"Q: Okay. So your -- just to sum up, your interactions were solely texting, getting assignments, getting things fixed on the computer?

A: Just work related stuff.

Q: Okay. Anything else?

A: That I could recall? No." Hussein Dep. 57:9-19 (Sept. 1, 2026)

In response to questions about the notarization process Mr. Hussein plead the fifth, stating:

"Q: Can you describe how you would fill out the affidavit of service?

A: By signing it.

Q: Okay. Where would you sign it?

A: I will take the fifth on that.

Q: So just to be clear, you are pleading the fifth against rights to self-incrimination. For the question of where you would fill out the affidavit of service?

A: Yes, sir.

Q: Okay. When would you fill out the affidavit of service?

A: I'll also plead a fifth on that one.

Q: Okay. What would you reference when you were filling it out?

A: I plead a fifth on that one.

Q: Would you check it against your paper logbook?

A: I plead a fifth on that one." Ex. C 126:18-25, 127:1-14 (Sept. 1, 2026)

A few questions later Mr. Hussein continued:

"Q: Okay. Were your affidavits of service notarized?

A: I plead the fifth.

Q: Who notarized your affidavits of service?

A: I plead the fifth.

Q: How did that notarization process work?

A: I plead the fifth.

Q: Were you in front of Francis (sic) Mondrone when you signed those affidavits of service?

A: I plead the fifth.

Q: Did Francis Mondrone notarize all of your affidavits?

A: I plead the fifth.

Q: Okay. Is there anything about the notarization process that you can tell us?

A: I plead the fifth." Ex. C 127:22-25, 128:1-17 (Sept. 1, 2026)

Hussein would not substantively answer any questions relating to any specific affidavit of service. In response to the question of whether Ms. Watkins' affidavit was true, Mr. Hussein pled the fifth; in response to the question of whether Ms. Watkins' affidavit of service bore Frances Mondrone's signature Mr. Hussein pled the fifth; in response to the question of whether Ms. Watkins' affidavit of service bore his signature Mr. Hussein pled the fifth. Ex. C176:13-16, 190-202 (Sept. 2, 2026). With respect to questions about specific affidavits of service, Mr. Hussein again pled the fifth.

Mr. Hussein's inability to testify to questions regarding the notary process without incriminating himself suggests that Allied Process Service and Frances Mondrone are not notarizing documents and are instead robosigning affidavits of service without the affiant present and without administering an oath or affirmation.

The notary serves a protective function to make sure that the statements in the affidavits of service are true and that process servers are attesting to the information they allege. For this reason, notarization misconduct is frequently seen in improper service schemes. For example, in *Pfau v. Forster and Garbus et. al.* Index No. 8236/2009 (Sup. Ct. Erie County) William Singler, an owner of Americal Legal Process, was engaged in widespread notary fraud, a crime he was eventually sent to prison for. Ex F (Pfau Complaint); *Velocity Investments, LLC v. McCaffrey*, 31 Misc. 3d 308 (Dist. Ct., Nassau County 2011).

### D. LEGAL STANDARD

Under Fed. R. Civ. P. 15(a)(1), "[a] party may amend its pleading once as a matter of course no later than . . . 21 days after serving it, or . . . 21 days after service of a responsive pleading or 21 days after service of a motion" to dismiss. Fed. R. Civ. P. 15(a)(2) continues: "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

Here, because Defendants answered her Complaint more than 21 days ago, Ms. Watkins asks permission to file her FAC under Fed. R. Civ. P. 15(a)(2). While the text of the rule provides that leave should be "freely" given, "a district court may decline to grant such leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Miller v. United States ex rel. Miller*, 110 F.4th 533, 550 (2d Cir. 2024) (citing to *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal quotation marks omitted).

"Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (citing to *State Teachers Ret. Bd. V. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (internal quotation marks omitted). Courts routinely grant leave to amend pleadings that were filed three, four, or even five years earlier. *See Richardson Greenshields Securities, Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (collecting cases). That a party's request to amend would not "result in new problems of proof," that no trial date has yet been set, and that no motions for summary judgment have yet been filed are all factors pointing to a lack of undue prejudice. *State Teachers Ret. Bd.*, 654 F.2d at 856.

The cases that have upheld the denial of a motion for leave to amend demonstrate just how extreme the facts must be to justify the denial of leave. In *Ruotolo*, the Second Circuit upheld the

denial of a motion to amend the file a third amended complaint *after the entry of final judgment*. *Ruotolo*, 514 F.3d at 190-93. See *also State Farm Ins. Cos. v. Kop-Coat, Inc.*, 183 Fed. Appx. 36, 38 (2d Cir. 2006) (unpublished) ("Appellants' motion to amend was submitted four years after commencement of this action, almost one year after the close of discovery, and five months after the district court's summary judgment ruling.")

**E. ARGUMENT**

A district court may decline to grant leave to amend, which is to be "freely" given, "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Such good reason does not exist here, as Plaintiff's proposed amendment is not futile, not in bad faith, not unduly delayed, and not unduly prejudicial to the opposing parties. *Miller*, 110 F.4th at 550.

*1. Plaintiff's Proposed Amendment as to Anthony Mondrone Is Not Futile*

As referenced above, Plaintiff's proposed amendment to her complaint is far from futile: it asserts a claim against the principal of a process serving agency under the FDCPA and alleges negligence and gross negligence in circumstances similar to those that have been held by other district courts to state a claim for those causes of action.

Anthony Mondrone is the principal of Allied, he is the owner, the record keeper and decision maker. In *Guzman v. Mel S. Harris,* the court specifically found that the principal of a process serving agency can be liable under the FDCPA if he "knows about and has adopted, ratified or approved [unlawful] collection tactics." *Guzman*, 2018 WL 1665252, at * 8 (citations omitted). Because the principal in Guzman was the sole owner of the process serving agency, his knowledge was the agency's knowledge, and a juror could find that he knew or should have known about the improper service of his process servers. The same is true here. Anthony

Mondrone is the sole owner of Allied, he keeps the records, he monitors the process servers, and he knew or should have know about Hussein's systemic practice of improper service. *Id* at 9.

"Under New York law, 'a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Sanchez v. Ehlrich*, 2018 WL 2084147, at *6 (S.D.N.Y. March 29, 2018) (quoting *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 177 (2d Cir. 2013)). "A party is grossly negligent when it fails to exercise even slight care or slight diligence," *Ryan v. IM Kapco, Inc.*, 88 A.D. 3d 682, 683 (App. Div. 2d Dep't 2011) (citation modified). "A party is grossly negligent when it fails to exercise even slight care ... or slight diligence." *Damian Batista and Sandra Batista v. Edelman Schwartz PLLC, et. al.*, 2026 WL 2905776 (September 28, 2026); citing *Calixto v. A. Balsamo Rosenblatt, P.C.,* 244 A.D. 3d at 677 (App. Div. 2nd Dep't. 2025).

Process serving agencies owe consumers a duty of care. *Wilson v. Selip & Stylianou, LLP*, No. 24-CV-4108 (ALC), 2026 WL 851338, at *8 (S.D.N.Y. Mar. 27, 2026). And the agency is liable for the process server's negligent acts when the process server serves as the agent, and where the agency was negligent in selecting, instructing, or supervising him. *Texidor v. Tromberg, Morris, & Poulin, PLLC,* 2023 WL 8043067 (E.D.N.Y. Nov. 20, 2023). In *Texidor* the court held that an illegal process serving scheme could state a claim for negligence and negligent hiring contingent on the relationship between the process server and the agency, describing it as a fact intensive inquiry that cannot be resolved at the early stage, and the same is true here. *Texidor* also held that the principal of the agency who was personally involved in the agency's business was liable for the same claims as asserted against the agency, which included negligence. *Id.* at *9; *cf. Guzman,* 2018 WL 1665252, at * 8.

Here, Mondrone's negligence and negligent hiring, retention and supervision are strongly supported by specific factual allegations. Hussein's improper service was clear to anyone making a passing glance at his logbook who would have seen the thousands of allegations of substitute service made in virtually every case over the course of years. Moreover, Mr. Mondrone was required by the New York Department of Consumer and Worker Protection to create monthly reports of Hussein's service to make sure this type of fraud did not occur. 6 RCNY § 2-234a (b)(2)(ii). If Mr. Mondrone would have engaged in the slightest examination of Hussein's records he would have immediately known they were false. The same is true of the notarization fraud. Mr. Mondrone knew or should have known Ms. Mondrone was not properly notarizing affidavits, as it was happening right under his nose in thousands of instances..

2. *Proposed Amendment Is Not In Bad Faith, Unduly Delayed, or Unduly Prejudicial*

A district court may decline to grant leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice." Plaintiff's proposed amendment is not made in bad faith, not unduly delayed, and not unduly prejudicial. The Court set a schedule for Plaintiff to amend and add new parties and Plaintiff is following that schedule.

Even if there were delay, that alone is an insufficient basis for denying a motion to amend, "absent a showing of bad faith or undue prejudice." *State Teachers Ret. Bd.* at 856. This leaves one argument: prejudice. "In determining what constitutes 'prejudice,' [the Second Circuit] consider[s] whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993). Discovery has begun in this case but because the additional claims are so related to the

existing ones it will not result in significant additional resources. Indeed, the depositions of Anthony Mondrone and Frances Mondrone have already been completed, and initial documents have already been exchanged, and scope of discovery will not be significantly altered by the additional claims as they arise from the same facts. For the same reason the amendment would not significantly delay resolution of the dispute.

3. *Plaintiff's Proposal To Amend Her Complaint To Add Claims Against Frances Mondrone Of Negligence, Negligence Per Se, And Notarial Misconduct Under Executive Law `35 Is Meritorious And Not Futile.*

Executive Law 135 provides a cause of action for notarial misconduct: specifically, "for any misconduct by a notary public in the performance of any of his powers such notary public shall be liable to the parties injured for all damages sustained by them."

Frances Mondrone is a duly qualified notary public within the state of New York and an employee and agent of Allied Process Service. Like all notaries public, to become qualified, Frances Mondrone had to take an oath of office, swearing to "faithfully discharge the duties of the office of Notary Public for the State of New York according to the best of my ability." But as the deposition testimony of Ms. Mondrone and Defendant Mr. Hussein shows, Ms. Mondrone failed to do so and has instead engaged in misconduct in the performance of her powers in order to enrich herself, her son, and her son's business.

New York law and regulations require notaries public to only notarize documents in the physical presence of the affiant (unless specific and detailed procedures for electronic notarization are required). They must also carefully administer an oath or affirmation to the affiant as to the truth of the document to be notarized. *See New York Department of State*, Notary Public License Law (Sept. 2026); 19 NYCRR § 182.3. This is not a technical requirement: the

oath or affirmation is be "administered in in a form calculated to awaken the conscience and impress the mind of the person taking it in accordance with his religious or ethical beliefs." CPLR § 2309(b). This serves to "to awaken the witness to his moral duty to tell the truth, and [] to deter false testimony." *See Burnett v. Andrews-Dyke*, 185 A.D.3d 1196, 1197 (2020).

Notaries public must also:

- "disqualify themselves from performing notarial acts for transactions in which the notary is a party or directly and pecuniarily interested in the transaction";
- "refuse to perform a notarial act when the requirements of this Part are not met, or if the notary is not satisfied that the official record or the presented record evidences the individual's capacity to act as the representative on the record presented for notarization"; and
- Maintain records as required by law.

*New York Department of State*, Notary Public License Law (Sept. 2026); 19 NYCRR Part 182

Ms. Mondrone did not fulfill these obligations of her office. She notarized Hussein's signature on a false affidavit of service claiming that he had been "duly sworn" and had "sworn to" the statements within the affidavit. In fact, Ms. Mondrone did not administer an oath or affirmation—which could have deterred Hussein from making statements—and did not confirm that Hussein swore to the truth of the statements within the affidavit. Ms. Mondrone also failed to conduct even a basic review of the documents she was notarized – if she had, she would have quickly realized that they were false and could not possibly be genuinely sworn to as true. Ms. Mondrone also failed to keep the statutorily required chronological journal of every notarial act she performed.

This was "misconduct by a notary public in the performance of [her] powers," and it caused Ms. Watkins harm. But for the notarized false affidavit of service, Malen would not have been able to obtain, and enforce on, the invalid default judgment that caused her loss of time and money along with emotional distress.

In addition, as a notary public under the laws of the state of New York who swore an oath of office, Frances Mondrone had a duty of care towards the individuals affected by her notarial acts as well as the public at large. She also had a statutory and regulatory duty of care arising out the laws governing the conduct of notaries public, including the Executive Law, the Notary Public License Law, and the Notaries Public regulations, 19 NYCRR, Part 182. Ms. Mondrone breached those duties of care by failing to carry out the basic duties of her office, causing Ms. Watkins harm.

For these reasons, Ms. Watkins' claims against Ms. Mondrone are not futile. Her proposal is not in bad faith, unduly delayed or prejudicial. Although Mr. Hussein's impossible affidavits of service suggested the possibility of notarial misconduct, Ms. Watkins did not have sufficient facts to plausibly allege misconduct by Ms. Mondrone until she took the depositions of Mr. Hussein and Ms. Mondrone. Now that she has done so, she promptly seeks leave to amend, and significant further discovery will not be needed.

## F. CONCLUSION

For these reasons, Ms. Watkins respectfully asks this Court to grant her Motion for Leave to Amend, and for such other and further relief as this Court deems appropriate.

Dated: Brooklyn, New York
September 30, 2026

Respectfully submitted,
/s/Matthew Schedler

Matthew Schedler, Of Counsel
CAMBA Legal Services, Inc.
Divya Subrahmanyam, Esq., Of Counsel
Pooja Patel, Of Counsel
Elizabeth Miller, General Counsel
20 Snyder Ave.
Brooklyn, NY 11226
Phone: (718) 940-6311 ext. 79284
Matthew.schedler@camba.org