UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

LORETTA WATKINS,
Plaintiff,
v.
MALEN & ASSOCIATES, P.C.; HASHEM HUSSEIN; A&F PROCESS SERVICE, INC. d/b/a ALLIED PROCESS SERVICE; and CAPITAL ONE N.A.,
Defendants.

Case No. 1:25-cv-4295

---

VIDEOTAPED DEPOSITION OF
HASHEM HUSSEIN

DATE: Tuesday, September 1, 2026
TIME: 9:49 a.m.
LOCATION: Remote Proceeding
Brooklyn, NY 11223
REPORTED BY: Jonathan Tejeda
JOB NO.: 8323704

APPEARANCES

ON BEHALF OF PLAINTIFF LORETTA WATKINS

MATTHEW AUSTIN SCHEDLER, ESQUIRE (by videoconference)
Camba Legal Services
20 Snyder Avenue
Brooklyn, NY 11226
matthew.schedler@camba.org
(718) 940-6311

POOJA PATEL, ESQUIRE (by videoconference)
Camba Legal Services
20 Snyder Avenue
Brooklyn, NY 11226
pooja.patel@camba.org
(929) 359-0433

AHMAD KESHAVARZ, ESQUIRE (by videoconference)
Ahmad Keshavarz Law Office
16 Court Street
Brooklyn, NY 11241
ahmad@newyorkconsumerattorney.com
(718) 522-7900



APPEARANCES (Cont'd)

ON BEHALF OF DEFENDANT MALEN & ASSOCIATES, P.C.

ADAM MARSHALL, ESQUIRE (by videoconference)
Kaufman Dolowich, LLP
135 Crossways Park Drive
Woodbury, NY 11797
amarshall@kaufmandolowich.com
(516) 283-8731

ON BEHALF OF DEFENDANT HASHEM HUSSEIN

HASHEM HUSSEIN, PRO SE (by videoconference)

ON BEHALF OF DEFENDANT A&F PROCESS SERVICE, INC. D/B/A ALLIED PROCESS SERVICE

ARTHUR SANDERS, ESQUIRE (by videoconference)
Barron & Newburger
30 South Main Street
New City, NY 10956
asanders@bn-lawyers.com
(845) 499-2990

ALSO PRESENT

Marco Sozio, Videographer (by videoconference)
Luke Lee, Observing Party for Camba Legal (by videoconference)



INDEX


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Schedler | 9 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Plaintiff: | | |
| Exhibit 1 | Educational Materials for Process Servers | 35 |
| Exhibit 2 | Office Policies and Procedures | 40 |
| Exhibit 3 | Process Server Engagement Agreement | 44 |
| Exhibit 4 | Allied Process Service Compliance Plan | 69 |
| Exhibit 5 | Appearance Counsel Management Agreement | 71 |
| Exhibit 6 | Email of Traverse Hearing Log Book | 82 |
| Exhibit 7 | Civil Court of New York Affidavit | 130 |
| Exhibit 8 | Clear Copy of Malen & Associates | 132 |
| Exhibit 9 | Google Maps Printout Between 2 Addresses | 133 |




H. HUSSEIN

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:49 a.m. Eastern Daylight Time on September 1, 2026. Please note that this deposition is being conducted virtually. Quality of recording depends on quality of camera and internet connections of participants.

What is seen from the witness and heard on the screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Hashem Hussein, taken by counsel for the plaintiff in the matter of Loretta Watkins vs. Malen & Associates, P.C., et al., filed in the federal court in New York, Eastern District of New York, case number 1:25-CV-4295.

This deposition is being conducted remotely using virtual technology. My name is Marco Sozio, representing Veritext New York, and I am the videographer. The

H. HUSSEIN

court reporter is Jonathan Tejeda from the firm Veritext New York.

I am not authorized to administer an oath. I'm not related to any party in this action, nor am I financially interested in the outcome. If there are any objections to the proceeding, please state them at the time of your appearance.

Counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. SCHEDLER: Matthew Schedler, Camba Legal Services for the plaintiff, Loretta Watkins.

MR. MARSHALL: Adam Marshall, Kaufman Dolowich, LLP, for Defendant Malen & Associates, P.C.

MR. SANDERS: And Arthur Sanders, Barron & Newburger for Defendant A&F Process Service d/b/a Allied Process Service.

MR. KESHAVARZ: Ahmad Keshavarz, co-counsel for Plaintiff, Law Office of



H. HUSSEIN

Ahmad Keshavarz.

MS. PATEL: Pooja Patel, Camba Legal Services for Plaintiff Loretta Watkins.

MR. HUSSEIN: Hashem Hussein, appearing pro se.

THE VIDEOGRAPHER: Okay, Jonathan.

THE REPORTER: All right. I'm just going to go over my required stipulation.

Before I do that, Mr. Hussein, I'm just going to go over some very basic instructions. I'm just going to ask that you speak very clearly. Your volume is good where it's at.

For the sake of the record, I'm going to ask that you avoid any mumbling, any whispering, and most importantly, any cross-talk. I cannot get two people speaking on the record at the same time.

So this will run much smoother if -- when the attorney asks you a question, you wait a second or two in case your attorney wants to object and then you respond afterwards. Does that make sense?

MR. HUSSEIN: Makes sense.



H. HUSSEIN

THE REPORTER: Okay. I'm going to also ask that you make your responses verbal. I can't take any -- take down any gestures, any nonverbal. At the end of the proceeding I may ask you to stay a little extra if I have to clarify on any spellings on the details that you give, but I will try to be prompt.

All right. I'm a notary authorized to take acknowledgments and administer oaths in New York. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute a written



H. HUSSEIN

stipulation of such.

Mr. Hussein, could you please raise your right hand?

WHEREUPON,

HASHEM HUSSEIN,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you very much.

Counsel, you may begin.

EXAMINATION

BY MR. SCHEDLER:

Q Okay. Good morning. My name is Matthew Schedler. I represent Loretta Watkins in this matter. We're here today for the deposition pursuant to Federal Rule of Civil Procedure 30(B)(1). Would you please state your full name for the record?

A Hashem Hussein.

Q Have you ever had your deposition taken before?

A Yes.

H. HUSSEIN

Q When?

A Not in this case. Probably, like, three months ago.

Q Okay. What case was that?

A I don't believe it's an open case. I believe it's an open investigation.

Q Okay. Have you ever testified under oath before?

A Yes.

Q Okay. When have you testified under oath?

A In a traverse hearing.

Q Okay. About how many traverse hearings have you done?

A I'll be lying if I give you a correct number. I don't know that number off the top of my head.

Q Okay. More than ten?

A I'll say roughly around there.

Q Okay. So even though you have some experience testifying, I'm still going to go over some ground rules. Do you understand that you're under oath



H. HUSSEIN

today and that your testimony has the same force and effect as if you were testifying in a court before a judge or jury?

A Yes, I do.

Q Okay. And do you understand that you're required to provide the whole truth? If I ask you something like, "Did you speak -- like who did you speak with?" You must tell me everyone you spoke with.

A Correct.

Q Okay. For my part, I will often ask, "anything else" or "is that all" to make sure I'm getting the complete answer. Does that make sense?

A Makes sense.

Q And for your part, if you answer a question incompletely and you later recall that there's more to the previous answer, you'll tell me your complete answer.

A [No audible response.]

Q I'm sorry, I didn't hear that.

A Understood.

Q Okay. Are you feeling well



H. HUSSEIN

today?

A Yes, sir.

Q Are you taking any medication or have you taken any medication in the last 24 hours that would affect your ability to testify truthfully and accurately?

A No, sir.

Q Okay. Is there any reason, medical, physical, or otherwise that would prevent you from giving your full and complete testimony today?

A -- sir.

Q Okay.

THE REPORTER: I didn't get -- I didn't get your response to the last question Hashem.

THE WITNESS: I said, "No, sir."

THE REPORTER: Thank you.

BY MR. SCHEDLER:

Q Is there any reason that you would not be able to understand my questions?

A No, sir.

Q Okay. At any time you do not



H. HUSSEIN

understand a question, will you let me know so I can rephrase it?

A Yes, sir.

Q Okay. If I ask you a question and you do not ask me to rephrase it, is it fair to say that you understood the question?

A Yes, sir.

Q Will you answer all questions verbally as opposed to gestures so the court reporter can take down your answer?

A Yes, sir.

Q I will try to ask clear questions and allow you to finish your answers. Please allow me to finish my questions before you begin your answer. Will you do that?

A Yes, sir.

Q And if Counsel makes an objection, will you still answer the question?

A It depends --

MR. MARSHALL: I object to that question.

Page 14

H. HUSSEIN

MR. SCHEDLER: Okay.
MR. MARSHALL: But you could proceed.
BY MR. SCHEDLER:
Q Okay. What did you do to prepare for today's deposition?
A Nothing.
Q Okay. Did you review any documents?
A I just recently seen the email, but didn't have time to go over the email that was just sent today morning.
Q Okay.
A I was having a little issue trying to log in.
Q Okay. Did you speak with anyone in preparation for your testimony today?
A No, sir.
Q Okay. What do you have in front of you in the room?
A I have a laptop in front of me.
Q Okay. And what do you have up on the screen?
A I have right now the Zoom virtual -- whatever. The, "Veritext" it

Page 15

H. HUSSEIN

says.
Q Okay. If you're consulting a document to answer your question, will you tell me what that is?
A Yes, sir.
Q Okay. Is there anyone else in the room with you?
A No, sir.
Q Okay. Will you refrain from messaging or communicating with anyone else via text or online messenger during the deposition?
A Yes, sir.
Q Okay. If you need a break at any time, please let me know. We can take one as long as there is no question pending. Do you understand?
A Yes, sir.
Q Okay. During the deposition, I am going to -- oh, if -- yeah, during the -- sorry. During the deposition I'm going to refer to Global Positioning System as GPS. Do you know what that means?

Page 16

H. HUSSEIN

A Yes, sir.
Q Okay. And when I refer to GPS, you'll understand what I'm referring to?
A Yes, sir.
Q Okay. What's your address?
A Currently it's 27 Frank Avenue, Buffalo, New York.
Q And how long have you lived there?
A Approximately, say, a year and a half.
Q And where did you live before?
A Before I lived in Brooklyn.
Q Okay. And how long did you live at the Brooklyn address?
A Oh, I lived in three different addresses. My last address, I lived there approximately two years.
Q Okay. Why did you move?
A Why did I move to Buffalo?
Q Yeah.
A Employment reasons. It's hard to get a job in New York and the cost of living is cheaper.

Page 17

H. HUSSEIN

Q What's your phone number?
A (347) 678-8878.
Q And what's your date of birth?
A [redacted]
Q And what's your current employment?
A Currently I work on a freight train part-time and I also do DoorDash part-time.
Q Okay. What is the -- what is your job description?
A My job description is to help load up the trucks, the cargo. And for DoorDash is to pick up produce and basically deliver food.
Q Okay. Do you have any professional certifications?
A Before this I was a process server.
Q Okay. So how long were you a process server?
A Approximately five years, six years.
Q Okay. When did you start?

Page 18

H. HUSSEIN

A 2017, 2018. It was, like, more towards the end of '17.
Q Okay. And when did you stop?
A I believe it was last year.
Q Okay. So what year is that?
A 2025.
Q Why did you stop?
A There was a lot of issues going on with process serving and a lot of cases.
Q So let's -- what do you mean when you say, "a lot of issues"?
A Basically lawsuits, traverse hearings. Basically legal proceedings to sum it up.
Q Okay. And why did those legal proceedings make you stop being a process server?
A Really -- I don't think anybody wants to deal with legal proceedings -- would be the best answer to give.
Q Okay. Were those legal proceedings against you?

Page 19

H. HUSSEIN

A I was involved in, not really against me.
Q Okay. When you say involved in, what do you mean?
A Like for instance, would this be considered against me or would this be considered involving me?
Q Well, this would be considered -- I would -- it's a good question. This would be considered against you because you're a defendant in the lawsuit.
A Okay. So you could -- the answer would be against me.
Q Okay.
A Because they're all basically around the same thing.
Q Okay. And what was that thing?
A Like, basically me being a defendant in a lawsuit or me being a -- being a witness in a traverse hearing. That's why I said it's either involving me or against me -- that -- I didn't know how you would categorize it.

Page 20

H. HUSSEIN

Q Okay. Well, let's break them both down. Okay. So the lawsuits that are against you, how many are there?
A Two. Both involving you.
Q Okay. And the lawsuits that involved you, how many are there?
A Two. The two that you brought up.
Q Okay. Okay. And why did they make you -- why did those cases force you to stop?
A Because I didn't want to deal with more headaches. Why would I continue to do something if it's already causing problems, I might as well -- it's like if you have a leak with something bleeding, you want to stop instead of continuing it.
Q What kind of problems were they causing --
A So the most rational -- rational thing would be to do is stop doing this and see -- and handle what's going on.
Q What kind of problems were -- oh, I'm sorry. I'll let you

Page 21

H. HUSSEIN

finish.
A I don't have nothing else to say.
Q What kind of problems were they causing?
A Like I stated earlier, legal issues, legal proceedings.
Q Okay. But you described it as like a leak in the roof, so.
A No, I'm saying -- I'm -- I was basically paraphrasing, like, to give you, like, an assumption. Like, if there's an issue you don't continue going on, you know, like let it keep going. Like, if you have a leak in your roof, sir. What I'm saying --
THE REPORTER: Can I stop -- can I stop you for a second? Could you please let him finish this question before you respond? You cut him --
THE WITNESS: Yes, sir.
THE REPORTER: You cut him off a little bit -- for the record please.
Thank you.

Page 22

H. HUSSEIN
BY MR. SCHEDLER:
Q You can finish your answer.
A Okay. So the -- a better way to -- I -- I guess I explained it wrong. It's, like, if you have a leak in your roof, do you let it -- let it keep going or do you stop and figure out what's going on?
Q Okay. What's your understanding of what a process server does?
A A process server is basically a legal mail delivery man. Mailman basically, but for legal work.
Q Okay. Why did you become a process server?
A At the time I became a process server 'cause it was a available job. It seemed like something that was good and a good fit. Somebody told me about it and I thought I'd give it a try.
Q Who told you about it?
A I had friends who told me about it.
Q Okay. Were they process

Page 23

H. HUSSEIN
servers?
A Yes.
Q And what did they tell you?
A That they're process server, they make blah blah blah and their job just entails being, like, a post man, but for legal work.
Q Okay. So how did you become a process server?
A After I was told about that, I went down to the Department of Consumer Affairs. I filed for an application, I took the test, did a background check, and my career started from there.
Q Okay. Did you study for the test?
A Yes, sir.
Q How did you study for the test?
A In the Department of Consumer Affairs they have a pamphlet that basically everything -- all the information you need is there.
Q Okay. Do you still have a copy of that pamphlet?

Page 24

H. HUSSEIN
A No, but I'm pretty sure Department of Consumer Affairs has it. It is also on the website. I can forward it to you if you'd like.
Q Okay. How long did you study the pamphlet?
A Probably a week, two weeks.
Q Okay. What happened after you passed the -- or did you pass the test on the first try?
A Yes, sir.
Q And what happened after you passed the test?
A After I passed the test I did fingerprinting and a background check.
Q Okay. And what'd you -- what happened after that?
A After that I waited for my license and I started looking for employment as a process server.
Q Okay. And then how did -- describe finding employment as a process server?
A I went on Craigslist, I went on

Page 25

H. HUSSEIN
Indeed, I went on LinkedIn. Like any job profession, you just start job hunting.
Q Okay. Tell me about getting employment as a process server.
A Can you rephrase that? I don't understand what you mean.
Q Sure. How did you find your first process serving job?
A I believe it was Craigslist or Indeed one of them. I forgot which one exactly. I'll be lying if I told you one or the other.
Q And what happened? How did you get the job?
A I was told to come in for an in-person interview.
Q Okay. And what was the name of the entity that interviewed you?
A The first one that I got employment with was Kinko [ph].
Q Okay. And who is Kinko [ph]?
A That's the name of the agency. I believe it was ran by a person named Keith.

Page 26

H. HUSSEIN

Q Okay. And when did you start with Kinko [ph]?

A I believe 2017 or 2018. I don't -- I can't recall the exact time.

Q Okay. And what was your interview with Kinko [ph] like?

A I went to a office, they explained to me what they wanted me to do, how much -- basically jobs I would be expecting. And they showed me how to use the app, the independent server app.

Q Okay. And how long did you work with Kinko [ph]?

A Approximately six months.

Q And why'd you leave?

A I was making $150 a week.

Q Okay. How much were they paying you per item of service?

A They were paying me $13, but they were a very extremely small agency so they couldn't really give me that much work. The most cases I would see was probably, like, maybe ten a week.

Q Okay. What happened after you

Page 27

H. HUSSEIN

left Kinko [ph]?

A I started looking for other employment.

Q Okay. What kind of employment were you looking for?

A I was looking for construction work. I was looking for more process serving work and -- yeah, that's it I believe at the time.

Q Okay. So who did you work with next?

A After that I worked with Allied Process.

Q Okay. Did you work with anyone between Kinko [ph] and Allied?

A No.

Q Okay. So how did you come to work for Allied?

A I went job hunting again. I forgot where I found Allied. If it was LinkedIn, Indeed, or Craigslist.

Q Did you have a job interview?

A Yes.

Q Who did you have a job interview

Page 28

H. HUSSEIN

with?

A Anthony.

Q Okay. What was Anthony -- what's Anthony's last name?

A I can't pronounce it. Majaron [ph] -- Madarn [ph]. M-A -- A-N-D. I can't really pronounce it. I'm going to -- make myself look like a moron trying.

Q Anthony Mondrone?

A Yes.

Q Okay. What questions did he ask?

A How long I've been a process server for? What do I know?

Q And what were your answers?

A I can't recall to be honest. That was probably like what, seven years ago? Eight years ago? I can't even tell you what I said last month.

Q Okay. Outside of the interview, what questions did Allied ask before hiring you as a process server?

A Driver's license and

Page 29

H. HUSSEIN

insurance -- and that's it.

Q Okay. Did they perform a background check?

A I'm not sure if they did. I wasn't aware of that or anything.

Q Other than Allied and Kinko [ph], did you work for any other process serving agencies?

A Yes, I tried working with ABC legal.

Q And when did you work -- I'm going to take them one by one -- oh, if you don't mind.

A Sure.

Q When was the -- when did you work for ABC -- when did you try to work -- hold on, let me rephrase. What do you mean by try to work with ABC Legal?

A That's what I was going to say. It was basically two different companies at the same time. It was ABC Legal and another company called Proof Legal.

They're basically -- they're a process service agency that's run through

Page 30

H. HUSSEIN

an application instead of a actual in-person agency because they're located in different states.

Q And what's the name of the application?

A One is ABC Legal and the other one is called Proof, P-R-O-O-F.

Q Okay. But I just want to be clear, you said they were run through an application, so do you mean like an app on a phone?

A Correct.

Q Okay. And the name of -- what's the name of that app?

A -- ABC Legal.

Q Okay. Okay. And when did you work for them?

A I don't remember the exact time because it was very short. ABC Legal, I tried them for like a month. Proof, I didn't even attempt to make a service for them.

Q Are ABC Legal and Proof the same company?

Page 31

H. HUSSEIN

A No, they're two different companies.

Q Okay. So let's start --

A But they -- they operate the same way. They're basically each other's competition.

Q Okay. Let's start with ABC Legal. How long did you work for them?

A Approximately a month. A month and a half.

Q Okay. And when was this?

A I believe 2024 or 2025. I forget exactly when. Actually, it was 2024.

Q Okay. And why did you leave?

A I was -- the jobs they were giving me was mainly in Staten Island. At the time I was residing in Brooklyn so I was paying more for tolls and gas than I was actually making in the day.

Q And how much were they paying you per service attempt?

A They were paying -- for an attempt or a complete service.

Page 32

H. HUSSEIN

Q So let's start with an attempt?

A An attempt -- they don't really pay you for an attempt because you have to do all three attempts. They pay you for, like -- if you attempted it and there's no service where the -- if there's like construction going on and stuff like that and you can't complete the service. At the time they were giving me $15.

Q To be clear. So for a completed service you were making $15?

A No, no. No. For the completed I was making 22 with them.

Q Okay. So 22 for a completed service and then $15 for an attempt?

A Yeah, If it was -- I -- if I complete all three attempts, not per attempt.

Q Okay. Okay. So that would be a fix and mail service --

A Correct.

Q -- you would get $15?

A Correct. Or where there's a discrepancy with the address.

Page 33

H. HUSSEIN

Q Okay. And Proof Legal, when did you try to work with them?

A Around the same time. Exact same time.

Q Okay. And why didn't you work for them?

A At the time I was trying out ABC Legal while I was -- waiting for, like, the startup process with Proof because there's like a -- they do -- I guess they do the background checks and everything, so there's, like, a two week timeframe wait.

So at the time I was already doing ABC Legal and I seen it wasn't worth it at all. So I was, like, I didn't even bother with them. I was already discouraged by the others, so. I figured why go to something that's smaller, that's not going to be any better.

Q Okay. Okay. Were you an employee of Allied?

A Well, not really. 'Cause we're considered, like, third party contractors

Page 34

H. HUSSEIN

as process service.

Q Okay. When Allied paid you, did they withhold taxes?

A No.

Q Okay. Did they pay any benefits?

A No.

Q Was there any contractual agreement between you and Allied?

A What do you mean by that? Can you rephrase that?

Q Yeah, was there an employment contract?

A To work solely with them? No, not that I recall.

Q Okay. Was there an employee manual?

A Not that I recall.

Q Okay. Were you licensed when you served process?

A Yes, sir.

Q Okay. Do you still have a copy of your license?

A No, sir.

Page 35

H. HUSSEIN

Q Okay. Who filled out the license application?

A You said the license application?

Q Correct?

A I did.

Q And who paid the license fee?

A I did.

Q When you first started as a process server, what training did you have?

A The manual.

Q Okay. What's the name of the -- oh --

A The DCA manual. I don't know the actual name of it.

Q Okay. So I am going to show you what has been marked as Plaintiff's Exhibit 1. Okay. So you can open this up. It's Exhibit 1 in the email that I sent you and just take some time to review it.

(Plaintiff Exhibit 1 was marked for identification.)

Page 36

H. HUSSEIN

A I believe that's actually the DCA handbook itself if I'm not mistaken.

Q Okay. So take some time to review it and let me know when you're ready?

A Do you want me to review what's on the screen with the email that you sent?

Q No. You can open it up on your own email so you can scroll and look at it. So you're not a prisoner of --

A I don't think I'm able to control this.

Q No. You're not. So that's why I sent you everything in the email so you can open it all up and look at it on your own.

A One moment. Fix -- yes, that is the DCA manual.

Q Okay. All right. So let the record reflect I am showing a clear copy of Plaintiff's Exhibit 1. Do you recognize this document?

A Yes, sir.

Page 37

H. HUSSEIN

Q What is it?

A That's the DCA -- handbook manual for process service.

Q Okay. How do you know what it is?

A Because that's the book pamphlet they give you when you go to the Department of Consumer Affairs.

Q Okay. And in your course of working as a process server, did you ever review this document?

A Yes, sir.

Q When?

A When I first got my license. In order to get my license, that's what I used to study.

Q Okay. Did you ever review it at any other time than that?

A No, sir.

Q Okay. Before you -- or when you worked at Allied, did you have any in-person training?

A I was taught how to use -- they didn't use a application for GPS. They

Page 38

H. HUSSEIN

had a website. I was taught how to use that and how to use their mainframe basically.

Q Okay. And who gave you that training?

A Anthony.

Q Okay. Were you given any training on serving process -- sorry, let me rephrase. Were you given any training on the rules of serving process?

A No, sir. You would not -- you would need to know the rules in order to get the license.

Q Okay. So the only training you had before you became a process server was reading these educational materials?

A Yes, sir.

Q While you were working with Allied, did they give you any other trainings?

A No, sir.

Q Okay. Do you know if the rules -- the process serving rules changed during the period you were a process

Page 39

H. HUSSEIN

server?

A Yes, sir.

Q Okay. And how did they change?

A In the beginning you had to use handwritten logbook. After Governor Hochul became governor she changed it and made it digital.

Q Okay. Do you know of any other rules that changed?

A I know they started -- there was a -- a vest rule that was changed. They sent an email out about that. Process servers were allowed to get bulletproof vest, I believe. I don't know why.

Q Okay. Anything else?

A Other than that? No, not that I'm aware of -- that I can recall at the moment.

Q Okay. When there was a rule change, would you have a training to update you?

A No.

Q Okay. I want to show you Plaintiff's Exhibit 2. Okay. Let the

Page 40

H. HUSSEIN

record reflect that I'm showing a clear copy of what has been marked as Plaintiff's Exhibit 2. Do you recognize this document? Take your time, take as much time as you need to look at it.

(Plaintiff Exhibit 2 was marked for identification.)

A I cannot recall this document.

Q Okay. Titled Allied's Policies and Procedures. And I want to show you Roman Numeral 6 Compliance Training. Okay?

A Okay.

Q And it's -- can you read that? Just read it to yourself.

A Okay.

Q Okay. This section describes annual trainings from Allied. Were you given those trainings?

A No, sir.

Q Okay. Okay. And I want to direct you to Roman Numeral 7 where it says: "Complaints and Managements," underlined. So take some time and review

Page 41

H. HUSSEIN

that?

A Okay. I've read it.

Q Okay. So do you see where it discusses the logging of complaints?

A Correct.

Q Do you know where those complaints were logged?

A No, sir.

Q Are you aware of any -- Yeah, go ahead.

A Oh, sorry. Sorry for interrupting.

Q No, I was interrupting you. I apologize. So I'm going to pose the question again and I'll let you answer fully. Are you aware of where those complaints were logged?

A No, sir. I would -- I would think that that question would be an internal question. Not, like -- like, for their sense because if the complaints are logged against them, that would be a mainframe. They would have -- they -- I wouldn't be able to be aware of that

Page 42

H. HUSSEIN

and --
Q Okay.
A If -- and this paper that you have me reading, if you look at it, is dated during the pandemic, so I wouldn't be able to have seen it.
Q Okay. So if there was a complaint against an individual process server, would you be aware of that?
A The only way you'd be aware is --I know the Department of Consumer Affairs keeps their own database for that.
Q Okay.
A I believe it's called the -- the Process Server Portal.
Q Okay. Were you -- are you aware of any complaints being made against you?
A I was aware of one complaint made against me in probably like 2019, 2020.
Q Okay. And who made that complaint?
A A person that I served process to.

Page 43

H. HUSSEIN

Q Do you remember their name?
A No, sir.
Q How did you become aware of that complaint?
A I was aware from the Department of Consumer Affairs.
Q And what was the nature of the complaint?
A The person stated that I was being aggressive towards them.
Q Okay. And how was that complaint resolved?
A I believe it got dismissed.
Q Okay. Any other complaints against you?
A No, sir. That I'm aware of, no.
Q Okay. Did Allied ever administer any tests to you?
A Can you repeat that question?
Q Yes. Did Allied ever administer any tests to you?
A No, sir. That I'm aware of? No.
Q Okay. So I mean -- and would

Page 44

H. HUSSEIN

you be aware if Allied gave you a test?
A No. I'm saying they -- you could be doing, like, a secret test. You know how, like, they have like a -- I'll do something, you don't know I'm testing you, just to see how it plays out. So maybe if they did something like that. So that's why I said not that I'm aware of.
Q Okay. But no written, sit-down tests?
A No, sir.
Q Okay. All right. I am going to now show you Exhibit 3 and you can open that up and take some time to review it. I'm really only going to focus on Paragraph 12, so if you could read that. And --
(Plaintiff Exhibit 3 was marked for identification.)
A Paragraph 12?
Q Yeah.
A Subcontract -- okay. I have read this.
Q Okay. Do you see where it

Page 45

H. HUSSEIN

references an annual testing on the Fair Debt Collection Practices Act?
A Yes, sir.
Q Okay. Did you take those tests?
A No, sir.
Q Did you have any training on the Fair Debt Collection Practices Act?
A No, sir. I never have heard of it.
Q Okay. Do you know what the Fair Debt Collection Practices Act is?
A No, sir.
Q Okay. All right. When you began serving process, did you ever shadow another process server?
A No, sir.
Q Okay. So going back to your beginnings as a process server, what else did you prepare to serve process? Sorry, let me rephrase. What else did you do to prepare to become a process server?
A I just -- I stated earlier, all I did was read the pamphlet to pass the test.

H. HUSSEIN

Q Okay. And how many trainings did you receive in the six years that you were a process server?

A Besides learning how to use applications 'cause different agencies use different applications. None.

Q Okay. Do you understand the rules for serving process?

A Yes, sir.

Q Did you always follow those rules?

A Yes, sir.

Q Was there ever an instance you did not comply with those rules?

A Not that I'm aware of.

Q Were you ever investigated by the New York City Department of Consumer Affairs and Worker Protection?

A Yes, sir.

Q Who are they?

A You said where were they or who are they?

Q Who? Who are they?

A The Department of Consumer



H. HUSSEIN

Affairs?

Q Mm-hmm.

A They're the people who basically oversee the cities and licensings.

Q Okay. What was the name --

A They changed their name to -- now they're no longer the Department of Consumer Affairs they're Department of Workers 'cause -- before it was DCA, now they're WDCP. I think Workers Protection something.

Q Okay. What was the nature of their investigation?

A They were investigating all my traverse hearings and the investigation that was lodged due to your law firm.

Q Okay. Why were they investigating your traverse hearings?

A I believe that's the -- I don't know, to be honest with you, I think that just, like, how they have it, like, internally done. Once there's complaints with something lodged where somebody's making a lawsuits against process service.



H. HUSSEIN

I guess that's their protocol. I wouldn't know how they operate so I wouldn't know.

Q Did they inform you of the nature of their investigation?

A No. They just said my current -- my license at the time was currently suspended and I had to wait for the investigation to be over to find out their ruling.

Q Did you ask them why you were being investigated?

A No, sir.

Q Why not?

A Because the email says I can't -- that you can't reply to it. I tried to send them an email. I got no response. I tried calling Department of Consumer Affairs, you're better off winning the lottery before you get an answer from them.

Q What did the --

A After that --

Q Go ahead.

A That's it. And at the time I



H. HUSSEIN

already moved -- I was already in the process of moving to Buffalo, so I was, like, you guys want to take the license, you could take it. I wasn't planning on being a process server anyway.

Q The email that you were trying to send them, what did it say?

A I wanted to -- at the time it had been almost -- I believe, like, three weeks and I was told I was supposed to get a response within seven -- seven business days. So I emailed them to know what was the outcome, what was going on, to see if I could get any more information.

Q Okay. Did you do anything else other than the email and the phone calls to try and get more information?

A No.

Q Did you speak with Allied about the investigation?

A I informed Allied that I wasn't going to be doing any service and I --

Q And what did --

A -- also informed them about the

Page 50

H. HUSSEIN

investigation.
Q And what did they say?
A Keep them up to date.
Q Did they have any questions for you?
A He said, "Do you know what the investigation's for?" And that sort of thing.
Q And what did you say?
A I can't recall exactly what I remember saying. All I remember is telling him, I'm just waiting on a response from DCA.
Q Okay. What was the result of the investigation?
A To -- to be honest with you, to this day they've never sent me a final disclosure or anything.
Q Okay.
A My license actually expired before they fully took it away.
Q Okay. Was your license ever suspended?
A It wasn't really -- they have

Page 51

H. HUSSEIN

two words. Like, there's one where it's, like, on pause -- I forgot what exact words they used for it. And then when it's, like, fully suspended that means, like, you're done. You can't come back.
Q Okay. And which are you?
A I was -- at the time I was inactive and it ended up just expiring before they even gave me a conclusion or anything. They sent me the renewal paperwork.
Q When did they send you the renewal paperwork?
A They sent it to me in December and then they sent it to me again in February. Because the deadline -- if you're already licensed and you're just renewing the deadline is actually April. So they'll send you a courtesy one in February when your license actually does expire.
Q Okay. So December of what year?
A 2025.
Q Okay. And then February of what

Page 52

H. HUSSEIN

year?
A 2026.
Q Okay. So do you know the current status of your license?
A Oh, it's expired.
Q Okay.
A It only lasts two years and it's always a even year they make you do a renewal. It's always a --
Q Okay. Have you ever been fined?
A No, sir.
Q Okay. All right. What is Anthony Mondrone's role at Allied?
A President? CEO? Owner? I don't know.
Q What does he do?
A I know he was my boss.
Q What did that entail?
A I basically worked for him. He is like any other boss. I don't know, like -- I don't know how to really explain it.
Q Okay. What --
A Boss is -- boss --

Page 53

H. HUSSEIN

Q What were your day-to-day interactions with Anthony Mondrone?
A I didn't have day-to-day interactions with Anthony.
Q Okay. What were your non day-to-day interactions with Anthony Mondrone?
A I would see Anthony if I needed to pick up work or I needed to go to the office. Other than that, I will text if there was anything that needed to be done. Maybe emails or phone calls if it's urgent.
Q What do you mean by, "Need to pick up work"?
A Like, paperwork that needs to be delivered.
Q So he would give you the process to be served?
A Yes, sir.
Q Okay. Did he do that for all the process you served?
A What do you mean?
Q So you said that he would give you process to be served, was that every

Page 54

H. HUSSEIN

time before you went out and did service he would give it to you?

A No, sir.

Q Okay. So tell me how that works?

A I usually get it -- I'll get the work in bulk. If there's urgent matters that's, like -- that needs to be done, he'll send it to me in an email.

Q Okay. So he would send you the urgent matters?

A Correct.

Q Okay. What other interactions did you have with him?

A Besides phone calls, emails and text messages? I don't -- nothing.

Q What were those phone calls, emails, and text messages about?

A Work.

Q What about work?

A I -- I can't really break it down. You're talking about a six year period of working with somebody, that's like me asking you, "Hey, can you tell

Page 55

H. HUSSEIN

me -- what your boss or coworkers all your text messages and phone calls?" I -- I wouldn't be able to recall that.

Q Sure. Typically, what would they be about?

A That's why I phrased it to sum it all up as work, like, if it's a job that needs to be done or something's about to -- I don't know, they vary.

Q Okay. What is Francis Mondrone role at Allied?

A I'm not sure.

Q Have you ever met Francis Mondrone?

A Yes.

Q Okay. What context?

A I believe she is Anthony's mom and I know she works for the company.

Q What --

A As a role? I've never really asked, that's not really my business.

Q Okay. What were your interactions with Francis Mondrone?

A Same. Probably text message,

Page 56

H. HUSSEIN

phone calls, email.

Q Okay. What would you call and text about?

A Work related stuff. Same thing with Anthony.

Q Okay. So when you say same thing as Anthony, you mean Francis would be giving you assignments to serve?

A Yes, sir. Or if there's any issues like if I can't log in the file number or something.

Q Okay. And what would she do if you couldn't log into the file number?

A They would enter it 'cause sometimes somebody would forget to actually enter it in their system. So it wouldn't let me do the job on my end unless it's entered already in their system.

Q Okay. What other interactions did you have with Francis Mondrone?

A At work? Nothing.

Q Did you ever see her in person?

A Yes.

Page 57

H. HUSSEIN

Q Okay. Describe that for me. When would you see her in person?

A I would see her in person when I go to the office.

Q Okay. And what --

A To walk by her office to make it to Anthony's office.

Q Okay. Okay. Did you ever have any other interactions with Francis Mondrone?

A No.

Q Okay. So your -- just to sum up, your interactions were solely texting, getting assignments, getting things fixed on the computer?

A Just work related stuff.

Q Okay. Anything else?

A That I could recall? No.

Q Okay. Other than Anthony and Francis, who else worked at Allied?

A I'm not sure who else worked at Allied.

Q Did you have contact with anyone else?

H. HUSSEIN
A Not really. People I guess go on different days. It's not like an in office thing. Everybody's -- being a process server you're basically on -- your office is the road.
Q Okay. So describe that for me. Tell me how it works?
A Being a process server or --
Q Yeah. Well, let's start there. Yep.
A Well, you get the paperwork, you look at the address, you put it on the GPS and you start driving.
Q Okay.
A As far as what's in the paperwork, that's none of your -- my business, that's nothing you need to know. It's not like -- they don't give you -- it's not like you get a picture of the person.
All you have is a name and an address. That's the only information you need. The rest of the case? It's none of your concern.



H. HUSSEIN
Q Okay. So you're not aware of any other employees that worked at Allied?
A No, sir.
Q Okay. Can you describe Allied's office space?
A It was in Long Island, second floor. I think there's, like, four offices in there.
Q Okay. And were all those offices for Allied?
A The whole building? No. I'm talking about -- and they're, like, a suite.
Q Okay.
A Because the -- the building itself is broken into I believe, like, ten suites for, like, ten different companies there. I believe there's, like, an insurance company on the first floor. There's a home care company if I'm not mistaken also there.
Q Okay. And how many offices are in their suite?
A That's the one I believe it was



H. HUSSEIN
like four maybe.
Q Okay.
A Maybe five.
Q Did you ever see anyone working there other than Anthony and Francis?
A Probably seen -- probably, like, two other people. Never spoke to them. Like, a quick glance.
Q Do you know what their roles were?
A No. That's what I said. I never spoke to them. Just quick glance. My job was -- to be honest, I -- it was a two and a half hour drive. I just wanted to get my work and go.
Q When you say, "get your work," what do you mean?
A As I stated earlier, we used to get the work in bulk, like, usually -- like, on a weekly -- two weekly thing basis. So you get a bunch of cases instead of going and picking up one.
And at that time I'm -- I'm already pressed for time or you barely



H. HUSSEIN
slept, you're already on the road, you're -- for five hours. So it's, like, there's no reason for me to talk to you and --
Q Okay. So about how -- when you -- sorry, let me rephrase. When you say work, you mean documents to serve for process?
A Correct.
Q About how many would you pick up when you go into the office?
A Not sure the exact number. It was never a set number that was -- it's basically different numbers, different times. You start to realize, like, probably the beginning of the year you get more work 'cause a lot of it was, like, credit card debt. So I guess during the holidays people would consume more debt.
Q Okay.
A So -- so it varied throughout the year. Varied throughout the time. It was never really a set number thing.
Q More than 50?

H. HUSSEIN
A Around there.
MR. SCHEDLER: Okay. All right. So we're coming up on the one hour mark. If it's okay with everyone to take a little break here? Does that work?
MR. MARSHALL: Fine with me?
THE VIDEOGRAPHER: Okay. All right --
MR. SCHEDLER: Arthur, Ahmad?
MR. KESHAVARZ: It's fine with me.
MR. SANDERS: It's fine. That's fine.
MR. SCHEDLER: Okay.
THE VIDEOGRAPHER: Okay.
MR. SCHEDLER: All right.
THE VIDEOGRAPHER: Let me take us off the record, please. Standby. This is the end of Media Unit Number 1. We are now off the record at 10:37 a.m. for media change and break.
THE REPORTER: Okay, thank you very much. The time is now 10:37 a.m., and we are off the record. Be back -- what do you need five minutes, ten minutes?



H. HUSSEIN
(Off the record.)
THE VIDEOGRAPHER: Right. So everyone please stand by for record. This is the beginning of Media Unit Number 2. We are now on the record at 10:45 a.m. back from break. Thank you.
Counsel?
MR. SCHEDLER: All right. Thank you.
BY MR. SCHEDLER:
Q Mr. Hussein, I'm just going to clean up some questions from before. What were your prior addresses in Brooklyn?
A Do you mind if I clear up one prior question from earlier since we are -- I am under oath here.
Q Sure.
A The only other employee that I knew of from Allied was James. I don't know his last name. I just knew his first name is James.
Q Okay. And what was James' role?
A I not sure. I met him a couple times. I never really asked him what his role is. I know he was -- he did court



H. HUSSEIN
filings and stuff like that.
Q Okay. What was the context of meeting James? How'd you meet him?
A I met James because sometimes, like I stated earlier, but -- instead of driving all the way, three hours into Long Island, I -- he lived in the -- also in Brooklyn. I would just meet him in downtown Brooklyn by the courts if I needed to pick up stuff.
Q And when you say pick up stuff, what do you mean?
A Like, work from Allied. Like, papers and stuff like that.
Q So he would give you documents to serve?
A Correct.
Q Okay. Do you know of anything else James did for Allied?
A I think he did the filings of the courts.
Q Okay. And when you say, "filings," what do you mean?
A Like, file the paperwork in the



H. HUSSEIN
courts I believe. That he -- I believe that, like, with the paperwork it has to get dropped off to the clerk's office.
Q Okay. Did you ever drop off paperwork to the clerk's office?
A No, sir.
Q Okay. So just going to clean some stuff up from before and thank you for bringing that to our attention. What were your prior addresses in Brooklyn?
A I've lived in 1455 Ovington Avenue. I've lived in 1526 -- I believe 76th Street. I know it was 76th Street. I don't -- I believe it was 1526. I was younger at that time. And I've lived at -- what was that address? Oh, 1757 Bath Avenue.
Q Okay. And what are the names of the process servers who suggested process serving to you as a career?
A I believe that's irrelevant information.
Q Okay. So you're not -- you're refusing to answer that question?

Page 66

H. HUSSEIN
A I don't see the relevance of it.
Q Okay. Relevance isn't an objection at a deposition, so I'm going to ask you again to please answer that question.
A One of the people's names was Taha. I didn't know his last name.
Q Okay. How do you spell that?
A T-A-H-A and the second one was Abudallah -- I don't know his last name as well.
Q Okay. How do you spell that?
A A-B-U-D-A-L-L-A-H. I probably misspelled that, but --
Q Okay. How do you know these people?
A I grew up around them. We grew up in the same neighborhood.
Q Where'd you grow up?
A Bensonhurst.
Q Okay. You mentioned when you went to DCA for your initial process serving application, that you reviewed a brochure.

Page 67

H. HUSSEIN
A That is correct.
Q Is that the document I showed you or a different document?
A No, that's the document. That's why I said that's the DCA manual.
Q Okay. So that is just to be clear, the document that you reviewed in preparation for your test?
A Correct.
Q Okay. And you mentioned that Allied said that you needed to get insurance. What did you mean by that?
A Car insurance. They need you to have valid car insurance.
Q Okay. Was there any other kind of insurance that you needed?
A No -- the only other -- something that would be considered insurance, but it -- it had nothing to do with Allied would be you needed a bond in order to get your license. But that was a -- a requirement though through the DCA.
Q Okay. And did you have a bond?

Page 68

H. HUSSEIN
A Yes, sir. You -- you can't get your license without it.
Q Okay. And who paid for the bond?
A I did, sir.
Q Okay. And then the emails and text with Anthony and Francis, do you still have those?
A I believe I have some. I'm not sure.
Q Did you search for those emails in the course of producing discovery?
A Yes, sir.
Q Okay. Do you still have the text messages?
A I believe so.
Q Okay. So I'm going to ask you to preserve those emails and text messages. And do you have the emails that you tried to send to DCA as part of your investigation?
A I believe so.
Q Okay. I'm going to ask you to preserve those emails as well. Okay. I

Page 69

H. HUSSEIN
am going to share my screen -- and show you Plaintiff's Exhibit 4. Let me know if this is too big.
(Plaintiff Exhibit 4 was marked for identification.)
A Do you mind if I look at it through my email?
Q No. I don't mind. No, no. No. Please look at all these documents through your email. All right?
A I didn't want you to think I was looking at any other documents or something.
Q No, that's totally fine. Take your time to review it. Let me know when you're ready.
A -- Exhibit -- Exhibit 4?
Q This is Exhibit 4. Yes.
A Okay. Okay.
Q Okay. Do you recognize this document?
A No, sir.
Q Have you seen it before?
A No, sir.

Page 70

H. HUSSEIN

Q Okay. Item Number 1 says that process servers have been instructed to follow the compliance plan. What is the compliance plan?
A I wouldn't know unless they're referring to the -- to the manual, the process server manual that's provided by the -- the city.
Q Were you ever shown anything called, "The Compliance Plan"?
A No, sir. I think this might be since it's labeled The Compliance Plan on top.
Q Okay. Have you seen this document before today?
A No, sir.
Q Did Allied ever instruct you on this document?
A No, sir.
Q Okay. Number 2 references writing a report for individual process servers. What is that individual report?
A I believe that's a report within them internally. If they're reviewing us

Page 71

H. HUSSEIN

I don't think that's something that I would be aware -- made aware of.
Q Did you ever see your written report?
A No, sir.
Q Are you aware of anyone from Allied ever reviewing your service?
A Not aware of, sir.
Q Okay. Did anyone at Allied ever raise issue with your service attempts?
A No, sir.
Q Okay. I'm going to show you what has been marked as Plaintiff's Exhibit 5. Let the record reflect that I'm showing a clear copy of this document. Take some time and review it. And you can review it on your screen.
(Plaintiff Exhibit 5 was marked for identification.)
A Okay.
Q Okay. Do you recognize this document?
A No, sir. It looks like a -- an agreement between Allied and Malen.

Page 72

H. HUSSEIN

Q Okay. I want to direct you to -- I'm sorry. So you've never seen this before?
A No, sir.
Q Okay. I want to direct you to Number 2, Part B Malen's Process Server Review. Are you aware of Malen reviewing your service?
A No, sir.
Q Are you aware of any law firms reviewing your service?
A No, sir.
Q Okay. I want to direct you to Question Number 4, Process Server Probation.
A Yes, sir.
Q Were you ever placed on probation?
A No, sir.
Q Okay. So when you -- that's fine. That's all I have. When you worked for Allied, how much were you paid for serving process?
A In the beginning when I first

Page 73

H. HUSSEIN

started off, I believe it was $13 for a successful.
Q And what is a successful service?
A Complete a service.
Q Okay. And what does that mean?
A You either get the person or you do a nail and mail.
Q Okay. So when you say get the person, what do you mean?
A You get the -- either the defendant or somebody of suitable age that knows of the defendant --
Q Okay.
A -- at the residence of -- as long as it's the same address.
Q Would you get paid if no one was there?
A Only if it's a nail mail after the third attempt.
Q Okay. So if you go there and you find somebody, you make $13 --
A In the beginning.
Q In the beginning.

Page 74

H. HUSSEIN
A Correct.
Q And if you go there and no one is home, you don't get paid until you've gone three other times; is that correct?
A But if it's a discrepancy with the -- with the address -- Malen gave $5.
Q So let's go back to the question I asked and then we'll go into what you just said because I didn't hear your response.
A Okay.
Q So if you go and you find somebody there, you get $13. And if no one is there, you don't get paid until you do three more attempts. Is that correct?
A No, not three more attempts. A total of three. So if you go the first day, that'll be considered the first attempt. You go the second day, that'll be considered the second attempt. And on the third day you're allowed to nail it.
Q Okay.
A So a total of three, not three more.

Page 75

H. HUSSEIN
Q Right. So on the third day you would get your $13?
A Correct.
Q Okay. And you were saying before, if the address was wrong, Malen would give you $5?
A Not Malen, allied.
Q Okay.
A I never -- I never, like, spoke with Malen, had any interactions with Malen. Everything that was, like, between -- I basically worked for Allied.
So whatever happened between Allied and Malen, that's between them. There's no, like, direct communication or something where I spoke to Malen where we had to discuss something. If they had to, like, relay a message, it would go through Allied.
Q Did Malen ever relay a message to you through Allied?
A Not that I recall.
MR. MARSHALL: Objection to the form.
THE WITNESS: Besides traverse

Page 76

H. HUSSEIN
hearings.
BY MR. SCHEDLER:
Q Okay. Okay. So you said you were getting paid $13 at the beginning. When did that change?
A That changed I believe after my first year, a year and a half.
Q Okay, so this would've been 2018?
A Correct.
Q How did it change?
A -- no, 2019.
Q 2019. How did it change?
A It went up to 14 or 15. I forgot which one.
Q Okay. And did it change after that?
A I believe -- I forgot if I ended with them -- if I was getting paid 15 or 16.
Q Okay. So from 2019 to 2025 it only increased $1 or $0?
A No, I increased 2 or $3. I started off with 13 and when I ended -- I

Page 77

H. HUSSEIN
believe I was at 15 or 16. So that would be a 2 to $3 in increase.
Q Okay. How did the payments work?
A I received it in check.
Q Okay. Okay. Can you describe what substitute service is?
A Substitute service would be somebody of suitable age. Like, for instance, if I was given your address and location and I go there and you're not there, a suitable person will be like a wife, a brother, somebody living at the residence. Could be, like, offsprings.
Q Okay. Can you describe --
A But -- have to be a suitable age.
Q And what is suitable age?
A I just found out recently that -- me -- to me, my entire service, like, while I was doing process service, I always considered it 18 or older. But then I found out recently that it was actually younger than that. But that's

H. HUSSEIN

irrelevant 'cause the whole time I thought it was 18 or older.

Q How did you find that out?

A I was doing a different deposition, I was informed of that.

Q Okay. Who is this deposition with?

A The Attorney General's Office.

Q Okay. Can you describe what a fix and mail service is?

A You mean nail mail?

Q Yes.

A Nail mail will be after the third attempt. You just post it on the thing and that's it. And then you also mail them a -- a copy as well.

Q When you say, "thing," what do you mean?

A Like, on the door.

Q Okay. And the door to the building or the door to the individual apartment?

A No, the door to the individual's apartment.



H. HUSSEIN

Q Okay. So does the fact that you were only paid for successful service, did that affect how you performed your job?

A No, sir. That's the field itself.

Q What do you mean when you say the field itself?

A The -- the processing field, that's how it operates. It's, like, for instance, it's like -- let's say I'm doing DoorDash or I'm doing Uber Eats, which obviously you have millions of people, like, even in New York City, just New York City alone doing it.

And the beginning -- only recently you started giving them hourly wages before they were just getting basically tips. So that's like telling somebody, "Hey, you're working for $2, does that affect your service?" It's just the field itself. Every field you can't expect to make big money.

It just -- that's what I mean by like it's the field itself, that you know



H. HUSSEIN

what you're getting into. Because some people were giving you less than that. Some were giving you 10, some were giving you 18. But the ones that was giving you 18 at the time were -- you needed five to ten years experience.

Q Okay. So you don't think the fact that you make more money if you do substitute service affected -- and no money if no one's there, affected the type of service you performed?

A No, because let's say on an average day, if I was doing ten to 12 services and on an average day, like let's say out of -- I'm sorry, let's say I was doing 20 services in a day and out of -- of those 20 only completed, like, seven, eight.

And when you look at that and then you look at the actual time, like, at the time we're speaking of 2018, 2019, that was basically minimum wage what I was making with completing less than half the services.



H. HUSSEIN

So it doesn't really affect it. That's why I said it's really the field. Some you're going to have good days, some days you're going to have bad days.

Q Okay. Did you keep a paper log book?

A Yes, sir.

Q Do you still have it?

A No, sir.

Q What happened to it?

A I lost it in -- when I left New York.

Q Okay. When was that?

A Last year. I can't give you an exact date.

Q Okay. So that's 2025?

A Yes, sir.

Q All right. How did you lose it?

A While I was moving, I'm not exactly sure. It got misplaced. I tried finding it. I asked my family that was still living in Brooklyn if it was there.

Q Okay. And why did you ask them to find it?

Page 82

H. HUSSEIN
A Because you guys requested it.
Q Okay.
A I mean your law firm requested it.
Q Okay. I'm going to show you what is marked as Plaintiff's Exhibit 6. Take some time, review it.
(Plaintiff Exhibit 6 was marked for identification.)
A Okay.
MR. MARSHALL: Folks, maybe I'm the only one. I don't think I have an Exhibit 6.
MR. SCHEDLER: So it is an Outlook document.
MR. MARSHALL: Okay.
MR. SCHEDLER: So if you're looking at -- for it as a PDF, you'll have to change it to all files. Just if you save this as a PDF, I want to reference an image in it and you can't do that. So this is in its native format.
MR. MARSHALL: Okay.
MR. SCHEDLER: So just take your time

Page 83

H. HUSSEIN
and let me know whenever you got it.
THE REPORTER: Would that be one of the ones labeled as, "Untitled"?
MR. SCHEDLER: No, it should be Exhibit 6. Do you have a copy of it?
THE REPORTER: I'm looking through my exhibits and I don't have an Exhibit 6, but I have a couple that came through as UntitledAttachments.EML.
THE WITNESS: It's the untitled one.
THE REPORTER: Thank you. Okay. Right. Yes, I did see these yesterday.
MR. MARSHALL: I apologize, I'm still not seeing it. Was there an email separate from the one that was circulated today at 7:55 a.m.
MR. SCHEDLER: There was not. That is the only email, but if you'd like, I can shoot it over to you again.
MR. MARSHALL: Oh, that would be great. I have -- I mean I have two native format emails, but neither of them include anything that says Exhibit 6. I'm assuming that you're questioning about one

Page 84

H. HUSSEIN
of those two documents? Because --
MR. SCHEDLER: Yeah, there's two of them. One should be labeled Exhibit 6, and I think one is -- they should be labeled Exhibit 19. If they're -- if you have them and they're not labeled, can you bring up the first one? And it might -- I mean, it might be an issue with how the --
THE WITNESS: It's not labeled as Exhibit 6. It was labeled as -- Attachment, but that's what it shows on the email that was sent out in the morning.
MR. MARSHALL: Well, just speaking for myself. If in the context of your questioning early on you can reference the subject line of the email, I'll be able to determine which document we're talking about.
MR. SCHEDLER: Sure. So why don't you -- so the subject line is RE Traverse Hearing, Monday, October 16. Okay. Okay.
BY MR. SCHEDLER:
Q All right. So let the record

Page 85

H. HUSSEIN
reflect I'm showing a clear copy of Plaintiff's Exhibit 6. Do you recognize this document?
A Yes, sir.
Q How do you recognize it?
A It's an email that I sent you for your discovery request.
Q Okay. I'm going to scroll down to the email with the image on it. Did you send this email?
A Yes, sir.
Q And do you see the image in it?
A Yes, sir.
Q Okay. What is it?
A It's a -- a picture from -- that I sent one of the attorneys pre traverse hearing I've done -- my logbook.
Q Okay. So this is an image of your paper logbook?
A Correct.
Q Okay. When would you write information in your paper logbook?
A After service and sometimes even though it was against rules, I'll do it at

Page 86

H. HUSSEIN

the end of the day.
Q Okay. When you say after service, what do you mean?
A After service, like let's say I came to your house and I completed the service, I would do it while -- I'm usually -- like, I do a lot of -- especially here, like, in Brooklyn where in Staten Island it's a lot of big buildings.
So I'll do it while, like, I'm going down the elevator, like, after I completed the service.
Q Okay. So between one instance of service and the other?
A Yes. But at one point I was doing it at the end of the day, which I knew it wasn't permissible.
Q Why were you doing it at the end of the day?
A It started getting hectic. I wanted to get out of there -- like as soon as possible 'cause, like, I was going to a lot of projects and stuff like that. A

Page 87

H. HUSSEIN

lot of people that I was serving, I'm like a bearer of bad news.
I'm somebody you don't really want to talk to. And it's hard to try to explain to them, "Hey listen, I'm just a delivery guy, I have nothing to do with this. Your -- your issue is whoever is taking you to court not me."
Q Okay. About how long would it take you to fill out your logbook after an attempted service?
A Not very long. Approximately -- I wouldn't be able to time it. I never really timed it.
Q A minute?
A Not sure. I never timed it.
Q Okay. More than a minute?
A Again, I can't give you a truthful answer.
Q Okay. Do you see the column that says: "Type of service"?
A Yes, sir.
Q Okay. What is the S for -- what does the S stand for?

Page 88

H. HUSSEIN

A Suitable.
Q Okay. So that means substitute service?
A Correct.
Q Okay. What does the C stand for?
A It's a company.
Q Okay. And when would you fill in a C?
A You fill in a C if it's a business or a corporation.
Q Okay.
A Sorry, I didn't -- sorry, it didn't stand for a company. It stood for a corporation.
Q Okay. What does P stand for?
A Personal.
Q Okay. Why is there no option for a fixed and mail service?
A -- you would write it as suitable and then do it -- do it in the end on the last part.
Q Okay. So describe for me how that would work?

Page 89

H. HUSSEIN

A So you -- the type of service, you'll leave it blank for the first couple attempts. Then after that when you complete it you put the S and then you put the address and write that you nailed it. But then you have to put the description of the door.
Q Okay. So if you were doing service and you knock on a door and no one is home, what would you put in this logbook?
A I would leave it -- basically to go through it you'll do everything the same, the -- the courts, everything, the timing, the address, everything will be the same. The second part of the logbook where it has the name and information, most of that will be left blank besides the city ZIP code and everything else.
Q So if no one was home, would there be three individual entries or just one?
A It'll be three different entries, but not on the same day.

Page 90

H. HUSSEIN

Q Okay.
A It'll be, like -- or as you went by it.
Q Okay. Do you see the column labeled: "Plaintiff and Petitioner"?
A Yes, sir.
Q Why are some of those blank?
A I meant to put a line on those two because it's the same complainer -- I mean plaintiff. Have you noticed on the rest -- the ones that I just put down -- 'cause it's usually I -- all the same law firms. So the same plaintiffs usually -- most majority of them is usually capital -- Capital One or Velocity.
Q Okay. And do you see the column that says: "Door Description"?
A Yes, sir.
Q And why is that blank?
A That -- you only fill that out when you do the nail mail. That was the one I was telling you earlier. Everything else besides that would be left blank when

Page 91

H. HUSSEIN

you do the nail mail except that part.
Q Do you see the column --
A So the part that has the height, weight, everything else is filled, that'll be left blank. But that section will be done. But if you're completing the service you don't have to do that part.
Q Okay. Do you see the column labeled: "Other ID attributes:?
A Yes, sir.
Q Okay. Why is this blank?
A You don't have to fill that out. That's not part of DCA requirements. Other attributes before -- it would be like, oh, glass -- wears glasses has a scar and everything. DCA regulations all they want name -- name, height, age, color of skin and hair color.
They took out the glasses part, they took out all the other stuff. So that's if you wanted to do it yourself.
Q Okay. And you never wanted to include that yourself?
A It's not a requirement. Why

Page 92

H. HUSSEIN

would I give myself extra work?
Q Okay. Did you keep an electronic logbook?
A The electronic logbook didn't go into effect until 2022.
Q Okay. In 2022 did you keep an electronic logbook?
A I was under the impression that our allied was doing it under their system.
Q Okay. Was that correct?
A I haven't spoken to Allied in a while to ever confirm anything, but I believe it was because they sent it to you in the discovery.
Q Okay. Did you have access to the electronic logbook?
A No, sir.
Q Okay. So when you were performing service post the electronic logbook rules going into effect, how were you recording your logbook entries?
A It was getting recorded through -- at the same time I was doing

Page 93

H. HUSSEIN

service and it was supposed to get integrated into their thing.
Q You still --
A That's what I was made under the impression of.
Q Okay. Were you still keeping a paper logbook?
A No. They took that out. You didn't have to do it.
Q Okay. So describe for me the system that you were using to make your logbook recordings?
A The log -- you don't -- the logbook reporting is -- done through Allied's website. So the same way I would enter the services and the information is the same way it gets plugged in.
Q Okay. So when would you do that?
A Right after service. 'Cause you had to put in the information to -- in order to get the GPS location and everything all at the same time -- which stores the exact timing.

Page 94

H. HUSSEIN

Q And what device would you input that information on?

A I put that on my phone through their website 'cause they didn't have a application -- everybody -- different, like, agencies usually use, like, different type of applications.

Like, for instance the main one, it would be the called the independent server app. I'm pretty sure -- like, every -- because that's the most common one. Allied -- deviate -- they made their own one, which I guess -- I don't know.

Q Okay. So describe for me how it works. You just performed service, you want to record the information. What happens next?

A You want me to break the whole process? Like, how to record the information or what happens after that?

Q Break it all down for me.

A So -- and me personally when I go there -- you have to log into the system regardless. So before I even get

Page 95

H. HUSSEIN

to the door, I log in, I put your file number -- 'cause each case had a different file number, which --

Q Oh, okay. Hold on one second. Did you have to log in before each service attempt?

A No. You just logged in once.

Q Okay. Continue?

A 'Cause you had your main login, so as long as you didn't exit the web server or anything, you were basically still logged in. Then after I logged in, every case has a file number which takes you to that particular case.

And then after you enter the file number, there's a -- it'll show you, like -- the person's name, the address, and right on top of it will be a button that says get my location. Which plugs in the -- the GPS coordinates and the time -- date and time stamps.

And -- which takes you to another part that lets you enter the information of the person you actually

Page 96

H. HUSSEIN

served. Or if you didn't do a service.

Q And would you have to type in this information by hand?

A No. The only information you have to type in is just the person's name. For -- and the age, everything else, like the hair and everything, you were basically just given four options.

Q Okay.

A And you'll click the button and it'll just have it, like, pre-written already for you.

Q Okay. And you would do this after every service attempt?

A I would -- I would start the process before the service attempt because the -- the date stamp, it doesn't matter if you're there or not, I still needed to plug it in. Even if it was like a -- I need to come for another attempt, you still have to put it in there.

So I'll start it -- and the only thing else after that is if somebody answers the door. I'll start the next

Page 97

H. HUSSEIN

process. Like, well I'm asking -- what's your name -- first thing I'll ask you is, "Do you know the person?" After that, "What is your name?

"And while you're telling me your name -- as long as you confirm you do know the person and they" -- then I start entering information while you get -- well, really your name. Because the age I don't really ask I just -- that's all approximate.

your skin color, I could see right in front of me, like, you know what the person's skin color. And weight is also an approximate.

Q Okay. So when would you put this information? When would you put the --

A The name? I put the name I put in right after you tell me. And while I'm handing you the papers, walking away, I'm pressing three other buttons.

Q Okay, so you're serving process, you're walking down the hallway and you're

Page 98

H. HUSSEIN

putting it in your --
A No, the name is, like -- all right. For instance, like a you -- you see how, like, when you get, like, a UPS package and they're standing right in front of you while they're giving you a package, they ask you for your name and while you're giving it to them they're typing it in?
Q Mm-hmm.
A I just basically follow the same format.
Q Okay. About how --
A While I walk -- while I walk away, the only thing I need to press is probably -- you go to the part where it says skin color, you press that it already gives you four options.
Like, you didn't have much options. It was either black, brown, white, and yellow. But they ended up taking out yellow 'cause people found it offensive.
Q Okay. And about how long would

Page 99

H. HUSSEIN

this take?
A Approximately, with the typing of the name or after I walk away from you?
Q Oh, let's start with the typing of the name first?
A While I'm speaking to you. I don't know. I would say probably, like, 15 seconds.
Q Okay. And how long would the walking away take?
A Like, 30 seconds. I just have to legit click three buttons.
Q Okay. Do you know how the GPS recording was made?
A No, I have no access to that. Don't know how that -- and that's also part of regulations, so you can't alter it.
Q Okay. How would you make a GPS recording on the website?
A That's why I said before -- before I go to the -- as soon as you log in and I put your file number, the first thing I said is there's a one button that

Page 100

H. HUSSEIN

says "get my location," which automatically, as soon as you press it puts in the GPS.
And that's the first thing I -- like I said earlier, it's the first thing I do because whether you're there or you're not there, I needed the timestamp and the location because in order -- the next attempt to say, "Hey, I served it. Hey, I got to do another attempt." I still have to press that button first.
Q Okay, so you -- when in the service process do you make the GPS recording?
A Before that.
Q When you say -- so --
A Before -- while I'm walking to your door, before you even answer the door.
Q Okay, so somewhere between leaving your bike or car and getting to the door, you make the GPS recording?
A Yes, sir.
Q And is that true in every

Page 101

H. HUSSEIN

instance?
A Yes, sir.
Q Okay.
A Because in order to go to the next step, you'll have to press that button. Because the next step is the one that gives you the option whether I served it or I didn't serve it, you need the GPS and the timestamp. So if you're there or you're not there, I still have to press that button regardless.
Q Okay. So -- and let me know if I'm getting this wrong. You get -- you're going to the door, you click the GPS button and then is that a predicate to being allowed to enter more information about the service?
A Yes, sir.
Q Okay. Did you always create a GPS record?
A Yes, sir.
Q Okay. Does it always record successfully?
A If it doesn't go successful, I

Page 102

H. HUSSEIN

wouldn't be aware of that. It doesn't tell me on my end if it does or doesn't.

Q Does it take a picture?

A No, sir.

Q Okay. Can you --

A The other applications did.

Q Okay. Can you return to the location later and redo it?

A What do you mean by that?

Q So let's say the GPS isn't successful. Can you go back and click it again?

A For that I wouldn't be able to know if it went successful. Not at that point I don't know, like I just stated just before, I wouldn't know if it's successful or not. It doesn't tell me as the user.

Q Okay. Does it show you the time that the record is created?

A Yes, sir.

Q Okay. And that gets recorded in your -- is it true that that gets recorded in your logbook as the time of service?

Page 103

H. HUSSEIN

A Yes, sir.

Q Okay. Okay. I know it's been a short minute, but do folks mind if we take a break again quick?

MR. MARSHALL: Fine with me.

THE VIDEOGRAPHER: All right, Counsel, I'll take us off the record.

MR. SCHEDLER: Thank you.

THE VIDEOGRAPHER: Thank you. This is the end of Media Unit Number 2. We are now off the record at 11:21 a.m. for media change and break.

(Off the record.)

THE VIDEOGRAPHER: Counsel, I just have to get us on the record. Standby for record. This is the beginning of Media Unit Number 3. We are now on the record at 11:27 a.m. back from break. Thank you. Counsel?

BY MR. SCHEDLER:

Q Okay. So I just want to follow up on a couple things. So just to be clear, you would receive no money if there was no successful service?

Page 104

H. HUSSEIN

A I -- no. I said again, if there's no success -- at the first attempt or altogether?

Q So let's go through both. So let's start with altogether?

A All altogether. I -- like I said earlier, you still get the full pay 'cause it's a nail mail --

Q -- let's say, okay. Go ahead.

A And then let's say there's a discrepancy with the address, you still get paid, you just get paid $5.

Q Okay. Let's say you go there and there's never anybody home.

A Then you do a nail mail and you get paid full service.

Q Okay. And you said you were paid by checks from Allied. Did you deposit those checks in your bank account?

A Yes, sir.

Q What account did you use?

A My TD account.

Q Okay. Okay. Sorry, just moving some things around here. Okay. You've

Page 105

H. HUSSEIN

previously stated that you testified at traverse hearings. How did you prepare for those hearings?

A I was given copy of the GPS record and once in a while I'll probably speak to the attorney that's representing the case. Other than that, there's really no preparation 'cause I don't know what they're going to ask.

Q Would you review prior attempts at service?

A Yes.

Q Okay. Would you review your log book?

A Yes, sir. 'Cause you have to bring it in. That's a requirement --

Q How much do you charge for -- oh, I'm sorry?

A Oh, sorry. I said that's a requirement by the courts for the traverse hearing. That you have to bring in the log book.

Q Did you always bring your log book?

H. HUSSEIN

A I believe so.
Q Okay. How much did you charge for appearing at a traverse hearings?
A $250 I believe.
Q What were the results of your traverse hearings?
A I don't know -- they don't really tell.
Q Did you ever --
A They don't tell me because most of the traverse hearings that I go to the judge will be, like, "Okay. You guys are here -- my ruling." But that goes to the attorneys, not me 'cause I'm considered a witness.
Q Do you know if you have to give those rulings to the Department of Consumer Affairs?
A That was done through Allied.
Q Okay. So did you ever see the rulings of any of your traverse hearings?
A Not that I'm aware of, no.
Q Okay. So you're not aware of the results of any of them?



H. HUSSEIN

A No. Again, I'm -- I'm a witness, not a defendant, not the plaintiff, that would go to either the defendant or the plaintiff. Not --
Q Okay. So I'm going to talk a little bit more about serving process. How do you get the summons and complaint?
A I get them from -- as I stated earlier, either from Anthony Allied or once in a while from email or other times from James.
Q Who is email?
A From -- like I stated earlier, either from Anthony or Fran.
Q Oh. Oh, I'm sorry. From email. Okay. Sorry I misheard you.
A Oh, sorry.
Q How are they printed out?
A At printer.
Q Okay. Do you print them or does Allied print them?
A No, Allied prints them.
Q Okay --
A -- I print them out on my end is



H. HUSSEIN

if they're sent to me by email.
Q And when would they be sent to you by email.
A Why would they be sent to me?
Q Mm-hmm.
A There'll be times they forgot to put a case in my -- in my batch. That's what we used to call it a batch 'cause you would get, like, a -- a stack instead of, like, one or two cases.
Q And where would you print them?
A I print them -- if I -- by email at home.
Q Who purchases the index number?
A That's done by Allied. I don't -- don't even know how that process is. Again, as a processor for your job is to deliver? Not --
Q Okay.
A -- do indexing.
Q How do you plan the route for service?
A I was using an applications called Route4me. It was made off for



H. HUSSEIN

truckers because at one point I was trying to use Google and you could put multiple stops. So I could just frame it out, like, instead of going in zigzags to realize that, yo, I could go like in a -- in a -- you know, a standard route in a sense.
But Google only lets you do -- I believe, don't quote me on this exact number. I believe the most it let you do is ten added stops. But the application is called Route4me is made for truckers. You could put up to 150 stops.
Q Okay. And when did you start using Route4me?
A I started early. Probably, like, 2018.
Q Okay. And would you print it out?
A No, it's an application. So just have it on your phone.
Q Okay. I want to show you, hold on one second. Okay. Sorry about that. What do you take with you when you're

H. HUSSEIN

serving process?

A What do you mean?

Q It's the start of the day. You're going to go serve some process. What do you bring with you?

A I bring my phone, I bring my wallet, I bring my car keys. I -- like -- you --

Q Okay.

A -- bring the papers. That's -- I don't know.

Q Okay. How do you carry the documents you're serving?

A I carry them in a -- it's -- it's not a briefcase. It's, like, those laptop holders.

Q Okay. And how do you organize the papers?

A I organize them by the route.

Q Okay. How do you travel to each location?

A I travel by location. In the beginning I have a -- I go by car and then I'll just park up 'cause I'll



H. HUSSEIN

do -- instead of doing, like, a whole borough, I'll do neighborhoods for instance.

So like I'll take my car and I'll go to Williamsburg and instead of traveling around Williamsburg trying to look for parking the whole time I just park my car and I have a little foldable bike and I just bike around.

Q Okay. So you get to a neighborhood, but to get from location to location that you're serving, that's by bike?

A Yes.

Q And is that bike pedal or electric?

A It's pedal.

Q Okay. Do you ever walk to a location?

A No.

Q Okay.

A I only walk to a location -- sorry. I walk to a location and -- there -- again since we do live in



H. HUSSEIN

Brooklyn and -- and a lot of them I do -- like I stated earlier, I do a lot of projects and stuff like that. I'll walk to locations 'cause it'll be building to building.

Q Okay.

A But, like, from walking routes? No, I wouldn't do that.

Q Okay. So what do you take with you on your bike?

A I just take my phone. I take my backpack, I leave the paperworks in it and the little briefcase and I start going.

Q Okay. When do you start?

A I start -- I'm technically supposed to start at six o'clock, but I like to get to the neighborhoods a little beforehand just in case there's traffic in the mornings. So I'll leave my house and get to set neighborhoods probably, like -- by, like, 5:45 and wait by -- six o'clock at my first stop.

Q Why do you have to wait till six o'clock?



H. HUSSEIN

A Because that's DCA regulations you can't serve before six and you can't serve after ten.

Q Why do you start so early?

A Because there's always somebody home.

Q Okay. When you arrive at --

A You have a 99 point -- percent chance of finding somebody home.

Q Okay. When you arrive at the first location, what do you do?

A If it's six o'clock, I knock on the door and start my routine.

Q Do you check to make sure the address is correct?

A Yes, sir. I wouldn't go there if it's not correct.

Q Okay. So how long does it take?

THE REPORTER: I'm sorry, can you repeat? Did you say you would not go there if the address is incorrect?

THE WITNESS: Correct.

THE REPORTER: Thank you.

//

Page 114

H. HUSSEIN

BY MR. SCHEDLER:

Q So how long does it take you to find the actual house number?

A Not hard at all. It's New York. They're -- go normal -- numbers.

Q Okay. If you had to estimate how long?

A From one location to another?

Q Yeah. So you go -- you know you're in a neighborhood, there's a bunch of houses, you know, you want to try and find the right one, you got to look to make sure it's correct. How long does that take?

A That's very vague. It could range from three minutes to ten minutes.

MR. MARSHALL: Mr. Hussein, I just want to be clear, one of the instructions earlier was to wait for objections. Please wait a moment so that counsel here can object. You may still need to answer, but just so the record is clear and we're not talking over each other. Okay?

THE WITNESS: Yes, sir.

Page 115

H. HUSSEIN

MR. MARSHALL: So I'm objecting to the form of the question.

BY MR. SCHEDLER:

Q Okay. You can answer the question.

A Like I was saying before, that's a very vague thing to answer because it could be two minutes. It could be -- I'm going from door to door in the same hallway. It could be I'm going across the street, it could be, like, I'm going next door or it could be I'm going down the block.

So that's very vague. Again, we live in New York City, you have approximately 500 people that live in one block.

Q Okay. So what do you do after you park your bike?

A After I park my bike, I go to the door.

Q Do you lock up your bike?

A Not really. It is a piece of shit bike. If you steal it, you steal it.

Page 116

H. HUSSEIN

Q Okay. Do you gather the papers you're going to serve?

A Yes, that's -- that's why I stated there earlier. I make them in order if the route that I'm going to make it easier for myself. They're already organized to go as my route goes.

Q Okay. Do you check to make sure the papers you're serving are for the correct address?

A Yes, I answered that as well.

Q How long does that take?

A I look down at the paper, I look up probably, like, five seconds, two seconds.

Q Okay. How do you get from the bike to the door of the address you're serving?

A How do I get there? Using my feet.

Q Okay. About how long does that take?

A That -- again, that's very vague.

Page 117

H. HUSSEIN

MR. MARSHALL: Objection to the form.

THE WITNESS: That's very vague. I could be going up the stairs, I could be just -- I'm ready there at the door sometimes. Like, let's say if you're on a family house, if I'm at your door, I'm at your door. It could be two seconds.

If it's -- I'm taking an elevator, I can't tell you how long an elevator's going to take.

BY MR. SCHEDLER:

Q Okay. So let's go through that. So let's say it's an elevator building.

A Yes, sir.

Q Generally speaking about how long does it take to get up there?

MR. MARSHALL: Objection to the form.

THE WITNESS: Approximately -- I don't know. Again, it's very vague.

BY MR. SCHEDLER:

Q Can you estimate?

A Not really. I'll be in lying if I said -- I gave you a number.

Q Can you give me a range?

Page 118

H. HUSSEIN

A Again, it varies. I don't know if you're on the second floor, I don't know if you're on the third floor. I don't know if you're on the 10th floor. You could be on the 15th floor.

Q How long would it take --

A You could be right there.

Q How long would it take to get to the 15th floor?

MR. MARSHALL: Objection to the form.

THE WITNESS: Again, I wouldn't know.

BY MR. SCHEDLER:

Q Okay. When you're serving on an elevator building, how did you gain access?

A What do you mean how I gained access to the elevator?

Q To the building.

A To the building. I'll buzz, go by the apartments. A lot of these buildings -- sorry to say, you could just pull the doors wide open.

Q Okay. And do you have an estimate of how long that takes?

Page 119

H. HUSSEIN

A No.

MR. MARSHALL: Objection to the form.

BY MR. SCHEDLER:

Q Okay. Okay. So what would you do when you got to the door to where you're performing service?

A As I stated earlier, I'll knock on the door.

Q Okay. How long would you wait for someone to answer?

A Again, it's very vague. Somebody could be up -- somebody won't be up. That ranges.

Q 30 seconds?

A -- not -- yeah, a lot of times probably less than that because if you buzz me in, you're ready by the door waiting to see who it is. Especially at that early in the morning.

Q How often would someone answer?

A Oh, very often. it's early in the morning you have a 99 percent chance of somebody being home.

Q How often would that be the

Page 120

H. HUSSEIN

person who's the defendant in the lawsuit?

A -- the person answering? Not very high. Some of the times they're home, they just don't want to come to the door.

Q But other people do want to come to the door?

A 'Cause they don't know who it is. I don't tell you who I am. You're just thinking this is just the delivery.

Q Okay. And how often would no one answer?

A At that time? Very rare. Extremely rare.

Q Okay. And when someone did answer, what would you do next?

A I would ask him if blah blah blah, lives there and is available. Whoever the defendant would be on the case.

Q Okay. Would you say anything else?

A After I asked that?

Q Yeah.

Page 121

H. HUSSEIN

A No, I'll wait for you to respond first.

Q Okay. And --

A I wouldn't -- I don't -- I don't announce what the paperwork is. I just ask -- the first thing I ask is, is the person -- Like, is John -- for instance, like, let's say the person's name is John Smith. I'd be like, "is John Smith available? Whether he still reside here?"

And then I would -- the person would tell me yes 'cause I don't want to give you more information where you possibly try lying for them. Be like, oh no he's not here. Oh no he doesn't live here. So the less information you know in the beginning, the better it is for me.

Q Okay. So what would you say next? After they said whatever their response was.

A If they say he's here -- it is either "I need to give him this paper," you're going to come to the door. They're like, "Oh, no." Then I'll be like, "Okay,

H. HUSSEIN

I'm just going to leave it with you.
"Can I get your name?" And either you're going to give me your name and if you don't give me your name, I'm just going to put you as a John and Jane Doe. 'Cause you confirmed that the person still resides there.
Q Okay. How long would those conversations take?
A Less than 45 seconds.
Q Okay. And would you write down the contents of those conversations?
A No.
Q Okay. And you previously said that you recorded the physical description in the app?
A Physical description only if it is a nail mail.
Q I'm sorry --
A You talking about the person or the door? Sorry.
Q The person.
A Oh, yeah. Yes, that's done in the app.



H. HUSSEIN

Q Okay. And just remind me again about how long that takes?
A That's -- again, I said that only takes a couple of seconds 'cause you don't have to physically type anything. It's -- you only have four options. Black, white, brown. And before there used to be yellow but they took out yellow.
That's for the skin color and for the hair color it's bold, white, black, blonde. And then there's one for other. If they have like, 'cause people started doing weird hair colors.
Q Would you ever talk to any neighbors?
A I'll talk to neighbors if I'm doing a nail mail to see if the person still actually lives there or not.
Q Okay. And about how long would those conversations take?
A I -- I wouldn't know. I can't -- sometimes it's -- the person's not there. I don't know.



H. HUSSEIN

Q Okay. So in total, how long would it take you to serve process?
MR. MARSHALL: Objection to the form.
THE WITNESS: Again, that's very vague. It could be next door neighbors. You could be right across the street. You could be two people in the same household.
BY MR. SCHEDLER:
Q Okay. All right. And so just to be clear, when you say you recorded it in the app, that's the app we were discussing? That's the -- I'm sorry, let me rephrase. Just to be clear, when you say recorded in the app, you're talking about the Allied website; correct?
A Correct.
Q Okay.
THE REPORTER: I'm sorry. I didn't get your last response, Mr. Hussein. Was that "correct"?
THE WITNESS: Correct.
THE REPORTER: Thank you.
THE WITNESS: No problem.
//



H. HUSSEIN

BY MR. SCHEDLER:
Q And then, sorry, I just need some clarity. Can you again, give me the name of the app that you use to plan your route?
A Route4me or Route4me.
Q Okay. Route4me. And is that available --
A If you want I could you -- you want to give me, like, 30 seconds? I can see the exact name of it --
Q Yeah, that'd be awesome. You can show us the screen.
A One second.
THE REPORTER: Oh, sir. Are you seeing the screen?
MR. SCHEDLER: I am.
BY MR. SCHEDLER:
Q Can you just scroll down a little bit so I can get the name?
A That was the name.
Q No part of it was blocked off.
All right. Perfect. Thank you. Okay. So can you describe your understanding of

Page 126

H. HUSSEIN

an affidavit of service?

A Affidavit of service? To my understanding was the summary of the case.

Q Okay. And what does that mean?

A Everything that happened in case, like, the person that was supposed to be served. The person that did get served.

Q Okay. And when you mean -- when you say case, you mean attempted service?

A No, like the case itself, like case file, index number, whatever you want to call it.

Q Okay. Are you aware that it's signed under oath?

A Yes, sir.

Q Can you describe how you would fill out the affidavit of service?

A By signing it.

Q Okay. Where would you sign it?

A I will take the fifth on that.

Q So just to be clear, you are pleading the fifth against rights to self-incrimination. For the question of where

Page 127

H. HUSSEIN

you would fill out the affidavit of service?

A Yes, sir.

Q Okay. When would you fill out the affidavit of service?

A I'll also plead a fifth on that one.

Q Okay. What would you reference when you were filling it out?

A I plead a fifth on that one.

Q Would you check it against your paper logbook?

A I plead a fifth on that one.

Q What is your understanding of why affidavits are notarized?

A -- has being a witness.

Q Can you describe the notarization process?

A There's a person signing and a person "notaring" who was a witness.

Q Okay. Were your affidavits of service notarized?

A I plead the fifth.

Q Who notarized your affidavits of

Page 128

H. HUSSEIN

service?

A I plead the fifth.

Q How did that notarization process work?

A I plead the fifth.

Q Were you in front of Francis Mondrone when you signed those affidavits of service?

A I plead the fifth.

Q Did Francis Mondrone notarize all of your affidavits?

A I plead the fifth.

Q Okay. Is there anything about the notarization process that you can tell us?

A I plead the fifth.

Q Okay. Can you describe how you mail the summons and complaint?

A That's handled by Allied.

Q All right. Do you know who at Allied mails them?

A I can't -- I don't know who does.

Q Okay. Do you mail them

Page 129

H. HUSSEIN

personally?

A No, I just said that's done by Allied.

Q Okay. Who files the affidavits of service?

A I wouldn't know.

Q Okay. Do you know what happens after you filed the affidavits of service?

A I wouldn't know 'cause I never said I filed it.

Q Okay.

A You just asked me if I filed the affidavits and I said no, so --

Q I said -- I'm sorry. Perhaps I was unclear. I was asking if you know what happens after they get filed?

A Well, no, 'cause you said me. What happens after I filed it and I was like, I never filed so I can't answer. I wouldn't know.

Q Okay. Okay. So I am going to show you Plaintiff's Exhibit 7. Sharing my screen. So you can just bring up Exhibit 7. Take your time, look at it.

H. HUSSEIN
Okay. Do you recognize this document?
(Plaintiff Exhibit 7 was marked for identification.)
A I know it's the affidavit of service.
Q Okay.
A The particular document? I plead the fifth.
Q I'm sorry. Can you repeat that?
A I said I know that the document itself is -- is an affidavit of service, but this particular document? I plead the fifth on. I do not.
Q Okay. So do you recognize it?
A This particular one? No.
Q Okay. Is that your signature above where it says Hashem Hussein?
A I plead the fifth.
Q Okay. Is that Francis Mondrone's signature above where it says notary public?
A I plead the fifth.
Q Okay. Do you see where it says: "Deponent completed service by mailing a



H. HUSSEIN
copy of the summons and complaint"?
A Yes, sir.
Q Is that true?
A I plead the fifth.
Q Okay. If you did not personally mail the summons and complaint, why did you swear to it?
A I plead the fifth.
Q Okay. I am going to move this and show you what has been marked as Plaintiff's Exhibit 7. Do you recognize this document?
A One minute please.
THE REPORTER: Also did you say 7?
THE WITNESS: That's the same one we just did -- you just asked me the same question. You said Exhibit 7.
MR. SCHEDLER: Oh, I'm sorry. That's a typo in my outline.
THE REPORTER: Do you mean 8?
MR. SCHEDLER: The Exhibit 8. Thank you everyone.
THE REPORTER: Also if you can ask your question again?



H. HUSSEIN
BY MR. SCHEDLER:
Q Let me start from the beginning. I am going to -- just let the record reflect that I'm showing a clear copy what has been marked as Plaintiff's Exhibit 8. Mr. Hussein, take some time and review the document.
(Plaintiff Exhibit 8 was marked for identification.)
A Okay.
Q Do you recognize this document?
A No, I do not.
Q Okay. Is that your signature above where it says Hashem Hussein?
A I plead the fifth.
Q Okay. Is that Francis Mondrone's signature?
A I plead the fifth.
Q Okay. You see where it says: "Deponent completed service by mailing a copy of the summons and complaint"? Is that true?
A I plead the fifth.
Q Okay. So do you see the address



H. HUSSEIN
on this document?
A Yes, sir.
Q Okay. And it says 172-14 133rd Avenue?
A Correct.
Q And then we're going to go back to Ms. Watkins address, that's the plaintiff. And do you see where it says 114-18 176th Avenue? See that?
A Yes, sir.
Q And Ms. Watkins was served at 6:16 and Mr. Walburg was served before that at 6:12. See that?
A One minute. I don't -- get to the other one. Yes, sir.
Q Okay. Now, I am going to show you what has been marked as Plaintiff's Exhibit 9. And this is a Google -- sorry. Take your time. Take a look at it.
(Plaintiff Exhibit 9 was marked for identification.)
A Okay.
Q So this shows a Google Maps printout between the two addresses. Do

Page 134

H. HUSSEIN

you agree?
A Correct.
Q Okay. And this says that the distance between the two addresses is two miles and a 12 minute bike ride. Do you agree?
MR. MARSHALL: Objection to the form.
THE WITNESS: -- I -- I don't agree with that but I agree with what it says on the screen, but not that it is 12 minutes.
BY MR. SCHEDLER:
Q Okay. Why don't you agree with it?
A Because Google algorithm does not show the same time for everybody 'cause it goes and varies by people's speeds.
Q About how fast would you be drive -- or would you be riding your bike?
A I never really calculated it, but I could tell you that different people -- even when it comes to driving, walking, everything, Google will show different people different timeframes for

Page 135

H. HUSSEIN

different -- because it goes by the person's actual speed. There's a whole algorithm behind it.
Q Okay. And just to be clear, you have a pedal bicycle, not an electric bicycle?
A Correct.
Q Okay. Do you know how -- sorry, strike that. How is it possible you were able to perform service four minutes apart at addresses that are 12 minutes apart?
A I can't recall any of that.
Q Okay. Do you believe that these service attempts comply with the law?
A Which service attempts?
Q The ones between Ms. Watkins and Mr. Walburg?
A In what sense do you mean comply with the law?
Q I mean are they legitimate service attempts? Did this actually happen?
A I can't recall.
Q You can't recall if this

Page 136

H. HUSSEIN

actually happened?
A No, I'm saying -- like you said, if this isn't like a recording, like I can't -- like, I don't know, like, maybe I did something wrong along the line. I can't say like, oh --
Q What might you have done wrong?
A For instance, like, let's say I didn't log in the -- the log -- 'cause the rule is you have to log in the logbook right after, for example. I know there's sometimes where I didn't follow that rule. I didn't log it in after. I would log in at the end of the day.
Q Okay, so describe --
A So to answer that -- to answer that question, that's why I said it would be very -- I can't really recall.
Q Oh, okay. So --
A Maybe I -- this would've been one of those days where instead of logging the logbook entry right after I did it -- I did it at end of the day. That's what I say.

Page 137

H. HUSSEIN

Q Okay. So let's break that down. So you said that sometimes you logged it into the day at the end of the day, but that was only true of your paper logbook; correct?
A No, I'm saying like, that's what I said it -- when you say that like, oh was everything done in accordance to law? That's what I'm saying. Like, that was one rule that I knew that sometimes I was breaking.
Q Were you breaking any other rules?
A No.
Q Okay.
A Well, actually -- I'm sorry. One time I did -- I log the service after the time I got there. It got logged in at 10:01, I believe, or 10:02.
Q Okay. Tell me what happened that -- at that time?
A I was at a case -- I was running a -- there probably 9:55. I was having issues getting the service I guess from

H. HUSSEIN

the place I was at -- I wasn't catching the location 'cause I wasn't getting any data signal through any cell tower. So I had to keep repeatedly doing it. And then I believe it got logged in. I -- at, like, 10:01.

Q Okay. Was that a common occurrence?

A No.

Q Okay. So I want to go back to this attempt and sort of my original question. How is it possible that you were able to serve -- perform service, 4 minutes apart at locations that are 12 minutes apart?

MR. MARSHALL: Objection, asked and answered.

BY MR. SCHEDLER:

Q You can answer.

A I did actually answer and then we went through the same thing. You're -- it is saying 12 minutes for you, but not everybody's going to say 12 minutes.



H. HUSSEIN

Q Do you know how fast you'd have to ride your bike to serve process in four minutes?

A To serve process in four minutes? Really not that fast. And if you really to look at it, it's making you go around when you can cut right through the park.

MR. SCHEDLER: Okay. All right. So if everyone's okay, I'm going to take a break right there. Any objection to that?

THE WITNESS: I object. Can we just finish this?

MR. SCHEDLER: I need to use the restroom, so.

THE WITNESS: All right.

MR. MARSHALL: All right. So now --

THE REPORTER: I'll have to put that on the record too.

MR. SCHEDLER: Yeah. Now everybody knows.

MR. KESHAVARZ: Now everyone knows.

THE VIDEOGRAPHER: All right. Stand -- let me take this off the record.



H. HUSSEIN

Standby, please. We are now off the record. The time is 12 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are now on the record. The time is 12:43 p.m., back from break.

MR. SCHEDLER: Okay. So we took half an hour break around 12:10. At 12:34, the deponent Hashem Hussein sent an email out to all of us saying that he caught a flat tire and he is waiting for a tow truck, and he wants to reschedule the deposition for tomorrow or a later date.

I sent him an email that said we would like to finish today. He apparently logged off his Zoom around 12:30. Is that fair to say?

THE VIDEOGRAPHER: Yes.

MR. SCHEDLER: And has not been seen from there and just sent an email waiting on AAA. So we are going to call Mr. Hussein now to preserve for the record what happened and to see if the deposition can continue for today. Anyone have



H. HUSSEIN

anything to add to that?

MR. KESHAVARZ: Well, we might want to mention that this is a subpoena, the equivalent of a subpoena, and you can't just walk away. All right. Hold on. Let me get him on.

MR. SCHEDLER: All right. So we called and he did not pick up.

MR. KESHAVARZ: I'm going to email him right now. Ask him to call my cell.

MR. SCHEDLER: Yeah.

MR. KESHAVARZ: All right. All right. So I just emailed him. Let's see what he says. Mr. Hussein, hi. It's Ahmad Keshavarz. Listen, you're on the record still in the deposition. Matt, did you have some stuff you wanted to say?

MR. SCHEDLER: Yeah, so you know, a deposition has the same legal force as a subpoena. The expectation is that you will be here and make yourself available for the entire eight hour, seven hour period or whatever it is.

So we would like to finish this

H. HUSSEIN

deposition today. We don't want to adjourn it. What is your timeline to come back and finish the testimony?

THE WITNESS: It was an unforeseen circumstance. It's not like something -- this is -- I planned for. I'm just barely waiting. Like, I just emailed you and trying to keep you up to date. I'm just waiting on AAA. I just didn't want --

MR. SCHEDLER: Where were you going?

THE WITNESS: -- that process was going to be, that's why I said if you guys wanted to wait or do you want to adjourn it? I'm not trying to stay away from it. That's why I've been present the whole day.

MR. SCHEDLER: We're not -- we don't want to wait and we don't want to adjourn it. We're moving forward today, so let us know when you can come back.

THE WITNESS: I'm just waiting on AAA.

MR. SCHEDLER: Where were you going,



H. HUSSEIN

Mr. Hussein? Where were you going?

THE WITNESS: I went to go grab food.

MR. SCHEDLER: Okay. And when did you leave?

THE WITNESS: I left probably, like, 12 -- I don't know, I didn't look at the time when I left. I just knew I had to be back by 12:40.

MR. SCHEDLER: Okay. Because it -- you signed off your Zoom at 12:30.

THE WITNESS: Okay.

MR. SCHEDLER: It feels illusory. Feels like you did not have a flat tire, but in fact you want to stop doing the deposition.

THE WITNESS: That's -- I object to that because that's exactly what happened. I did have to -- so I don't know why you're just saying that. You're just assuming something.

MR. SCHEDLER: When do you think -- when is AAA supposed to get there?

THE WITNESS: Right now they have it on the app. It doesn't say -- it just



H. HUSSEIN

says waiting on service.

MR. SCHEDLER: Did they give you an estimate?

THE WITNESS: No. It just says waiting on service. That's what I'm waiting on.

MR. KESHAVARZ: This is Keshavarz. Is there a reason you have to wait there? Why don't you just come back into the room that you were doing your deposition in?

THE WITNESS: Because I'm not going to leave my car here.

MR. KESHAVARZ: You pulled over; right?

THE WITNESS: Yeah, but I'm not going to leave my car here. I'm not near my home.

MR. KESHAVARZ: You drove there in ten minutes?

THE WITNESS: Drove where? To get food?

MR. KESHAVARZ: Where are you physically right now?

THE WITNESS: Right now I am



H. HUSSEIN

currently by Coney Island. I was just grabbing -- and -- real quick.

MR. KESHAVARZ: All right. How far away from your home are you or from wherever you can get a computer from?

THE WITNESS: From my location? Approximately, like, 11 minutes. That's what I'm saying, I'm just waiting for a tow truck. I'm not even going to the tire shop. I just don't want to leave my car here.

MR. KESHAVARZ: Well, you pulled over; right?

THE WITNESS: Yes.

MR. KESHAVARZ: All right, well why don't you just walk over. It's 11 minutes.

THE WITNESS: That would entail me leaving my car here? No?

MR. KESHAVARZ: Yeah, so?

THE WITNESS: Okay.

MR. KESHAVARZ: Is there a reason why you can't do that?

THE WITNESS: Because it's in the

H. HUSSEIN
middle of Coney Island. It's not a place you could just leave your car.
MR. KESHAVARZ: Well, you're parked; right?
THE WITNESS: No, I'm pulled over.
MR. KESHAVARZ: All right. Well, you can do it -- you can do the Zoom on your phone now; right?
THE WITNESS: No, I was doing it on the laptop. You told me not to do it on the phone, on the email because I would have to see exhibits.
MR. KESHAVARZ: Okay. But right now you can get back on the phone right through the Zoom?
THE WITNESS: Yeah. Okay. I would have to download the app. Yes. Is that what you would like me to do? Because again, you guys stated that you wanted me to do it on the computer device so I could see exhibits.
Is that not what you guys not told me on the email? 'Cause originally that's what I was going to do it on the phone.



H. HUSSEIN
And then you got to send a follow up email confirming that I'm going to be able to have a computer device.
MR. KESHAVARZ: Do you have a iPhone or an Android?
THE WITNESS: I have a iPhone.
MR. KESHAVARZ: All right. Well, why don't you just turn on your FaceTime?
THE WITNESS: I -- I just -- I just said that -- I said that's not a problem. I could sit there and I could download the app.
MR. KESHAVARZ: Well, can you just turn on FaceTime? Let me just see where you are right now.
THE WITNESS: For what?
MR. KESHAVARZ: I don't know. So I could see at your -- can you press your FaceTime button?
THE WITNESS: Would you like me to download the app or would you want until I get back to the computer, which one would you like?
MR. KESHAVARZ: Would you press the



H. HUSSEIN
FaceTime button on the phone that you're on; please? And he hangs up.
MR. MARSHALL: Okay. Have we -- have we made our record or are we going to -- are we going to pause and see what, if anything he does?
MR. SCHEDLER: I think we should pause and see any -- what, if anything he does.
MR. MARSHALL: Okay.
MR. SCHEDLER: Right. I think getting this done is the most important thing.
THE VIDEOGRAPHER: Okay, counsel, should I take us off the record now or do you want me to still stay on?
MR. SCHEDLER: You can take us off.
THE VIDEOGRAPHER: Okay. Standby, please. We are now off the record. The time is 12:52 p.m.
(Off the record.)
THE VIDEOGRAPHER: We are now on the record. The time is 1:31 p.m. Okay. Counsel?



H. HUSSEIN
MR. MARSHALL: All right. Matt, do you want to leave a voicemail message from or I can?
MR. SCHEDLER: Hi, Mr. Hussein, you're on the record with the attorneys at your deposition. We'd like to get this done today. We're all in agreement on that, so please email us with when you're going to be available.
Also, if you could please email us a picture of the flat tire and a screenshot of the AAA app, we'd appreciate that as well.
MR. KESHAVARZ: All right.
THE VIDEOGRAPHER: Okay. Counsel, should I take us off the record?
MR. SCHEDLER: Yes, please.
THE VIDEOGRAPHER: Okay. Standby, please. We are now off the record. The time is 1:34 p.m.
(Off the record.)
THE VIDEOGRAPHER: We are now on the record. The time is 2 p.m. Okay.
Counsel?

H. HUSSEIN

MR. SCHEDLER: Okay. So we just attempted to call Mr. Hussein five times. He did not pick up. We have emailed him to pick up the deposition tomorrow at 1:30, and we sent him an email to that effect. So we would like to keep the deposition open and rescheduled for tomorrow at 1:30.

THE VIDEOGRAPHER: Okay. Counsel -- oh, go ahead. Sorry.

MR. SCHEDLER: That -- thank you.

THE VIDEOGRAPHER: Okay, so I'll take us off the record. Hold --

THE REPORTER: Hold on before you go off the record.

THE VIDEOGRAPHER: Okay.

THE REPORTER: For -- for today's transcript. Let me see. Mr. --

MR. SCHEDLER: Schedler?

THE REPORTER: No, I -- I have your order, sir.

Mr. Sanders, will you be ordering? I can't hear you, sir.

MR. KESHAVARZ: Arthur, we can't hear



H. HUSSEIN

you.

MR. MARSHALL: Does this need to be on the record?

MR. KESHAVARZ: No, we're off the record.

THE REPORTER: No, we're still on the record.

MR. KESHAVARZ: Oh.

MR. MARSHALL: For ordering the transcript?

THE REPORTER: Correct.

Mr. Sanders, are you ordering the transcript?

MR. SANDERS: Yes.

THE REPORTER: Is standard format okay for you, PDF?

MR. SANDERS: Yeah. PDF only. Thank you.

THE REPORTER: Okay.

And, Mr. Marshall, will you be ordering?

MR. MARSHALL: Yes.

THE REPORTER: Same format?

MR. MARSHALL: And a mini.



H. HUSSEIN

MR. KESHAVARZ: And also an e-tran for the plaintiff.

THE REPORTER: Sorry, one second. Mr. --

MR. MARSHALL: Those are delivered in PDF format; correct?

THE REPORTER: Yes.

Mr. Sozio, you're all good if you want to go off the record.

THE VIDEOGRAPHER: Okay. Thank you. Standby, please. We are off -- oh, sorry.

We are off the record at 2:02 p.m. Eastern Daylight Time, and this is the end of today's testimony given by Hashem Hussein. The total number of media used was three and will be retained by Veritext New York.

(Signature reserved.)

(Whereupon, at 2:02 p.m., the proceeding was concluded.)



CERTIFICATE OF DEPOSITION OFFICER

I, JONATHAN TEJEDA, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Jonathan Tejeda

JONATHAN TEJEDA
Notary Public in and for the
State of New York

Page 154

CERTIFICATE OF TRANSCRIBER

I, NOU KHOU YANG, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties here vise interested in the o

NOU KHOU YANG

Page 155

Watkins, Loretta v. Malen & Associates, P.C., Et Al.
Hashem Hussein (#8323704)

E R R A T A S H E E T

PAGE____ LINE____ CHANGE________________________
______________________________________________
REASON________________________________________
PAGE____ LINE____ CHANGE________________________
______________________________________________
REASON________________________________________
PAGE____ LINE____ CHANGE________________________
______________________________________________
REASON________________________________________
PAGE____ LINE____ CHANGE________________________
______________________________________________
REASON________________________________________
PAGE____ LINE____ CHANGE________________________
______________________________________________
REASON________________________________________
PAGE____ LINE____ CHANGE________________________
______________________________________________
REASON________________________________________

_____________________________ ______________
Hashem Hussein Date

Page 156

Watkins, Loretta v. Malen & Associates, P.C., Et Al.
Hashem Hussein (#8323704)

ACKNOWLEDGEMENT OF DEPONENT

I, Hashem Hussein, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____________________________ ______________
Hashem Hussein Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF _______________, 20___.

________________________
NOTARY PUBLIC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

---

LORETTA WATKINS,

Plaintiff,

v. Case No.

MALEN & ASSOCIATES, P.C.; 1:25-cv-04295-

HASHEM HUSSEIN; and A & F EK-LKE

PROCESS SERVICE, INC., D/B/A

ALLIED PROCESS SERVICE,

Defendants.

---

VIDEOTAPED DEPOSITION OF HASHEM HUSSEIN

VOLUME II

DATE: Wednesday, September 2, 2026

TIME: 1:34 p.m.

LOCATION: Remote Proceeding

Brooklyn, NY 11219

REPORTED BY: Robert Lombardi

JOB NO.: 8427370

Page 158

APPEARANCES

ON BEHALF OF PLAINTIFF LORETTA WATKINS:
MATTHEW SCHEDLER, ESQUIRE (by videoconference)
Of Counsel, Camba Legal Services
20 Snyder Avenue
Brooklyn, NY 11226
matthew.schedler@camba.org
(718) 940-6311

ON BEHALF OF PLAINTIFF LORETTA WATKINS:
POOJA PATEL, ESQUIRE (by videoconference)
Camba Legal Services
20 Snyder Avenue
Brooklyn, NY 11226
pooja.patel@camba.org
(718) 940-6311

ON BEHALF OF PLAINTIFF LORETTA WATKINS:
AHMAD KESHAVARZ, ESQUIRE (by videoconference)
The Law Office of Ahmad Keshavarz
16 Court Street
Brooklyn, NY 11241
ahmad@newyorkconsumerattorney.com
(718) 522-7900

Page 159

APPEARANCES (Cont'd)

ON BEHALF OF DEFENDANT MALEN & ASSOCIATES, P.C.:
ADAM MARSHALL, ESQUIRE (by videoconference)
Kaufman Dolowich, LLP
135 Crossways Park Drive, Suite 201
Woodbury, NY 11797
amarshall@kaufmandolowich.com
(516) 283-8731

ON BEHALF OF DEFENDANT HASHEM HUSSEIN:
HASHEM HUSSEIN, PRO SE

ON BEHALF OF DEFENDANT A & F PROCESS SERVICE, INC.,
D/B/A ALLIED PROCESS SERVICE:
ARTHUR SANDERS, ESQUIRE (by videoconference)
Barron & Newburger
30 South Main Street
New City, NY 10956
asanders@bn-lawyers.com
(845) 499-2990

ALSO PRESENT:
Marco Sozio, Videographer (by videoconference)

Page 160

INDEX


| EXAMINATION: | | PAGE |
|---|---|---|
| By Mr. Schedler | | 165 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Plaintiff: | | |
| Exhibit 20 | Collection of Affidavits | 188 |


Page 161

H. HUSSEIN

THE VIDEOGRAPHER: Good afternoon. We are going on the record at 1:34 p.m. Eastern Daylight Time on September 2, 2026.

Please note that this deposition is being conducted virtually. Quality of recording depends on quality of camera and internet connection of participants. What is seen from the witness and heard on the screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is the -- this is media unit one of the continued -recorded deposition of Hashem Hussein, taken by counsel for the plaintiff in the matter of Loretta Watkins vs. Malen and Associates, P.C., et al., filed in the United States District Court for the Eastern District of New York, Case Number 1:25-cv-4295.

This deposition is being conducted remotely using virtual technology.

My name is Marco Sozio, representing

Page 162

H. HUSSEIN

Veritext, New York, and I am the videographer. The court reporter is Robert Lombardi from the firm Veritext, New York.

I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to the proceeding, please state them at the time of your appearance.

Okay, Robert.

THE REPORTER: Thank you.

Good afternoon, everybody. My name is Robert Lombardi; I'm the reporter assigned by Veritext to take the record of today's proceeding.

I am a notary authorized to take acknowledgments and administer oaths in both the states of Massachusetts as well as New York.

Parties agree that I'll swear in the witness remotely.

Additionally, absent an objection on

Page 163

H. HUSSEIN

the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

Now, at this time, will everyone in attendance please come forward and identify yourselves for the record, beginning with our taking attorney.

MR. SCHEDLER: Matthew Schedler, from Camba Legal Services, for the plaintiff, Loretta Watkins.

MS. PATEL: Pooja Patel, from Camba Legal Services, for the plaintiff, Loretta Watkins.

MR. SANDERS: And Arthur Sanders, Barron and Newburger, for co-defendant,

Page 164

H. HUSSEIN

Allied Process Service.

MR. MARSHALL: Adam Marshall, Kaufman Dolowich, LLP, for defendant, Malen and Associates P.C.

And I'll represent that Ahmad Keshavarz -- oh, go ahead, Ahmad.

MR. KESHAVARZ: Ahmad Keshavarz, The Law Office of Ahmad Keshavarz, also for plaintiff.

THE REPORTER: Thank you. And hearing no objection, I will go ahead and swear in our witness.

Mr. Hussein, if you'll please raise your right hand for me.

MR. HUSSEIN: I apologize. My audio went down. Sorry.

WHEREUPON,

HASHEM HUSSEIN,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Okay. You may proceed today, Counsel.

Page 165

H. HUSSEIN

EXAMINATION

BY MR. SCHEDLER:

Q All right. Good afternoon, Mr. Hussein. Can you hear me?
A Yes, I do.
Q Okay. Can you state your name for the record?
A Hashem Hussein.
Q Okay. And do you understand that you're under oath today, and that your testimony has the same force and effect as if you were testifying in court before a judge and jury?
A Yes, I do.
Q And do you understand that you are required to provide the whole truth? If I ask you something like, "Who did you speak with," you must tell me everyone you spoke with.
A Yes, I do.
Q Are you feeling well today?
A Yes, I am.
Q Are you taking any medications -- or have you taken any

Page 166

H. HUSSEIN

medications in the last 24 hours that would affect your ability to testify truthfully and accurately?

A No, I haven't.

Q Is there any reason -- medical, physical, or otherwise -- that would prevent you from giving a full and complete testimony today?

Did you hear me, Mr. Hussein?

A Yeah, I said, "No."

Q Oh, okay. I'm sorry. I didn't hear that.

A That's all right.

Q Is there any reason you would not be able to understand my questions?

A No.

Q Okay. What did you do to prepare for today's deposition?

A Nothing.

Q Okay. What do you have in front of you in the room?

A In front of me is a laptop.

Q Is there anyone in the room with you?

Page 167

H. HUSSEIN

A I have my sister in the room that helped me with the audio.

Q Okay. Is she able to hear this deposition?

A No, she already left. I just wanted to clarify, 'cause she was there earlier.

Q Okay. All right. That's no problem. Okay, so just a reminder: refrain from messaging or communicating with anyone via text or online.

Do -- or, sorry, let me rephrase: Will you agree to refrain from messaging or communicating with anyone via text or online messenger during the deposition?

A Yes.

Q Okay. All right. Did you have any other jobs while you were a process server?

A I've had side jobs once in a while. I've done DoorDash, I've tried trading in the stock market.

Q Okay. And when was that?

Page 168

H. HUSSEIN

A Which one? DoorDash or in the --

Q Yeah, let's start with DoorDash.

A DoorDash, that was during the pandemic 'cause there was -- the only job available.

Q Okay. And stock trading, when was -- let me rephrase that in the form of a question. When did you try stock trading?

A It been on and off for, like, the last eight years.

Q Okay. So yesterday you testified that you did not receive any training while you worked at Allied; correct?

A Correct.

Q And you also testified that you were aware of changes in the process serving rules; correct?

How did you become aware of those changes?

A Well, the DCA [ph] also sends out emails to register process service,

Page 169

H. HUSSEIN

'cause you have to register your email as well.

Q Okay. Do you still have those emails?

A I'm not sure. I haven't really looked for them.

Q Okay. Yesterday you testified that you received $250 for appearing at Traverse Hearings. Was that money paid to you directly or through Allied?

A That was paid by check. It got sent from, like, the law firm to Allied, and Allied -- and -- gave it to me.

Q Would they give you the entire amount?

A Yes.

Q Okay. Yesterday you testified that you used the Route4Me app to plan your service; correct?

I'm sorry. Okay. Sorry, I'm having a little trouble hearing you sometimes. So I may be asking you to repeat yourself.

MR. SCHEDLER: Is anyone else --

Page 170

H. HUSSEIN

THE REPORTER: Yeah.
Can you repeat that answer for me?
Sorry, Mr. Hussein, you didn't come through again.
THE WITNESS: -- correct. Can you hear me?
THE REPORTER: Yeah. It's not picking up the first part of your sentence sometimes.
MR. SCHEDLER: Court Reporter --
THE REPORTER: The answer was "Correct," though; right?
THE WITNESS: Yes.
THE REPORTER: Okay.
MR. SCHEDLER: Court Reporter, are there any responses that have been missing?
THE REPORTER: I don't think so. Just that last one was the first one that I heard.
MR. SCHEDLER: Okay.
BY MR. SCHEDLER:
Q Did you have a subscription to the app?

Page 171

H. HUSSEIN

A Using the free trial -- the free trial only allows you under a hundred stops.
Q Do you still have it on your phone?
A No, sir.
Q Okay. Would Route4Me give you the time for a route?
A What -- can you rephrase that -- what do you mean?
Q Yeah, so when you're putting in the address information -- so let me rephrase. So is it correct that you would put in all the addresses into the route from the app?
MR. SCHEDLER: Okay. Did we get that?
THE REPORTER: No. I was just about to say I did not get that.
THE VIDEOGRAPHER: Audio is canceling out.
THE WITNESS: I said, "Correct."
BY MR. SCHEDLER:
Q Okay. And that would --

Page 172

H. HUSSEIN

A -- you want me to try pulling the laptop, maybe, closer? Maybe it's the mic.
Q You can try that. Yeah, just tilt the top down so we can get better framing. Thank you.
A No problem.
Q Okay. And would the route that Route4Me planned show how long the route would take?
A Yes, it has that feature, but I never really used that feature for the simple fact is, like I stated yesterday, in my -- yesterday's testimonial, I will do it to plug in the addresses and to see which neighborhoods, because, for instance, like, let's say I have a bunch of Williamsburg -- if you're aware -- in Brooklyn, where I have a bunch in, like, Brownsville, I have a bunch in Staten Island, 'cause I was doing also Staten Island and Queens
I would know, like, by punching them all in the map, okay, I could put

Page 173

H. HUSSEIN

this in this area, this in that area.
Q Do you know if the times for those routes were accurate?
A I never did the Route4Me thing for it.
Q Okay.
A I never tried using that feature.
Q Okay. You testified yesterday that sometimes you would fill out your paper logbook later in the day; is that correct?
A Correct.
Q Okay. About how often did you do this?
A More often than I should have.
Q What does that mean -- can you give me a number?
A I -- that would be a vague number. I can't really give you an exact number on that one.
Q Okay. Was it an everyday occurrence?
A No, not an everyday occurrence.

H. HUSSEIN

Q Every other day?

A Probably, like, once or twice a week.

Q Okay. Is it possible to enter information into -- sorry, let me rephrase. Is it possible to enter service information into Allied's website later in the day?

A What do you mean by that?

Q So in the same way that you would enter paper logbook information after you had done all your service, is it possible to do the same thing when you're putting service into Allied's website?

A No, the -- that would be -- they would have access to that. Me, personally, and all the process service, the only thing you have access to is to log in the service at the time.

It won't let you go back and change anything. Won't go back and look at what you entered or anything.

Q But do you have the ability to log in the service in the first instance



H. HUSSEIN

later in the day?

A If, like -- for instance, I could log in to see what file number it is and stuff like that. Like, if I didn't complete the task or anything, that's the only thing. But once you complete the task, you're not able to see it again.

Q Okay. So would you be able to, for example, make the GPS log and then leave the service information blank and put it in later?

A No, it would -- it time's out because of the GPS and the time.

Q Okay. What is the least amount of time it would take you to perform an instance of service?

A That's very vague because it could be in minutes, it could be in seconds. 'Cause, again, sometimes you will have service for two different individuals in the same apartment, or you'll have service for individuals on the same floor.

Q Okay. How long would it take



H. HUSSEIN

you to serve individuals on the same floor?

A I'll be like two minutes, three minutes.

Q Okay. I want to direct you to Exhibit 7, and I'm going to share my screen. Take your time and take a look at it. We talked about this yesterday. This is Ms. Watkins' Affidavit. Can you see it?

A Yes, I do.

Q Okay. Is the information in the Watkins Affidavit true?

A As I stated yesterday, I plead the Fifth.

Q Okay. All right. I now want to show you Plaintiff's Exhibit 10. So do you have the ability to bring that up?

A One minute. Let me go find the email.

Q And I'm happy to share my screen if you need time to look at it, time to review anything, want me to move my cursor over everything, or scroll up or scroll



H. HUSSEIN

down. Feel free to ask, and I'm happy to do that for you to.

A Would you be able to share that -- oh, sorry, it's actually on the screen. I'm sitting there trying to look for it.

Q So yeah, whatever's more convenient to you. I'm happy to have you look --

A Would you -- would you be able to just pull up on the screen, 'cause I can't locate the email from yesterday 'cause all the other correspondence.

Q Yeah. So happy to show it on the screen. Let me know that you can see it, and let me know if you want me to scroll anywhere if that's helpful in your reviewing it.

A Are we looking at the Loretta Watkins, with the circle yellow?

Q Yeah.

THE REPORTER: You're on Exhibit 7 here, still, Counsel.

MR. SCHEDLER: Okay, thank you. Let

H. HUSSEIN

me share. Okay, is that better? Can everyone see it?

THE REPORTER: Excel file?

MR. SCHEDLER: Yeah.

THE REPORTER: Yep.

BY MR. SCHEDLER:

Q Okay. Can you see this, Mr. Hussein?

A Yes, I can.

Q Okay. Do you want me to scroll anywhere?

A No.

Q Okay. Do you recognize this document?

A Kind of.

Q When you say, "Kind of," what do you mean?

A The first time I've ever seen this type of document was when it was done in the discovery. And I assume this will be the electronic log that's provided by Allied.

Q That's correct.

A Okay.



H. HUSSEIN

Q Okay. I want to highlight Ms. Watkins' service attempt right here. This is going to be in cell 840. Okay. So do you see the entry after "Ms. Watkins"?

A Yes, "Phillip Johnson.

Q Okay. And do you agree that Mr. Johnson was served five minutes after Ms. Watkins?

A Allegedly.

Q Why do you say, "Allegedly"?

A Because, again, this is not provided for me, so I can't basically tell you how accurate this is.

Q Okay. I'm going to show you Plaintiff's Exhibit 11. Okay. Can you see this exhibit?

A Correct. I can. It's GPS?

Q Yes. This is a Google Maps printout of the distance between Ms. Watkins' apartment and Mr. Johnson's apartment.

Okay. Do you agree that Exhibit 11 shows that those addresses are



H. HUSSEIN

2 miles and 15 minutes apart by bike?

A Correct.

Q Okay. So how is it possible you were able to perform service five minutes apart at locations that are 15 minutes apart?

MR. MARSHALL: Objection to the form.

BY MR. SCHEDLER:

Q You can answer.

A Again, like I just stated before, I can't -- I don't -- can't recall this case. I can't recall which one I did.

I can't recall -- you're going off of this on -- based information that wasn't provided for me, so I can't really recall the -- that far back.

Q Okay. I'm going to go back to the logbook, and I want -- let me -- hold on, let me share my screen again.

I want you to look at the service attempts for April 7th, right here. This is the date Ms. Watkins was served.



H. HUSSEIN

Okay. Do you see, in the logbook, where it says that you performed service nine times between 6 a.m. and 6:37 a.m.?

I can make that bigger, too. Take your time.

A Yes.

Q Okay. And I'm going to show you Plaintiff's Exhibit 12. Okay. This is the full route. I'm sorry, I'm showing --

MR. SCHEDLER: Let the record reflect that I'm showing Mr. Hussein what is marked as Plaintiff's Exhibit -- a clear copy of what is marked as Plaintiff's Exhibit 12.

BY MR. SCHEDLER:

Q Mr. Hussein, do you recognize this document?

A No, I don't recognize this document, but it seems to be a Google Maps.

Q Okay. This is a Google Maps of the addresses that I just showed you in the logbook. Do you see on the map where

Page 182

H. HUSSEIN

it says that this route is 17.6 miles and takes one hour and forty-nine minutes?

A Yes, I see that.

Q Okay. How were you able to serve process in thirty-seven minutes along a route that takes one hour and forty-nine minutes to travel?

MR. MARSHALL: Objection to the form.

THE WITNESS: Again, this will be the same answer as your last question, 'cause it's the same thing: all you do, just add more stops.

BY MR. SCHEDLER:

Q Okay. Go back to Exhibit 10. I'm going to direct you to cells number 447 and 446. Hold on one second. Let me actually share it. That would be helpful. Okay, and they're right here.

And do you see where the logbook shows that you performed service one minute apart at two separate addresses?

A I see what that shows. But, again, like I stated a couple times, this is not my logbook. This was provided by

Page 183

H. HUSSEIN

somebody else.

Q Do you have a reason to believe that this information is inaccurate?

A I have never been through -- seen this information. I can't say anything about this. I haven't digested it, so I can't really speak about it.

Q Okay.

A If it was something I provided you or something that I -- I can't recall, and I'm able to speak on, I can, but it's still the same answer no matter how you put it.

Q Okay. Hold on one second. Okay, I'm going to direct you to cells -- let's see -- 451 and 452. Just circling them here. This shows service at two separate addresses, three minutes apart.

And so the same question: How is this possible?

A And it's going to be the same answer.

Q And what's that?

A I can't speak on something that

Page 184

H. HUSSEIN

I -- I do not recall. I did not provide this information, so I can't speak on the accuracy of it.

Q Okay. So I am going to sort this document by service type. Okay. And scroll down all the way to the bottom. This is your 2023 logbook. Do you see on the last cell where it's numbered 3,840?

A Yes.

Q Okay. Do you agree that this is the number of service attempts you made in 2023?

A No.

Q Okay. Why do you disagree with that?

A It was definitely less than that.

Q Okay. How do you know it was less than that?

A Because I know it wasn't 3,000.

Q Okay. How many do you think you made?

A I have no idea, but I know it's not 3,000.

Page 185

H. HUSSEIN

Q Okay. I'm going to scroll up. Do you have a reason to believe this logbook is inaccurate?

A I can't speak on something that I wasn't -- I did not provide this. I've never seen this until discovery, so I can't speak on the accuracy of this.

Q Okay. I want you to take a look -- so this is, again, sorted by type of service, and I'm going to scroll down to cell number 74. So would you agree that there are 74 instances here of service that is not substitute service?

A I can't really count how many there are, but I'm going to take your word for it.

Q So the cell is numbered 74, so you can just --

A Oh, okay.

Q Okay. Do you agree with that?

A I agree, from what I see, it shows 74.

Q Okay. And scrolling down, all the other cells down to 3,840 are for

Page 186

H. HUSSEIN
service on a person of suitable age and discretion. Do you agree with that?
A From what it shows, yes.
Q Okay. How is it possible that in all these attempts there are so few instances of finding no one home?
MR. MARSHALL: Objection to form.
THE WITNESS: Again, this is the same answer -- Oh, sorry for interruption.
MR. MARSHALL: Objection to the form.
BY MR. SCHEDLER:
Q You can answer.
A Again, this is the same answer that I've given you for the last six times of you answering the same question. I cannot speak to the accuracy of this since it was not provided by me.
Q Okay. And, you know, we just want to have clarity for the record. So, even though it may be --
A No, I understand.
Q -- answers that are similar, still want to get through it. Okay. How is it possible that in all these attempts

Page 187

H. HUSSEIN
there are so few instances of you finding the defendant home?
A Cannot speak to the accuracy of this -- thing that you're using to state -- make these statements of.
Q Okay.
A And like I stated at yesterday testimonial, in the cases that I did complete that I can't speak on, it's because I go early in the morning where you have 99 percent chance of finding somebody at six in the morning.
Q Mr. Hussein, did you get my email that I sent this morning?
MR. SCHEDLER: Did everyone get my email this morning?
THE WITNESS: For the Veritext meeting?
BY MR. SCHEDLER:
Q No, there was a second one with a document attached to it.
A No. All I received was the new login information.
MR. SCHEDLER: Okay. Did everyone

Page 188

H. HUSSEIN
else receive my email?
MR. KESHAVARZ: I certainly did, sir.
MR. SCHEDLER: With Exhibit 20 in it? Okay.
MR. KESHAVARZ: I received it.
BY MR. SCHEDLER:
Q Mr. Hussein, are you able to access your email from that computer?
A I'm trying to use my phone, currently, to find the email.
Q Okay. So take your time, find the email.
A It seems to be a bunch of affidavits, if that's the one you're speaking of.
Q That's the one I'm speaking of.
A Okay.
Q All right. So I'm going to share this with you now. Can you see it on my screen?
(Plaintiff Exhibit 20 was marked for identification.)
A Yes, I do.
Q Okay. So this is the first

Page 189

H. HUSSEIN
Affidavit of Service from Renaissance Equity versus Louis Gachelin. This is a collection of affidavits marked as Plaintiff's Exhibit 20.
MR. SCHEDLER: Let the record reflect that I'm showing a clear copy of Plaintiff's Exhibit 20.
BY MR. SCHEDLER:
Q Can you read this document Mr. Hussein?
A I can see this document.
Q Okay. Have you seen this document -- do you recognize this document?
A I recognize this document from other discovery from your partner, Ahmad's, case.
Q Okay. It --
THE REPORTER: Sorry, from what's case?
THE WITNESS: The other -- his co-counsel, Ahmad Keshavarz.
BY MR. SCHEDLER:
Q Okay. I'm going to scroll down.

Page 190

H. HUSSEIN
Is that your signature at the bottom?
A I plead the Fifth.
Q Is that Frances Mondrone's signature?
A I plead the Fifth.
Q Okay. Did you deliver a Summons and Complaint to Deborah H. Abrahams?
A I cannot recall.
Q Okay. Is the information in this Affidavit true?
A I plead the Fifth.
Q Okay, going to scroll down to the second Affidavit.
MR. KESHAVARZ: I didn't hear the answer. Was the last answer, "I plead the Fifth"?
THE WITNESS: Correct.
MR. KESHAVARZ: Thank you.
BY MR. SCHEDLER:
Q Okay, I'm scrolling down to page 2, the second Affidavit. Is this your signature?
A Plead the Fifth. It's the same Affidavit.

Page 191

H. HUSSEIN
Q I believe it is for two different people. So this one is for Louis Gachelin, and this one is --
A This says "Louis" also.
Q Okay. This is for Deborah H. Abrahams. So one is for Ms. Abrahams, and the second one is for Mr. Gachelin.
So I'm going to repeat my question: Is this your -- I'm sorry, let me rephrase. So do you see that distinction?
A Yes, I do.
Q Okay. So is this your signature?
A I plead the Fifth.
Q Is that Frances Mondrone's signature?
A I plead the Fifth.
Q Okay. Did you deliver the Summons and Complaint to Kenyatis Gachelin?
A I cannot recall.
Q Okay. And let me correct an error in my last set of questioning. I

Page 192

H. HUSSEIN
asked if you delivered the complaint to Deborah H. Abrahams. I was misreading the Affidavit of Service.
I meant to ask: Did you deliver this Summons and Complaint to Kenyatis Gachelin?
A I can't recall.
Q Okay. So I'm now back on the second Affidavit, page 2. Is the information in this Affidavit true?
A I plead the Fifth.
Q Okay. I'm scrolling down to the third Affidavit. Mr. Hussein, is this your signature?
A I plead the Fifth.
Q Is it Frances Mondrone's signature?
A I plead the Fifth.
Q Did you deliver this Summons and Complaint to a John Doe?
A Do not recall this case.
Q Is this Affidavit of Service true?
A I plead the Fifth because I

Page 193

H. HUSSEIN
cannot recall.
Q Sorry, do you plead the Fifth or can you not recall?
A Can you repeat the question?
Q Yeah. Is the Affidavit of Service true?
A I plead the Fifth.
Q Okay. Scrolling down to Affidavit Number 4: Mr. Hussein, is this your signature?
A I plead the Fifth.
Q Is it Frances Mondrone's signature?
A I plead the Fifth.
Q Is it true you gave a copy of the Summons and Complaint to Xavier Vanderpuije?
A I cannot recall.
Q Is this Affidavit of Service true?
A I plead the Fifth.
Q Scrolling down to page 5. Is this your signature, Mr. Hussein?
A I plead the Fifth.

Page 194

H. HUSSEIN

Q Is it Frances Mondrone's?
A I plead the Fifth.
Q Did you deliver a copy of the Summons and Complaint to Natalie Manning [sic]?
A I cannot recall.
Q Is the information in this Affidavit of serve as true?
A I plead the Fifth.
Q Going to scroll down to Affidavit Number 6. Mr. Hussein, is this your signature?
A I plead the Fifth.
Q Is this Frances Mondrone's signature?
A I plead the Fifth.
Q Did you deliver the Summons and Complaint to get Gemma Manley?
A I cannot recall.
Q Is the information in the Affidavit of Service true?
A I plead the Fifth.
Q Going to scroll down to Affidavit Number 7. Mr. Hussein, is this

Page 195

H. HUSSEIN

your signature?
A I plead the Fifth.
Q Is it Frances Mondrone's signature?
A I lead the Fifth.
Q Is it true you delivered the Summons and Complaint to Mason Accardi?
A I cannot recall.
Q Is the Affidavit of Service true?
A I plead the Fifth.
Q Okay, going to scroll down to Affidavit Number 8. Mr. Hussein, is this your signature?
A I plead the Fifth.
Q Is this Frances Mondrone's signature?
A I plead the Fifth. Actually, to be honest, I can barely see anything on this.
Q Okay, so if you can't read it, then --
A I don't think anybody can read this.

Page 196

H. HUSSEIN

Q Okay, well, I can enlarge it if you'd like. Is that helpful?
A Yeah. Can you please repeat -- can you read it to me because I can't see it -- can even enlarge it.
Q Yeah, so it just says "Deponent," which you pled the Fifth on that question --
A But I'm saying I -- I can't -- I can't even see it. But you said you can -- so can you -- are you able to read it?
Q The Summons and Complaint, yes. Would you like me to -- or I'm sorry, the Affidavit of Service. Would you like me to read it to you?
A No, I'm just saying I could barely see anything else on it.
Q Okay. Can you read it now?
A No.
Q Okay. Scroll down to Affidavit Number 9. Is this better?
A Yes, sir.
Q Okay. Is that your signature?

Page 197

H. HUSSEIN

A I plead the Fifth.
Q Is this Frances Mondrone's signature?
A I plead the Fifth.
Q Okay. Did you deliver the Summons and Complaint on a John Doe?
A I cannot recall.
Q And is this Affidavit of Service true?
A I plead the Fifth.
Q Okay. Scrolling down to Affidavit Number 10. Is this your signature?
A I plead the Fifth.
Q Is it Frances Mondrone's signature?
A I plead the Fifth.
Q Is it true you gave a copy of the Summons and Complaint to Keisha Brown?
A I cannot recall.
Q Is this Affidavit of Service true?
A I plead the Fifth.
Q Scrolling down to Affidavit

Page 198

H. HUSSEIN

Number 11. Is that your signature?
A I plead the Fifth.
Q Is it Frances Mondrone's signature?
A I plead the Fifth.
Q Is it true that you delivered the Summons and Complaint to Marisol Arias?
A I cannot recall.
Q Is this Affidavit of Service true?
A I plead the Fifth.
Q Scrolling down to Affidavit Number 12. Mr. Hussein, is this your signature?
A I plead the Fifth.
Q Is it Frances Mondrone's signature?
A I plead the Fifth.
Q Did you deliver the Summons and Complaint to Alfredo Villamar?
A I cannot recall.
Q Is this Affidavit of Service true?

Page 199

H. HUSSEIN

A I plead the Fifth.
Q Scrolling down to Affidavit of Service Number 13. Mr. Hussein, is this your signature?
A I plead the Fifth.
Q Is it Frances Mondrone's signature?
A Plead the Fifth.
Q Did you deliver the Summons and Complaint to Wilson Sanchez?
A Cannot recall.
Q Or I'm sorry, let me rephrase: Did you deliver the Summons and Complaint to Patricia Sanchez?
A I cannot recall. It's been three years.
Q Okay. Is this Affidavit of Service true?
A I plead the Fifth.
Q Scrolling down to Affidavit Number 14. Mr. Hussein, is this your signature?
A That looks very unreadable, but I plead the Fifth.

Page 200

H. HUSSEIN

Q Okay. Is this Affidavit of Service true?
A I plead the Fifth.
Q Okay. Scrolling down to Affidavit of Service Number 15. Mr. Hussein, is this your signature?
A For the record, I cannot read this as well, but I plead the Fifth.
Q Okay. Can you read Affidavit Number 16?
A Yes.
Q Is that your signature?
A I plead the Fifth.
Q Is it Frances Mondrone's signature?
A I plead the Fifth.
Q Did you deliver the Summons and Complaint to Fernando Jimenez?
A I cannot recall. It's been three years.
Q It -- Service true?
A I plead the Fifth.
Q Okay. Scrolling to Affidavit Number 17. Mr. Hussein, is this your

Page 201

H. HUSSEIN

signature?
A I plead the Fifth.
Q Is it Frances Mondrone's signature?
A I plead the Fifth.
Q Is it true you gave a copy of the Summons and Complaint to Vanessa Banks?
A I cannot recall.
Q Is the Affidavit of Service true?
A I plead the Fifth.
Q Okay. Scroll down to Affidavit Number 18. Can you read this, Mr. Hussein?
A Yes.
Q Is that your signature?
A I plead the Fifth.
Q Is it Frances Mondrone's signature?
A I plead the Fifth.
Q Did you deliver the Summons and Complaint to Camellia Hasan?
A I cannot recall.

H. HUSSEIN

Q Is the Affidavit of Service true?

A I plead the Fifth.

MR. SCHEDLER: Okay. Okay, so I only have a few questions left. If we want to take a quick five-minute break and then come back, we can wrap everything up.

Does that work for folks?

MR. MARSHALL: Sure.

THE VIDEOGRAPHER: Okay.

MR. SCHEDLER: Yep.

THE VIDEOGRAPHER: All right. I'll take us off the record. Standby, please.

MR. SCHEDLER: Okay.

THE VIDEOGRAPHER: We are now -- we are now off the record. The time is 2:11 p.m. for break.

(Off the record.)

THE VIDEOGRAPHER: We are now on the record. The time is 2:23 p.m., back from break.

Thank you, Counsel.

BY MR. SCHEDLER:

Q So yesterday you testified that



H. HUSSEIN

sometimes you perform multiple services in the same building; is that correct?

Sorry, did that come through?

A Yes, correct.

Q Okay. Would the Route4Me app help you plan delivering those services?

A If it's in the same address?

Q Yes.

A No, that would be common sense for me as a person. Like, if I enter the address -- like, let's say I have a -- a stack of, like, 50 cases and I'm going down the line entering those cases.

If I enter a case that was previously entered -- like, let's say number two case was 775 Madison, and then number 46 case was 775 Madison, it will tell me the case has already been entered.

So at that point, I already know I have multiple for that address.

Q Okay. And when you're performing service at that address, how would you find those addresses? The -- I'm sorry, strike that.



H. HUSSEIN

When you're performing service at that address, how would you find those individual apartments?

A Those individual apartments -- well, in New York City, they made it simple, where usually every floor is either all As, where every floor will be the same number.

Then it goes either alphabetical or numerical order up and down. Like, for instance, the first floor sometimes it'll be all As, like 1A, 2A, 3A, 4A. The second floor would be in the Bs, and sometimes it'll be vice versa.

Q Okay. So you can look at the apartment number and know where you're going?

Okay.

THE REPORTER: Sorry, repeat that answer for me.

THE WITNESS: Correct.

BY MR. SCHEDLER:

Q Okay. I'm just going to share Exhibit 10 again. I'm going to go back to



H. HUSSEIN

the April 7th date. Do you see that?

A Yes.

Q Okay. So you previously testified that you don't know about the accuracy of this document; correct?

Sorry, I --

THE REPORTER: Say that -- one more time.

THE WITNESS: Correct.

BY MR. SCHEDLER:

Q Okay. So let's assume that this is true. Is it possible to perform service at nine different locations in 37 minutes?

A Well, that's a very vague question because let's say all services are in the same building.

Q Okay. In this instance, we can see that they're not in the same building, that there are different addresses. Is that possible?

A What was the question on this again? Can you repeat that?

Q Yeah. Is service at nine

H. HUSSEIN

different addresses in 37 minutes on the same day possible?

A So you're asking me again about the accuracy of this?

Q No, I'm saying assume this is right.

A No. No, that's what I'm saying. That's why I said before, I said, "Yes, there'd be times where you can't promote -- perform that amount of services in 37 minutes because, if they're all in the same area, sometimes the same building.

I've had that where it's multiple people who owe the same person in one building.

Q Okay. But this is not in the same building. So when they're all different addresses --

A Exactly. I can't -- I cannot speak on the accuracy of this.

Q Okay. Right, but I'm just saying, assume it's true; right? Preserving that you have questions about



H. HUSSEIN

its accuracy, is it possible?

A It -- with these locations?

Q Correct.

A No. With these locations, no.

Q Okay. Thank you.

MR. MARSHALL: Can we have that question --

MR. KESHAVARZ: Just so I'm clear: those are line entries -- what's the row column number?

MR. SCHEDLER: So it is 836 through 844.

MR. KESHAVARZ: Thank you.

MR. MARSHALL: Mr. Reporter, can we please have that last question read back?

THE REPORTER: Yep. I'll give you a playback of the audio. I'll have to stop the screen share. Just give me one second.

(The reporter repeated the record as requested.)

THE REPORTER: Guys, one moment. All right, you may proceed again.

MR. SCHEDLER: Yeah. So this is the



H. HUSSEIN

service on April 7th. This is cell 836, and then it ends at cell 844.

MR. MARSHALL: Okay.

MR. SCHEDLER: Okay.

BY MR. SCHEDLER:

Q Okay. All right. So we've reviewed a lot of logbooks and a lot of affidavits, and I asked a lot of questions.

After reviewing everything we've done over the last two days, is there anything you would change about the way you performed service?

A Can you rephrase that question? I don't understand exactly what you're saying.

Q Yeah, sure. So we reviewed a lot of information and, you know, a lot of documents. Would you have done anything differently over the past six years?

A That my logbook -- the way I handled my logbook was the only thing I would say different.

THE REPORTER: Sorry, can you repeat



H. HUSSEIN

that for me?

THE WITNESS: The logbook.

BY MR. SCHEDLER:

Q Okay. And I just want to get a little bit more clarity on the -- a question from a couple questions ago on the date of service.

Okay. So again, where these cells here -- and just assuming that the information we got from Allied is true, is this possible?

MR. HUSSEIN: Again, asked and answered.

You just asked the same thing just before, same exact way. You just reworded it.

BY MR. SCHEDLER:

Q Do you mind answering it again?

A Again, I can't -- like I stated multiple times, I cannot speak on the accuracy of this.

Q Okay. But assuming that it is accurate?

A -- before, assuming that it is

H. HUSSEIN

and keeping my authenticity -- doing it with these addresses, no.

MR. SCHEDLER: Okay. All right. Thank you, Mr. Hussein. That is all of my questions.

Does anyone else have anything?

MR. KESHAVARZ: Adam?

MR. MARSHALL: Yeah. On behalf of Malen and Associates, no questions.

MR. KESHAVARZ: All right.

Mr. Hussein, since I have you here, I don't want to take your deposition all over again in the Gachelin case and ask you the same questions.

Is it okay with you if we use this testimony in the Gachelin case, or do you want me to take your deposition?

MR. HUSSEIN: Would it be possible if I give you -- ask about it tomorrow? I'm just waiting on an answer from the pro se office.

MR. KESHAVARZ: Sure, thanks.

MR. HUSSEIN: No problem.

THE REPORTER: Okay, Counsel,



H. HUSSEIN

anything else?

MR. SANDERS: I have no questions for Mr. Hussein.

THE REPORTER: All right, then, before we hop off the record here, Counsel Matthew, starting with yourself, what format would you like for a transcript from today?

MR. SCHEDLER: Oh, I don't have it -- Ahmad, what kind of transcript --

MR. KESHAVARZ: Yeah, that -- electronic only.

THE REPORTER: Got you. Does a PDF work?

MR. KESHAVARZ: PDF and E-Tran.

Just to be clear: the spreadsheet doesn't need to be printed out as an exhibit. It's like --

THE REPORTER: Got you. And then --

MR. KESHAVARZ: -- pages long.

THE REPORTER: Got you.

And then, for yourself, Arthur?

MR. SANDERS: Just PDF, yes, we do want it. And yes, by PDF only.



H. HUSSEIN

THE REPORTER: Got you.

And then, Adam?

MR. MARSHALL: PDF please. But also with a condensed version.

THE REPORTER: Got you.

All right, Marco. I'm all set.

THE VIDEOGRAPHER: Okay, so Counsels, are we concluding with Mr. Hussein?

MR. SCHEDLER: Yes.

THE VIDEOGRAPHER: Okay, I'll take us off the record. Standby, please.

We are off the record at 2:33 p.m. Eastern Daylight Time, and this concludes today's testimony given by Hashem Hussein.

The total number of media used was one, and will be retained by Veritext, New York.

(Whereupon, at 2:33 p.m., the proceeding was concluded.)



CERTIFICATE OF DEPOSITION OFFICER

I, ROBERT LOMBARDI, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

ROBERT LOMBARDI
Notary Public in and for the
Commonwealth of Massachusetts

CERTIFICATE OF TRANSCRIBER

I, TERESA HIGGINS, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Teresa Higgins

TERESA HIGGINS



Watkins, Loretta v. Malen & Associates, P.C., Et Al.

Hashem Hussein , V2 (#8427370)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE_________________________

_________________________________________________

REASON_________________________________________

PAGE_____ LINE_____ CHANGE_________________________

_________________________________________________

REASON_________________________________________

PAGE_____ LINE_____ CHANGE_________________________

_________________________________________________

REASON_________________________________________

PAGE_____ LINE_____ CHANGE_________________________

_________________________________________________

REASON_________________________________________

PAGE_____ LINE_____ CHANGE_________________________

_________________________________________________

REASON_________________________________________

PAGE_____ LINE_____ CHANGE_________________________

_________________________________________________

REASON_________________________________________

_______________________________ ________________

Hashem Hussein , V2 Date



Watkins, Loretta v. Malen & Associates, P.C., Et Al.

Hashem Hussein , V2 (#8427370)

ACKNOWLEDGEMENT OF DEPONENT

I, Hashem Hussein , V2, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_______________________________ ________________

Hashem Hussein , V2 Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

___________________________

NOTARY PUBLIC