UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORETTA WATKINS, Plaintiff, | Case No.: 1:25-cv-04295-EK-LKE |
| – against – | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| MALEN & ASSOCIATES, P.C., HASHEM HUSSEIN, A & F PROCESS SERVICE, INC. d/b/a ALLIED PROCESS SERVICE, ANTHONY MONDRONE; and FRANCES MONDRONE Defendants. | |

## PRELIMINARY STATEMENT

Plaintiff Loretta Watkins files suit against Defendants Malen & Associates, P.C. ("Malen"), as well as Hashem Hussein and Allied Process Service ("Allied"), for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. sec.* (the "FDCPA"), N.Y.; against Malen for its violation of Judiciary Law § 487; against all Defendants for violations of New York General Business Law § 349; against all Defendants for negligence, negligence *per se*, and gross negligence; against Malen for conversion; and against Hussein and Allied for their violations of New York City Administrative Code § 20-409.2, alleges as follows:

## SUMMARY OF CLAIMS[1]

Plaintiff Loretta Watkins is an elderly low-income widow who lives by herself in Queens. Sometime after August 4, 2024, she learned that Capital One had sued her and had, without her knowledge, obtained a default judgment against her for $14,890.22 on April 18, 2024. Capital

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

One, through its attorneys Malen & Associates, obtained this default judgment based on an affidavit of service by process server Hashem Hussein ("Hussein"). This affidavit describes service that did not happen. The person allegedly served does not exist and 4 minutes prior to serving Ms. Watkins, Hussein claims to have performed service 30 minutes away. This is not a one-off instance of improper service: Hussein's logbook reveals a pattern of improper service that includes always performing substitute service, claims of being in multiple locations at virtually the same time, and repeated claims of service on non-existent relatives. Malen then enforced the default judgment, on Ms. Watkins, taking unclaimed funds that belonged to her in September of 2024.

On March 6, 2024, Ms. Watkins, through her counsel at CAMBA Legal Services, a non-profit legal services provider, filed an exhaustive Order to Show Cause documenting in detail how Hussein did not serve Ms. Watkins and how the service attempt sworn to in the affidavit was not possible.

Despite this overwhelming evidence, Malen doubled down, filing a boilerplate Opposition that did not address any of the evidence in the Order to Show Cause, but simply stated that Ms. Watkins was served because the affidavit of service says she was. Ms. Watkins' Order to Show Cause was granted, and the Court ruled that she had rebutted the affidavit of service and ordered a traverse hearing. In response, Malen tripled down, pressing forward with the traverse hearing until the afternoon before, when they stipulated to vacate the default judgment and discontinue the action. By then, the damage was done. Ms. Watkins had already expended time and paid transportation costs to go to and return from CAMBA's office, first to sign the papers needed for the Order to Show Cause, and then again to prepare for the traverse hearing. As the traverse hearing grew closer, Ms. Watkins's fear and anxiety climbed, robbing her of her sleep and increasing the

strain on her already damaged vision.

As stated above, this is not a one-off occurrence, but part of a broad pattern engaged in by Malen, Allied, and Mr. Hussein that they continue to perpetrate despite receiving numerous Orders to Show Cause detailing the fraud. In fact, Ms. Watkins was just one of thousands of consumers victimized by Defendants. In response to a subpoena issued in preparation for the traverse hearing, Hussein produced his electronic service records in the form of an Excel spreadsheet he received from Allied, a process serving agency for which he worked. The spreadsheet documents systematic impossible service. The spreadsheet covers service attempts from October 3, 2022 to September 25, 2023. During this time, Hussein attempted service for 3,525 lawsuits. Unbelievably, Hussein successfully performed service 100 percent of the time; effected service on the first attempt 100 percent of the time; and made service on a person of suitable age and discretion (the most difficult form of service to challenge) 100 percent of the time. The vast majority—2,715 out of 3,525, more than 77%—of Hussein's service occurred between the hours of 6 AM and 7 AM each day, and 3,436 of 3,525, more than 97%, occurred before noon. These service attempts covered fantastical distances and were not humanly possible given the dates, times, and locations of the "services" listed. Most of Hussein's service attempts were on behalf of Capital One and Malen. Of the 3,525 lawsuits listed on the spreadsheet, 2,141, or 60 percent, were for Capital One. Malen is just one of three law firms that Capital One used to file collection lawsuits in Queens County in 2022 and 2023.

To make matters worse, all the parties knew or should have known about the improper service. Court files demonstrate that even before Ms. Watkins's March 6, 2025, Order to Show Cause and Malen's subsequent April 4, 2025, Opposition on behalf of Capital One, Malen and Capital One received multiple Orders to Show Cause in which defendants dispute claims of service

that mirror the impossible claims of service in Ms. Watkins's case and in the logbook. Malen and Capital One did not investigate these claims or alter their practices. Instead, they opposed the orders to show cause with the same boilerplate objections.

The Defendants in this case systematically created and filed false affidavits of service, obtained improper default judgments, and then collected on those judgments. Ms. Watkins is merely one victim of thousands. As a result of Defendants' scheme of false or "sewer service,"[2] Ms. Watkins has suffered harm and brings this action for relief.

## THE PARTIES

1. Plaintiff Loretta Watkins ("Ms. Watkins") is an individual who resides in Queens County, New York.

2. Ms. Watkins is a consumer as defined by 15 U.S.C. § 1692a(3) because she was alleged to owe a debt to Capital One arising from a credit card. Plaintiffs' alleged obligation is a "debt" as defined by 15 U.S.C. § 1692a(5) because it was incurred primarily for family, personal, or household purposes.

3. Defendant Malen & Associates, P.C. ("Malen") is a debt collection law firm organized under the laws of the State of New York. Malen engages in business in New York State and this suit arises out of Malen's business in New York State. Malen's principal place of business is in Westbury, NY 11590.

4. Malen is a debt collector as defined in 15 U.S.C. § 1692a(6) as they regularly collect or attempt to collect, directly or indirectly, debts owed or due or asserted to be due another, and

[2] *See, e.g. Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010) (""[S]ewer service" [is] the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit attesting to service. When the debtors failed to appear in court because they did not have notice of the lawsuits, defendants obtained default judgments against them.")

that is their principal purpose. Specifically, Malen files thousands of collections lawsuits in civil court and seeks to enforce thousands of putative debts.

5. Capital One used Allied, and specifically Hussein, to "serve" 2,141 lawsuits between October 3, 2022 and September 25, 2023, including as to Ms. Watkins. Between October 1, 2022 and Sept 30, 2023 Allied performed service in Malen cases 3,524 times.

6. Defendant Hashem Hussein ("Hussein") is an individual who resides in Kings County, New York. Hussein is a process server with the current license number 2119375 who alleged (falsely) to have served Ms. Watkins in 2023, and who routinely executes false affidavits of service.

7. Hussein regularly failed to serve summons and complaints, and regularly executed false affidavits of service allowing Malen and other debt collection law firms to use false affidavits of service to enter sewer service judgments against consumers including Ms. Watkins. Hussein is therefore a debt collector as defined by 15 U.S.C. § 1692a(6).

8. Defendant A & F Process Service d/b/a Allied Process Service ("Allied") is a process serving agency organized under the laws of the State of New York, located in Nassau County.

9. Allied regularly fails to serve summons and complaints, and regularly executes false affidavits of service allowing the entry of default judgments against putative debtors, including Ms. Watkins. Allied is therefore a debt collector within the meaning of 15 U.S.C. § 1692a(6).

10. Allied Process Service utilized Hussein and is liable for Hussein's conduct acting within the scope of his employment and/or his agency. Allied is liable for all the process server misconduct that forms the basis of this suit.

11. Anthony Mondrone is the principal of Allied Process Service. Mr. Mondrone makes the business decisions, is the sole employee of the company, hires the process servers, is in charge of the record keeping and fulfills many of the day to day duties for the company. He personally takes all the actions and makes all the decisions for Allied Process Service other than those delineated to Frances Mondrone, as indicated below

12. Frances Mondrone is currently a former employee of of Allied Process Service who still works there part time. At the time of the actions that form the basis of the complaint, she was an employee of Allied Process Service and a duly qualified notary public under the laws of the State of New York. She notarizes all the affidavits of service for Allied Process Service, including Hussein's and Hussein's affidavit of service upon Ms. Watkins, permitting them to be filed in debt collection actions brought by Malen and to support Malen's applications for default judgments.

## STATEMENT OF FACTS

### Malen Files the Collection Lawsuit and Uses a False Affidavit of Service to Obtain Default Judgment

13. Ms. Watkins is a retired senior living on a limited, fixed income. She is disabled and struggles with her hearing and vision. Since the passing of her husband in 2019 she has been living alone.

14. Unbeknownst to Ms. Watkins, on March 24, 2023, Capital One, through their law firm Malen, commenced a lawsuit against her in Queens County Civil Court captioned *Capital One, N.A. v. Loretta Watkins*, CV-005138-23/QU seeking $14,725.22 plus costs for an alleged credit card debt. Ex. A (Summons and Complaint).[3]

15. Malen prepared the summons and complaint and transmitted it to Allied, who filed

[3] All Exhibits to this Complaint are incorporated by reference in their entirety.

it with the court and obtained an index number. Allied then contracted Hussein to execute the affidavit of service.

16. On April 25, 2023, Allied process server Hussein executed an affidavit falsely alleging service on a phantom family member, Isaiah Watkins, on April 7, 2023. Ex. B (Affidavit of Service). Frances Mondrone, an employee of Allied Process Service, allegedly notarized the signature. But although the affidavit of service purports that Hussein was "duly sworn" and that he "swor[e] to" the contents of the affidavit, in truth Ms. Mondrone did not administer an oath or affirmation to him and he did not swear that his statements were true.

17. The affidavits of service filed by Mr. Hussein are false in many ways. Hussein does not in fact mail a copy of the summons and complaint to consumers as he alleges in the affidavit. Ex K Hussein Dep. 128:18-25, 129:1-4 (Sept. 1, 2026). Further, on information and belief, Hussein in fact does not sign the affidavits of service, nor does he have it notarized in front of a notary. Hussein testified that his only interaction with Ms. Mondrone, Allied's sole notary, is getting service assignments and information about cases. Ex K. 55-57 (Sept. 1, 2026). He testified does not have any other interactions with her, much less signing hundreds of affidavits of service in front of her to notarize. *Id*. In response to direct questions about the notarization process Hussein asserted his Fifth Amendment right against self-incrimination, when he was asked if his signatures on any of the affidavits of service was his he plead the fifth again and when asked if Frances Mondrone's signature was on the notary line he again plead the fifth. Ex. K176:13-16, 190-202 (Sept. 2, 2026)

18. Allied Process Service, as agent for Malen, then filed the affidavit of service and it, along with the service data, to Malen.Malen then used the false affidavit of service to make a false representation of service to the Court in support of its application for a default judgment. Based

on the false statements in the affidavit of service, the Court issued a default judgment on April 18, 2024 for $14,890,22. Ex. C (Application for Default Judgment, June 26, 2023). Ex. D (Judgment, April 18, 2024).

19. Ms. Watkins was never served with the summons and complaint, nor received notice of the lawsuit or the resulting judgment.

**Ms. Watkins Files an Order to Show Cause With Overwhelming Evidence That She Was Never Served.**

20. Ms. Watkins did not learn of the Collection Lawsuit or resulting judgment until a CAMBA attorney representing Ms. Watkins in another matter searched eCourts on or shortly after August 4, 2024 to see if there were any actions or judgments against her.

21. On March 6, 2025, Ms. Watkins through her counsel CAMBA Legal Services filed an Order to Show Cause seeking to vacate the default judgment and dismiss the complaint or in the alternative order a traverse hearing to determine whether Ms. Watkins had been properly served. Ex. E (Order to show cause).

22. On February 3, 2025, Ms. Watkins had to expend time and pay transportation costs to go to and return from the CAMBA office to review and sign documents needed to support her Order to Show Cause to vacate the default judgment.

23. The application contained exhaustive evidence demonstrating that Hussein did not, and could not have, served Ms. Watkins as alleged in the affidavit of service, including the below.

24. Significantly, service as described in the process server's affidavit is not possible, because the process server swears to have been serving process at an address 30 minutes away from Ms. Watkins's home four minutes before allegedly serving her.

25. This impossible service is not a one-off occurrence—Hussein has a practice of

swearing to perform service on addresses too far apart for service to be possible, as well as always claiming to perform substitute service, another impossibility.

26. Specifically, in the affidavit of service for this case, Hussein claims that he served Ms. Watkins at 6:13 AM on April 7, 2023 by leaving the Summons and Complaint with a 20-year old relative named Isaiah Watkins.

27. Ms. Watkins is a senior citizen who resides alone, does not know anyone named Isaiah Watkins, does not have any relatives with this name, and did not have any 20-year-olds in her house.

28. Just four minutes before Hussein allegedly handed the Summons and Complaint to Isaiah Watkins, he swore in a different affidavit that he was serving a summons and complaint on Richard Walburg, by leaving the Summons and Complaint with Jennifer Walburg at 172-14 133rd Avenue, Apt 9A, Jamaica, NY 11434, an address approximately 30 minutes away from Ms. Watkins. Ms. Mondrone allegedly notarized the affidavit of service on the same day as she notarized the affidavit of service upon Ms. Watkins.

29. In preparing for the Order to Show Cause, CAMBA Legal Services reviewed 41 of Hussein's Affidavits of Service in other cases. Hussein swore to substitute service in every single case reviewed. All were allegedly notarized by Ms. Mondrone.

30. In all but five of the cases, he swore to substitute service on a family member with the same last name as the named defendant in the case.

31. In no case did he perform personal service on the defendant, and in no instance did he perform affix and mail service. Remarkably, in all 41 instances, Hussein found someone home who was not the defendant and was able to serve them. Hussein had zero instances where no person was home and zero instances where he was able to serve the defendant.

32. Upon information and belief, Hussein claims to serve by substitute service because it is harder to verify. If Hussein claims personal service, the court can easily check the description in the affidavit of service against the appearance of the defendant. If Hussein claims affix and mail service, the court can confirm he was there by reviewing his GPS records. Substitute service does not have these factual checks and is harder to verify, making it attractive to bad actor process servers who do not want to get caught performing improper service.

33. The Affidavit of Service swears to substitute service upon Ms. Watkins by delivery of the summons and complaint to a "relative" named Isaiah Watkins on April 7, 2023 at 6:16 A.M. at 114-18 178th Street, Jamaica, NY 11434. Ex. C (Affidavit of Service) to Ex. E (Order to Show Cause).

34. The Affidavit of Service states that Isaiah Watkins was approximately twenty years old, weighing 165 pounds, 5'9", male, and having black skin and black hair. *Id*.

35. The process server affirms that on April 18, 2023, he mailed a copy of the Summons and Complaint to Ms. Watkins to "defendant's/respondent's last known address." *Id*.

36. At the time of alleged service, 6:16 AM on a Friday, Ms. Watkins would have been at home and sleeping.

37. Ms. Watkins does not have any family members named Isaiah, nor has she ever had anyone in her home matching the description in the process server's affidavit. She has two children: Bobby Fields, age 50, who lives in Virginia, and Renard Fields, age 46, who travels frequently around the country and stays in Brooklyn with his fiancé when he is not traveling. She has two grandchildren: a girl who is almost nine years old, and a boy who is almost six years old. Nobody in her family is around twenty years old and there was no one matching the description in the process server's affidavit in her home. There is nobody in Ms. Watkins's family or circle of

friends named Isaiah.

38. The Affidavit of Service states that a copy was mailed to "defendant's/respondent's last known address," without specifying an address. *Id*. Ms. Watkins did not receive the Summons and Complaint by mail.

**The Order to Show Cause Documented Hussein's Contradictory Affidavits and History of Sewer Service**

39. The Order to Show Cause documented Hussein's pattern of contradictory affidavits and demonstrated a history of sewer service.

40. As discussed above, at 6:12 AM on April 7, 2023, four minutes before Hussein's alleged service on Isaiah Watkins at 144-78 178th Street, Jamaica, NY 11434, he served another individual, Richard Walburg, by leaving the Summons and Complaint with Jennifer Walburg at 172- 14 133rd Avenue, Apt 9A, Jamaica, NY 11434. Ex. D (Affidavit of Service for Index No. 5137/2023) to Ex. E (Order to Show Cause).

41. Traveling between 172-14 133rd Avenue, Jamaica, NY 11434 and 144-78 178th Street, Jamaica, NY 11434 takes about a half hour. Ex. E (Google Maps printout 1) to Ex. E (Order to Show Cause). This means it is impossible for Hussein to have performed process as sworn to in his affidavits.

42. At 6:29 AM that same day, thirteen minutes after the alleged service on Isaiah Watkins, Hussein allegedly performed service on defendant Kevin Campbell by leaving a Summons and Complaint with Brenda Campbell at 9029 139th Street, Jamaica, NY 11435. Ex. F (Affidavit of Service for Index No. 5135/2023) to Ex. E (Order to Show Cause).

43. Like the attempt on Ms. Watkins, service as described on Kevin Campbell is not possible, traveling between 144-78 178th Street, Jamaica, NY 11434 and 9029 139th Street, Jamaica, NY 11435 alone takes about eighteen minutes. Ex. G (Google Maps printout 2) to Ex. E

(Order to Show Cause). This only accounts for driving time and does not account for the time it would have taken Hussein to leave Ms. Watkins's address, walk to his car, fill out his logbook, find the new address, find parking, leave his car, and walk to the next address. Like the other attempts described, it is impossible that Hussein was able to do all this in less time than it takes to travel between the two locations.

44. All three defendants were allegedly served by substitute service on an alleged relative who shares the same last name, a pattern pervasive across Hussein's service attempts.

45. Hussein's other Affidavits of Service repeat the same pattern of questionable service times and methods.

46. On March 18, 2023, for example, Hussein allegedly served ten individuals in Queens in quick succession within the span of an hour and a half: at 5:38 AM, 6:01 AM, 6:06 AM, 6:08 AM, 6:14 AM, 6:20 AM, 6:38 AM, 6:47 AM, 6:50 AM, 7:07 AM. Ex. H (March 18, 2023 Affidavits of Service) to Ex. E (Order to Show Cause). Two of these service attempts, one at 6:06 AM and another at 6:08 AM, take place a mere two minutes apart and are located in two different buildings. *Id*. All ten instances of service were allegedly completed by substitute service. Eight of the ten were served on individuals with the same last name as the defendant, and the other two were John or Jane Doe. *Id*.

47. On the morning of March 21, 2023, process server Hussein served another ten individuals in Queens at: 6:00 AM, 6:07 AM, 6:09 AM, 6:14 AM, 6:21 AM, 6:33 AM, 6:38 AM, 10:03 AM, 10:16 AM, 11:00 AM. Ex. I (March 21, 2023 Affidavits of Service) to Ex. E (Order to Show Cause). As with all his other attempts, he allegedly completed substitute service on all ten. *Id*. All ten individuals who he allegedly served shared the same last name as the named defendant. *Id*.

48. On the morning of April 3, 3023, Hussein allegedly served nine individuals in Queens in less than one hour at: 8:44 AM, 8:48 AM, 8:56 AM, 9:00 AM, 9:07 AM, 9:13 AM, 9:19 AM, 9:30 AM, 9:38 AM. Ex. J (April 3, 2025 Affidavits of Service) to Ex. E (Order to Show Cause). As with the prior days, he alleged substitute service on all nine attempts. *Id*. Seven of the nine were served on individuals with the same last name as the defendant, and the other two were John or Jane Doe. *Id*.

49. All of the affidavits of service described herein were allegedly notarized by Ms. Mondrone.

50. But even though the affidavits of service state that Hussein was duly sworn, Ms. Mondrone does not always administer an oath or affirmation or otherwise confirm that the affiant is swearing to the statements within the affidavit of service.

51. On January 18, 2024, the Legal Aid Society submitted a Traverse Report Form for Legal Advocates to the New York City Department of Consumer and Worker Protection, f/k/a Department of Consumer Affairs, complaining that process server Hussein had alleged substitute service on a non-existent person in *Capital One Bank (USA) N.A. v. Dornella Nedd*, Index No. CV-29065-21/QU. See Ex. K (stating that Hussein had alleged substitute service on a "Keshawn Nedd" in a case against Dornella Nedd, but that Keshawn Nedd was a made-up person) to Ex. E (Order to Show Cause).

***Malen Doubles Down and Opposes the Order to Show Cause Despite Overwhelming Proof That the Affidavit of Service Was False***

52. Counsels appeared at the Monday April 7, 2025 hearing on the Order to Show Cause. One the return date, Malen submitted opposition and the matter was adjourned to April 21, 2025.

53. Despite the overwhelming evidence of sewer in the Order to Show Cause, including

the affidavits that show the attempt on Ms. Watkins was impossible, Malen opposed by filing a boilerplate argument, asserting that Mr. Hussein's false affidavit of service was all the evidence they needed to prove service and that Ms. Watkins request should be denied. Ex. F (Malen Opposition). Bewilderingly, the Opposition claimed that Ms. Watkins "failed to specifically refute the contents of the Affidavit of Service" and ignored the affidavits submitted as evidence in support of the Order to Show Cause. *Id*.

54. Malen either failed to perform the necessary meaningful review that would have revealed the Affidavit of Service was physically impossible and claimed substitute service on a nonexistent person, or it did perform such a review and made the statements in the Opposition aware of their falsity. If nothing else, in relying upon the false affidavit of Hussein in the Opposition to the Order to Show Cause, Malen ratified the sewer service, and attempted to retain the benefits obtained through that false affidavit: the default judgment.

55. On April 18, 2025, Ms. Watkins filed a Reply noting that Malen's Opposition did not address, much less challenge, the overwhelming evidence of sewer service. Ex. G (April 18, 2025 Reply).

56. On the return date, April 21, 2025, the counsel for Malen refused to argue the motion stating, given the evidence, he could not do so in good faith. Despite this, Malen would not agree to the relief sought in the Order to Show Cause, further ratifying the misconduct of using the false affidavit of service to obtain the default judgment.

57. The next day, April 22, 2025, the Court issued an Order granting the Order to Show Cause in that it found that Ms. Watkins had provided sufficient evidence to refute the assertions of service in the affidavit of service, and set the matter down for a traverse hearing for June 3, 2025.

**Malen Triples Down By Forcing Watkins to Prepare for Traverse Hearing Despite Overwhelming Evidence of Sewer Service**

58. In preparation for this hearing, on May 14, 2025 CAMBA issued and paid to serve a subpoena on Hussein for his electronic logbook reflecting his service of process for the period beginning October 1, 2022 and ending September 30, 2023. Ex. H (May 14, 2025 subpoena).

59. In response to this subpoena, on May 28, 2025, Hussein provided the subpoenaed records in the form of an Excel spreadsheet listing information in the putative service in 3,525 lawsuits.

60. While engaging in extensive preparation for the hearing, and given the clear-cut evidence of improper service, CAMBA repeatedly reached out to Malen to confirm that they would be going forward. Malen repeatedly confirmed that they were, in email exchanges throughout the final two weeks of May. In fact, Malen and CAMBA engaged in pre-hearing discussions regarding evidentiary issues and CAMBA's subpoena to the process server.

61. On May 20, Malen attorney Adam Hughes, the attorney who signed the Complaint, the Application for Default Judgment, and the Opposition, sought to speak with CAMBA about the case regarding the subpoena to the process server, and on the next day CAMBA spoke with Hughes as representative of Malen. After this discussion, Malen still did not discontinue the case, despite being on notice as to the strength of Ms. Watkins's evidence and her intention of fighting the case. Hughes spoke with Ms. Watkins's CAMBA attorney again on May 27 and again refused to discontinue the case. On May 29 and 30, CAMBA subsequently informed Hughes of the evidence they intended to introduce at the traverse hearing. It was only on the eve of the hearing that Malen agreed to discontinue the case the next day.

62. As a result, Ms. Watkins again incurred damages by having to travel from Queens to CAMBA's office in Brooklyn solely for the purpose of preparing for the traverse hearing.

Because of her age and vision issues, Ms. Watkins had to pay to have friends drive her to the office and back home, as she did when she came in to draft and sign her affidavit in support of her order to show cause.

63. Only on the afternoon before the day of the hearing did Malen agree to stipulate to vacate the judgment and discontinue the action.

***Allied's Own Records Reveal Systematic Facially Impossible Service By Its Process Server, Hussein***

64. The electronic records of service that Hussein produced on May 28, 2025 in response to the subpoena documented "service" by Hussein specifically for Allied in 3,525 cases from October 3, 2022 through September 25, 2023.

65. While these records were provided by Hussein (after communication and coordination with Malen in regards to CAMBA's subpoena), every single one of the 3,525 attempts at service contained in these records was made on behalf of Allied Process Service, the d/b/a name of A & F. Additionally, according to Hussein's own email, he needed "the agency to approve the release" and this caused a delay in his production of the records. "The agency"—Allied—controls these records and causes them to be made.

66. Mr. Hussein claims he travels to the locations he allegedly serves via bicycle. He plans his routes the day before using an app called routeforme. He then drives to the first location to effect service, unpacks a foldable bike he keeps in his trunk, and physically pedals to the remaining locations he is supposed to serve. Ex. I Hussein Dep. 111 (Sept. 1, 2026).

67. Allied only paid Mr. Hussein $14 or 15 for successful completion of service. He was not paid anything for an unsuccessful attempt at service. So if Mr. Hussein went to a location and no one was home, he would not get paid. Instead, to get paid, he would have had to go back to the address on another occasion until he met the due diligence requirement of CPLR § 308.

Hussein Dep. 72-76 (Sept. 1, 2026). For this reason, it is much more lucrative and efficient if Mr. Hussein is able to report that he successfully performed process on the first try.

68. Hussein's spreadsheet demonstrates, on its face, the impossibility of service by Hussein.

69. First and foremost, the records claim that in all 3,525 lawsuits, Hussein was able to perform service on the first attempt every time; and that service was made on a person of suitable age and discretion every time.

70. This means that in Hussein's 3,525 attempts of service, he never made an attempt where no one was home, and never made an attempt where the defendant was home. Instead, all 3,525 times, he found someone who was not the defendant who was able to accept service.

71. Additionally, the times of service were absurd. The vast majority—2,715 out of 3,525, more than 77%—of Hussein's service occurred between the hours of 6 AM and 7 AM each day, and 3,436 of 3,525, more than 97%, occurred before noon.

72. And that is just on the face of the spreadsheet. A closer look at the times and locations of service on the spreadsheet further demonstrates the impossibility of service.

73. For example, on April 11, 2023, beginning at 6:00:03 AM and ending at 6:41:22 AM, Hussein claims to have served 35 defendants in the sprawling, multi-block, multi-building Flatbush Gardens complex (formerly Vanderveer Estates) in 41 minutes, supposedly serving a new defendant every one minute and eleven seconds.

74. For this to be true, in each instance of service, Hussein would have had to have traveled to the correct apartment, often in a different building and/or on a different floor from the previous apartment served; knocked on the door; waited for someone to come to the door; had a brief conversation with the person answering the door (who in every instance is not the defendant)

in which he assessed that they were of suitable age and discretion; left papers with the person answering the door; and made his logbook entry, all in one minute and eleven seconds.

75. On April 12, beginning at 6:00:01 AM and ending at 6:34:15 AM, Hussein claims to have served 26 defendants in the Flatbush Gardens complex in 34 minutes, supposedly serving a new defendant every one minute and nineteen seconds.

76. On April 13, beginning at 6:00:42 AM and ending at 6:39:27 AM, Hussein claims to have served 37 defendants in the Flatbush Gardens complex in 39 minutes, supposedly serving a new defendant every one minute and three seconds.

77. According to the same records, Hussein is a prolific server of process specifically on behalf of Malen & Associates and Capital One. Between October 3, 2022 and September 25, 2023, Hussein claims to have made more than 2,000 attempts at service on defendants being sued by Capital One.

78. It would be impossible for Malen to employ Hussein's services as a process server as frequently as it has without becoming aware of his blatant patterns of fraudulent service. When a law firm employs the services of a process server, they do not become disengaged from the question of when, where, and how the documents are served. An affidavit of service for a summons and complaint initiating a case is not simply a ministerial document, but central to the prosecution of any lawsuit because service establishes personal jurisdiction. A law firm cannot proceed with a case until service of a summons and complaint has been affected. A lawyer prosecuting a lawsuit must examine an affidavit of service to determine when an answer should be expected and if and when a proposed default judgment can be sought. Indeed, the date of service determines the trajectory of the case, and the affidavit of service becomes an exhibit in future filings. Malen cannot claim to have effectively prosecuted any of the thousands of cases they employed Hussein's

services on and claim to be ignorant of the fraudulent contents of the affidavits of service or the implausible and impossible patterns of service they swear to.

79. Nevertheless, Hussein continued to work as a process server, including for Allied, and served process on cases for Capital One and for Malen & Associates, throughout at least September 25, 2023, according to the spreadsheet.

***Malen Had Notice of Hussein's Sewer Service Prior to Watkins' Order to Show Cause***

80. Before Ms. Watkins's March 6, 2025, Order to Show Cause and Malen's subsequent April 4, 2025, Opposition on behalf of Capital One, Malen had notice of Hussein's improper service brought to their attention via Orders to Show Cause filed by other Capital One defendants that allege defects in service of the same type as experienced by Ms. Watkins and shown through the Spreadsheet.

81. This shows Malen was on notice of Hussein's bad conduct. Malen's non-responsive boilerplate Oppositions, asserting affidavits of service are prima facie evidence of proper service and failing to rebut various defendants' specific allegations of fraudulent service, that were filed in response, show a continued willfulness in attempting to retain fraudulently obtained judgments.

82. For example, in the case *Capital One, N.A. v. Sergey Izbash*, CV-027450-21/KI, defendant Sergey Izbash filed an order to show cause alleging failure of service on August 28, 2024, and Malen promptly filed a boilerplate opposition substantially identical in all material respects to the one against Ms. Watkins. According to a later supplemental affidavit filed by Mr. Izbash, once Mr. Izbash received access to the court file, sometime after the filing of his OSC, he reviewed Hussein's affidavit of service and found that Hussein claimed to have served a nonexistent female relative, "Victoria Izbash"; Mr. Izbash swore in his affidavit that he did not live with or provide apartment access to any women fitting the description given and that all of his

relatives were in Russia, not the United States. After a traverse hearing was granted on December 16, 2024, Mr. Izbash, who acknowledged the debt, settled with Capital One in February 2025.

83. Similarly, in the case *Capital One, N.A. v. Irina Mednik*, CV-020579-21/KI, defendant Irina Mednik discovered the case against her from an unrelated eCourts search and filed a pro se answer; the case then stalled for two years before Malen moved for a judgment in 2023, at which time Ms. Mednik obtained the assistance of a legal services organization and filed a Motion to Dismiss rebutting Hussein's affidavit of service in detail on June 17, 2024. In support of her Motion to Dismiss, Ms. Mednik explained that at the time of Hussein's alleged service via substitute service on a "Richard Mednik", she would have been home either sleeping or getting her daughter ready for elementary school; that none of the men in her household bore the first name Richard nor the last name Mednik; that none of the men in her household fit the description given; and that given the layout of her unit and the neighboring unit inhabited by her in-laws, any attempt at service at 6:27 AM would have likely disturbed Ms. Mednik's in-laws in the neighboring unit. After receiving Ms. Mednik's detailed refutation of their alleged service, Malen did not dismiss, discontinue, or settle the case. Instead, they forced Ms. Mednik to come to court again and again, only to adjourn each hearing, needlessly forcing Ms. Mednik to come to court on July 9, 2024, December 2, 2024, March 17, 2025, and May 13, 2025, before finally participating in the *fifth* hearing scheduled on Ms. Mednik's Motion to Dismiss on June 30, 2025, at which the motion was finally granted and the case dismissed.

84. In the case *Capital One, N.A. v. Dornella Nedd*, CV-029065-21/QU, discussed elsewhere herein, defendant Dornella Nedd filed an Order to Show Cause on August 28, 2024, with the assistance of the Legal Aid Society, likewise refuting Hussein's affidavit of service in

detail. Ms. Nedd's affidavit states that the person allegedly served, "Keshawn Nedd", does not bear the name nor meet the description of anyone Ms. Nedd lives with or otherwise knows.

85. In other words, on at least three separate occasions *prior* to their efforts to collect from Ms. Watkins using the fraudulently-obtained default judgment, Malen received detailed written notice of fatal defects in Hussein's service in other cases—defects indicative of fraud. On all three occasions, just as with Ms. Watkins, Malen continued to attempt to collect using the fraudulent affidavits of service for months or even years

86. By the time Malen moved to enforce the fraudulently-obtained default judgment against Ms. Watkins, Malen knew or should have known about the persistent fraudulent conduct of their chosen process server, conduct which they ratified and sought to profit from by seeking to collect from consumer defendants across New York City using Hussein's fraudulent affidavits of service.

**Mr. Hussein's False Service Is Confirmed By His Own GPS Recordings**

87. Process servers licensed to serve in New York City are required to use a GPS, or Global Positioning System, device to record their location contemporaneously at the alleged time of service. This is to ensure that they are actually at the locations where and when they are claiming to serve process. 6 RCNY § 2-233b.

88. While Hussein uses a GPS system, he does not make his location recordings at the actual address of service and a close inspection of his records confirms that he is not going to those addresses.

89. Despite this, Allied employs a GPS recording and printout system that is used to falsely claim that process servers like Hussein are actually serving process.

90. Allied Process Service uses a proprietary website that incorporates GPS recording, and whose data is accessible by Allied and its law firm clients but not by the general public. When a process server performs service, he clicks a button on the website that says "record my location" and a GPS recording is made. The process server is also able to type in information related to how service was performed such as the name and description of the person served and, based on what the process server inputs, an affidavit of service is later generated.

91. Users of Allied's website, like a law firm,can search for an instance of service and receive a record that shows a Google map of a marked location at the longitude and latitude coordinates recorded by the process server, the time of service, the name of the person served, the name of the process server, and other case identifying information. The record does *not* include the address of service and does not show the address of service on the map. Exhibit L (Watkins Record and Maps)

92. This record gives the impression that a GPS recording was made at the service address, and Allied, Malen, and other law firms routinely submit printouts of these records to courts as evidence of proper service..

93. 92. That is exactly what happened here: Allied generated a compelling-looking GPS record of Hussein's location at the alleged time of service on Ms. Watkins that gives the impression that Mr. Hussein went to her address,. Ex. L.

94. But in truth, Hussein did not attempt service at Ms. Watkins' home. Instead, the GPS coordinates (recorded by Mr. Hussein himself) are for a parking lot about 1.7 miles away from Ms. Watkins' home, as shown by the Google maps printout showing both Ms. Watkins' home and the coordinates on Allied's GPS record. Ex L.

95. The misleading record in Ms. Watkins' case was not an isolated instance. Mr. Hussein routinely makes GPS recordings at locations far away from where he is allegedly performing service. For example, on April 7, 2023, the day he served Ms. Watkins, Mr. Hussein's logbook shows that he allegedly performed service on nine separate addresses in the 37 minutes between 6:00 A.M and 6:37 A.M.

96. A Google Maps printout of the bicycle route through all these addresses, in the order alleged by Mr. Hussein, shows the travel time it takes to bike between these locations is about an hour and 26 minutes. Ex M (April 7, 2023 service addresses map). Given the distance between these locations, service at the times alleged by Mr. Hussein is impossible.

97. Mr. Hussein's own GPS records support this: although there are GPS recordings made for each attempt, they do *not* follow the locations of service. This can be seen by comparing by the map of the route through longitude and latitude coordinates for the GPS recordings made on April 7, 2023, attached as Exhibit N, with the map of the route through the addresses he was supposed to be serving, Ex M.

98. As the GPS map at Exhibit N shows, Mr. Hussein made a series of GPS entries in an almost straight line that excludes many of the addresses he was supposed to perform service. And it is visibly different from the route he would have had to take to actually effect service, shown in Exhibit L, which zigs and zags through various locations.

99. In other words, Mr. Hussein was not making GPS recordings at the locations where he was supposed to be performing service or even traveling to these addresses.

100. Exhibit N also shows that the travel time through the locations where the GPS recordings were made was 36 minutes – about the same amount of time Mr. Hussein claims to taken to have effected service at all nine addresses. This explains the implausibly short times

between alleged service attempts: rather than actually visiting all the addresses (which would have taken an hour and 26 minutes) Mr. Hussein took just enough time to make the GPS recordings and leave.

101. This confirms Mr. Hussein is not serving process, that his affidavits of service are all false, and that he is not making GPS recordings at the locations where he is supposed to be performing service. Allied's system of generating GPS printouts that do not list or map the actual service address conceal this misconduct and misrepresent to the court that service was effected when it was not.

***Allied's Illegal Notarization Process***

102. Mr. Hussein's false affidavits of service are enabled, in part, by a deficient notarization process.

103. Frances Mondrone is the notary for Allied Process Service, and she allegedly notarizes the affidavits of service executed by Allied Process Service's process servers. Ms. Mondrone does not keep a record of her notarizations

104. Worse, Ms. Mondrone also does not administer an oath or affirmation to the process server to ensure the affidavit of service is accurate, and she does not notarize the affidavits of service in the physical presence of the person who is signing them.

105. Mr. Hussein testified in his deposition that he was not sure what Frances Mondrone's role at Allied Process Service was, that he communicated with her via text, email, and on the phone but their interactions only involved her giving him process to serve and general office help and did not involve notarizing his affidavits of service. Ex K. 55-57 (Sept. 1, 2026). On this point Mr. Hussein was specific:



Last saved: 9/30/2026 7:58 PM

"Q: Okay. So your -- just to sum up, your interactions were solely texting, getting assignments, getting things fixed on the computer?

A: Just work related stuff.

Q: Okay. Anything else?

A: That I could recall? No." Hussein Dep. 57:9-19 (Sept. 1, 2026)

106. In response to questions about the notarization process Mr. Hussein plead the fifth, stating:

"Q: Can you describe how you would fill out the affidavit of service?

A: By signing it.

Q: Okay. Where would you sign it?

A: I will take the fifth on that.

Q: So just to be clear, you are pleading the fifth against rights to self-incrimination. For the question of where you would fill out the affidavit of service?

A: Yes, sir.

Q: Okay. When would you fill out the affidavit of service?

A: I'll also plead a fifth on that one.

Q: Okay. What would you reference when you were filling it out?

A: I plead a fifth on that one.

Q: Would you check it against your paper logbook?

A: I plead a fifth on that one." Hussein Dep. 126:18-25, 127:1-14 (Sept. 1, 2026)

107. A few questions later Mr. Hussein continued:

"Q: Okay. Were your affidavits of service notarized?

A: I plead the fifth.

Q: Who notarized your affidavits of service?

A: I plead the fifth.

Q: How did that notarization process work?

A: I plead the fifth.

Q: Were you in front of Francis (sic) Mondrone when you signed those affidavits of service?

A: I plead the fifth.

Q: Did Francis Mondrone notarize all of your affidavits?

A: I plead the fifth.

Q: Okay. Is there anything about the notarization process that you can tell us?

A: I plead the fifth." Hussein Dep.127:22-25, 128:1-17 (Sept. 1, 2026)

108. Hussein would not substantively answer any questions relating to any specific affidavit of service. In response to the question of whether Ms. Watkins' affidavit was true, Mr. Hussein pled the fifth; in response to the question of whether Ms. Watkins' affidavit of service bore Frances Mondrone's signature Mr. Hussein pled the fifth; in response to the question of whether Ms. Watkins' affidavit of service bore his signature Mr. Hussein pled the fifth. Ex. K176:13-16, 190-202 (Sept. 2, 2026). With respect to questions about specific affidavits of service, Mr. Hussein again pled the fifth.

109. Mr. Hussein's inability to testify to questions regarding the notary process without incriminating himself suggests that Allied Process Service and Frances Mondrone are not notarizing documents and are instead robosigning affidavits of service without the affiant present and without administering an oath or affirmation.

110. The notary serves a protective function to make sure that the statements in the affidavits of service are true and that process servers are attesting to the information they allege. For this reason, notarization misconduct is frequently seen in improper service schemes. For example, in *Pfau v. Forster and Garbus et. al.* Index No. 8236/2009 (Sup. Ct. Erie County) William Singler, an owner of Americal Legal Process, was engaged in widespread notary fraud, a crime he was eventually sent to prison for. Ex O (Pfau Complaint); *Velocity Investments, LLC v. McCaffrey*, 31 Misc. 3d 308 (Dist. Ct., Nassau County 2011).

***The Collection Lawsuit Caused Ms. Watkins Significant Emotional Distress Damages, Forced Her to Incur Travel Expenses and Lost Time to Fight the Default Judgment, and Resulted in the Seizure and Conversion of Her Funds***

111. Upon learning of the lawsuit from her CAMBA attorney, Ms. Watkins was shocked and aggravated, but she resolved to fight the lawsuit.

112. Ms. Watkins is retired and living on a fixed income. The prospect of a large money judgment against her caused a significant deal of stress.

113. Ms. Watkins lives alone and does not have nearby family to support her.

114. Ms. Watkins is disabled and struggles with her hearing and vision. Stress causes her vision troubles in particular to flare up, limiting her eyesight and making her vision cloudy.

115. From the moment she found out about the Queens County Civil Court collection lawsuit, Ms. Watkins felt powerless, and confused because nobody had notified her prior to her CAMBA attorney.

116. Whenever she was reminded of the lawsuit, Ms. Watkins became stressed and began to lose focus in her daily tasks. The stress of the lawsuit affected Ms. Watkins's ability to keep her home orderly and attend to other needs.

117. Whenever she was reminded of the lawsuit, Ms. Watkins struggled to fall asleep

and stay asleep.

118. As the June 3, 2025 date of a traverse hearing in the collection lawsuit approached, Ms. Watkins had consistent trouble sleeping and her vision suffered from the stress.

119. Ms. Watkins was fearful of a garnishment or a bank levy, and knew this was a possibility now that there was a judgment against her.

120. Ms. Watkins does not have a car and relied on the help of friends to travel from Queens to CAMBA's office in Brooklyn.

121. Ms. Watkins paid a friend $30 to drive her from her home in Queens to CAMBA's office in Brooklyn for the sole reason of executing documents in support of the Order to Show Cause that was filed to vacate the sewer service judgment. Ms. Watkins paid a different friend $15 to drive her back home.

122. Ms. Watkins also incurred similar travel expenses traveling to the CAMBA office solely for the purpose of preparing for the hearing—a hearing which would have never been necessary if Malen had not filed a false affidavit of service to obtain a fraudulent judgment, or if they had agreed to discontinue the case prior to the afternoon before the traverse hearing given the overwhelming evidence of sewer service.

123. Malen contends that in September or October of 2025, it used the (fraudulent) default judgment for a marshal to seize Ms. Watkin's unclaimed funds held in trust for her by the New York State Comptroller's Office.

124. The June 3, 2025 So Ordered Stipulation to Vacate and Discontinue stated "any monies taken from Defendant are to be returned forthwith." Ex. I (So Ordered Stipulation to Vacate and Discontinue).

125. Malen mailed a check of $269.06 with a cover letter dated July 3, 2025 tersely

stating, "Enclosed please find a copy of: Refund Check." Ex. J (Letter and Refund Check). Apparently, this represents the share of the seized funds that were received by Malen and Capital One. However, given that there was no check from the marshal, on information and belief, the marshal's fee has not been returned.

126. As discussed in the Conversion section below, Malen obtained the default judgment by making a misrepresentation to the issuing authority, the New York City Civil Court, that Ms. Watkins had been served. As a result, any money obtained by use of the fraudulent judgment constitutes conversion in the first instance, irrespective of whether the judgment is eventually vacated.

**FIRST CAUSE OF ACTION**

Violation of the FDCPA, 15 U.S.C. §§ 1692e 1692f

*Against Malen, Hussein, Anthony Mondrone and Allied*

127. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

128. The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

129. Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been

subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

130. The obligation alleged to be owed by Plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because they were charges made on card were for personal, family, or household purposes.

131. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt" as defined by 15 U.S.C. § 1692a(5).

132. For the reasons set forth in the "Parties" section of this Complaint, Malen, Hussein and Allied are each a "debt collector" as defined in 15 U.S.C. § 1692a(6).

133. Malen, Hussein, and Allied violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation Defendant violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely representing or implying that a communication is from an attorney (as to Malen only); threatening to take and actually taking an action prohibited by law; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

134. As a direct and proximate result of the violations of Malen, Hussein, and Allied, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, humiliation, and travel costs.

135. The injuries inflicted on Plaintiff by Malen, Hussein, and Allied are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

136. Plaintiff suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out-of-pocket expenses for travel costs.

137. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: negligence, conversion, invasion of privacy, intrusion upon seclusion, and abuse of process.

**SECOND CAUSE OF ACTION**
Violation of N.Y. Gen. Bus. L. § 349
*Against All Defendants*

138. New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state."

139. An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. Law § 349(h).

140. Defendants violated N.Y. Gen. Bus. Law § 349 *et seq.* by using consumer-oriented deceptive acts and practices in the conduct of their businesses.

141. As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 *et seq*, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and punitive damages, together with costs and

attorney's fees. Plaintiff's injuries are analogous to, inter alia, the following common law claims: negligence, conversion, invasion of privacy, intrusion upon seclusion, and abuse of process.

**THIRD CAUSE OF ACTION**
Violation of Judiciary Law § 487
*Against Malen*

142. An attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party" is owes treble damages to a party injured by such deceit or collusion. Judiciary Law § 487.

143. Malen violated Judiciary Law § 487 by filing a false affidavit of service with the intent to deceive the court that Ms. Watkins was actually served. Based on Malen's false representation to the issuing authority, the Court, the Court issued a sewer service default judgment. Malen's conduct inflicted economic injury and emotional distress on Ms. Watkins.

144. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: negligence, conversion, invasion of privacy, intrusion upon seclusion, and abuse of process.

**FOURTH CAUSE OF ACTION**
Violation of N.Y.C. Admin. Code § 20-409.2
*Against Hussein and Allied*

145. Under New York City Administrative Code § 20-409.2, "[a]ny person injured by the failure of a process server to act in accordance with the laws and rules governing service of process in New York state" has "a cause of action against such process server and process serving agency, which distributed or assigned process for service." Injured individuals may recover compensatory damages, punitive damages for willful failure to service process, injunctive and declaratory relief, costs, and attorneys' fees. *Id.*

146. Defendants Hussein and Allied violated New York City Administrative Code § 20-409.2 by failing to act in accordance with the laws and rules governing service of process in New

York. Defendants' violations include but are not limited to:

- Failing to lawfully effectuate service of process; and
- Preparing, signing, and notarizing, a false affidavit of service to be filed and used to support an application for default judgment

147. The failure to serve process of Hussein and Allied was willful.

148. As a direct and proximate result of these violations of New York City Administrative Code § 20-409.2, Plaintiff has suffered and continue to suffer compensable harm and is entitled to recover compensatory and punitive damages, costs, and attorneys' fees. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: negligence, conversion, invasion of privacy, intrusion upon seclusion, and abuse of process.

**FIFTH CAUSE OF ACTION**

Conversion

*Against Malen*

149. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

150. The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

151. Property subject to conversion includes unclaimed funds held in trust by the New York Comptroller for the benefit of Ms. Watkins.

152. According to Malen, it forwarded the default judgment in September or October 2024, to a marshal to seize unclaimed funds held in trust by the New York Comptroller for the benefit of Ms. Watkins.

153. Malen knew or had reason to know that the affidavits of service executed by Hussein were false, including as to Ms. Watkins.

154. Nevertheless, Malen used the known false affidavit of service to obtain a fraudulent default judgment against Ms. Watkins. As such, Malen procured the default judgment by means of an intentional misrepresentation to this issuing authority, here a false representation to the civil court.

155. "Although in general '[o]ne is privileged to commit acts which would otherwise be a trespass to a chattel or a conversion when he acts pursuant to a court order which is valid or fair on its face,' the actor has no such privilege when he has procured the order by means of an intentional misrepresentation to the issuing authority." *Calamia v. City of New York*, 879 F.2d 1025, 1031 (2d Cir. 1989) (*quoting* Restatement (Second) of Torts § 266 (1965)). *See also Polanco v. NCO Portfolio Mgmt., Inc.*, 23 F. Supp. 3d 363, 371 (S.D.N.Y. 2014) (using a false affidavit of service to obtain a default judgment and then using that judgment to have a marshal seize funds subjects debt collection law firm to conversion even without the vacating of the default judgment) *citing Calamia*, 879 F.2d at 1031.

156. Malen's improper seizure of Ms. Watkins's money held in trust by the New York Comptroller interfered with Plaintiff's rights to control her own property and constitutes conversion in the first instance, regardless of if or when the judgment is vacated.

157. For the reasons stated in the statement of facts and above, Malen's conduct was gross, wanton or deliberate and demonstrates a high degree of moral culpability. The conduct demonstrates malice, insult, and/or willful or reckless disregard of Plaintiff's rights, or other aggravated acts. Malen's conduct evidences a high degree of moral culpability, or is so flagrant as to transcend mere carelessness, or constitutes willful or wanton negligence or recklessness to justify a punitive damage award.

158. For these reasons, Plaintiff is entitled to punitive damages, in addition to actual

damages. Actual damages include, *inter alia*, the loss of use of money for the period Malen wrongfully exercised dominion and control over Plaintiff's funds, and consequential damages resulting therefrom.

**SIXTH, SEVENTH, and EIGHTH CAUSES OF ACTION**

Negligence, Negligent Hiring/Retention/Supervision, Negligence *Per Se* and Gross Negligence
*Against all Malen, Hussein, Allied Process Service, and Anthony Mondrone*

159. Defendants, as debt collectors and process servers on their own debts, owed Ms. Watkins a duty of reasonable care in their debt collection efforts.Husesein, Allied and Mondrone also owed Ms. Watkins a duty of reasonable care in their process serving efforts.

160. Defendants' failure to exercise even slight care or diligence amounts to negligence and gross negligence.

161. Hussein actively shirked his duty of reasonable care by intentionally fabricating the affidavit of service in Ms. Watkins's case.

162. Malen is well aware of Allied's use of Hussein as a process server. Malen, Allied, and Mondrone are all well aware of Hussein's history and practice of sewer service.

163. Had Defendants Malen, Allied, and Anthony Mondrone made even the smallest effort to review affidavits of service submitted by Hussein, they would have seen that process could not have been served in the manner Hussein alleged. They would not have filed those affidavits and/or would have ceased distributing process to him.

164. Malen could have contracted service in Ms. Watkins's case to another process serving agency or process server, or Allied could have contracted service to another process server. Ms. Watkins would have received proper notice of the lawsuit and complete information about the claim against her.

165. Once Malen received Ms. Watkins's motion to dismiss, it should have seen that the

court lacked jurisdiction because Hussein's affidavit of service was false. It should have promptly consented to discontinuing the lawsuit.

166. Allied and Mondrone's negligent selection, hiring, training, supervising, and use of Hussein to serve process on Ms. Watkins and others was not a one-off mistake. Allied's entire practice of hiring and using of process servers is, at minimum, negligent for failing to investigate or outright ignoring the history of misconduct of the process servers. Allied's practice of notarizing and submitting affidavits of service that are false is also at minimum negligent for failing to review or ignoring affidavits of service detailing impossible attempts at service.

167. As a result of Defendants' actions, Ms. Watkins was injured.

168. In addition, Defendants' actions evince a reckless disregard for the rights of others and smack of intentional wrongdoing.

169. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

## **NINTH, TENTH, and ELEVENTH CAUSES OF ACTION**

Notarial Misconduct in Violation of NY Exec. L. § 135; Negligence; Negligence *per se*
*Against Frances Mondrone*

170. Frances Mondrone is a duly qualified notary public within the state of New York and an [employee and agent] of Allied Process Service.

171. To become a qualified notary public, on information and belief, Frances Mondrone had to take an oath of office, swearing to "faithfully discharge the duties of the office of Notary Public for the State of New York according to the best of my ability."

172. But Ms. Mondrone has failed to do so and instead has engaged in misconduct in the performance of her powers in order to enrich herself, her son, and her son's business, that caused

Ms. Watkins harm.

173. New York law and regulations require notaries public to only notarize documents in the physical presence of the affiant (unless specific and detailed procedures for electronic notarization are required). They must also carefully administer an oath or affirmation to the affiant as to the truth of the document to be notarized. *See New York Department of State*, Notary Public License Law (Sept. 2026); 19 NYCRR § 182.3. This is not a technical requirement: the oath or affirmation is be "administered in in a form calculated to awaken the conscience and impress the mind of the person taking it in accordance with his religious or ethical beliefs." CPLR § 2309(b). This serves to "to awaken the witness to his moral duty to tell the truth, and [] to deter false testimony." *See* *Burnett v. Andrews-Dyke*, 185 A.D.3d 1196, 1197, 128 N.Y.S.3d 66, 68 (2020).

174. Notaries public must also:

- "disqualify themselves from performing notarial acts for transactions in which the notary is a party or directly and pecuniarily interested in the transaction";
- "refuse to perform a notarial act when the requirements of this Part are not met, or if the notary is not satisfied that the official record or the presented record evidences the individual's capacity to act as the representative on the record presented for notarization"; and
- Maintain records as required by law.

*New York Department of State*, Notary Public License Law (Sept. 2026); 19 NYCRR Part 182

175. Ms. Mondrone did not fulfill these obligations of her office. She notarized Hussein's signature on a false affidavit of service claiming that he had been "duly sworn" and had "sworn to" the statements within the affidavit. In fact, Ms. Mondrone did not administer

an oath or affirmation—which could have deterred Hussein from making statements—and did not confirm that Hussein swore to the truth of the statements within the affidavit. Ms. Mondrone also failed to conduct even a basic review of the documents she was notarized – if she had, she would have quickly realized that they were false and could not possibly be genuinely sworn to as true. Ms. Mondrone also failed to keep the statutorily required chronological journal of every notarial act she performed.

176. In addition, as a notary public under the laws of the state of New York who swore an oath of office, Frances Mondrone had a duty of care towards the individuals affected by her notarial acts as well as the public at large.

177. She also had a statutory and regulatory duty of care arising out the laws governing the conduct of notaries public, including the Executive Law, the Notary Public License Law, and the Notaries Public regulations, 19 NYCRR, Part 182.

178. Ms. Mondrone breached those duties of care by failing to carry out the basic duties of her office. She notarized Hussein's false affidavit, permitting it to be filed in the case against Ms. Watkins and used to obtain Malen's default judgment against Ms. Watkins.

179. Ms. Mondrone's actions directly caused Ms. Watkins injury, in the form of loss of her money, time and expense, and emotional distress. But for Ms. Mondrone's notarial misconduct, Ms. Watkins would not have ended up with a judgment against her, and would not have experienced the harm described here.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

a. A declaration that all Defendants have committed the violations of law alleged in this action;

b. Statutory damages;

c. Reasonable attorney's fees and costs;

d. Actual damages;

e. Compensatory damages;

f. Treble damages;

g. Exemplary and punitive damages;

h. An order, pursuant to GBL 349(h) and N.Y.C. Admin. Code § 20-409.2, enjoining and directing Defendants to cease violating those statutes;

i. Prejudgment and post judgment interest as allowed by law;

j. All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

Dated: September 30, 2026

Respectfully submitted,

LAW OFFICE OF AHMAD KESHAVARZ

By: *____/s/ Ahmad Keshavarz*

Ahmad Keshavarz, Esq.
16 Court St., Suite 2600
Brooklyn, NY 11241
Phone: (718) 522-7900
ahmad@NewYorkConsumerAttorney.com

CAMBA LEGAL SERVICES, INC.

By: ___/s/ Matthew Schedler

Matthew Schedler, Of Counsel
Elizabeth Miller, General Counsel
20 Snyder Ave.
Brooklyn, NY 11226
Phone: (718) 940-6311
Pooja.Patel@CAMBA.ORG



Last saved: 9/30/2026 7:58 PM

MatthewSc@camba.org